**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

--------------------------------------------------------------- x
In re:                                         :
                                               :        **Chapter 11**
                                               :
**SKILLSOFT CORPORATION**, *et al.*            :        **Case No. 20– _____ (       )**
                                               :
                                               :        **(Joint Administration Requested)**
                        Debtors.[1]            :
                                               :
--------------------------------------------------------------- x

**JOINT PREPACKAGED CHAPTER 11 PLAN OF**
**SKILLSOFT CORPORATION AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Gary T. Holtzer
Robert J. Lemons
Katherine Theresa Lewis
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Amanda R. Steele (No. 5530)
Christopher M. De Lillo (No. 6355)
One Rodney Square
910 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

Dated  June 14, 2020
        Wilmington Delaware

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Skillsoft Corporation (6115); Amber Holding Inc. (0335); SumTotal Systems LLC (7228); MindLeaders, Inc. (6072); Accero, Inc. (4684); CyberShift Holdings, Inc. (2109); CyberShift, Inc. (U.S.) (0586); Pointwell Limited; SSI Investments I Limited; SSI Investments II Limited; SSI Investments III Limited; Skillsoft Limited; Skillsoft Ireland Limited; ThirdForce Group Limited; Skillsoft U.K. Limited; and Skillsoft Canada, Ltd.  The location of the Debtors' corporate U.S. headquarters is 300 Innovative Way, Suite 201, Nashua, NH 03062.

## Table of Contents

**ARTICLE I.      Definitions and Interpretation.** ........................................................................1

  1.1        Definitions ................................................................................................ 1

  1.2        Interpretation; Application of Definitions; Rules of Construction. ................ 15

  1.3        Reference to Monetary Figures ................................................................ 15

  1.4        Consent and Termination Rights of Consenting Creditors. ........................... 16

  1.5        Controlling Document. ............................................................................. 16

**ARTICLE II.     Administrative Expense Claims, Fee Claims, priority tax claims, and DIP Claims.** ...............................................................................16

  2.1        Treatment of Administrative Expense Claims. .......................................... 16

  2.2        Treatment of Fee Claims .......................................................................... 16

  2.3        Treatment of Priority Tax Claims. ........................................................... 17

  2.4        Treatment of DIP Facility Claims. ........................................................... 18

  2.5        Payment of Fees and Expenses under DIP Orders ..................................... 18

  2.6        Restructuring Fees and Expenses. ............................................................ 18

  2.7        Statutory Fees ........................................................................................ 19

**ARTICLE III.    Classification of Claims and Interests.** ...............................................19

  3.1        Classification in General. ......................................................................... 19

  3.2        Formation of Debtor Groups for Convenience Only. .................................. 19

  3.3        Summary of Classification of Claims and Interests .................................... 19

  3.4        Special Provision Governing Unimpaired Claims. ..................................... 20

  3.5        Elimination of Vacant Classes. ................................................................ 20

  3.6        Voting Classes; Presumed Acceptance by Non-Voting Classes .................... 20

  3.7        Voting; Presumptions; Solicitation. ......................................................... 20

  3.8        Cramdown. ............................................................................................. 21

  3.9        No Waiver. ............................................................................................. 21

**ARTICLE IV.    Treatment of Claims and Interests.** .....................................................21

  4.1        Class 1:  Other Priority Claims. ............................................................... 21

  4.2        Class 2:  Other Secured Claims. .............................................................. 22

  4.3        Class 3:  First Lien Debt Claims. ............................................................. 22

  4.4        Class 4:  Second Lien Debt Claims ........................................................... 23

| | | |
|---|---|---|
| 4.5 | Class 5:  General Unsecured Claims. | 23 |
| 4.6 | Class 6:  Subordinated Claims | 23 |
| 4.7 | Class 7:  Intercompany Claims. | 24 |
| 4.8 | Class 8:  Existing Parent Equity Interests | 24 |
| 4.9 | Class 9:  Other Equity Interests. | 24 |
| 4.10 | Class 10:  Intercompany Interests. | 24 |

**ARTICLE V.    Means for Implementation. ..................................................25**

| | | |
|---|---|---|
| 5.1 | Plan Funding. | 25 |
| 5.2 | Compromise and Settlement of Claims, Interests, and Controversies. | 25 |
| 5.3 | Continued Corporate Existence; Effectuating Documents; Further Transactions. | 25 |
| 5.4 | Cancellation of Existing Securities and Agreements. | 26 |
| 5.5 | Cancellation of Certain Existing Security Interests. | 27 |
| 5.6 | Officers and Boards of Directors. | 27 |
| 5.7 | Incentive Plans. | 28 |
| 5.8 | Authorization and Issuance of Newco Equity and Warrants. | 28 |
| 5.9 | Securities Exemptions. | 28 |
| 5.10 | Exit Credit Agreement. | 29 |
| 5.11 | Intercompany Interests. | 30 |
| 5.12 | Restructuring Transactions and Restructuring Transaction Steps. | 30 |
| 5.13 | Separate Plans. | 30 |
| 5.14 | Closing of Chapter 11 Cases. | 30 |

**ARTICLE VI.    Distributions. ....................................................................31**

| | | |
|---|---|---|
| 6.1 | Distributions Generally. | 31 |
| 6.2 | Postpetition Interest on Claims. | 31 |
| 6.3 | Date of Distributions. | 31 |
| 6.4 | Distribution Record Date. | 31 |
| 6.5 | Distributions after Effective Date. | 32 |
| 6.6 | Disbursing Agent. | 32 |
| 6.7 | Delivery of Distributions. | 32 |
| 6.8 | Unclaimed Property. | 33 |
| 6.9 | Satisfaction of Claims. | 33 |
| 6.10 | Manner of Payment under Plan. | 33 |

6.11  Fractional Shares. ................................................................. 33

6.12  Minimum Distribution. ......................................................... 34

6.13  No Distribution in Excess of Amount of Allowed Claim. ............. 34

6.14  Allocation of Distributions Between Principal and Interest. ......... 34

6.15  Setoffs and Recoupments. .................................................... 34

6.16  Rights and Powers of Disbursing Agent. ................................ 34

6.17  Expenses of Disbursing Agent. .............................................. 35

6.18  Withholding and Reporting Requirements. .............................. 35

**ARTICLE VII.  Procedures for Resolving Claims. ..............................36**

7.1  Disputed Claims Process. ...................................................... 36

7.2  Objections to Claims. ........................................................... 36

7.3  Estimation of Claims. ........................................................... 36

7.4  Claim Resolution Procedures Cumulative. ............................... 37

7.5  No Distributions Pending Allowance. ...................................... 37

7.6  Distributions after Allowance. ............................................... 37

**ARTICLE VIII. Executory Contracts and Unexpired Leases. ...........................37**

8.1  General Treatment. .............................................................. 37

8.2  Determination of Assumption and Cure Disputes; Deemed Consent. ........... 38

8.3  Rejection Damages Claims. ................................................... 39

8.4  Survival of the Debtors' Indemnification Obligations. ................. 39

8.5  Compensation and Benefit Plans. .......................................... 39

8.6  Insurance Policies. .............................................................. 39

8.7  Reservation of Rights. .......................................................... 40

**ARTICLE IX.  Conditions Precedent to the Occurrence of the  Effective Date. ...........40**

9.1  Conditions Precedent to Effective Date. .................................. 40

9.2  Waiver of Conditions Precedent. ........................................... 41

9.3  Effect of Failure of a Condition. ............................................ 42

**ARTICLE X.  Effect of Confirmation. ...........................................................42**

10.1  Binding Effect. ................................................................... 42

10.2  Vesting of Assets. ............................................................... 42

10.3  Discharge of Claims and Interests. ......................................... 42

| | | |
|---|---|---|
| 10.4 | Pre-Confirmation Injunctions and Stays. | 43 |
| 10.5 | Injunction against Interference with Plan. | 43 |
| 10.6 | Plan Injunction. | 43 |
| 10.7 | Releases | 44 |
| 10.8 | Exculpation. | 45 |
| 10.9 | Injunction Related to Releases and Exculpation. | 45 |
| 10.10 | Subordinated Claims. | 46 |
| 10.11 | Retention of Causes of Action and Reservation of Rights. | 46 |
| 10.12 | Ipso Facto and Similar Provisions Ineffective. | 46 |
| **ARTICLE XI.** | **Retention of Jurisdiction.** | **46** |
| 11.1 | Retention of Jurisdiction. | 46 |
| **ARTICLE XII.** | **Miscellaneous Provisions.** | **48** |
| 12.1 | Exemption from Certain Transfer Taxes. | 48 |
| 12.2 | Request for Expedited Determination of Taxes. | 49 |
| 12.3 | Dates of Actions to Implement Plan. | 49 |
| 12.4 | Amendments. | 49 |
| 12.5 | Revocation or Withdrawal of Plan. | 49 |
| 12.6 | Severability. | 50 |
| 12.7 | Governing Law. | 50 |
| 12.8 | Immediate Binding Effect. | 50 |
| 12.9 | Successors and Assigns. | 51 |
| 12.10 | Entire Agreement. | 51 |
| 12.11 | Computing Time. | 51 |
| 12.12 | Exhibits to Plan. | 51 |
| 12.13 | Notices. | 51 |
| 12.14 | Reservation of Rights. | 53 |

Each of Skillsoft Corporation; Amber Holding Inc.; SumTotal Systems LLC; MindLeaders, Inc.; Accero, Inc.; CyberShift Holdings, Inc.; CyberShift, Inc. (U.S.); Pointwell Limited; SSI Investments I Limited; SSI Investments II Limited; SSI Investments III Limited; Skillsoft Limited; Skillsoft Ireland Limited; ThirdForce Group Limited; Skillsoft U.K. Limited; and Skillsoft Canada, Ltd (each, a "**Debtor**" and collectively, the "**Company**" or the "**Debtors**") propose the following joint prepackaged chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in <u>section 1.1</u> below.

## ARTICLE I.          DEFINITIONS AND INTERPRETATION.

### 1.1    <u>Definitions</u>.

The following terms shall have the respective meanings specified below:

"**Adequate Protection Payments**" has the meaning set forth in the DIP Orders, as applicable.

"**Ad Hoc Crossholder Group**" has the meaning set forth in the Restructuring Support Agreement.

"**Ad Hoc First Lien Group**" has the meaning set forth in the Restructuring Support Agreement.

"**Administrative Expense Claim**" means any Claim (other than DIP Claims) for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses, (ii) Fee Claims, and (iii) Restructuring Fees and Expenses.

"**Allowed**" means, with respect to any Claim against or Interest in a Debtor, (i) any Claim that is not Disputed to which the Debtors and the holder of the Claim agree to the amount of the Claim or a court of competent jurisdiction has determined the amount of the Claim by Final Order, (ii) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to (a) the terms of this Plan, (b) any stipulation filed with or Final Order entered by the Bankruptcy Court, or (c) the terms of any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith (iii) any Claim that is listed in the Schedules, if filed, as liquidated, non-contingent, and undisputed, or (iv) any Claim or Interest expressly allowed hereunder; *provided, however,* that, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to this Plan.

"**Asset**" means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible property.

**"Bankruptcy Code"** means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and as applicable to the Chapter 11 Cases.

**"Board Incentive Plan"** or "**BIP**" means a post-Effective Date board of directors incentive plan, consistent in all material respects with the terms set forth on the Reorganization Term Sheet, subject to compliance with Luxembourg law.

**"Business Day"** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are authorized or required by law or other governmental action to close.

**"Canadian Plan Confirmation Recognition Order"** has the meaning set forth in the Restructuring Support Agreement.

**"Cash"** means legal tender of the United States of America.

**"Cause of Action"** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer, fraudulent conveyance, or voidable transfer claim.

**"Chapter 11 Case"** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

2

**"Claim"** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

**"Class"** means any group of Claims or Interests classified under this Plan pursuant to section 1123(a)(1) of the Bankruptcy Code.

**"Collateral"** means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

**"Company"** has the meaning set forth in the introductory paragraph of this Plan.

**"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order within the meaning of Bankruptcy Rules 5003 and 9021.

**"Confirmation Hearing"** means the hearing to be held by the Bankruptcy Court regarding approval of the Disclosure Statement and confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**"Confirmation Order"** means the order of the Bankruptcy Court (i) approving (a) the Disclosure Statement pursuant to sections 1125 and 1126(b) of the Bankruptcy Code, (b) the solicitation of votes and voting procedures, and (c) the form of ballots, and (ii) confirming this Plan pursuant to section 1129 of the Bankruptcy Code, with such order being consistent with the Restructuring Support Agreement and subject to the Definitive Document Requirements.

**"Consenting Creditor Advisors"** has the meaning set forth in the Restructuring Support Agreement.

**"Consenting Creditors"** has the meaning set forth in the Restructuring Support Agreement.

**"Credit Agreements"** means the First Lien Credit Agreement and the Second Lien Credit Agreement.

**"Cure Amount"** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**"Debtor(s)"** has the meaning set forth in the introductory paragraph of this Plan.

**"Definitive Document Requirements"** means that the Definitive Documents shall be subject to the respective consent rights of the Debtors and the applicable Consenting Creditors, as set forth in the Restructuring Support Agreement.

**"Definitive Documents"** has the meaning set forth in the Restructuring Support Agreement.

"**DIP Agent**" means Wilmington Savings Fund Society, FSB, solely in its capacity as administrative agent and collateral agent under the DIP Facility, or its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"**DIP and Exit Facility Term Sheet**" means that certain term sheet (including any schedules and exhibits thereto) annexed to the Restructuring Term Sheet as <u>Exhibit C</u>.

"**DIP Claim**" means all Claims held by the DIP Secured Parties on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the DIP Orders, including Claims for all principal amounts outstanding, interest, reasonable and documented fees, expenses, costs, and other charges of the DIP Secured Parties.

"**DIP Credit Agreement**" means that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, to be dated after the Petition Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), by and among, Skillsoft Corporation, as borrower, Pointwell, as parent, the DIP Lenders, the DIP Agent, and the DIP Escrow Agent, which shall be subject to the Definitive Document Requirements.

"**DIP Escrow Agent**" means Wilmington Savings Fund Society, FSB, solely in its capacity as escrow agent under the DIP Facility, or its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"**DIP Facility**" means the debtor-in-possession financing facility provided to the Company pursuant to (i) the DIP Credit Agreement and (ii) the DIP Orders.

"**DIP Financing Documents**" has the meaning set forth in the Restructuring Support Agreement.

"**DIP Lenders**" means lenders from time to time party to the DIP Credit Agreement.

"**DIP Orders**" means, collectively, (i) the Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims and (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying Automatic Stay, (V) Scheduling Final Hearing, and (VI) Granting Related Relief and (ii) a Final Order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and access the DIP Facility, which DIP Orders shall be in form and substance reasonably acceptable to the DIP Lenders.

"**DIP Secured Parties**" means, collectively, the DIP Agent, the DIP Escrow Agent, and the DIP Lenders.

"**Disbursing Agent**" means any Entity in its capacity as a disbursing agent under <u>section 6.6</u> hereof, including any Debtor or Reorganized Debtor, as applicable, that acts in such capacity to make distributions pursuant to this Plan.

**"Disclosure Statement"** means the disclosure statement for this Plan, including all exhibits, schedules, supplements, modifications, amendments, and annexes thereto, each as supplemented from time to time, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law.

**"Disputed"** means, with respect to a Claim, (i) any Claim, which Claim is disputed under ARTICLE VII of this Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed, (iii) any Claim that is listed in the Schedules, if filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of claim has been filed, or (iv) any Claim that is otherwise disputed by any of the Debtors or Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

**"Distribution Record Date"** means, except as otherwise provided in this Plan or the Plan Documents, the Effective Date.

**"DTC"** means Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

**"Effective Date"** means the date which is the first Business Day on which (i) all conditions to the effectiveness of this Plan set forth in section 9.1 of this Plan have been satisfied or waived in accordance with the terms of this Plan and (ii) no stay of the Confirmation Order is in effect.

**"Entity"** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**"Estate(s)"** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**"Evergreen Skills Entities"** means Holdings, the Lux Borrower, Evergreen Skills Holding Lux, and Evergreen Skills Top Holding Lux.

**"Exchange Act"** means the Securities Exchange Act of 1934, as amended.

**"Exculpated Parties"** means, collectively, and in each case in their capacities as such during the Chapter 11 Cases, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, (iv) the First Lien Agent, (v) the Second Lien Agent, (vi) CIT Bank, N.A., (vii) the Ad Hoc First Lien Group and its current and former members, (viii) the Ad Hoc Crossholder Group and its current and former members, (ix) the DIP Lenders; (x) the DIP Agent; (xi) the DIP Escrow Agent, (xii) with respect to each of the foregoing Persons in clauses (i) through (xi), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, equity holders, members, partners, managers,

employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, *provided however* notwithstanding the foregoing, if the Sponsor Side Agreement is not in effect on the Effective Date, the definition of Exculpated Party shall not include, in each case, regardless of whether such party or entity would otherwise meet the definition of Exculpated Party:  (x) the Sponsor; (y) the Evergreen Skills Entities; or (z) with respect to each of the foregoing (x)-(y), their respective current and former affiliates (other than the Company), subsidiaries (other than the Company), members, managers, equity owners, employees, professionals, consultants, directors and officers (in each case solely in their respective capacities as such).

**"Existing Parent Equity Interests"** means the entire issued share capital of the Parent.

**"Exit A/R Agent"** means CIT Bank, N.A. in its capacity as agent under the Exit A/R Facility Agreement.

**"Exit A/R Borrower"** means Skillsoft Receivables Financing LLC in its capacity as borrower under the Exit A/R Facility Agreement.

**"Exit A/R Facility Agreement"** means the credit agreement to be entered into prior to the Effective Date among Exit A/R Borrower, the lenders party thereto, and the Exit A/R Agent to provide an accounts receivable financing facility in a principal amount up to $75 million.

**"Exit Credit Agreement"** means that certain term loan credit agreement, dated as of the Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), containing terms substantially consistent with the DIP and Exit Facility Term Sheet with respect to the Exit Credit Facility, which shall be subject to the Definitive Document Requirements.

**"Exit Credit Facility"** means the term loan facility encompassing the New First Out Term Loan Facility and the New Second Out Term Loan Facility to be provided to the Company on the Effective Date pursuant to the Exit Credit Agreement.

"**Exit Credit Agreement Agent**" means the administrative agent and collateral agent under the Exit Credit Agreement.

**"Fee Claim"** means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Confirmation Date by Professional Persons.

**"Final Order"** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought,

such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure, under any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or under sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

"**First Lien Agent**" means Wilmington Savings Fund Society, FSB, solely in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement, or its successors, assigns, or any replacement agent appointed pursuant to the terms of the First Lien Credit Agreement.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of April 28, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) among Holdings, as holdings; Lux Borrower, Skillsoft Canada Ltd., and Skillsoft Corporation, as borrowers; the First Lien Agent; the First Lien Lenders; and the other parties thereto from time to time.

"**First Lien Debt Claim**" means all Secured and deficiency Claims on account of, arising under, or relating to the First Lien Credit Agreement, including without limitation any accrued and unpaid principal, interest and fees as of the Petition Date.

"**First Lien Lenders**" means the lenders party to the First Lien Credit Agreement from time to time.

"**General Unsecured Claim**" means any prepetition, general unsecured Claim, excluding Claims held by one or more Debtors, Claims held by one or more non-Debtor affiliates of Parent (including Claims held by the Evergreen Skills Entities and/or the Sponsor or its affiliates), First Lien Debt Claims, Second Lien Debt Claims, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Subordinated Claims.

"**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"**Holdings**" means Evergreen Skills Intermediate Lux S.à r.l., a private limited liability company, incorporated under the laws of Luxembourg, having its registered office at 8, rue Notre-Dame L-2240 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register under number B 186.054.

"**Impaired**" means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

"**Incentive Plans**" means the Board Incentive Plan and the Management Incentive Plan.

**"Intercompany Claim"** means any prepetition Claim against one or more Debtors held by another Debtor or by a non-Debtor affiliate of Parent, including any Claims held by Holdings, the Lux Borrower, or any other Evergreen Skills Entities.

**"Intercompany Interest"** means any means any prepetition Interest in a Debtor held by another Debtor or by a non-Debtor affiliate of Parent (excluding the Evergreen Skills Entities and the Sponsor).

**"Interest"** means any equity security (as defined in section 101(16) of the Bankruptcy Code) of any Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in such Debtor, whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

**"Lien"** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**"Lux Borrower"** means Evergreen Skills Lux S.à r.l., a private limited liability company, incorporated under the laws of Luxembourg, having its registered office at 8, rue Notre-Dame, L-2240 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register under number B 185.790.

**"Management Incentive Plan"** or "**MIP**" means a post-Effective Date management incentive plan consistent in all material respects with the terms in the Reorganization Term Sheet, subject to compliance with Luxembourg law, as applicable.

**"New Board"** means the board of directors of Newco Parent as of the Effective Date.

**"New Corporate Governance Documents"** means the applicable Organizational Documents and stockholders agreement (if applicable) of Newco Parent, in each case, consistent with the Governance Term Sheet and subject to the Definitive Document Requirements.

**"New First Out Term Loan Commitment"** means the commitment to provide the amounts contemplated under the New First Out Term Loan Facility.

**"New First Out Term Loan Facility"** means a new "first out" term loan facility under the Exit Credit Agreement pursuant to which, as of the Effective Date, New First Out Term Loans will be borrowed in an aggregate principal amount equal to the sum of (i) the aggregate principal amount outstanding under the DIP Facility as of ten days prior to the Effective Date (the "**Converted DIP Facility Loans**") (which converted DIP Facility Loans shall be converted into New First Out Term Loans) and (ii) Cash in an amount equal to $110 million less the amount of the Converted DIP Facility Loans.  Ten days prior to the Effective Date, the Debtors shall provide the Consenting Creditors with an estimate of Converted DIP Facility Loans as of the Effective Date.

**"New First Out Term Loans"** means the term loans to be issued under the New First Out Term Loan Facility.

**"New Second Out Term Loan Facility"** means a new "second out" term loan facility under the Exit Credit Agreement pursuant to which New Second Out Term Loans will be borrowed in an aggregate principal amount of $410 million.

**"New Second Out Term Loans"** means the term loans to be issued under the New Second Out Term Loan Facility.

"**Newco Borrower**" means a newly-formed entity organized under the laws of Luxembourg that will directly own 100% of the equity interests of the Reorganized Parent.

**"Newco Equity"** means the equity interests of Newco Parent to be issued in connection with implementation of the Plan.

**"Newco Parent"** means a newly-formed entity organized under the laws of Luxembourg that will directly or indirectly own 100% of the equity interests of the Reorganized Parent and be treated as a corporation for tax purposes, as set forth in the Restructuring Transaction Steps.

**"Organizational Documents"** means, of any Person, the forms of certificates or articles of incorporation, certificates, or articles of formation, bylaws, constitutions, limited liability company agreements, or other forms of organization documents of such Person.

**"Other Equity Interests"** means all Interests other than Existing Parent Equity Interests and Intercompany Interests.

**"Other Priority Claim"** means any Claim other than an Administrative Expense Claim, a DIP Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

**"Other Secured Claim"** means any Secured Claim other than a Priority Tax Claim, a DIP Claim, a First Lien Debt Claim, or a Second Lien Debt Claim.

**"Parent"** means Pointwell Limited.

**"Person"** means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

**"Petition Date"** means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

**"Plan Distribution"** means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under this Plan.

**"Plan Document"** means any Definitive Document.

**"Plan"** means this joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to this Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the Restructuring Support Agreement.

**"Plan Supplement"** means a supplement or supplements to this Plan containing the forms of certain documents, schedules, and exhibits relevant to the implementation of this Plan, which shall include (i) the New Corporate Governance Documents, (ii) the slate of directors to be appointed to the New Board (to the extent known and determined), (iii) with respect to the members of the New Board disclosed pursuant to clause (ii), information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (iv) the Exit Credit Agreement, (v) the Warrant Agreement, (vi) Rejected Executory Contract and Unexpired Lease List; (vii) a schedule of retained Causes of Action; (viii) the A/R Exit Facility Agreement; (ix) the Restructuring Transaction Steps; and (x) such other documents as are necessary or advisable to implement the Restructuring contemplated by the Restructuring Support Agreement and the Plan, each of which shall be consistent with the Restructuring Support Agreement and subject to the Definitive Document Requirements *provided*, *however*, that, through the Effective Date, the Debtors shall have the right to amend the documents and schedules contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan and the Restructuring Support Agreement.

**"Pointwell Intercompany Debt"** means certain intercompany obligations owed to the Lux Borrower by the Parent which have been pledged to the First Lien Lenders pursuant to (x) that certain First Lien Share Charge and Security Assignment, dated as of April 28, 2014, between the Lux Borrower and the First Lien Agent and (y) that certain First Lien Security Agreement, dated as of April 28, 2014, by and between Holdings, the First Lien Borrowers, certain subsidiaries of Holdings party thereto as grantors and the First Lien Agent and the Second Lien Lenders pursuant to (x) that certain Second Lien Share Charge and Security Assignment, dated as of April 28, 2014, between the Lux Borrower and the Second Lien Agent and (y) that certain Second Lien Security Agreement, dated as of April 28, 2014, by and between Holdings, the Second Lien Borrowers, certain subsidiaries of Holdings party thereto as grantors and the Second Lien Agent.

**"Pointwell Intercompany Debt Claim"** means any Claim on account of the Pointwell Intercompany Debt.

**"Priority Tax Claim"** means any Claim of a Governmental Unit of the kind entitled to priority of payment as specified in section 507(a)(8) of the Bankruptcy Code.

**"Pro Rata"** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

**"Professional Fee Escrow"** means an interest-bearing account in an amount equal to Professional Fee Reserve Amount and funded by the Debtors on the Effective Date.

**"Professional Fee Reserve Amount"** shall consist of the total amount of (i) any unpaid invoices for fees and expenses incurred by Professional Persons retained by the Company or any official committee through and including the Effective Date; (ii) estimated fees and expenses of the Professional Persons retained by the Company or any Committee, as estimated by such Professional Persons in good faith, for (a) accrued but uninvoiced fees and expenses and (b) post-Effective Date activities; and (iii) the estimated reasonable and documented fees and expenses of the Ad Hoc First Lien Group and the Ad Hoc Crossholder Group, in each case, in accordance with the terms of their applicable engagement or reimbursement letters and as estimated in good faith for (a) accrued and uninvoiced fees and expenses through and including the Effective Date and (b) necessary post-Effective Date activities.

**"Professional Person"** means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

**"Rejected Executory Contract and Unexpired Lease List"** means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to this Plan, if any, as the same may be amended, modified, or supplemented from time to time.

**"Released Parties"** means, collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the First Lien Agent, (iv) the Second Lien Agent, (v) CIT Bank, N.A., (vi) the Ad Hoc First Lien Group and its current and former members, (vii) the Ad Hoc Crossholder Group and its current and former members, (viii) the DIP Lenders; (ix) the DIP Agent; (x) the DIP Escrow Agent, (xi) with respect to each of the foregoing Persons in clauses (i) through (x), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and (xii) the Sponsor, the Evergreen Skills Entities, and Sponsor Affiliates; *provided that* releases of the Evergreen Skills Entities shall not be effective until such time as is consistent with the Restructuring Transaction Steps; *provided further that*, notwithstanding any of the foregoing, if a Sponsor Material Breach has occurred or if the Sponsor Side Agreement has been terminated for any reason other than the occurrence of the Effective Date then the Sponsor, the Evergreen Skills Entities, and the Sponsor Affiliates  shall not be Released Parties.

**"Releasing Parties"** means, collectively, (i) the holders of all Claims or Interests who vote to accept this Plan, (ii) holders of Claims or Interests that are Unimpaired under this Plan, where the applicable Claims or Interests have been fully paid or otherwise satisfied in accordance with this Plan, (iii) holders of Claims or Interests whose vote to accept or reject this Plan was solicited but who did not vote either to accept or to reject this Plan, (iv) holders of Claims or Interests who voted to reject this Plan but did not opt out of granting the releases set forth herein, and (vi) the Released Parties; *provided*, *however*, that if the Sponsor and Evergreen Skills Entities are not Released Parties, the Sponsor and the Evergreen Skills Entities and each of their respective current and former affiliates (other than the Company), subsidiaries (other than

the Company), members, managers, equity, owners, managed entities, investment managers, employees, professionals, consultants, directors, and officers (in each case solely in their respective capacities as such) shall not be Releasing Parties.

"**Reorganization Term Sheet**" means that certain term sheet attached as Exhibit D to the Restructuring Support Agreement.

"**Reorganized Debtor(s)**" means, with respect to each Debtor, such Debtor as reorganized as of the Effective Date in accordance with this Plan.

"**Reorganized Parent**" means Parent as reorganized on the Effective Date in accordance with this Plan.

"**Requisite Creditors**" has the meaning set forth in the Restructuring Support Agreement.

"**Restructuring Fees and Expenses**" means all reasonable and documented fees and expenses incurred or estimated to be incurred by the Ad Hoc First Lien Group and the Ad Hoc Crossholder Group, including without limitation the fees and expenses of the Consenting Creditor Advisors.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, including all exhibits thereto, dated as of June 12, 2020, by and among the Debtors and the Consenting Creditors, attached hereto as Exhibit A, as the same may be amended, restated, or otherwise modified in accordance with its terms.

"**Restructuring Term Sheets**" means, collectively, the Reorganization Term Sheet, the DIP and Exit Facility Term Sheet, the Governance Term Sheet, and the Warrant Term Sheet, as applicable.

"**Restructuring Transaction Steps**" means the memorandum setting out the steps of the Restructuring Transactions (including any schedules and exhibits thereto), which shall be subject to the Definitive Document Requirements.

"**Restructuring Transactions**" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including (i) the consummation of the transactions provided for under or contemplated by the Restructuring Support Agreements and the Restructuring Term Sheets (including if a Sponsor Material Breach has occurred or the Sponsor Side Agreement has terminated for any reason other than the occurrence of the Effective Date), (ii) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of this Plan, the Restructuring Support Agreement, and the Restructuring Term Sheets, and that satisfy the requirements of applicable law, (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan, the Restructuring Support Agreement, and the Restructuring Term Sheets, and (iv) all other actions that the Debtors or

Reorganized Debtors, as applicable, determine, subject to the Definitive Document Requirements and the terms of the Restructuring Support Agreement and the Restructuring Term Sheets, are necessary or appropriate and consistent with the Restructuring Support Agreement and the Restructuring Term Sheets.

**"Restructuring"** has the meaning set forth in the Restructuring Support Agreement.

**"Schedules"** means, the schedules of Assets and liabilities, statements of financial affairs, lists of holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

**"Second Lien Agent"** means Wilmington Savings Fund Society, FSB, solely in its capacity as administrative agent and collateral agent under the Second Lien Credit Agreement, or its successors, assigns, or any replacement agent appointed pursuant to the terms of the Second Lien Credit Agreement.

**"Second Lien Credit Agreement"** means that certain Second Lien Credit Agreement, dated as of April 28, 2014, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) among Holdings, as holdings; Lux Borrower and Skillsoft Corporation, as borrowers; the Second Lien Agent; the Second Lien Lenders; and the other parties thereto from time to time.

**"Second Lien Debt Claim"** means all Secured and deficiency Claims on account of, arising under, or relating to the Second Lien Credit Agreement, including without limitation any accrued and unpaid principal, interest and fees as of the Petition Date.

**"Second Lien Lenders"** means the lenders party to the Second Lien Credit Agreement from time to time.

**"Secured Claim"** means a Claim to the extent (i) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (a) as set forth in this Plan, (b) as agreed to by the holder of such Claim and the Debtors, or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code.

**"Securities Act"** means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

**"Security"** means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

**"Sponsor"** means Charterhouse General Partners (IX) Limited, acting in its capacity as general partner of Charterhouse Evergreen LP.

"**Sponsor Affiliates**" means (i) with respect a person any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person; and (ii) each of their respective current and former employees, professionals, consultants, directors and officers (in each case in their respective capacities as such), but excluding any portfolio company of any fund or account managed or advised by the Sponsor (other than the Debtors or any of their direct or indirect subsidiaries), provided that:  (A) for the purposes of this definition of Sponsor Affiliate the term "control", "controlled by" and "under common control with" means the possession, directly or indirectly, through one or more intermediaries, of: (1) the power to direct or cause the direction of the management and policies of a person; (2) the right to more than 50 percent of the profits of a person, in each case whether through the ownership of shares, interests and/or other securities of any kind, by contract or otherwise; or (3) vote on more than 50 percent, of the securities having ordinary voting power for the election of directors of such person; (B) in respect of a limited partnership or a fund, any general partner, investment manager, investment adviser, nominee or trustee of such limited partnership or fund, shall be deemed to be a Sponsor Affiliate of any member of the Sponsor; (C) a portfolio company of any fund or account managed or advised by the Sponsor other than the Debtors or any of their direct or indirect subsidiaries, shall not be deemed to be a Sponsor Affiliate of any member of the Sponsor and (D) any person which is deemed to be a Sponsor Affiliate of the Sponsor principally as a result of being managed and/or advised by the Sponsor shall only be a "Sponsor Affiliate" for so long as it continues to be managed and/or advised in such manner.

"**Sponsor Material Breach**" has the meaning set forth in the Sponsor Side Agreement.

"**Sponsor Side Agreement**" means the agreement, dated as of June 12, 2020, evidencing the Sponsor's and the Evergreen Skills Entities' consent to the Restructuring by and among the Parent, the Sponsor, the Evergreen Skills Entities, and the Consenting Creditors party thereto annexed hereto as Exhibit B.

"**Statutory Fees**" means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

"**Steering Committee**" has the meaning set forth in the Governance Term Sheet.

"**Subordinated Claims**" means any claim subject to subordination under section 510(b) of the Bankruptcy Code, including without limitation all accrued and unpaid management fees and other amounts owed to the Sponsor.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Tranche A Warrants**" means warrants issued pursuant to the Warrant Agreement representing the right to acquire 5.0% of the Newco Equity issued and outstanding immediately after the Effective Date, subject to dilution by the Incentive Plans.

"**Tranche B Warrants**" means warrants issued pursuant to the Warrant Agreement representing the right to acquire 10.0% of the Newco Equity issued and outstanding immediately after the Effective Date, subject to dilution by the Incentive Plans.

14

"**U.S. Trustee**" means the United States Trustee for Region 3.

"**Unimpaired**" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

"**Voting Deadline**" means June 26, 2020 at 5:00 p.m. prevailing Eastern Time, or such other date and time as may set by the Bankruptcy Court.

"**Warrant Agreement**" means the warrant agreement to be entered into by and among Newco Parent and the warrant agent named therein that will govern the terms of the Warrants and be in form and substance consistent with the Warrant Term Sheet and subject to the Definitive Document Requirements.

"**Warrant Equity**" means the Newco Equity to be issued upon the exercise of the Warrants.

"**Warrant Term Sheet**" means that certain term sheet (including any schedules and exhibits thereto) annexed to the Restructuring Support Agreement as <u>Exhibit F</u>.

"**Warrants**" means, collectively, the Tranche A Warrants and the Tranche B Warrants.

**1.2**    **Interpretation; Application of Definitions; Rules of Construction**.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the Restructuring Support Agreement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively. The words "includes" and "including" are not limiting. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

**1.3**    **Reference to Monetary Figures**.

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

**1.4**      **Consent and Termination Rights of Consenting Creditors**.

Notwithstanding anything herein to the contrary, any and all consent and/or termination rights of the Requisite Creditors and/or Consenting Creditors, as applicable, as set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, and any other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

**1.5**      **Controlling Document**.

In the event of an inconsistency between this Plan and any document in the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, *however*, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

**ARTICLE II.**      **ADMINISTRATIVE  EXPENSE  CLAIMS,  FEE  CLAIMS, PRIORITY TAX CLAIMS, AND DIP CLAIMS.**

**2.1**      **Treatment of Administrative Expense Claims**.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim (other than Restructuring Fees and Expenses or a Fee Claim) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

**2.2**      **Treatment of Fee Claims.**

(a)      All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is

forty five (45) days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim. The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)    On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow. The Debtors shall fund the Professional Fee Escrow with Cash equal to the Professional Fee Reserve Amount. Funds held in the Professional Fee Escrow shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court and all Restructuring Fees and Expenses have been irrevocably paid in full. The Professional Fee Escrow shall be held in trust for Professional Persons retained by the Debtors and any official committee, as well as for the Consenting Creditor Advisors, but for no other parties until all Restructuring Fees and Expenses and Allowed Fee Claims have been paid in full. Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which a Final Order relating to any such Allowed Fee Claim is entered or (ii) on such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Reorganized Debtors, as applicable. The Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Escrow. To the extent that funds held in the Professional Fee Escrow are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with section 2.1 of this Plan. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way, other than customary liens in favor of the depository bank at which the Professional Fee Escrow is maintained.

(c)    Any objections to Fee Claims shall be served and filed (i) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (ii) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

## 2.3    <u>Treatment of Priority Tax Claims</u>.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.

**2.4**     **Treatment of DIP Facility Claims**.

Subject to the DIP Orders, on the Effective Date, the amount outstanding under the DIP Claims shall be deemed to be Allowed in the full amount due and owing under the DIP Credit Agreement, including, for the avoidance of doubt, (i) the principal amount outstanding under the DIP Facility on such date; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued fees, expenses, and indemnification obligations payable under the DIP Financing Documents.  For the avoidance of doubt, the DIP Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

On the Effective Date,  each holder of any Allowed DIP Claim shall receive, in full and final satisfaction of such Claim: (i) in exchange for the principal amounts of such Allowed DIP Claim, on a dollar-for-dollar basis, (A) New First Out Term Loans or (B) Cash (provided the New First Out Term Loan Commitment is met in full) and (ii) in exchange for all amounts of such Allowed DIP Claim not attributable to principal (including, for the avoidance of doubt, accrued interest and other obligations under the DIP Facility) payment in full in Cash on the Effective Date.

**2.5**     **Payment of Fees and Expenses under DIP Orders**.

On the earlier of (i) the Effective Date and (ii) the date on which any accrued and unpaid fees, expenses or disbursements in respect of the DIP Facility would be required to be paid under the terms of the applicable DIP Order, the Restructuring Support Agreement or any other order of the Bankruptcy Court, the Debtors or Reorganized Debtors (as applicable) shall pay in Cash all fees, expenses and disbursements of the DIP Agent, DIP Escrow Agent, and the DIP Lenders, in each case, that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the DIP Orders, the Restructuring Support Agreement, or any other order of the Bankruptcy Court, including, for the avoidance of doubt, the Adequate Protection Payments.

**2.6**     **Restructuring Fees and Expenses**.

The Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date activities, after the Effective Date), shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.  All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses.  On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

**2.7**     **Statutory Fees**.

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor or Reorganized Debtor, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's, or Reorganized Debtor's, as applicable, case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

**ARTICLE III.          CLASSIFICATION OF CLAIMS AND INTERESTS.**

**3.1     Classification in General**.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

**3.2     Formation of Debtor Groups for Convenience Only**.

This Plan groups the Debtors together solely for the purpose of describing the treatment of Claims and Interests under this Plan, the confirmation requirements of this Plan, and the making of Plan Distributions in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.

**3.3     Summary of Classification of Claims and Interests**.

The following table designates the Classes of Claims and Interests and specifies which Classes are (i) Impaired and Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject this Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 3 | First Lien Debt Claims | Impaired | Yes |
| Class 4 | Second Lien Debt Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 7 | Intercompany Claims | Impaired / Unimpaired | No (Deemed to accept or reject) |
| Class 8 | Existing Parent Equity Interests | Impaired | No (Deemed to reject) |
| Class 9 | Other Equity Interests | Impaired | No (Deemed to reject) |
| Class 10 | Intercompany Interests | Impaired / Unimpaired | No (Deemed to accept or reject) |

**3.4** **Special Provision Governing Unimpaired Claims**.

Except as otherwise provided in this Plan, nothing in this Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**3.5** **Elimination of Vacant Classes**.

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**3.6** **Voting Classes; Presumed Acceptance by Non-Voting Classes**.

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject this Plan, this Plan shall be presumed accepted by such Class.

**3.7** **Voting; Presumptions; Solicitation**.

(a)    **Acceptance by Certain Impaired Classes**.  Only holders of Claims in Class 3 and Class 4 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have

voted to accept this Plan.  Holders of Claims in Class 3 and Class 4 shall receive ballots containing detailed voting instructions.

(b)    **Deemed Acceptance by Unimpaired Classes**.  Holders of Claims in Classes 1, 2, and 5 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(c)    **Deemed Rejection by Impaired Class**.  Holders of Claims and Interests in Classes 6, 8, and 9 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(d)    **Deemed Acceptance or Rejection by Unimpaired / Impaired Classes**.  Holders of Claims or Interests in Classes 7 and 10 are conclusively deemed to have either accepted or rejected this Plan pursuant to section 1126 (f) or (g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

**3.8    <u>Cramdown</u>**.

If any Class (other than Class 3 or 4) is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code, including by (A) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or (B) withdrawing the Plan as to an individual Debtor at any time before the Confirmation Date.  If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**3.9    <u>No Waiver</u>**.

Nothing contained in this Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim.

**ARTICLE IV.        TREATMENT OF CLAIMS AND INTERESTS.**

**4.1    <u>Class 1:  Other Priority Claims</u>**.

(a)    **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) such other treatment sufficient to render such holder's Allowed Other Priority Claim Unimpaired pursuant

to section 1124 of the Bankruptcy Code, or (iii) other treatment consistent with the provisions of section 1129 of the Bankruptcy Code.

(b) **Impairment and Voting**:  Allowed Other Priority Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Priority Claims.

**4.2** **Class 2:  Other Secured Claims**.

(a) **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(b) **Impairment and Voting**:  Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

**4.3** **Class 3:  First Lien Debt Claims**.

(a) **Treatment**:  On the Effective Date, in full and final satisfaction, release, and discharge of the Allowed First Lien Debt Claims, the holders of Allowed First Lien Debt Claims (or the permitted assigns or designees of such holders) shall receive their Pro Rata share of:

(i)     New Second Out Term Loans; and

(ii)    96% of Newco Equity (subject to dilution by the Warrants and the Incentive Plans).

(b) **Impairment and Voting**:  First Lien Debt Claims are Impaired.  Holders of First Lien Debt Claims are entitled to vote on this Plan.

(c) **Allowance**:  The First Lien Debt Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $1,404,396,384.46, *plus* (i) accrued but unpaid interest owed as of the Petition Date and any fees, charges, and other amounts due but unpaid under the First Lien Credit Agreement or any related documents as of the Petition Date, and (ii) any other First Lien Debt Claims accrued under any order of the Bankruptcy Court but

unpaid as of the Effective Date.  Neither the holders of First Lien Debt Claims nor the First Lien Agent shall be required to file proofs of Claim on account of any First Lien Debt Claim.

**4.4    Class 4: Second Lien Debt Claims**.

(a)    **Treatment**:  On the Effective Date, in full and final satisfaction, release, and discharge of the Allowed Second Lien Debt Claims, the holders of Allowed Second Lien Debt Claims shall receive their Pro Rata share of:

(i)    4% of Newco Equity (subject to dilution by the Warrants and the Incentive Plans);

(ii)    the Tranche A Warrants; and

(iii)    the Tranche B Warrants.

(b)    **Impairment and Voting**:  Second Lien Debt Claims are Impaired. Holders of Second Lien Debt Claims are entitled to vote on this Plan.

(c)    **Allowance**:  The Second Lien Debt Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $696,604,104.28, *plus* (i) accrued but unpaid interest owed as of the Petition Date and any fees, charges, and other amounts due but unpaid under the Second Lien Credit Agreement or any related documents as of the Petition Date, and (ii) any other Second Lien Debt Claims accrued under any order of the Bankruptcy Court but unpaid as of the Effective Date.  Neither the holders of Second Lien Debt Claims nor the Second Lien Agent shall be required to file proofs of Claim on account of any Second Lien Debt Claim.

**4.5    Class 5:  General Unsecured Claims**.

(a)    **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, or as soon as reasonably practicable thereafter, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

(b)    **Impairment and Voting**:  Allowed General Unsecured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed General Unsecured Claims.

**4.6    Class 6:  Subordinated Claims**.

(a)    **Treatment**: On the Effective Date, or as soon as practicable thereafter, all Subordinated Claims shall be deemed cancelled without further action by or order of the

Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(b) **Impairment and Voting**: All Subordinated Claims are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Subordinated Claims.

## 4.7    Class 7:  Intercompany Claims.

(a) **Treatment**: On the Effective Date, all Intercompany Claims shall be reinstated, cancelled, reduced, transferred, or otherwise treated (by way of contribution to capital or otherwise), in each case at the Debtors' or Reorganized Debtors' option (with the consent of the Requisite Creditors), in accordance with the Restructuring Transaction Steps.

(b) **Impairment and Voting**: Holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Intercompany Claims.

## 4.8    Class 8:  Existing Parent Equity Interests

(a) **Treatment**: On the Effective Date, the entire share capital of Parent shall be transferred to Newco Borrower in accordance with the Restructuring Transaction Steps. Holders of Existing Parent Equity Interests shall receive no distribution under this Plan.

(b) **Impairment and Voting**: Existing Equity Parent Interests are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, holders of Existing Equity Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Existing Equity Interests.

## 4.9    Class 9:  Other Equity Interests.

(a) **Treatment**:  On the Effective Date, Other Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect.

(b) **Impairment and Voting**:  Other Equity Interests are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, holders of Other Equity Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Other Equity Interests.

## 4.10    Class 10:  Intercompany Interests.

(a) **Treatment**: On the Effective Date, all Intercompany Interests shall be reinstated, modified, cancelled, or otherwise treated, in each case at the Debtors' or Reorganized Debtors' option (with the consent of the Requisite Creditors), in accordance with the Restructuring Transaction Steps.

(b)    **Impairment and Voting**:    Holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Intercompany Interests.

## ARTICLE V.        MEANS FOR IMPLEMENTATION.

### 5.1    Plan Funding.

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from proceeds of the New First Out Term Loan Facility.

### 5.2    Compromise and Settlement of Claims, Interests, and Controversies.

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

### 5.3    Continued Corporate Existence; Effectuating Documents; Further Transactions.

(a)    Except as otherwise provided in this Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and their Organizational Documents.

(b)    On and after the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action.  On or after the Effective Date, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and its Organizational Documents., as such Reorganized Debtor may determine is reasonable and appropriate, including without limitation causing (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor, (ii) a Reorganized Debtor to be dissolved, (iii) the legal name of a Reorganized Debtor to be changed, or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under applicable state, federal, or foreign law).

(c)    On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any

transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including without limitation (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation, (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law, (iv) the Restructuring Transactions, and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

**5.4** **Cancellation of Existing Securities and Agreements**.

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, or in any Plan Document, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, Securities and other documents evidencing any Claim or Interest (other than Claims or Interests that are not modified by this Plan, including the Allowed General Unsecured Claims, Existing Parent Equity Interests, and Intercompany Interests) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged and, as applicable, shall be deemed to have been surrendered to the Disbursing Agent; provided, that notwithstanding Confirmation or the occurrence of the Effective Date, any such instrument or document that governs the rights of a Holder of a DIP Claim, First Lien Debt Claim or Second Lien Debt Claim shall continue in effect solely for purposes of: (i) allowing such Holders to receive distributions under the Plan, including taking action in accordance with the Restructuring Transaction Steps; (ii) allowing each of the First Lien Agent, the Second Lien Agent, and the DIP Agent to enforce its rights, claims, and interests vis-à-vis any parties other than the Debtors; (iii) allowing each of the DIP Agent, First Lien Agent and the Second Lien Agent to make the distributions in accordance with the Plan; (iv) preserving any rights of each of the First Lien Agent, the Second Lien Agent, and the DIP Agent to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders of First Lien Debt Claims, Second Lien Debt Claims or DIP Claims, as applicable, under the Credit Agreements or the DIP Credit Agreement, as applicable, including any rights to priority of payment and/or to exercise charging liens; (v) preserving the rights of each of the First Lien Agent, the Second Lien Agent, and the DIP Agent to enforce any obligations owed to the DIP Secured Parties, the First Lien Lenders, and the Second Lien Lenders, respectively, under the Plan; (vi) allowing each of the First Lien Agent, the Second Lien Agent, and the DIP Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, but not limited, to enforce the respective obligations owed to the DIP Secured Parties, the First Lien Lenders, and the Second Lien Lenders, respectively, under the Plan; and (vii) permitting each of the First Lien Agent, the Second Lien Agent, and the DIP Agent to perform any functions that are necessary to effectuate the foregoing..  The holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan.

Each of the First Lien Agent and the Second Lien Agent shall be released and shall have no further obligation or liability except as provided in or contemplated by the Plan, Restructuring Transaction Steps, and Confirmation Order, and after the performance by the First Lien Agent and the Second Lien Agent and their respective representatives and professionals of any obligations and duties required under or related to the Plan, Restructuring Transaction Steps, or Confirmation Order, including effectuating Distributions to the applicable Prepetition Secured Parties, each of the First Lien Agent and the Second Lien Agent shall be relieved of and released from any obligations and duties arising thereunder.  Any fees, expenses and other amounts payable to each of the First Lien Agent and the Second Lien Agent under the applicable Credit Agreement as of the Effective Date shall be paid by the Debtors to the First Lien Agent and the Second Lien Agent on the Effective Date in full, in Cash.

Except as provided in this Plan, upon satisfaction of the DIP Claims on the Effective Date, the DIP Agent and its agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement. The commitments and obligations, if any, of the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Credit Agreement, as applicable, shall fully terminate and be of no further force or effect on the Effective Date. To the extent that any provision of the DIP Credit Agreement or DIP Orders are of a type that survives repayment of the subject indebtedness or the termination thereof (including, without limitation, any indemnification obligations of the DIP Lenders to the DIP Agent), such provisions shall remain in effect notwithstanding satisfaction of the DIP Claims.  Any fees, expenses and other amounts payable to the DIP Agent under the DIP Credit Agreement as of the Effective Date shall be paid by the Debtors to the DIP Agent on the Effective Date in full, in Cash.

**5.5**     **Cancellation of Certain Existing Security Interests**.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

**5.6**     **Officers and Boards of Directors**.

(a)     On the Effective Date and subject to the terms of the New Corporate Governance Documents, the New Board shall consist of (i) Newco Parent's chief executive officer; (ii) three directors appointed by the Steering Committee; (iii) two directors appointed by the Ad Hoc Crossholder Group; and (iv) one independent director nominated by mutual agreement of the Steering Commitee and Ad Hoc Crossholder Group, to be disclosed in the Plan Supplement to the extent known and determined.  The identity and affiliations of any Person proposed to serve on the New Board shall be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)    Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the officers of each of the respective Reorganized Debtors on and after the Effective Date.

(c)    Except to the extent that a member of the board of directors, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations or duties to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable Organizational Documents of such Reorganized Debtor and may be replaced or removed in accordance with such Organizational Documents.

## 5.7    **Incentive Plans**.

After the Effective Date, the New Board shall adopt the Incentive Plans.  The participants and amounts allocated under the Incentive Plans and other terms and conditions thereof shall be determined in the sole discretion of the New Board; *provided*, *however*, that the Incentive Plans shall be in form and substance consistent with the Reorganization Term Sheet.

## 5.8    **Authorization and Issuance of Newco Equity and Warrants**.

On and after the Effective Date, Newco Parent is authorized to issue or cause to be issued and shall issue (a) the Newco Equity and (b) the Warrants, each in accordance with the terms of this Plan without the need for any further act or actions by any Person.  All of the Newco Equity and the Warrants issuable under this Plan, when so issued, shall be duly authorized, validly issued, and, in the case of the Newco Equity, fully paid, and non-assessable. The Warrant Equity (upon payment or satisfaction of the exercise price in accordance with the terms of the applicable Warrants) issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

## 5.9    **Securities Exemptions**.

The issuance of and the distribution under this Plan of the Newco Equity and the Warrants (and the Warrant Equity issuable upon exercise thereof) shall  be exempt, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  The Newco Equity and the Warrants (and the Warrant Equity issuable upon exercise thereof) shall be freely tradable by the recipients thereof, (a) unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code and (b) subject to (i) compliance with, or the limitations of, any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities (including, but not limited to, Rule 144 under the Securities Act (or any successor provision) and its limitation on transfers by persons who are "affiliates" (as defined in Rule 405 of the Securities Act) of the issuer), (ii) the restrictions, if any, on the

transferability of such securities under the terms of the New Corporate Governance Documents or the Warrant Agreements, as applicable, and (iii) applicable regulatory approval.  Should the Newco Parent elect on or after the Effective Date to reflect any ownership of the Newco Equity or the Warrants (including the Warrant Equity issuable upon exercise thereof) through the facilities of DTC or any Alternative Service (as defined below), Newco Parent need not provide any further evidence, other than the Plan or the Confirmation Order, with respect to the treatment of such securities under applicable securities laws.  Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC, or any Alternative Service) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the initial sale and delivery by the issuer to the holders of Newco Equity or the Warrants (including the Warrant Equity issuable upon exercise thereof) is exempt from registration and/or eligible for DTC (or any Alternative Service) book-entry delivery, settlement, and depository services.  The Confirmation Order shall provide that DTC (or any Alternative Service) shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the Newco Equity or the Warrants (including the Warrant Equity issuable upon exercise thereof) is exempt from registration and/or eligible for DTC (or any Alternative Service) book-entry delivery, settlement, and depository services. Notwithstanding the preceding, the Company may elect to use any other book entry delivery, settlement and depositary service in lieu of DTC as it deems efficient and appropriate (an "**Alternative Service**").

### 5.10    Exit Credit Agreement.

(a)    On the Effective Date, the Reorganized Debtors are authorized to and shall enter into the Exit Credit Agreement and all other documents, notes, agreements, guaranties, and other collateral documents contemplated thereby.  The Exit Credit Agreement shall constitute legal, valid, binding, and authorized joint and several obligations of the Reorganized Debtors enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, this Plan, or the Confirmation Order.  On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit Credit Agreement (y) shall be valid, binding, perfected, enforceable first priority Liens and security interests in the property subject to a security interest granted by the applicable Reorganized Debtors pursuant to the Exit Credit Facility, with the priorities established in respect thereof under applicable non-bankruptcy law and (z) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, this Plan, or the Confirmation Order.

(b)    The Exit Credit Agreement Agent is hereby authorized to file, with the appropriate authorities, financing statements, amendments thereto or assignments thereof and other documents, including mortgages or amendments or assignments thereof in order to evidence the first priority Liens, pledges, mortgages, and security interests granted in connection with the Exit Credit Agreement.  The guaranties, mortgages, pledges, Liens, and other security interests granted in connection with the Exit Credit Agreement are granted in good faith as an inducement to the lenders under the Exit Credit Agreement to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance and the priorities of such Liens, mortgages, pledges, and security

interests shall be as set forth in the Exit Credit Agreement and/or the collateral documents executed and delivered in connection therewith.

**5.11** **Intercompany Interests**.

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect. For the avoidance of doubt, to the extent reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date.

**5.12** **Restructuring Transactions and Restructuring Transaction Steps**.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan.

Notwithstanding anything to the contrary herein, (i) the Restructuring Transactions set forth in the Restructuring Transaction Steps shall occur on the Effective Date in the order set forth in the Restructuring Transaction Steps, including that no discharge or release of the First Lien Debt Claims or Second Lien Debt Claims shall occur until the previous Restructuring Transaction Steps have been completed and (ii) the Pointwell Intercompany Debt shall only be discharged, released, reduced, or waived, in whole or in part, to the extent and at the time set forth in the Restructuring Transaction Steps.

**5.13** **Separate Plans**.

Notwithstanding the combination herein of separate plans of reorganization for each Debtor for purposes of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

**5.14** **Closing of Chapter 11 Cases**.

Promptly after the full administration of the Chapter 11 Cases, the Reorganized Debtors shall file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided*, as of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly; *provided further* that matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed. Nothing in this Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered. Any request for *nunc pro tunc* relief shall be made

on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Bankruptcy Rule 3022-1(c).

## ARTICLE VI.        DISTRIBUTIONS.

### 6.1    Distributions Generally.

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of this Plan.

### 6.2    Postpetition Interest on Claims.

Except as otherwise provided in this Plan, the Plan Documents, or the Confirmation Order, postpetition interest shall accrue, and shall be paid, on any Claims (except for First Lien Debt Claims, Second Lien Debt Claims or any other prepetition funded indebtedness of a Debtor) in the ordinary course of business in accordance with any applicable law, agreement, document, or Final Order, as the case may be, as if the Chapter 11 Cases had never been commenced.

### 6.3    Date of Distributions.

Unless otherwise provided in this Plan, any distributions and deliveries to be made under this Plan shall be made on the Effective Date or as soon as practicable thereafter; *provided, however,* that the Reorganized Debtors may implement periodic distribution dates to the extent they determine them to be appropriate.

### 6.4    Distribution Record Date.

(a)    As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)    Notwithstanding anything in this Plan to the contrary, in connection with any Plan Distribution to be effected through the facilities of DTC or any Alternative Service (whether by means of book entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under this Plan with holders of Newco Equity to the extent consistent with the customary practices of DTC (or any Alternative Service) used in connection with such distributions.  All Newco Equity to be distributed under this Plan shall be issued in the names of such holders or their nominees in

accordance with DTC's (or, if applicable, the Alternative Service's) book entry exchange procedures to the extent that holders of Newco Equity held their Existing Equity Interests through the facilities of DTC (or such Alternative Service); *provided*, *however*, that such share of Newco Equity are permitted to be held through DTC's (or the Alternative Service's) book entry system; *provided*, *further*, *however*, that to the extent the shares of Newco Equity are not eligible for distribution in accordance with DTC's (or Alternative Service's) customary practices, Newco Parent shall take all such reasonable actions as may be required to cause the distribution of the Newco Equity under this Plan. Notwithstanding anything in this Plan to the contrary, no Person (including, for the avoidance of doubt, DTC or any Alternative Service) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, whether the initial sale and delivery Newco Equity is exempt from registration and/or eligible for DTC (or the Alternative Service) book-entry delivery, settlement, and depository services.

**6.5**     **Distributions after Effective Date**.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**6.6**     **Disbursing Agent**.

All distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records. The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.18 of this Plan.

**6.7**     **Delivery of Distributions**.

Subject to section 6.4(a) of this Plan, the Disbursing Agent will issue or cause to be issued, the applicable consideration under this Plan and, subject to Bankruptcy Rule 9010, will make all distributions to any holder of an Allowed Claim as and when required by this Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest..

All Distributions on account of Allowed DIP Claims, First Lien Debt Claims or Second Lien Debt Claims shall be made to or at the direction of the DIP Agent, First Lien Agent or the Second Lien Agent, as applicable, for further distribution to the DIP Lenders, First Lien

Lenders or the Second Lien Lenders, as applicable, in accordance with the DIP Credit Agreement, the Credit Agreements and the Plan, and shall be deemed completed when made to or at the direction of the DIP Agent, First Lien Agent or the Second Lien Agent, as applicable. As soon as practicable following any delivery of distributions to the DIP Agent, First Lien Agent or the Second Lien Agent, as applicable, on account of Allowed DIP Claims, First Lien Debt Claims or Second Lien Debt Claims, as applicable, the DIP Agent, First Lien Agent or the Second Lien Agent, as applicable, shall arrange to deliver any such distributions to the DIP Lenders, First Lien Lenders or the Second Lien Lenders, as applicable, in accordance with the DIP Credit Agreement, Credit Agreements and the Plan.  For the avoidance of doubt, none of the DIP Agent, the First Lien Agent, or the Second Lien Agent shall have any liability to any party for actions taken in accordance with this Plan or in reliance upon information provided to it in accordance with this Plan, and the Reorganized Debtors shall reimburse the DIP Agent, First Lien Agent and the Second Lien Agent for any reasonable and documented fees and expenses (including reasonable and documented fees and expenses of its counsel and agents) incurred on or after the Effective Date in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan.

**6.8**     **Unclaimed Property**.

One year from the later of:  (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

**6.9**     **Satisfaction of Claims**.

Unless otherwise provided in this Plan, any distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

**6.10**    **Manner of Payment under Plan**.

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

**6.11**    **Fractional Shares**.

No fractional shares of Newco Equity (including Newco Equity issued upon exercise of the Warrants) or fractional Warrants shall be distributed.  When any distribution would otherwise result in the issuance of a number of shares of Newco Equity (including Newco Equity issued upon exercise of the Warrants) or Warrants that is not a whole number, the Newco Equity or Warrants subject to such distribution shall be rounded to the next higher or lower

whole number as follows:  (i) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (ii) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of shares of Newco Equity (including Newco Equity issued upon exercise of the Warrants) or Warrants to be distributed on account of Allowed Claims shall be adjusted as necessary to account for the rounding provided for herein.  No consideration shall be provided in lieu of fractional shares that are rounded down.

**6.12**    **Minimum Distribution**.

Neither the Reorganized Debtors nor the Disbursing Agent, as applicable, shall have an obligation to make a distribution pursuant to this Plan that is less than one (1) share of Newco Equity, less than one (1) Warrant, or less than $100.00 in Cash.

**6.13**    **No Distribution in Excess of Amount of Allowed Claim**.

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by section 6.2 of this Plan).

**6.14**    **Allocation of Distributions Between Principal and Interest**.

Except as otherwise provided in this Plan and subject to section 6.2 of this Plan or as otherwise required by law (as determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

**6.15**    **Setoffs and Recoupments**.

Other than with respect to the Claims in Class 3 and Class 4, each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; *provided*, *however*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

**6.16**    **Rights and Powers of Disbursing Agent**.

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all applicable distributions or payments provided for under this Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including

any Final Order issued after the Effective Date) or pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**6.17    Expenses of Disbursing Agent**.

Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' fees and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

**6.18    Withholding and Reporting Requirements**.

In connection with this Plan, any Person issuing any instrument or making any distribution or payment in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (ii) pay the withholding tax using its own funds and retain such withheld property.  The distributing party shall have the right not to make a distribution under this Plan until its withholding or reporting obligation is satisfied pursuant to the preceding sentences.  Any amounts withheld pursuant to this Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

Any party entitled to receive any property as an issuance or distribution under this Plan shall, upon request, deliver to the withholding agent or such other Person designated by the Reorganized Debtors a Form W-8, Form W-9 and/or any other forms or documents, as applicable, requested by any Reorganized Debtor to reduce or eliminate any required federal, state, or local withholding.  If the party entitled to receive such property as an issuance or distribution fails to comply with any such request for a one hundred eighty (180) day period beginning on the date after the date such request is made, the amount of such issuance or distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution under this Plan shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

## ARTICLE VII.    PROCEDURES FOR RESOLVING CLAIMS.

**7.1    Disputed Claims Process**.

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in this Plan, holders of Claims need not file proofs of claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced.  Except for (i) proofs of claim asserting damages arising out of the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to section 8.3 of this Plan, (ii) in respect of non-ordinary course Administrative Expense Claims made under section 2.1 of this Plan or pursuant to the Confirmation Order and (iii) proofs of claim that have been objected to by the Debtors before the Effective Date, (x) the holders of Claims shall not be subject to any claims resolution process in the Bankruptcy Court in connection with their Claims and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties and (y) upon the Effective Date, any filed Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn.  To the extent not otherwise provided in this Plan, the deemed withdrawal of a proof of Claim is without prejudice to such claimant's rights under section 7.1 of this Plan to assert its Claims in any forum as though the Debtors' Chapter 11 Cases had not been commenced.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

**7.2    Objections to Claims**.

Except insofar as a Claim is Allowed under this Plan, the Debtors, the Reorganized Debtors, or any other party in interest shall be entitled to object to Claims.  Any objections to Claims shall be served and filed (i) on or before the ninetieth (90th) day following the later of (a) the Effective Date and (b) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or the Reorganized Debtors.

**7.3    Estimation of Claims**.

The Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of

such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

**7.4     Claim Resolution Procedures Cumulative**.

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan without further notice or Bankruptcy Court approval.

**7.5     No Distributions Pending Allowance**.

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

**7.6     Distributions after Allowance**.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

**ARTICLE VIII.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**8.1     General Treatment**.

(a)     As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all executory contracts and unexpired leases shall be deemed assumed, including the Restructuring Support Agreement, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such executory contract or unexpired lease:  (i) was assumed or rejected previously by the Debtors; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject filed on or before the Effective Date; or (iv) is identified on the Rejected Executory Contract and Unexpired Lease List.  Any executory contract or unexpired lease that is not deemed assumed on the Effective Date in accordance with this section 8.1(a) shall be deemed rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code.

(b)     Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumption and assignment, or rejections, as applicable, of such executory contracts or unexpired leases as provided for in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date.  Each Executory Contract or

Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume executory contracts or unexpired leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

**8.2**     **Determination of Assumption and Cure Disputes; Deemed Consent**.

(a)     Following the Petition Date, the Debtors shall have served a notice to parties of executory contracts and unexpired leases to be assumed stating the Debtors' intention to assume such contracts or leases in connection with this Plan and indicating that Cure Amounts (if any) they believe are payable by the Debtors or the Reorganized Debtors, as applicable, as a condition to such assumption.  Any monetary amounts by which any executory contract or unexpired lease to be assumed under this Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof.

(b)     If there is a dispute regarding (i) any Cure Amount, (ii) the ability of the Reorganized Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective.  Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Amounts, the applicable Reorganized Debtor may assume the executory contract or unexpired lease prior to the resolution of any such dispute; *provided*, *however*, that the Reorganized Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Amount by the contract counterparty; *provided*, *further*, *however*, that following entry of a Final Order resolving any such dispute, the Reorganized Debtor shall have the right to reject any executory contract or unexpired lease within thirty (30) days of such resolution, and any such rejection shall constitute rejection under the Plan.

(c)     Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption of such executory contract or unexpired lease or the proposed Cure Amount in accordance with the procedures set forth therein, shall be deemed to have assented to such assumption and Cure Amount and shall be forever barred, estopped, and enjoined from challenging the validity of such assumption thereafter.

(d)     Subject to resolution of any dispute regarding any Cure Amount, all Cure Amounts shall be satisfied by the Debtors or Reorganized Debtors, as the case may be, upon assumption of the applicable underlying contracts and unexpired leases.  Assumption of any executory contract or unexpired lease pursuant to this Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the

assumption.  Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed or assigned shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or unexpired lease.

**8.3**     **Rejection Damages Claims**.

Any counterparty to a contract or lease that is identified on the Rejected Executory Contract and Unexpired Lease List or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease.

**8.4**     **Survival of the Debtors' Indemnification Obligations**.

The Company's indemnification provisions currently in place (whether in the bylaws, certificates of incorporation (or other equivalent governing documents), or employment contracts) for current and former directors, officers, employees, managing agents, and professionals and their respective affiliates will be assumed by the Company and not modified in any way by the Restructuring through the Plan or the transactions contemplated thereby.

**8.5**     **Compensation and Benefit Plans**.

All employment policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans in effect on the Effective Date, are deemed to be, and shall be treated as, executory contracts under this Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

**8.6**     **Insurance Policies**.

(a)     All insurance policies to which any Debtor is a party as of the Effective Date, including any directors' and officers' insurance policies, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

(b)     In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

**8.7**     **Reservation of Rights**.

(a)     Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)     Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)     Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)     If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE IX.     CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE.**

**9.1**     **Conditions Precedent to Effective Date**.

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)     the Definitive Documents shall be consistent in all material respects with the Restructuring Support Agreement and otherwise approved by the parties thereto in accordance with the Definitive Document Requirements;

(b)     the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect;

(c)     the Plan Supplement has been filed;

(d)     the Bankruptcy Court has entered the Confirmation Order and such Confirmation Order has not been stayed, modified, or vacated;

(e)     the Canadian Plan Confirmation Recognition Order shall have been issued and such Canadian Plan Confirmation Recognition Order has not been stayed, modified, or vacated, and shall not be subject to an application for leave to appeal, appeal, or other review;

(f)     the conditions to the effectiveness of the Exit Credit Agreement, and all documentation related thereto, have been satisfied or waived in accordance with the terms

thereof and the Exit Credit Agreement is in full force and effect and binding on all parties thereto;

(g)     the conditions to the effectiveness of the Exit A/R Facility Agreement, and all documentation related thereto, have been satisfied or waived in accordance with the terms thereof except for the occurrence of the Effective Date.

(h)     all governmental approvals, including Bankruptcy Court approval necessary to effectuate the Restructuring shall have been obtained and all applicable waiting periods have expired;

(i)     the Professional Fee Escrow shall have been funded in full in Cash in an amount equal to the Professional Fee Reserve Amount;

(j)     all Restructuring Fees and Expenses shall have been paid in Cash;

(k)     the Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with the terms of the Plan as confirmed by the Confirmation Order and the Restructuring Support Agreement; and

(l)     all conditions to the Effective Date set forth in the Restructuring Support Agreement shall have been satisfied or waived in accordance with the terms set forth therein.

**9.2**     **<u>Waiver of Conditions Precedent</u>**.

(a)     Subject to the terms of the Restructuring Support Agreement, each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors and the Requisite Creditors without leave of or order of the Bankruptcy Court.  Subject to the terms of the Restructuring Support Agreement, if any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge this Plan in any court.

(b)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(c)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

**9.3**     **Effect of Failure of a Condition**.

If the conditions listed in <u>section 9.1</u> of this Plan are not satisfied or waived in accordance with <u>section 9.2</u> of this Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (ii) prejudice in any manner the rights of any Person, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Creditors, or any other Person.

## ARTICLE X.          EFFECT OF CONFIRMATION.

**10.1**     **Binding Effect**.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on after entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under this Plan and whether such holder has accepted this Plan.

**10.2**     **Vesting of Assets**.

Except as otherwise provided in this Plan, or any Plan Document, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with this Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests.  Subject to the terms of this Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Confirmation Date for Professional Persons' fees, disbursements, expenses, or related support services without application to or order of the Bankruptcy Court.

**10.3**     **Discharge of Claims and Interests**.

Upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise expressly provided in this Plan or in the Confirmation Order, each holder (as well as any trustee or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Except as

otherwise provided in this Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or Reorganized Debtor.

**10.4    Pre-Confirmation Injunctions and Stays**.

Unless otherwise provided in this Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**10.5    Injunction against Interference with Plan**.

Upon entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

**10.6    Plan Injunction**.

(a)    Except as otherwise provided in this Plan, in the Plan Documents, or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are permanently enjoined after the entry of the Confirmation Order from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor, (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan, and the Plan Documents, to the full extent permitted by applicable law, and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan and the Plan Documents.

(b)    By accepting distributions pursuant to this Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by this Plan, including the injunctions set forth in <u>section 10.6</u> of this Plan.

**10.7    <u>Releases</u>.**

(a)    **Releases by Debtors.  Except as otherwise expressly provided in this Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including without limitation the efforts of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring contemplated by the Restructuring Support Agreement, on and after the Effective Date, to the maximum extent permitted by applicable law, the Debtors and the Estates are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time prior to or on the Effective Date, arising from or related in any way in whole or in part to the Chapter 11 Cases, the Restructuring, the Evergreen Skills Entities, the Parent, the Company or any direct or indirect subsidiary of the Parent, the First Lien Credit Agreement, Second Lien Credit Agreement, any Credit Document (as defined in the Credit Agreements), the Existing AR Credit Agreement, the purchase, sale, or rescission of the offer, purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim against or equity interest in the Company that is treated hereunder, or the negotiation, formulation, or preparation of the Definitive Documents or related agreements, instruments, or other documents, in each case other than claims or liabilities arising out of a Released Party's own intentional fraud, gross negligence, or willful misconduct.**

(b)    **Releases by Holders of Claims or Interests.  Except as otherwise expressly provided in this Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including without limitation the efforts of the Debtors and Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring contemplated by the Restructuring Support Agreement, on and after the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time prior to or on the Effective Date, arising from or related in any way in whole or in**

44

part to the Chapter 11 Cases, the Restructuring, the Evergreen Skills Entities, the Parent, the Company or any direct or indirect subsidiary of the Parent, the First Lien Credit Agreement, Second Lien Credit Agreement, any Credit Document (as defined in the Credit Agreements), the Existing AR Credit Agreement, the purchase, sale, or rescission of the offer, purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim against or equity interest in the Company that is treated hereunder, or the negotiation, formulation, or preparation of the Definitive Documents or related agreements, instruments, or other documents, in each case other than claims or liabilities arising out of a Released Party's own intentional fraud, gross negligence, or willful misconduct.    Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any First Lien Lender, Second Lien Lender, or DIP Lender from its respective obligations to the First Lien Agent, the Second Lien Agent, or the DIP Agent (and their respective successors, agents, and servants), as the case may be, under the applicable Credit Agreements or the DIP Credit Agreement.

**10.8    Exculpation**.

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any claim or Cause of Action in connection with or arising out of the administration of the chapter 11 cases; the negotiation and pursuit of the DIP Facility, the New First Out Term Loan Facility, the New Second Out Term Loan Facility, the Exit AR Facility, the Warrants, the Incentive Plans, the Disclosure Statement, the Restructuring Supporting Agreement, the Restructuring, and the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes intentional fraud or willful misconduct as determined by a Final Order.  In all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

**10.9    Injunction Related to Releases and Exculpation**.

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or

liabilities released pursuant to this Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

**10.10**  **Subordinated Claims**.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**10.11**  **Retention of Causes of Action and Reservation of Rights**.

Except as otherwise provided in this Plan, including sections 10.6, 10.7, 10.8, and 10.9, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including any affirmative Causes of Action against parties with a relationship with the Debtors.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**10.12**  **Ipso Facto and Similar Provisions Ineffective**.

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, (iii) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation, or (iv) the Restructuring Transactions.

**ARTICLE XI.**       **RETENTION OF JURISDICTION.**

**11.1**  **Retention of Jurisdiction**.

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)     to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)     to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     to ensure that distributions to holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under this Plan;

(e)     to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, except as otherwise permitted under this Plan or the Confirmation Order;

(f)     to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)     to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing, other than the Exit Credit Facility Agreement and the Exit A/R Facility Agreement;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the

Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan;

(m)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)    to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(q)    to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE X of this Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(r)    to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory, except as otherwise permitted under this Plan or the Confirmation Order;

(s)    to recover all Assets of the Debtors and property of the Estates, wherever located; and

(t)    to enter a final decree closing each of the Chapter 11 Cases.

## ARTICLE XII.    MISCELLANEOUS PROVISIONS.

### 12.1    Exemption from Certain Transfer Taxes.

Pursuant to section 1146 of the Bankruptcy Code, (i) the issuance, transfer or exchange of any Securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under this Plan, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of Collateral under the Exit Credit Agreement, and (vi) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording

tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

**12.2    Request for Expedited Determination of Taxes**.

　　　　The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

**12.3    Dates of Actions to Implement Plan**.

　　　　In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

**12.4    Amendments**.

　　　　(a)    **Plan Modifications**. Subject to the Restructuring Support Agreement, this Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, subject to the Restructuring Support Agreement, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented; *provided*, *however*, that any such modification is acceptable to the Requisite Creditors.

　　　　(b)    **Certain Technical Amendments**. Subject to the Restructuring Support Agreement, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under this Plan.

**12.5    Revocation or Withdrawal of Plan**.

　　　　Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor (i) this Plan shall be null and

void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (iii) nothing contained in this Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (b) prejudice in any manner the rights of such Debtor or any other Person, or (c) constitute an admission of any sort by any Debtor or any other Person.

**12.6**    **Severability**.

      If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the terms of the Restructuring Support Agreement, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, subject to the terms of the Restructuring Support Agreement, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this section, is (i) valid and enforceable pursuant to its terms, (ii) integral to this Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (iii) nonseverable and mutually dependent.

**12.7**    **Governing Law**.

      Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

**12.8**    **Immediate Binding Effect**.

      Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

**12.9     Successors and Assigns**.

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

**12.10    Entire Agreement**.

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**12.11    Computing Time**.

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**12.12    Exhibits to Plan**.

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full in this Plan.

**12.13    Notices**.

All notices, requests, and demands hereunder shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)     if to the Debtors or Reorganized Debtors:

Skillsoft Corporate US Headquarters
300 Innovative Way, Suite 201
Nashua, NH 03062
Telephone: (603) 324-3000
Attn: Greg Porto

– and –

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq. and Amanda R. Steele, Esq.
Telephone: (302) 651-7700

Facsimile: (302) 651-7701

*Attorneys for Debtors*

– and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:  Gary T. Holtzer, Esq., Robert J. Lemons, Esq., and
Katherine T. Lewis, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*

(b)     if to a member of the Ad Hoc First Lien Group (in its capacity as a Consenting Creditor), or a transferee thereof, to the addresses set forth below such member's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attn: Scott J. Greenberg, Esq., Steven A. Domanowski, Esq.,
Matthew J. Williams, Esq., and Christina M. Brown, Esq.
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035

*Attorneys for Ad Hoc First Lien Group*

(c)     if to a member of the Ad Hoc Crossholder Group (in its capacity as a Consenting Creditor), or a transferee thereof, to the addresses set forth below such member's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attn: Evan Fleck, Esq., Yushan Ng, Esq., Sarah Levin, Esq., and
Benjamin Schak, Esq.
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

*Attorneys for Ad Hoc Crossholder Group*

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that in order to continue to receive documents pursuant to

Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, *however*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those entities that have filed such renewed requests.

**12.14** **Reservation of Rights**.

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated:  June 14, 2020
　　　　Wilmington, Delaware

Respectfully submitted,


/s/ *John Frederick*＿＿＿＿＿＿＿＿＿＿＿
Name: John Frederick
Title:   Chief Administrative Officer


on behalf of

Skillsoft Corporation
Amber Holding Inc.
SumTotal Systems LLC
MindLeaders, Inc.
Accero, Inc.
CyberShift Holdings, Inc.
CyberShift, Inc. (U.S.)
Pointwell Limited
SSI Investments I Limited
SSI Investments II Limited
SSI Investments III Limited
Skillsoft Limited
Skillsoft Ireland Limited
ThirdForce Group Limited
Skillsoft U.K. Limited
Skillsoft Canada, Ltd.

## **Exhibit A**

**Restructuring Support Agreement**

EXECUTION VERSION

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (collectively with the Reorganization Term Sheet (as defined below) and all other exhibits, schedules and attachments hereto and thereto, each as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of June 12, 2020, is entered into by and among:

(a)    Pointwell Limited, a private limited company incorporated in Ireland, having its registered office at 2nd Floor, 1-2 Victoria Buildings, Haddington Road, Dublin 4, D04 XN32 and registered under number 540778 (the "**Parent**"), and each entity listed on <u>Schedule 1</u> to the Reorganization Term Sheet, each such entity a subsidiary or affiliate of the Parent (each, a "**Company Party**" and, collectively with the Parent, the "**Company**" or the "**Debtors**"); and

(b)    the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain First Lien Credit Agreement dated as of April 28, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"; the term loans issued thereunder, the "**First Lien Term Loans**"; the revolving loans issued thereunder, the "**First Lien Revolving Loans**" and, together with the First Lien Term Loans, the "**First Lien Debt**") among Evergreen Skills Intermediate Lux S.à r.l., a private limited liability company, incorporated under the laws of Luxembourg, having its registered office at 8, rue Notre-Dame L-2240 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register under number B 186.054 ("**Holdings**"), Evergreen Skills Lux S.à r.l., a private limited liability company, incorporated under the laws of Luxembourg, having its registered office at 8, rue Notre-Dame, L-2240 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register under number B 185.790 (the "**Lux Borrower**"), Skillsoft Canada Ltd, a New Brunswick corporation (the "**Canadian Borrower**"), and Skillsoft Corporation (the "**U.S. Borrower**" and, collectively with the Lux Borrower and the Canadian Borrower, the "**First Lien Borrowers**"), the administrative and collateral agent party thereto (in such capacity, the "**First Lien Agent**"), the lenders party thereto from time to time (the "**First Lien Lenders**" and, the undersigned First Lien Lenders (together with their respective successors and permitted assigns) and any subsequent First Lien Lender that becomes party hereto in accordance with the terms hereof, each in its capacity as a First Lien Lender, each individually, a "**Consenting First Lien Lender**" and, collectively, the "**Consenting First Lien Lenders**"), and the other parties thereto from time to time; and

(c)    the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain Second Lien Credit Agreement, dated as of April 28, 2014, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**" and, together with the First Lien Credit Agreement, the "**Credit Agreements**"; the term loans issued under the Second Lien Credit Agreement, the "**Second Lien Debt**" and, together with the First Lien Debt, the "**Indebtedness**") among Holdings, the Lux Borrower, the U.S. Borrower (together with the Lux Borrower in their capacity borrowers under the Second Lien Credit Agreement, the "**Second Lien Borrowers**"), and the administrative and collateral agent party thereto (in such capacity, the "**Second Lien Agent**" and, together with the First Lien Agent, the "**Agents**"), the lenders party thereto from time to time (the "**Second Lien Lenders**" and, the undersigned Second Lien Lenders (together with their respective successors and permitted assigns) and any subsequent Second Lien Lender that becomes

party hereto in accordance with the terms hereof, each in its capacity as a Second Lien Lender, each individually, a "**Consenting Second Lien Lender**" and, collectively, the "**Consenting Second Lien Lenders**" and, together with the Consenting First Lien Lenders, the "**Consenting Creditors**").

The Company Parties and each Consenting Creditor, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein collectively as the "**Parties**" and each individually as a "**Party**" until the end of the Support Period applicable to it. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Restructuring Term Sheets (defined below), as applicable.

## RECITALS

**WHEREAS**, the Parties have negotiated in good faith at arm's length and agreed to enter into certain transactions in furtherance of a global restructuring of the Company's capital structure (the "**Restructuring**"), which is anticipated to be implemented through, among other things, a plan of reorganization (as may be supplemented, amended, or modified from time to time, the "**Plan**" and any supplement(s) thereto, as such may be supplemented, amended, or modified from time to time, the "**Plan Supplement**"), a corresponding disclosure statement in respect of the Plan (as may be supplemented, amended, or modified from time to time, the "**Disclosure Statement**"), a solicitation of votes thereon (the "**Solicitation**" and the materials with respect thereto, the "**Solicitation Materials**"), and the commencement by the Parent and each Company Party of a voluntary case (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, as of the date hereof, the Consenting First Lien Lenders, in the aggregate, hold, manage, or control approximately 81.2% of the aggregate outstanding principal amount of the First Lien Debt, including approximately 84.1% of the aggregate outstanding principal amount of the First Lien Term Loans and approximately 33.3% of the aggregate outstanding principal amount of the First Lien Revolving Loans;

**WHEREAS**, as of the date hereof, the Consenting Second Lien Lenders, in the aggregate, hold, manage, or control approximately 83.5% of the aggregate outstanding principal amount of the Second Lien Debt;

**WHEREAS**, the Company and certain of the Consenting First Lien Lenders (in such capacity, the "**DIP Lenders**") have reached an agreement regarding the Company's entry into the DIP Credit Agreement (defined below);

**WHEREAS**, the Restructuring contemplates pursuing a recapitalization transaction in accordance with the terms of the Reorganization Term Sheet (defined below); and

**WHEREAS**, subject to the terms and conditions set forth herein, the Parties desire to express to each other their mutual support and commitment in respect of the matters set forth in this Agreement, including the Restructuring Term Sheets;

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound on a several but not joint basis, agree as follows:

1.    **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)    "**Ad Hoc Crossholder Group**" means that certain ad hoc group of First Lien Lenders and Second Lien Lenders listed on **Exhibit A** hereto (together with their respective successors and permitted assigns) represented by Milbank LLP, which, as of the date hereof, holds, manages, or controls, in the aggregate, approximately 38.50% of the aggregate outstanding principal amount of the First Lien Debt (comprised of approximately 36.76% of the aggregate outstanding principal amount of the First Lien Term Loans and approximately 66.67% of the aggregate outstanding principal amount of the First Lien Revolving Loans) and approximately 79.07% of the aggregate outstanding principal amount of the Second Lien Debt.

(b)    "**Ad Hoc First Lien Group**" means that certain ad hoc group of First Lien Lenders and Second Lien Lenders listed on **Exhibit B** hereto (together with their respective successors and permitted assigns) represented by Gibson, Dunn & Crutcher LLP, which, as of the date hereof, holds, manages, or controls, in the aggregate, approximately 51.28% of the aggregate outstanding principal amount of the First Lien Debt (comprised of approximately 54.44% of the aggregate outstanding principal amount of the First Lien Term Loans and approximately 0.00% of the aggregate outstanding principal amount of the First Lien Revolving Loans) and approximately 6.36% of the aggregate outstanding principal amount of the Second Lien Debt.

(c)    "**Alternative Transaction**" means any new money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, winding up, assignment for the benefit of creditors, transaction, debt investment, equity investment, joint venture, partnership, sale, plan proposal, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more of the Parent, the Company Parties or a non-Debtor subsidiary of Parent or the debt, equity, or other interests in any one or more of the Parent or a subsidiary of Parent that is an alternative to the Restructuring (including any of the Restructuring Transactions), the Plan and the transactions contemplated by the Plan.

(d)    "**Board Incentive Plan**" or "**BIP**" means a post-Effective Date board of directors incentive plan, consistent in all material respects with the terms set forth on the Reorganization Term Sheet, subject to compliance with Luxembourg law, as applicable.

(e)    "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure).

(f)    "**Canadian Court**" means the Court of Queen's Bench of New Brunswick (Trial Division).

(g)    "**Canadian Final DIP Recognition Order**" means an order of the Canadian Court in the Canadian Recognition Proceeding, which recognizes and enforces the Final DIP Order in Canada.

(h)    "**Canadian Initial Recognition Order**" means an order of the Canadian Court, which, among other things, recognizes the Chapter 11 Cases as a "foreign main proceeding" under Part IV of the CCAA, commences the Canadian Recognition Proceeding and grants a stay in Canada.

(i)    "**Canadian Interim DIP Recognition Order**" means an order of the Canadian Court in the Canadian Recognition Proceeding, which, among other things, recognizes the Interim DIP Order in Canada and provides for a super priority charge over the collateral of the Canadian Borrower and collateral located in Canada of the other Company Parties in respect of the DIP Lenders' claims.  For the avoidance of doubt, the Canadian Interim DIP Recognition Order may be part of the Canadian Supplemental Order.

(j)    "**Canadian Plan Confirmation Recognition Order**" means an order of the Canadian Court in the Canadian Recognition Proceeding, which recognizes and enforces the Confirmation Order in Canada.

(k)    "**Canadian Recognition Orders**" means, collectively, the Canadian Initial Recognition Order, the Canadian Interim DIP Recognition Order, the Canadian Supplemental Order, the Canadian Final DIP Recognition Order, the Canadian Plan Confirmation Recognition Order and any other order of the Canadian Court in the Canadian Recognition Proceeding.

(l)    "**Canadian Recognition Proceeding**" means a proceeding commenced in the Canadian Court to recognize or otherwise give effect to the Chapter 11 Cases in furtherance of the Restructuring.

(m)    "**Canadian Supplemental Order"** means an order of the Canadian Court, which grants customary additional relief in the Canadian Recognition Proceeding.

(n)    "**CCAA**" means the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c. C-36, as amended.

(o)    "**Claim**", with respect to Parent or any Company Party, has the meaning set forth in section 101(5) of the Bankruptcy Code.

(p)    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases (including, if applicable, to the extent combined with an order approving the Disclosure Statement).

(q)    "**Consenting Creditor Advisors**" means Consenting Creditor Counsel, Greenhill & Co., LLC, as financial advisor to the Ad Hoc First Lien Group, Moelis & Company LLC, as financial advisor to the Ad Hoc Crossholder Group, and any other professional advisors (including non-U.S. counsel and local counsel) that may be retained from time to time by the Ad Hoc First Lien Group or the Ad Hoc Crossholder Group.

(r) "**Consenting Creditor Counsel**" means Gibson, Dunn & Crutcher LLP, as counsel to the Ad Hoc First Lien Group, and Milbank LLP, as counsel to the Ad Hoc Crossholder Group.

(s) "**Definitive Documents**" means (i) this Agreement, (ii) the Plan and the Plan Supplement, (iii) the Disclosure Statement and the Solicitation Materials, (iv) the Confirmation Order, (v) the motion seeking approval by the Bankruptcy Court of the DIP Facility, the applicable proposed DIP Orders related thereto, and the DIP Financing Documents, (vi) the New Corporate Governance Documents, (vii) any material document implementing the Restructuring, including, the Pledge Enforcement Documents, the Canadian Recognition Orders, any material motion, brief, or other pleading filed by the Company in the Chapter 11 Cases or by the Company or its "foreign representative" (or equivalent) in any recognition or ancillary proceeding; (viii) the Exit Financing Documents, (ix) the Exit AR Financing Documents, (x) the Warrant Agreements, (xi) the Incentive Plans, and (xii) any material motion or pleading seeking approval or confirmation of any of the foregoing documents, including the motion to approve the Disclosure Statement, the brief in support of confirmation, and pleadings in support of recognition in a Recognition Proceeding, and (xiii) any proposed order to approve any of the foregoing.

(t) "**DIP Credit Agreement**" means the credit agreement (including any amendments, modifications, or supplements thereto) evidencing the DIP Facility on the terms set forth in the DIP and Exit Facility Term Sheet and otherwise in form and substance reasonably acceptable to both the DIP Lenders and the Company.

(u) "**DIP Facility**" means the debtor-in-possession facility to be provided to the Company pursuant to (x) the DIP Credit Agreement and (y) the terms and conditions of the interim and final orders of the Bankruptcy Court approving the same (respectively, the "**Interim DIP Order**" and the "**Final DIP Order**" and, collectively, the "**DIP Orders**").

(v) "**DIP Financing Documents**" means the DIP Credit Agreement, together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith and the DIP Orders, in each case, in form and substance reasonably acceptable to both the DIP Lenders and the Company.

(w) "**DIP and Exit Facility Term Sheet**" means that certain term sheet (including any schedules and exhibits thereto) annexed hereto as **Exhibit C**.

(x) "**Effective Date**" means the date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective.

(y) "**Evergreen Skills Entities**" means Holdings, the Lux Borrower, Evergreen Skills Holding Lux, and Evergreen Skills Top Holding Lux.

(z) "**Existing AR Credit Agreement**" means that certain Credit Agreement (as may be further amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time), dated as of December 20, 2018, among Skillsoft Receivables

Financing LLC, a Delaware Limited Liability Company, the lenders party thereto and CIT Bank, N.A., as administrative agent, collateral agent and accounts bank ("**CIT**").

(aa)    "**Exit AR Credit Agreement**" means the credit agreement evidencing the Exit AR Facility on the terms set forth in the Reorganization Term Sheet and otherwise in form and substance reasonably acceptable to both the Requisite Creditors and the Company.

(bb)    "**Exit AR Financing Documents**" means the Exit AR Credit Agreement, as well as related agreements, in each case, in form and substance reasonably acceptable to both the Requisite Creditors and the Company.

(cc)    "**Exit Credit Agreement**" means the credit agreement (including any amendments, modifications, or supplements thereto) evidencing the Exit Credit Facility on the terms set forth in the DIP and Exit Facility Term Sheet and otherwise in form and substance reasonably acceptable to both the Requisite Creditors and the Company.

(dd)    "**Exit Credit Facility**" means the term loan facility to be provided to the Company on the Effective Date pursuant to the Exit Credit Agreement.

(ee)    "**Exit Financing Documents**" means the Exit Credit Agreement, together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith, in each case, in form and substance reasonably acceptable to both the Requisite Creditors and the Company.

(ff)    "**Governance Term Sheet**" means that certain term sheet (including any schedules and exhibits thereto) annexed hereto as **Exhibit E**.

(gg)    "**Incentive Plans**" means the Board Incentive Plan and the Management Incentive Plan.

(hh)    "**Interest**" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) of the Parent or any Company Party, including all ordinary shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments, evidencing any fixed or contingent ownership interest in the Parent or any Company Party, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Parent or any Company Party, that existed immediately before the Effective Date.

(ii)    "**Management Incentive Plan**" or "**MIP**" means a post-Effective Date management incentive plan consistent in all material respects with the terms in the Reorganization Term Sheet, subject to compliance with Luxembourg law, as applicable.

(jj)    "**New Board**" means the board of directors of Newco Parent.

(kk)    "**New Corporate Governance Documents**" means the applicable Organizational Documents and stockholders agreement (if applicable) of Newco Parent, in each

case, consistent with the Governance Term Sheet and in form and substance reasonably acceptable to both the Requisite Creditors and the Company.

(ll)　　"**Newco Borrower**" means a newly-formed entity organized under the laws of Luxembourg that will directly own 100% of the equity interests of the Reorganized Parent.

(mm)　"**Newco Equity**" means the equity interests of Newco Parent to be issued in connection with implementation of the Plan.

(nn)　　"**Newco Parent**" means a newly-formed entity organized under the laws of Luxembourg that will directly or indirectly own 100% of the equity interests of the Reorganized Parent and be treated as a corporation for tax purposes, as set forth in the Restructuring Transaction Steps.

(oo)　　"**Organizational Documents**" means, of any Person, the forms of certificates or articles of incorporation, certificates, or articles of formation, bylaws, constitutions, limited liability company agreements, or other forms of organization documents of such Person.

(pp)　　"**Person**" means any "person" as defined in section 101(41) of the Bankruptcy Code, including any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

(qq)　　"**Pledge Enforcement**" means the appointment of a receiver (the "**Receiver**") in Ireland and/or exercise of other rights and remedies by the Collateral Agent (approved by the Parent and Consenting First Lien Lenders constituting the Required Lenders under the First Lien Credit Agreement with respect to (A) the entire share capital of Parent (the "**Pointwell Share Capital**"), which has been pledged to (x) the First Lien Lenders pursuant to that certain First Lien Share Charge and Security Assignment, dated as of April 28, 2014 (the "**First Lien Share Charge**"), between the Lux Borrower and the First Lien Agent and (y) the Second Lien Lenders pursuant to that certain Second Lien Share Charge and Security Assignment, dated as of April 28, 2014 (the "**Second Lien Share Charge**"), between the Lux Borrower and the Second Lien Agent, and (B) certain intercompany obligations owed to the Lux Borrower by the Parent (the "**Pointwell Intercompany Debt**") which have been pledged to the First Lien Lenders pursuant (x) the First Lien Share Charge and (y) that certain First Lien Security Agreement, dated as of April 28, 2014, by and between Holdings, the First Lien Borrowers, certain subsidiaries of Holdings party thereto as grantors and the First Lien Agent and the Second Lien Lenders pursuant to (x) the Second Lien Share Charge and (y) that certain Second Lien Security Agreement, dated as of April 28, 2014, by and between Holdings, the Second Lien Borrowers, certain subsidiaries of Holdings party thereto as grantors and the Second Lien Agent.

(rr)　　"**Pledge Enforcement Documents**" means (i) a letter from the required number of First Lien Lenders instructing the First Lien Agent to accelerate and demand repayment of the First Lien Debt and appoint the Receiver; (ii) a letter from the First Lien Agent accelerating and demanding repayment of the First Lien Debt; (iii) the instrument of appointment for the Receiver; (iv) a sale and purchase agreement governing the sale and purchase of the Pointwell Share Capital (governed by Irish law); (v) an assignment agreement of the Pointwell Intercompany

Debt; and (vi) any ancillary documentation that may be necessary or desirable to support, facilitate, implement or otherwise give effect to the Pledge Enforcement and/or Share and Intercompany Debt Transfer, in each case in form and substance reasonably acceptable to both the Company and the Requisite Creditors.

(ss)    "**Recognition Proceeding**" means any proceeding commenced in a jurisdiction outside of the United States to recognize or otherwise give effect to the Chapter 11 Cases in furtherance of the Restructuring, including the Canadian Recognition Proceeding.

(tt)    "**Reorganized Debtors**" means the Parent and each of the Company Parties as reorganized on the Effective Date in accordance with the Plan.

(uu)    "**Reorganized Parent**" means the Parent as reorganized on the Effective Date in accordance with the Plan.

(vv)    "**Reorganization Term Sheet**" means that certain term sheet (including any schedules and exhibits thereto) annexed hereto as **Exhibit D**.

(ww)    "**Requisite Creditors**" means the Requisite First Lien Lenders and the Requisite Second Lien Lenders.

(xx)    "**Requisite First Lien Lenders**" means, as of the date of determination, Consenting First Lien Lenders holding at least a majority of the aggregate principal amount outstanding of the First Lien Debt then held by all Consenting First Lien Lenders.

(yy)    "**Requisite Second Lien Lenders**" means, as of the date of determination, Consenting Second Lien Lenders holding at least a majority of the aggregate principal amount outstanding of the Second Lien Debt then held by all Consenting Second Lien Lenders.

(zz)    "**Restructuring Term Sheets**" means, collectively, the Reorganization Term Sheet, the DIP and Exit Facility Term Sheet, the Governance Term Sheet, and the Warrant Term Sheet, as applicable.

(aaa)    "**Restructuring Transaction Steps**" means a memorandum of transaction steps (including any schedules and exhibits thereto) in form and substance reasonably acceptable to both the Company and the Requisite Creditors.

(bbb)    "**Securities Act**" means the Securities Act of 1933, as amended.

(ccc)    "**Share and Intercompany Debt Transfer**" means the sale or transfer (and any steps taken to effect such sale or transfer) and/or exercise of other rights and remedies by the First Lien Agent of or in relation to the Pointwell Share Capital and the Pointwell Intercompany Debt by the Receiver to Newco Borrower in accordance with the Pledge Enforcement Documents.

(ddd)    "**Sponsor**" means Charterhouse Capital Partners LLP and its affiliates (excluding the Company), including CCP IX LP No. 1, CCP IX LP No. 2, and CCP IX Co-Investment LP.

(eee)    "**Sponsor Side Agreement**" means an agreement evidencing the Sponsor's and the Evergreen Skills Entities' consent to the Restructuring by and among the Company, the Sponsor, the Evergreen Skills Entities, and the Consenting Creditors party thereto.

(fff)    "**Support Effective Date**" means the date on which (i) counterpart signature pages to this Agreement shall have been executed and delivered by (A) the Company and (B) Consenting Creditors (x) holding at least 66⅔% of the aggregate outstanding principal amount of the First Lien Debt and (y) holding at least 66⅔% of the aggregate outstanding principal amount of the Second Lien Debt and (ii) all invoiced and outstanding reasonable and documented fees and expenses (for which invoices have been received by the Company at least one (1) Business Day prior to the date the conditions in subsection (i) are satisfied) of each of the Consenting Creditor Advisors have been paid in full.

(ggg)    "**Support Period**" means, with respect to each Party, the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 5 hereof with respect to that Party and (ii) the Effective Date.

(hhh)    "**Voting Deadline**" means 5:00 p.m. (prevailing Eastern Time) on June 24, 2020 (or such other time as may be mutually agreed by the Company and the Requisite Creditors).

(iii)    "**Warrant Agreements**" means warrant agreements evidencing the warrants to be issued on the Effective Date on the terms set forth in the Warrant Term Sheet and otherwise in form and substance reasonably acceptable to both the Requisite Creditors and the Company.

(jjj)    "**Warrant Term Sheet**" means that certain term sheet (including any schedules and exhibits thereto) annexed hereto as **Exhibit F**.

2.    **Implementation; Plan of Reorganization; Recognition Proceedings**.

(a)    Restructuring Term Sheets.  The Restructuring Term Sheets are expressly incorporated herein and made a part of this Agreement.  The terms and conditions of the Restructuring are set forth in the Restructuring Term Sheets; *provided, however*, that the Restructuring Term Sheets are supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Restructuring Term Sheets, the terms of the applicable Restructuring Term Sheet shall govern.

(b)    Definitive Documents.  Each of the Definitive Documents shall (i) contain terms and conditions consistent in all material respects with this Agreement, the Restructuring Term Sheets, and the Restructuring Transaction Steps and (ii) otherwise (x) except with respect to the DIP Financing Documents, be in form and substance reasonably acceptable to both the Requisite Creditors and the Company, or (y) with respect to the DIP Financing Documents, be in form and substance reasonably acceptable to both the DIP Lenders and the Company.

(c)    Milestones.  The Company shall use commercially reasonable efforts to comply with each of the following milestones (each, a "**Milestone**" and, collectively,

9

the "**Milestones**"), as applicable, unless otherwise expressly and mutually agreed in writing among the Company and the Requisite Creditors:

(i)      <u>Chapter 11 Cases</u>

(A)      <u>Solicitation</u>.  At or prior to 11:59 p.m. prevailing Eastern Time on June 14, 2020, the Company shall have commenced the Solicitation in accordance with section 1126(b) of the Bankruptcy Code;

(B)      <u>Commencement of the Chapter 11 Cases</u>.  Provided that the Support Effective Date has occurred, the Company hereby agrees that, as soon as reasonably practicable, but in no event later than 11:59 p.m. prevailing Eastern Time on June 14, 2020 (the "**Outside Petition Date**") (the date on which such filing actually occurs, the "**Petition Date**"), each of the Parent and the Company Parties shall commence the Chapter 11 Cases;

(C)      <u>Filing of the Plan and Disclosure Statement</u>.  No later than one (1) Business Day following the Petition Date, the Company shall file the Plan (the votes for which shall have already been solicited), the Disclosure Statement, and a motion seeking preliminary approval of the Disclosure Statement and requesting a combined hearing for approval of the Disclosure Statement and confirmation of the Plan with the Bankruptcy Court (the "**Prepack Scheduling Order**");

(D)      <u>DIP Financing and Cash Collateral Motion</u>.  No later than one (1) Business Day following the Petition Date, the Company shall file a motion with the Bankruptcy Court seeking interim and final authority to procure the DIP Facility and consensually use cash collateral, each in accordance with the DIP Orders;

(E)      <u>Interim DIP Order; Prepack Scheduling Order</u>.  At or prior to 11:59 p.m. prevailing Eastern Time on the date that is three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order (in form and substance reasonably acceptable to the DIP Lenders and the Requisite Creditors) and the Prepack Scheduling Order (in form and substance reasonably acceptable to the Requisite Creditors);

(F)      <u>Final DIP Order</u>.  At or prior to 11:59 p.m. prevailing Eastern Time on the date that is twenty-five (25) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(G)      <u>Confirmation</u>.  At or prior to 11:59 p.m. prevailing Eastern Time on the date that is sixty (60) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order, and, if applicable, an order approving the Disclosure Statement (the date on which the Bankruptcy Court enters the Confirmation Order, the "**Confirmation Date**"); and

(H)    Effective Date.  At or prior to 11:59 p.m. prevailing Eastern Time on the date that is eighty (80) calendar days after the Petition Date (the "**Outside Date**"), the Effective Date shall have occurred.

(ii)    Canadian Recognition Proceeding.

(A)    Commencement of the Canadian Recognition Proceeding. As soon as reasonably practicable, but in any event no later than four (4) Business Days following the entry of the Interim DIP Order and Prepack Scheduling Order, the Canadian Borrower shall commence the Canadian Recognition Proceeding by filing, with the Canadian Court, a petition for the issuance of the Canadian Initial Recognition Order and Canadian Supplemental Order (which latter order shall include, for greater certainty, the Canadian Interim DIP Order), each in form and substance reasonably acceptable to the DIP Lenders and the Requisite Creditors.  The granting of the Canadian Recognition Orders shall be a condition precedent to the effectiveness of the Plan.

(B)    Canadian Final DIP Recognition Order.  As soon as reasonably practicable, but in any event no later than four (4) Business Days following the entry of the Final DIP Order, the Canadian Borrower shall file a motion for the issuance, by the Canadian Court, of the Canadian Final DIP Recognition Order in the Canadian Recognition Proceeding (in form and substance reasonably acceptable to the DIP Lenders and the Requisite Creditors).

(C)    Canadian Plan Confirmation Recognition Order.  As soon as reasonably practicable, but in any event no later than four (4) Business Days following the entry of the Confirmation Order, the Canadian Borrower shall file a motion for the issuance, by the Canadian Court of the Canadian Plan Confirmation Recognition Order (in form and substance reasonably acceptable to the DIP Lenders and the Requisite Creditors).

(d)    Pledge Enforcement.  If a Sponsor Material Breach (as defined in the Sponsor Side Agreement) has occurred or if the Sponsor Side Agreement has been terminated for any reason other than the occurrence of the Effective Date, the Consenting First Lien Lenders (constituting Required Lenders as defined under the First Lien Credit Agreement) shall promptly instruct the First Lien Agent to effectuate the Pledge Enforcement and take such other steps as may be necessary or desirable (including voting (or exercising any powers or rights available to it) in favor of any matter) to support, facilitate, implement or otherwise give effect to the Pledge Enforcement and the Share and Intercompany Debt Transfer, including entry into the Pledge Enforcement Documents.

11

3. **Agreements of the Consenting Creditors.**

(a)    Voting; Support.  Each Consenting Creditor agrees (on a several and not joint basis) that, for the duration of the Support Period applicable to such Consenting Creditor, such Consenting Creditor shall:

(i)    timely vote or cause to be voted all of its Claims and Interests, to accept the Plan by delivering or causing to be delivered by its duly authorized, executed, and completed ballot or ballots, and consent to and, if applicable, not opt out of, the releases set forth in the Plan against each Released Party on a timely basis and, in any event, within five (5) Business Days following the commencement of the Solicitation;

(ii)    not change or withdraw (or cause or direct to be changed or withdrawn) any such vote or release described in clause (i) or (ii) above; *provided, however*, that notwithstanding anything in this Agreement to the contrary, a Consenting Creditor's vote and release may, upon prior written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void ab initio) by any Consenting Creditor at any time following (and solely in the event of) the termination of this Agreement with respect to such Consenting Creditor pursuant to Section 5 hereof;

(iii)    timely vote (or cause to be voted) its Claims or Interests against and express opposition to any Alternative Transaction;

(iv)    negotiate in good faith with the Company regarding the form and substance of the Definitive Documents and, as applicable, execute the Definitive Documents; *provided, however*, that no Consenting Creditor shall be obligated to agree to any modification of any document that is materially inconsistent with the Restructuring Term Sheets (unless otherwise consented to in accordance with Section 9 hereof);

(v)    not directly or indirectly, through any Person (including any administrative agent or collateral agent) seek, solicit, propose, support, assist, engage in negotiations with or participate in the formulation, preparation, filing or prosecution of any Alternative Transaction or object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or confirmation and consummation of the Plan, any Recognition Proceeding, the Share and Intercompany Debt Transfer, the approval of and entry of the DIP Orders, or the consummation of the Restructuring;

(vi)    (A) not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and (B) if any administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, to use commercially reasonable efforts to cause such

administrative agent or collateral agent to cease, withdraw, and refrain from taking any such action; *provided* that each Consenting Creditor specifically agrees that this Agreement constitutes a direction to both Agents to refrain from exercising any remedy available or power conferred to either Agent vis-à-vis the Company or any of its assets except as set forth in this Agreement;

(vii)    support and take all actions necessary or reasonably requested by the Company to facilitate the Restructuring and the Solicitation, approval of and entry of the DIP Orders, confirmation and consummation of the Plan, any Recognition Proceeding, and the Share and Intercompany Debt Transfer within the timeframes contemplated by this Agreement; and

(viii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional, or alternative provisions to address any such impediment to the extent reasonably requested by the Company; *provided*, for the avoidance of doubt, that no such additional or alternative provisions shall modify any Consenting Creditor's economic treatment as set forth in the Restructuring Term Sheets without such Consenting Creditor's express written consent.

(b)    <u>Transfers</u>.  Each Consenting Creditor agrees that, for the duration of the Support Period applicable to such Consenting Creditor, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign, or otherwise dispose of (each, a "**Transfer**"), directly or indirectly, in whole or in part, any of its Claims or Interests or any option thereon (including grant any proxies, deposit any Claims or Interests into a voting trust, or enter into a voting agreement with respect thereto), unless the transferee thereof either (i) is a Consenting Creditor or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims or Interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is annexed hereto as **<u>Exhibit G</u>** (the "**Joinder Agreement**"), and delivering an executed copy thereof within three (3) Business Days following such execution, to Weil, Gotshal & Manges LLP ("**Weil**"), as counsel to the Company, and the Consenting Creditor Counsel, in which event (A) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder with respect to such transferred Claims or Interest and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred Claims or Interests.  Each Consenting Creditor agrees that any Transfer of any Claims or Interests that does not comply with the terms and procedures set forth herein shall be deemed void ab initio, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.  Notwithstanding anything to the contrary herein, a Consenting Creditor may Transfer its Claims or Interests to an entity that is acting in its capacity as a Qualified Marketmaker[1] without the requirement that the Qualified

---

[1] As used herein, the term "**Qualified Marketmaker**" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims against or Interests in the Company (or enter with customers into long and short positions in Claims against or Interests in the Company), in its capacity as a dealer or marketmaker in Claims against or Interests in the

Marketmaker become a Party; *provided, however*, that (i) such Qualified Marketmaker must Transfer such right, title or interest five (5) Business Days prior to the Voting Deadline and (ii) the transferee of such Company Claims or Interests from the Qualified Marketmaker shall become a Consenting Creditor hereunder and comply in all respects with the terms of this Agreement (including executing and delivering a Joinder) and (iii) notwithstanding anything to the contrary in this Agreement, to the extent that a Consenting Creditor, acting in its capacity as a Qualified Marketmaker, acquires any Company Claims or Interests from a holder of such claims that is not a Consenting Creditor, such Qualified Marketmaker may Transfer such Company Claims or Interests without the requirement that the transferee be or become a Consenting Creditor.

(c)     <u>Additional Claims or Interests</u>.  To the extent any Consenting Creditor (i) acquires additional Claims or Interests or (ii) Transfers any Claims or Interests, then, in each case, each such Consenting Creditor shall promptly (in no event less than three (3) Business Days following such acquisition or transaction) notify Weil and Consenting Creditor Counsel and each such Consenting Creditor agrees that such additional Claims or Interests shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims or Interests entitled to vote on the Plan in a manner consistent with <u>Section 3(a)</u> hereof (and in the event the Solicitation has already commenced and the Voting Deadline has not elapsed, as soon as reasonably practicable following the acquisition of such Claims or Interests but in any event on or prior to the Voting Deadline).

(d)     <u>Forbearance</u>.  During the Support Period, each Consenting Creditor agrees, to forbear from the exercise of its rights (including any right of set-off) or remedies it may have under any of the Credit Agreements and any agreement contemplated thereby or executed in connection therewith, as applicable, and under applicable U.S. or non-U.S. law or otherwise, in each case, with respect to any breaches, defaults, events of defaults or potential defaults by the Company or any other Credit Party (as defined in the Credit Agreements).  Each Consenting Creditor specifically agrees that this Agreement constitutes a direction to both Agents to refrain from exercising any remedy available or power conferred to either Agent against the Company or any of its assets except as necessary to effectuate the Restructuring (including the Plan, any Recognition Proceeding, the Pledge Enforcement or the Share and Intercompany Debt Transfer). For the avoidance of doubt, nothing in this paragraph (d) shall restrict or limit the Consenting Creditors or either the First Lien Agent or the Second Lien Agent from taking any action permitted or required to be taken hereunder for the purposes of the Plan, any Recognition Proceeding, the Pledge Enforcement (if applicable), or to effectuate the Share and Intercompany Debt Transfer.

4.     **Agreements of the Company.**

(a)     <u>Covenants</u>.  Parent and each Company Party agrees that, for the duration of the Support Period, the Company shall:

(i)     use commercially reasonable efforts to (A) pursue and consummate the Restructuring on the terms of, and in compliance with the Milestones set forth in, this Agreement, including by negotiating the Definitive Documents in good faith

---

Company and (ii) is, in fact, regularly in the business of making a market in claims against or interests in issuers or borrowers (including debt securities or other debt).

and (B) cooperate with the Consenting Creditors to obtain Bankruptcy Court approval of the Definitive Documents, as applicable, and to obtain any other required court or regulatory approvals in connection therewith;

(ii)    not take any action, and not encourage any other person or entity to take any action, directly or indirectly that is inconsistent with, or is intended to interfere with the consummation of the Restructuring in accordance with this Agreement, or that would reasonably be expected to interfere with the acceptance or implementation of the Restructuring, this Agreement, or the Plan (except in accordance with clause (vii) below); *provided, however*, that the Company shall not be obligated to agree to any modification of any document that is inconsistent with the Restructuring Term Sheets or the Definitive Documents;

(iii)    negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative agreements to address any legal, financial, or structural impediment to the Restructuring or that are necessary to effectuate the Restructuring;

(iv)    use commercially reasonable efforts to obtain those required court, regulatory, and/or third-party approvals required to consummate the Restructuring under applicable U.S. and non-U.S. law or otherwise;

(v)    use commercially reasonable efforts to seek additional support for the Restructuring from other material stakeholders to the extent reasonably prudent;

(vi)    not seek, solicit, or support any Alternative Transaction; *provided that*, if the Company receives a written or oral proposal or expression of interest regarding any Alternative Transaction, the Company shall notify (email being sufficient) Consenting Creditor Counsel of any such proposal or expression of interest, including the material terms thereof. For the avoidance of doubt, and notwithstanding any provisions to the contrary herein, in order to fulfil the fiduciary obligations of the officers of the Parent or any Company Party, the Company may receive proposals or offers for Alternative Transactions from other parties and provide due diligence and/or analyse and/or, subject to the Requisite Creditors' consent (which consent shall not be unreasonably withheld, conditioned, or delayed), negotiate, such Alternative Transactions without breaching or terminating this Agreement, and may terminate this Agreement in accordance with the terms hereof;

(vii)    provide to the Consenting Creditor Counsel draft copies of all Definitive Documents and all material orders, motions or applications related to the Restructuring (including all "first day" and "second day" motions, applications and orders, the Plan, the Disclosure Statement, the Solicitation Materials, and a proposed Confirmation Order) that the Company intends to file with the Bankruptcy Court, in a Recognition Proceeding, or in connection with the Pledge Enforcement at least three (3) Business Days prior to the date when the Company intends to file any such document, motion, application, or proposed form of order

(provided that if delivery of such documents, motions, orders, or applications at least three (3) Business Days in advance is not reasonably practicable prior to filing, such document, motion, order, or application shall be delivered as soon as reasonably practicable prior to filing), and the Company shall consult in good faith with the Consenting Creditor Counsel regarding the form and substance of any such proposed filings;

(viii)   subject to applicable professional responsibilities, in connection with the Chapter 11 Cases, any Recognition Proceeding, and the Pledge Enforcement, timely file a written objection to any motion or document filed by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, (D) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, (E) enjoining the Pledge Enforcement (if applicable) or the Share and Intercompany Debt Transfer, (F) denying recognition of the Chapter 11 Cases as a "foreign main proceeding" or opposing the recognition of any order issued by the Bankruptcy Court, including the DIP Orders and the Confirmation Order, or (G) dismissing any Recognition Proceeding;

(ix)   not modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects, and not file any motion, pleading, or Definitive Document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement;

(x)   operate its business in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (A) resulting from or relating to this Agreement or the filing or prosecution of the Chapter 11 Cases or (B) imposed by the Bankruptcy Court;

(xi)   promptly provide written notice to the Consenting Creditors and the Consenting Creditor Advisors of (A) the occurrence, or failure to occur, of any event of which the Company has actual knowledge which occurrence or failure would be likely to cause any condition contained in this Agreement not to occur or become impossible to satisfy, (B) the receipt of any written notice from any governmental authority alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, or (C) receipt of any written notice of any proceeding commenced or, to the actual knowledge of the Company, threatened against the Company relating to or involving or otherwise affecting in any material respect the transactions contemplated by this Agreement or the Restructuring; and

(xii)   not (A) increase the base salary, target bonus opportunity, or other benefits payable by the Company to any senior management employee without the consent of the Requisite Creditors or (B) make any amendment, waiver, supplement

16

or other modification to any senior management employment agreement or senior management employee retention, severance, incentive, or other compensation plan, agreement or arrangement, or enter into any new senior management employment agreement or senior management employee retention, severance, incentive or other compensation plan, agreement or arrangement or pay any amount contemplated by any currently existing senior management employment agreement or senior management employee retention, severance, incentive or other compensation plan, agreement or arrangement before the date on which such amount becomes due and payable pursuant to the terms of such agreements, arrangements or plans, as applicable, in each case, without the consent of the Requisite Creditors.

(b)     Limited Waiver of Automatic Stay.  The Company acknowledges and agrees and shall not dispute that, after the commencement of the Chapter 11 Cases, the giving of notice of termination of this Agreement by any Party solely in accordance with the terms of this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code or any other stay (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay or any other stay to the giving of such notice); *provided, however*, that nothing herein shall prejudice any Party's rights to argue that the giving of any notice of default or termination was not proper under the terms of this Agreement.

## 5.     **Termination of Agreement.**

(a)     This Agreement shall terminate three (3) Business Days following the delivery of written notice (in accordance with Section 20 hereof) from: (i) the Requisite First Lien Lenders to Parent and counsel to the Ad Hoc Crossholder Group at any time after the occurrence and during the continuance of any Creditor Termination Event (defined below); (ii) the Requisite Second Lien Lenders to Parent and counsel to the Ad Hoc First Lien Group at any time after the occurrence and during the continuance of any Creditor Termination Event; or (iii) Parent to the Consenting Creditors at any time after the occurrence and during the continuance of any Company Termination Event (defined below).  Notwithstanding any provision to the contrary in this Section 5, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions in breach of this Agreement), with such failure to perform or comply causing, or resulting in, the occurrence of a Creditor Termination Event or Company Termination Event specified herein.  This Agreement shall terminate on the Effective Date without any further required action or notice.

(b)     A "Creditor Termination Event" shall mean any of the following:

(i)     the breach by the Company of any of the undertakings, representations, warranties, or covenants of the Company set forth herein in any material respect that remains uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Section 5 and in accordance with Section 20 (as applicable);

17

(ii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or prohibiting the Debtors from implementing the Plan, the Pledge Enforcement (if applicable), the Share and Intercompany Debt Transfer, any Recognition Proceeding, or the Restructuring, and such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) days after such issuance;

(iii)    the failure of the Company to satisfy any Milestone as and when due;

(iv)     the Bankruptcy Court or any other court of competent jurisdiction enters an order (A) directing the appointment of a trustee, receiver or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(v)      the Canadian Court enters an order (A) dismissing the Canadian Recognition Proceeding, (B) denying recognition of the Chapter 11 Cases as a "foreign main proceeding" or (C) denying recognition of any order issued by the Bankruptcy Court, including the DIP Orders or the Confirmation Order;

(vi)     the Bankruptcy Court or any other court of competent jurisdiction enters a final order that grants relief terminating, annulling, or materially modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) or any other stay with regard to any material asset that, to the extent such relief were granted, would have a material adverse effect on the consummation of the Restructuring;

(vii)    the Debtors withdraw the Plan or file any plan of reorganization or liquidation or disclosure statement that is inconsistent in any material respect with this Agreement, the Restructuring Term Sheets, or the Plan;

(viii)   the Company files any document, motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Consenting Creditors' Claims;

(ix)     termination of the DIP Facility and the acceleration of any amounts outstanding thereunder in accordance with the terms of the DIP Financing Documents;

(x)      the Company files a document, motion, application, or adversary proceeding (or the Company supports any such document, motion, application, or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, perfection, or priority of, or seeking the avoidance or subordination of, any portion of the Indebtedness or asserting any other cause of action against the Consenting Creditors or with respect or relating to such

18

Indebtedness, the Credit Agreements or any Credit Document (as such term is defined in the Credit Agreements) or the prepetition liens securing the Indebtedness or (B) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Indebtedness or asserting any other cause of action against the Consenting Creditors or with respect or relating to such Indebtedness or the prepetition liens securing the Indebtedness;

(xi)    the Debtors lose the exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(xii)    the commencement of an involuntary case against the Company or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of the Company, or its debts, or of a substantial part of its assets, under any federal, state, provincial, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect (provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof), or if any court grants the relief sought in such involuntary proceeding; or

(xiii)    without the prior consent of the Requisite Creditors, the Company (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state, provincial, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except as contemplated by this Agreement (other than an application for examinership in Ireland for the purpose of implementing the Restructuring, if ultimately determined necessary), (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) files an answer admitting the material allegations of a petition filed against it in any such proceeding; or (D) applies for or consents to the appointment of a receiver (other than in furtherance of the Pledge Enforcement and the Share and Intercompany Debt Transfer), administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official, trustee or examiner pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, (E) makes a general assignment or arrangement for the benefit of creditors, or (F) takes any corporate action directly or indirectly authorizing any of the foregoing.

(c)    A "Company Termination Event" shall mean any of the following:

(i)    the breach by one or more of the Consenting Creditors of any of the undertakings, representations, warranties, or covenants of the Consenting Creditors set forth herein in any material respect that remains uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Section 5 and in accordance with Section 20 hereof (as applicable), but only if the non-breaching Consenting Creditors collectively hold less than 66⅔% of the

aggregate principal amount of each of the First Lien Debt and the Second Lien Debt then outstanding or comprise less than half in number of each of the First Lien Lenders and the Second Lien Lenders;

(ii)    the board of directors, managers, members, or partners, as applicable, of Parent or any Company Party hereto reasonably determines in good faith, based upon the advice of counsel, that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided, however*, that Parent or such Company Party provides notice of such determination to the Consenting Creditors within five (5) Business Days after the date thereof;

(iii)    if, as of 11:59 p.m. prevailing Eastern Time on June 13, 2020, the Support Effective Date has not occurred;

(iv)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or prohibiting the Debtors from implementing the Plan, the Pledge Enforcement (if applicable), the Share and Intercompany Debt Transfer, any Recognition Proceeding, or the Restructuring, and such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) days after such issuance;

(v)    termination of the DIP Facility and the acceleration of any amounts outstanding thereunder in accordance with the terms of the DIP Credit Agreement;

(vi)    if counsel to the Ad Hoc First Lien Group and/or counsel to the Ad Hoc Second Lien Group give notice of termination of this Agreement pursuant to this Section 5;

(vii)    the Bankruptcy Court or any other court of competent jurisdiction enters an order (A) directing the appointment of a trustee, receiver or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases (other than an application for examinership in Ireland for the purpose of implementing the Restructuring, if ultimately determined necessary), (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(viii)    the Canadian Court enters an order (A) dismissing the Canadian Recognition Proceeding, (B) denying recognition of the Chapter 11 Cases as "foreign main proceedings" or (C) denying recognition of any order issued by the Bankruptcy Court, including the DIP Orders or the Confirmation Order; or

(ix)    the occurrence of the Outside Date if the Effective Date has not occurred.

Notwithstanding the foregoing, any of the dates or deadlines set forth in Section 5(b) and 5(c) may be extended by the mutual agreement of the Company and the Requisite Creditors.

In addition, notwithstanding anything set forth herein, the Requisite First Lien Lenders (determined without including the holdings of any breaching Party in the numerator or the denominator), on behalf of the Consenting First Lien Lenders, may terminate this Agreement upon the breach by any Consenting Second Lien Lender of any of the undertakings, representations, warranties, or covenants of the Consenting Second Lien Lenders set forth herein in any material respect that remain uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Section 5 and in accordance with Section 20 hereof (as applicable), but only if the non-breaching Consenting Second Lien Lenders collectively hold less than 66⅔% of the aggregate principal amount of the Second Lien Debt then outstanding or comprise less than half in number of the Second Lien Lenders; and *provided further* that the Requisite Second Lien Lenders (determined without including the holdings of any breaching Party in the numerator or the denominator), on behalf of the Consenting Second Lien Lenders, may terminate this Agreement upon the breach by any Consenting First Lien Lender of any of the undertakings, representations, warranties, or covenants of the Consenting First Lien Lenders set forth herein in any material respect that remain uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Section 5 and in accordance with Section 20 hereof (as applicable), but only if the non-breaching Consenting First Lien Lenders collectively hold less than 66⅔% of the aggregate principal amount of the First Lien Debt then outstanding or comprise less than half in number of the First Lien Lenders.

(d)    Mutual Termination.    This Agreement may be terminated by mutual agreement of the Company and the Requisite Creditors upon the receipt of written notice delivered in accordance with Section 20 hereof.

(e)    Effect of Termination.    Subject to the provisions contained in Section 5(a) and Section 13, upon the termination of this Agreement in accordance with this Section 5, this Agreement shall forthwith become null and void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; *provided, however*, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of any of its obligations hereunder prior to the date of such termination.

(f)    If the Restructuring is not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights.  This Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the Agreement's terms, and, if applicable, Federal Rule of Evidence 408 and any other applicable rules shall apply.

6.    **Definitive Documents; Good Faith Cooperation; Further Assurances.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation, and consummation of, the Plan, any Recognition Proceeding, the Pledge Enforcement, the Share and Intercompany Debt Transfer, and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall (i) take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and (ii) refrain from taking any action that would frustrate the purposes and intent of this Agreement.

7.    **Representations and Warranties.**

(a)    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases, the commencement of any Recognition Proceeding, and the consummation of the Pledge Enforcement and Share and Intercompany Debt Transfer;

(iii)    the execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other

22

similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Creditor severally (and not jointly) represents and warrants to the other Parties that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is, or subject to clearance of trades pending as of (or immediately prior to) the date of such Consenting Creditor becoming party to this Agreement, was or will be the owner of the aggregate principal amount of Indebtedness and/or Interests set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof), free and clear of any restrictions on transfer, liens or options, warrants, purchase rights, contracts, commitments, claims, demands, and other encumbrances and does not own any other Claims or Interests (other than pursuant to any trades pending as of (or immediately prior to) the date of such Consenting Creditor becoming party to this Agreement), and/or (ii) has, with respect to the beneficial owners of such Claims or Interests, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Claims or Interests to exchange, assign, and transfer such Claims or Interests, and (C) full power and authority to bind or act on the behalf of, such beneficial owners; *provided that* to the extent there are any discrepancies between the amounts set forth on a signature page hereto (or on a signature page to a Joinder Agreement) and the amounts set forth on the official registers maintained by the Agents, such Consenting Creditor and the Company shall work together in good faith to resolve such discrepancies with the Agents and to update, if necessary, the amounts set forth on the underlying signature page at issue.

8.    **Disclosure; Publicity.**

The Company shall submit drafts to Consenting Creditor Counsel of any press releases regarding the Restructuring at least one (1) Business Day prior to making any such disclosure.  Except as required by applicable law, rule, or regulation and notwithstanding any provision of any other agreement between the Company and such Consenting Creditor to the contrary, no Party or its advisors shall disclose to any Person (including, for the avoidance of doubt, any other Consenting Creditor), other than advisors to the Company and the Consenting Creditor Counsel, the principal amount or percentage of any Indebtedness of or Claims against the Company held by any Consenting Creditor without such Consenting Creditor's prior written consent; *provided, however*, that (a) if such disclosure is required by law, rule, or regulation, the disclosing Party shall, to the extent permitted by law, afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take commercially reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Indebtedness collectively held by the Consenting Creditors.  Notwithstanding the provisions in this Section 8, any Party may disclose, to the extent consented to in writing by a Consenting Creditor, such Consenting Creditor's individual holdings.

9.    **Amendments and Waivers.**

(a)    Other than as set forth in <u>Section 9(b)</u>, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except with the written consent of the Company and the Requisite Creditors (with an email from counsel to the Company, counsel to the Ad Hoc First Lien Group (on behalf of the Requisite First Lien Lenders), and counsel to the Ad Hoc Crossholder Group (on behalf of the Requisite Second Lien Lenders) being sufficient with respect to each such Party).

(b)    Notwithstanding <u>Section 9(a)</u>:

(i)    any waiver, modification, amendment, or supplement to this <u>Section 9</u> shall require the written consent of all of the Parties;

(ii)    any modification, amendment, or change to the definition of "Requisite Creditors" shall require the written consent of each Consenting Creditor and the Parent;

(iii)    any modification, amendment, or change to the definition of "Requisite First Lien Creditors" shall require the written consent of each Consenting First Lien Creditor and the Parent;

(iv)    any modification, amendment, or change to the definition of "Requisite Second Lien Creditors" shall require the written consent of each Consenting Second Lien Creditor and the Parent;

(v)    any change, modification, or amendment to this Agreement, any of the Restructuring Term Sheets, or any of the Definitive Documents that contemplates a sale of the shares in the Parent, all or substantially all of the assets of the Company or a significant business line of the Company shall require the written consent of each Consenting Creditor; and

(vi)    any change, modification, or amendment to this Agreement, any of the Restructuring Term Sheets, or any of the Definitive Documents that treats or affects any Consenting Creditor's Claims arising under the Indebtedness in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which (A) if such Consenting Creditor is a Consenting First Lien Lender, the Consenting First Lien Lenders or (B) if such Consenting Creditor is a Consenting Second Lien Lender, the Consenting Second Lien Lenders, are treated (after taking into account each of the Consenting First Lien Lenders' and Consenting Second Lien Lenders', as applicable, respective holdings in the Company and the recoveries contemplated by the Reorganization Term Sheet (as in effect as of the Support Effective Date)) shall require the written consent of such materially adversely and disproportionately affected Consenting Creditor.

(c)    In the event that (x) a Consenting Creditor referred to in Section 9(b)(v) or (y) a materially adversely and disproportionately affected Consenting Creditor referred to in

Section 9(b)(vi) (in each case, a "**Non-Consenting Creditor**") does not consent to a waiver, change, modification, or amendment to this Agreement requiring the consent of such Consenting Creditor, but such waiver, change, modification, or amendment receives the consent of Consenting Creditors owning at least 66⅔% of the outstanding principal amount of First Lien Debt or Second Lien Debt (whichever held by such Non-Consenting Creditor), this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditor, but this Agreement shall continue in full force and effect in respect to all other Consenting Creditors from time to time without the consent of any Consenting Creditors who have so consented.

10. **Effectiveness.**

This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the Support Effective Date; *provided, however*, that signature pages executed by Consenting Creditors shall be delivered to (i) other Consenting Creditors in a redacted form that removes such Consenting Creditors' account and/or fund name(s), holdings of Claims (including Indebtedness), and holdings of Interests and (ii) the Company, Weil, and Consenting Creditor Counsel in an unredacted form (to be held by Weil and Consenting Creditor Counsel on a professionals'-eyes-only basis).

11. **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

(a) This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

(b) Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any Party shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York (the "**New York Courts**") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring. Each of the Parties agrees not to commence any proceeding relating to this Agreement or the Restructuring except in the New York Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any New York Court. Each of the Parties further agrees that notice as provided in Section 20 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the New York Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 11(b) shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

12.    **Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including reasonable attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

13.    **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, the agreements and obligations of the Parties in this Section 13 and Sections 5(e), 5(f), 8, 11, 12, 14, 15, 16, 17, 18, 19, 20, and 21 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided, however*, that any liability of a Party for breach of the terms of this Agreement shall survive such termination.

14.    **Headings.**

The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

15.    **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns; *provided, however*, that nothing contained in this Section 15 shall be deemed to permit Transfers of the Claims or Interests other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in

whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations, and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

16. **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties (and their permitted successors and assigns) and no other Person shall be a third-party beneficiary hereof.

17. **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (including the Restructuring Term Sheets), constitutes the entire agreement of the Parties and supersedes all other prior negotiations with respect to the subject matter hereof and thereof.

18. **Confidential Information.**

Any obligations the Company may have under or in connection with this Agreement to furnish Confidential Information to a Consenting Creditor shall be subject to such Consenting Creditor executing a confidentiality agreement with the Company in form and substance reasonably acceptable to the Company.

19. **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

20. **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses:

(1)   If to the Company, to:

Pointwell Limited
2nd Floor 1-2 Victoria Buildings
Haddington Road, Dublin 4, Ireland D04XN32
Attention:   Greg Porto
(Greg.Porto@skillsoft.com)

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:    Gary Holtzer, Esq.
                (Gary.Holtzer@weil.com)
                Andrew Wilkinson, Esq.
                (Andrew.Wilkinson@weil.com)
                Robert Lemons, Esq.
                (robert.lemons@weil.com)
                Katherine T. Lewis, Esq.
                (katherine.lewis@weil.com)

(2)      If to a member of the Ad Hoc First Lien Group (in its capacity as a Consenting Creditor), or a transferee thereof, to the addresses set forth below such member's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Gibson Dunn & Crutcher LLP
1285 6th Avenue
New York, NY 10019

Attention:    Scott J. Greenberg, Esq.
                (sgreenberg@gibsondunn.com)
                Steven A. Domanowski, Esq.
                (sdomanowski@gibsondunn.com)
                Matthew J. Williams, Esq.
                (mjwilliams@gibsondunn.com)
                Christina M. Brown, Esq.
                (christina.brown@gibsondunn.com)

WEIL:\97465673\22\74473.0003

(3)    If to a member of the Ad Hoc Crossholder Group (in its capacity as a Consenting Creditor), or a transferee thereof, to the addresses set forth below such member's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Milbank LLP
55 Hudson Yards
New York, NY 10001

Attention:    Evan Fleck
(efleck@milbank.com)
Yushan Ng
(yng@milbank.com)
Sarah Levin
(slevin@milbank.com)
Benjamin Schak
(bschak@milbank.com)

Any notice, consent, or authorization under this Agreement may be delivered by electronic mail (with an email from counsel to the Company, counsel to the Ad Hoc First Lien Group (on behalf of the Requisite First Lien Lenders), and counsel to the Ad Hoc Crossholder Group (on behalf of the Requisite Second Lien Lenders) being sufficient with respect to each such Party). Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission.

21.    **No Solicitation; Representation by Counsel; Adequate Information.**

(a)    This Agreement is not and shall not be deemed to be a solicitation of an offer to buy securities or a solicitation for votes in favor of the Plan in the Chapter 11 Cases. The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditor has received the Disclosure Statement and, as applicable, related ballots and other Solicitation Materials. In addition, this Agreement does not constitute an offer to issue or sell securities to any Person or the solicitation of an offer to acquire or buy securities in any jurisdiction where such offer or solicitation would be unlawful.

(b)    Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law, or order, or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)    Each Consenting Creditor acknowledges, agrees, and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501 of Regulation D of the Securities Act, (ii) is a "qualified institutional buyer" as such term is defined in Rule 144A under the Securities Act or an institutional "Accredited Investor" as defined in Rule 501(a)(1), (2),

(3), (7), or (8) under the Securities Act, (iii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring, such securities have not been and will not be registered under the Securities Act and that such securities are, to the extent not offered, solicited, or acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor, as applicable, is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

22.    **Miscellaneous.**

When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," (iv) the word "or" shall not be exclusive and shall be read to mean "and/or" and (v) unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if".

[Signature Pages Follow]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

PARENT:

**POINTWELL LIMITED**

By: _____

Name:     Ronald Hovsepian

Title:     Director

COMPANY PARTIES:

**SSI INVESTMENTS I LIMITED**

By: _____
Name:    Bobby Jenkins
Title:    Director

**SSI INVESTMENTS II LIMITED**

By: _____
Name:    Bobby Jenkins
Title:    Director

**SSI INVESTMENTS III LIMITED**

By: _____
Name:    Bobby Jenkins
Title:    Director

**SKILLSOFT LIMITED**

By: _____
Name:    Bobby Jenkins
Title:    Director

**SKILLSOFT IRELAND LIMITED**

By: _____
Name:    Bobby Jenkins
Title:    Director

*[Signature Page to Restructuring Support Agreement]*

**THIRDFORCE GROUP LIMITED**

By: _____

    Name:   Bobby Jenkins
    Title:    Director

**MINDLEADERS IRELAND LEARNING
LIMITED**

By: _____

    Name:   Bobby Jenkins
    Title:    Director

**MINDLEADERS, INC.**

By: _____
    Name:   Bobby Jenkins
    Title:    Director


**SKILLSOFT CORPORATION**

By: _____
    Name:   John Frederick
    Title:    Director


**AMBER HOLDING INC.**

By: _____
    Name:   Greg Porto
    Title:    Director


**SUMTOTAL SYSTEMS LLC**
by Amber Holding Inc., its sole member

By: _____
    Name:   Greg Porto
    Title:    Director


**ACCERO, INC.**

By: _____
    Name:   Greg Porto
    Title:    Director


[*Signature Page to Restructuring Support Agreement*]

**MINDLEADERS, INC.**

By: _____

Name: Bobby Jenkins
Title: Director


**SKILLSOFT CORPORATION**

By: _____

Name: John Frederick
Title: Director


**AMBER HOLDING INC.**

By: _____

Name: Greg Porto
Title: Director


**SUMTOTAL SYSTEMS LLC**
by Amber Holding Inc., its sole member

By: _____

Name: Greg Porto
Title: Director


**ACCERO, INC.**

By: _____

Name: Greg Porto
Title: Director


*[Signature Page to Restructuring Support Agreement]*

**MINDLEADERS, INC.**

By: _____

    Name:   Bobby Jenkins
    Title:    Director


**SKILLSOFT CORPORATION**

By: _____

    Name:   John Frederick
    Title:    Director


**AMBER HOLDING INC.**

By: _____

    Name:   Greg Porto
    Title:    Director


**SUMTOTAL SYSTEMS LLC**
by Amber Holding Inc., its sole member

By: _____

    Name:   Greg Porto
    Title:    Director


**ACCERO, INC.**

By: _____

    Name:   Greg Porto
    Title:    Director


[*Signature Page to Restructuring Support Agreement*]

**CYBERSHIFT HOLDINGS, INC.**

By: _____

Name:   Greg Porto
Title:    Director


**CYBERSHIFT, INC.**

By: _____

Name:   Greg Porto
Title:    Director

**SKILLSOFT U.K. LIMITED**

By: _____

Name:    Bobby Jenkins
Title:    Director

**SKILLSOFT CANADA, LTD.**

By: _____

Name:    Bobb Jenkins

Title:     Director

**CONSENTING CREDITOR**

By: _____

Name: <u>Patrick Hutchines   Jens Hoellermann</u>

Title: _____<u>Managers</u>_____

Principal Amount of the First Lien Term Loans: ██████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____

<u>Notice Address</u>: 160 Queen Victoria street, London EC4V 4LA

Fax:
Attention: Amos Ouattara and Christopher Schubert
Email: <u>amos.ouattara@alcentra.com</u> / <u>Christopher.schubert@alcentra.com</u>

**CONSENTING CREDITOR**

By: _____

Name:  Chris Barris
       _____

Title:  Portfolio Manager
       _____

Principal Amount of the First Lien Term Loans:  ██████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:
200 Park Avenue, New York, NY 10166, US

and

160 Queen Victoria Street, London EC4V 4LA, UK


Fax:
Attention: Chris Barris, Amos Ouattara and Christopher Schubert
Email: chris.barris@alcentra.com / amos.ouattara@alcentra.com /
christopher.schubert@alcentra.com

**CONSENTING CREDITOR**

By: _____

Name: Patrick Hutchines   Jens Hoellermann

Title: Managers

Principal Amount of the First Lien Term Loans: ▮▮▮▮

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address: 160 Queen Victoria street, London EC4V 4LA

Fax:
Attention: Amos Ouattara and Christopher Schubert
Email: amos.ouattara@alcentra.com / Christopher.schubert@alcentra.com

**CONSENTING CREDITOR**

By:

Name:    Chris Barris

Title:    Portfolio Manager

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____

Notice Address:
200 Park Avenue, New York, NY 10166, US

and

160 Queen Victoria Street, London EC4V 4LA, UK

Fax:
Attention: Chris Barris, Amos Ouattara and Christopher Schubert
Email: chris.barris@alcentra.com / amos.ouattara@alcentra.com /
christopher.schubert@alcentra.com

**CONSENTING CREDITOR**

By: _____

Name: Chris Barris

Title: Portfolio Manager

Principal Amount of the First Lien Term Loans: ████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

Notice Address:
200 Park Avenue, New York, NY 10166, US

and

160 Queen Victoria Street, London EC4V 4LA, UK

Fax:
Attention: Chris Barris, Amos Ouattara and Christopher Schubert
Email: chris.barris@alcentra.com / amos.ouattara@alcentra.com / christopher.schubert@alcentra.com

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

By:

Name:    Chris Barris

Title:    Portfolio Manager

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
200 Park Avenue, New York, NY 10166, US

and

160 Queen Victoria Street, London EC4V 4LA, UK

Fax:
Attention: Chris Barris, Amos Ouattara and Christopher Schubert
Email: chris.barris@alcentra.com / amos.ouattara@alcentra.com /
christopher.schubert@alcentra.com

**CONSENTING CREDITOR**

By: _____

Name:  Chris Barris

Title:  Portfolio Manager

Principal Amount of the First Lien Term Loans:  ▮▮▮▮▮▮

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____

Notice Address:
200 Park Avenue, New York, NY 10166, US

and

160 Queen Victoria Street, London EC4V 4LA, UK

Fax:
Attention: Chris Barris, Amos Ouattara and Christopher Schubert
Email: chris.barris@alcentra.com / amos.ouattara@alcentra.com /
christopher.schubert@alcentra.com

**CONSENTING CREDITOR**

By: *Eric Larsson*
(for Alcentra Limited as investment manager)

Name:  Eric Larsson

Title:  Managing Director

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address: Alcentra Limited, 160 Queen Victoria Street, London EC4V 4LA

Fax: _____
Attention: Amos Ouattara / Christopher Schubert___
Email: amos.ouattara@alcentra.com / Christopher.schubert@alcentra.com

**CONSENTING CREDITOR**

By: Apollo Credit Management (CLO), LLC,
     its collateral manager

By: _____

Name:    Joseph D. Glatt

Title:    Vice President


Principal Amount of the First Lien Term Loans: ███████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

███████████████

By: Apollo Credit Management (CLO), LLC,
       its collateral manager

By:     _____

Name:     Joseph D. Glatt

Title:     Vice President

Principal Amount of the First Lien Term Loans:    ███████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:    $_____

Interests (please describe):  _____

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

**CONSENTING CREDITOR**

██████████████

By: Apollo Credit Management (CLO), LLC,
      its collateral manager

By:    _____

Name:    Joseph D. Glatt

Title:    Vice President

Principal Amount of the First Lien Term Loans:    ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

**CONSENTING CREDITOR**

███████████████████

By: Apollo Credit Management (CLO), LLC,
     its collateral manager

By: _____

Name:   Joseph D. Glatt_____

Title:    Vice President_____


Principal Amount of the First Lien Term Loans: ████████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____



<u>Notice Address</u>:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

████████████████████████████

By: Apollo Credit Management, LLC,
       its investment manager

By:      _____

Name:      Joseph D. Glatt_____

Title:      Vice President_____


Principal Amount of the First Lien Term Loans:   ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:   ████████

Interests (please describe): _____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

By: Apollo ST Fund Management LLC,
      its investment manager

By: _____

Name: _____Joseph D. Glatt_____

Title: _____Vice President_____


Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

████████████████████████

By: Apollo ST Fund Management LLC,
      its collateral manager

By:      _____

Name:      Joseph D. Glatt_____

Title:      Vice President_____


Principal Amount of the First Lien Term Loans:   ██████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:   $_____

Interests (please describe):   _____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

███████████████████████

By: Apollo ST Fund Management LLC,
     its investment adviser

By:     _____

Name:    Joseph D. Glatt_____

Title:     Vice President_____


Principal Amount of the First Lien Term Loans:   ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:   $_____

Interests (please describe): _____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

███████████████

By: Apollo TRF MP Management, LLC,
    its investment manager

By: _____

Name: _____Joseph D. Glatt_____

Title: _____Vice President_____


Principal Amount of the First Lien Term Loans:  ██████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

**CONSENTING CREDITOR**

████████

By: Redding Ridge Asset Management LLC,
      its portfolio manager

By: _____

Name:   Joseph D. Glatt_____

Title:   Chief Legal Officer_____

Principal Amount of the First Lien Term Loans:  ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  ██████

Interests (please describe): _____

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

By: Redding Ridge Asset Management LLC, Management Series 2,
　　its collateral manager

By:　　　_____

Name:　　Joseph D. Glatt

Title:　　Chief Legal Officer

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

**CONSENTING CREDITOR**



By: Redding Ridge Asset Management LLC,
     its collateral manager

By: _____

Name:    Joseph D. Glatt_____

Title:    Chief Legal Officer_____

Principal Amount of the First Lien Term Loans: ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt: ██████

Interests (please describe): _____

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

**CONSENTING CREDITOR**

███████████████████████

By: Apollo ST Fund Management LLC,
       its investment adviser

By: _____

Name:   Joseph D. Glatt_____

Title:    Vice President_____


Principal Amount of the First Lien Term Loans:  █████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

███████████████████████

By: Apollo ST Fund Management LLC,
      its investment adviser

By: _____

Name:    Joseph D. Glatt_____

Title:     Vice President_____


Principal Amount of the First Lien Term Loans:  █████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

By: Redding Ridge Asset Management LLC,
     its collateral manager

By:     _____

Name:    Joseph D. Glatt

Title:     Chief Legal Officer


Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

**CONSENTING CREDITOR**

By: Redding Ridge Asset Management LLC,
    its asset manager

By: _____

Name:   Joseph D. Glatt

Title:    Chief Legal Officer

Principal Amount of the First Lien Term Loans: 

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

**CONSENTING CREDITOR**

████████████████████████████

By: Apollo Credit Management, LLC,
     its investment adviser

By: _____

Name:   Joseph D. Glatt_____

Title:   Vice President_____

Principal Amount of the First Lien Term Loans:  ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  ████████

Interests (please describe): _____

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

█████████████████████████

By: Apollo Credit Management (CLO), LLC,
     its collateral manager

By:     _____

Name:     Joseph D. Glatt _____

Title:     Vice President _____


Principal Amount of the First Lien Term Loans: ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

## CONSENTING CREDITOR

████████████████

By: Apollo Credit Management (CLO), LLC,
     its collateral manager

By: _____

Name:   Joseph D. Glatt_____

Title:    Vice President_____


Principal Amount of the First Lien Term Loans:  $_____

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  ███████

Interests (please describe): _____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

**Benefit Street Partners LLC**, on behalf of certain managed funds and accounts

By: _____

Name:    Alex McMillan

Title:    Chief Compliance Officer


Principal Amount of the First Lien Term Loans: ███████

Principal Amount of the First Lien Revolving Loans:  $0

Principal Amount of the Second Lien Debt:  $0

Interests (please describe):  n/a


Notice Address:
9 W 57th St, Suite 4920
New York, NY 10019


Fax: n/a
Attention: Alex McMillan
Email: a.mcmillan@benefitstreetpartners.com and j.rodbard@benefitstreetpartners.com

**CONSENTING CREDITOR**

**DDJ Capital Management, LLC,**
in its capacity on behalf of the
Consenting Creditors that it manages and/or advises

By: _____

Name:    David J. Breazzano_____

Title:    President_____

Principal Amount of the First Lien Term Loans: ██████████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

Notice Address:

DDJ Capital Management, LLC
130 Turner Street
Building #3, Suite 600
Waltham, MA 02453

Fax: (781) 419-9189
Attention: Legal Department
Email: legal@ddjcap.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

By: Eaton Vance Management
**as Portfolio Manager**


By:

Name:      Michael B. Botthof
              Vice President

Title:

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:

2 International Place
Boston MA 02110


Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

███████████████████████████████████

By: Eaton Vance Management
as Investment Sub-Advisor

By:

Name: *Michael B. Botthof*

Michael B. Botthof

Title: Vice President

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____

Notice Address:

2 International Place
Boston MA 02110

Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

By: Calvert Research and Management

By:

Name:      Michael B. Botthof
               Vice President
Title:

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____

Notice Address:

2 International Place
Boston MA 02110

Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

## CONSENTING CREDITOR

████████████████████
By: Eaton Vance Management
**Portfolio Manager**


By:      _Michael B. Botthof_

Name:      Michael B. Botthof
                 Vice President

Title:      _____


Principal Amount of the First Lien Term Loans:  ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:

2 International Place
Boston MA 02110


Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

███████████████████████

By: Eaton Vance Management
As Investment Advisor

By:

Name: *Michael B. Botthof*

        Michael B. Botthof

Title:       Vice President

Principal Amount of the First Lien Term Loans:  ███████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____

Notice Address:

2 International Place
Boston MA 02110

Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

By: Eaton Vance Management
**as Investment Advisor**

By:

Name:          Michael B. Botthof

Title:          Vice President

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____

Notice Address:

2 International Place
Boston MA 02110

Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

████████████████████████

By: Eaton Vance Management
**as Investment Advisor**

By:      _Michael B. Botthof_

Name:      Michael B. Botthof
              Vice President

Title:      _____

Principal Amount of the First Lien Term Loans:    ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):   _____

Notice Address:

2 International Place
Boston MA 02110

Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

████████████
████████████
By: Eaton Vance Management
**as Investment Advisor**


By:        *michael B. Botthof*

Name:        Michael B. Botthof

Title:        Vice President


Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____


Notice Address:

2 International Place
Boston MA 02110


Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

███████████████
███████

By: Eaton Vance Management
**as Investment Advisor**


By:

Name: _Michael B. Botthof_
              Michael B. Botthof

Title: _____
              Vice President

Principal Amount of the First Lien Term Loans: ███████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:

2 International Place
Boston MA 02110


Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

████████████████████████████████

By: Eaton Vance Management as Investment Advisor

By:

Name: Michael B. Botthof

Title: Vice President

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____

Notice Address:

2 International Place
Boston MA 02110

Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

█████████

By: Eaton Vance Management
as Investment Advisor

By:

Name:    *Michael B. Botthof*
         Michael B. Botthof
Title:        Vice President

Principal Amount of the First Lien Term Loans:  ██████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____

Notice Address:

2 International Place
Boston MA 02110

Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

## CONSENTING CREDITOR

By: Eaton Vance Management as Investment Advisor

By: _____

Name: _____ Michael B. Botthof

Title: _____ Vice President

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____

Notice Address:

2 International Place
Boston MA 02110

Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

By: Eaton Vance Management as Investment Advisor


By:

Name: *Michael B. Botthof*

     Michael B. Botthof

Title:     Vice President


Principal Amount of the First Lien Term Loans: ▮▮▮▮▮▮▮▮▮▮▮▮▮

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:

2 International Place
Boston MA 02110


Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

████████████████████████████

By: Eaton Vance Management as Investment Advisor

By:

Name: Michael B. Botthof

Title: Vice President

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____


Notice Address:

2 International Place
Boston MA 02110


Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

By: Eaton Vance Management
**as Investment Advisor**

By:

Name:  Michael B. Botthof

Title:  Vice President

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____

Notice Address:

2 International Place
Boston MA 02110

Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

███████████████████████

By: Boston Management and Research
**as Investment Advisor**


By:

Name:

Title:

Michael B. Botthof

Vice President


Principal Amount of the First Lien Term Loans: ████████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:

2 International Place
Boston MA 02110


Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

## CONSENTING CREDITOR


By: Boston Management and Research
**as Investment Advisor**


By:

Name:          Michael B. Botthof

Title:          **Vice President**


Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:

2 International Place
Boston MA 02110


Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

███████████ ██████

By: Eaton Vance Management
**as Investment Advisor**


By:

Name:      *Michael B. Botthof*
           Michael B. Botthof

Title:      Vice President


Principal Amount of the First Lien Term Loans:  ████████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe):  _____


Notice Address:

2 International Place
Boston MA 02110


Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

███████████████████

By: PGIM, Inc., as Collateral Manager

By: _Ian Johnston_

Name: _Ian Johnston_

Title: _Vice President_

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _____

Name: Ian Johnston

Title: Vice President


Principal Amount of the First Lien Term Loans: ███████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____


Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102


Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com


*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

███████████████████

By: PGIM, Inc., as Collateral Manager

By: _Ian Jht._

Name: _Ian Johnston_

Title: _Vice President_

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

<u>Notice Address</u>:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

████████████████████

By: PGIM, Inc., as Collateral Manager

By: _____

Name: Ian Johnston

Title: Vice President

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _Ian Jht._

Name: _Ian Johnston_

Title: _Vice President_

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

██████████████████

By: PGIM, Inc., as Collateral Manager

By: _Jev Jht._

Name: _Ian Johnston_

Title: _Vice President_

Principal Amount of the First Lien Term Loans: ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _____

Name: _Ian Johnston_

Title: _Vice President_

Principal Amount of the First Lien Term Loans: ▮▮▮▮

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

███████████████████

By: PGIM, Inc., as Collateral Manager

By: _____

Name: Ian Johnston

Title: Vice President

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

███████████████

By: PGIM, Inc., as Collateral Manager

By: _Ian Johnston_ (signature)

Name: Ian Johnston

Title: Vice President

Principal Amount of the First Lien Term Loans: ████████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

■■■■■■■■■■■■■■■

By: PGIM, Inc., as Collateral Manager

By: _Jan Jhn J._

Name: _Ian Johnston_

Title: _Vice President_

Principal Amount of the First Lien Term Loans: ■■■■■■■

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _Ian Johnston_ (signature)

Name: Ian Johnston

Title: Vice President

Principal Amount of the First Lien Term Loans: ████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

By: PGIM, Inc. as Collateral Manager

By: _Ian Johnston_

Name: _Ian Johnston_

Title: _Vice President_

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _Ian Johnston_

Name: _Ian Johnston_

Title: _Vice President_

Principal Amount of the First Lien Term Loans: █████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

████████████████████

By: PGIM, Inc., as Collateral Manager

By:      _Ian Johnston (signature)_

Name:    Ian Johnston

Title:   Vice President

Principal Amount of the First Lien Term Loans: ███████████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _____

Name: Ian Johnston

Title: Vice President

Principal Amount of the First Lien Term Loans: ▮▮▮▮▮▮

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _Jew Jht._

Name: _Ian Johnston_

Title: _Vice President_

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

▬▬▬▬▬▬▬▬

By: PGIM, Inc., as Collateral Manager

By: _____

Name: _____

Title: _____

Principal Amount of the First Lien Term Loans: ▬▬▬▬▬

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

<span style="background:black">            </span>

By: PGIM, Inc., as Collateral Manager

By: *[signature]*

Name: Ian Johnston

Title: Vice President

Principal Amount of the First Lien Term Loans: <span style="background:black">        </span>

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____


Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102


Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

███████████████████████████████████

By: PGIM, Inc., as Investment Advisor

By: _Ian Johnston_ (signature)

Name: Ian Johnston

Title: Vice President

Principal Amount of the First Lien Term Loans: ████████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: $_____

Interests (please describe): _____

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

████████████████████████████████

By: PGIM, Inc., as Investment Advisor

By:  _____

Name:  _Ian Johnston_

Title:  _Vice President_

Principal Amount of the First Lien Term Loans: ██████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

## CONSENTING CREDITOR

████████████████████████

By: PGIM, Inc., as Investment Manager

By: _Jen PhT._

Name: _Ian Johnston_

Title: _Vice President_

Principal Amount of the First Lien Term Loans: ██████████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:
 655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

*[Signature Page to Restructuring Support Agreement]*

## CONSENTING CREDITOR

By: _Judith MacDonald_

Name:    Judith MacDonald

Title:     Authorized Signatory

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:

Interests (please describe): _____


Notice Address:


Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

███████████████████████

By: _Judith MacDonald_

Name: <u>Judith MacDonald</u>

Title: <u>Authorized Signatory</u>

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt: ████████████

Interests (please describe): _____

<u>Notice Address</u>:

Fax: <u>415-291-9635</u>
Attention: <u>Loan Operations</u>
Email: <u>loan.ops@symphonyasset.com</u>

**CONSENTING CREDITOR**

████████████████████████████

By:    _Judith MacDonald_

Name:    Judith MacDonald

Title:    Authorized Signatory

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt: ████████████

Interests (please describe): _____

Notice Address:

Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

████████████████████████

By:  *Judith MacDonald*

Name:    Judith MacDonald

Title:    Authorized Signatory

Principal Amount of the First Lien Term Loans:  ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  ████████

Interests (please describe):  _____

Notice Address:

Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

████████████████████████████████

**By: Symphony Asset Management LLC, as Investment Advisor**

By:   _Judith MacDonald_

Name:   _Judith MacDonald_

Title:   _General Counsel_

Principal Amount of the First Lien Term Loans:   ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:   ████████████

Interests (please describe):  _____

Notice Address:

Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

█████████████████████

By: *Judith MacDonald*

Name:    Judith MacDonald

Title:    Authorized Signatory


Principal Amount of the First Lien Term Loans: ███████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt: ███████████

Interests (please describe): _____


Notice Address:


Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

███████████████████████

By:  *Judith MacDonald*

Name:  Judith MacDonald

Title:  Authorized Signatory

Principal Amount of the First Lien Term Loans:  ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  ██████████

Interests (please describe): _____

Notice Address:

Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

▬▬▬▬▬▬▬▬▬▬

**By: Symphony Asset Management LLC, as Collateral Manager**

By: *Judith MacDonald*

Name: <u>Judith MacDonald</u>

Title: <u>General Counsel</u>

Principal Amount of the First Lien Term Loans: ▬▬▬▬

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt:

Interests (please describe): _____

<u>Notice Address</u>:

Fax: <u>415-291-9635</u>
Attention: <u>Loan Operations</u>
Email: <u>loan.ops@symphonyasset.com</u>

**CONSENTING CREDITOR**

████████████████████████

**By: Symphony Asset Management LLC, as Investment Advisor**

By:    *Judith MacDonald*

Name:    Judith MacDonald

Title:    General Counsel


Principal Amount of the First Lien Term Loans:    ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:

Interests (please describe):  _____


Notice Address:


Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**<u>CONSENTING CREDITOR</u>**

████████████

**By: Symphony Asset Management LLC, as Collateral Manager**

By:  *Judith MacDonald*

Name:  <u>Judith MacDonald</u>

Title:  <u>General Counsel</u>

Principal Amount of the First Lien Term Loans:  ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:

Interests (please describe):  _____

<u>Notice Address</u>:

Fax: <u>415-291-9635</u>
Attention: <u>Loan Operations</u>
Email: <u>loan.ops@symphonyasset.com</u>

**CONSENTING CREDITOR**

<span style="background-color:black; color:black;">███████████████████████</span>

**By: Symphony Asset Management LLC, as Collateral Manager**

By: _Judith MacDonald_ (signature)

Name:     Judith MacDonald

Title:      General Counsel

Principal Amount of the First Lien Term Loans:   ██████████

Principal Amount of the First Lien Revolving Loans:   $_____

Principal Amount of the Second Lien Debt:

Interests (please describe): _____

Notice Address:

Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

By: _Judith MacDonald_

Name:    Judith MacDonald

Title:    Authorized Signatory

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:

Interests (please describe): _____

Notice Address:

Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

By: _Judith MacDonald_

Name: _Judith MacDonald_

Title: _Authorized Signatory_

Principal Amount of the First Lien Term Loans: ▮▮▮▮▮▮▮

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt: ▮▮▮▮▮▮

Interests (please describe): _____

Notice Address:

Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

████████

**By: Symphony Asset Management LLC, as Investment Advisor**

By:  *Judith MacDonald*

Name:   Judith MacDonald

Title:   General Counsel


Principal Amount of the First Lien Term Loans:  ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  ████████

Interests (please describe):  _____


Notice Address:


Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

███████████████████████

**By: Symphony Asset Management LLC, as General Partner**

By:       _Judith MacDonald_

Name:       Judith MacDonald

Title:       General Counsel


Principal Amount of the First Lien Term Loans:    ██████████

Principal Amount of the First Lien Revolving Loans:   $_____

Principal Amount of the Second Lien Debt:   ██████████

Interests (please describe):   _____


Notice Address:


Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

██████████████████

**By: Symphony Asset Management LLC, as Collateral Manager**

By: _Judith MacDonald_

Name: <u>Judith MacDonald</u>

Title: <u>General Counsel</u>

Principal Amount of the First Lien Term Loans: ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:

Interests (please describe): _____

<u>Notice Address:</u>

Fax: <u>415-291-9635</u>
Attention: <u>Loan Operations</u>
Email: <u>loan.ops@symphonyasset.com</u>

**<u>CONSENTING CREDITOR</u>**

████████████████████

**By: Symphony Asset Management LLC, as Collateral Manager**

By: _Judith MacDonald_

Name:   <u>Judith MacDonald</u>

Title:   <u>General Counsel</u>

Principal Amount of the First Lien Term Loans:   ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:

Interests (please describe): _____

<u>Notice Address</u>:

Fax: <u>415-291-9635</u>
Attention: <u>Loan Operations</u>
Email: <u>loan.ops@symphonyasset.com</u>

**CONSENTING CREDITOR**

███████████████████████

**By: Symphony Asset Management LLC, as Collateral Manager**

By: _Judith MacDonald_

Name: _Judith MacDonald_

Title: _General Counsel_

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans: $_____

Principal Amount of the Second Lien Debt:

Interests (please describe): _____

Notice Address:

Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

███████████████████████████

**By: Symphony Asset Management LLC, as General Partner**

By:      *Judith MacDonald*

Name:    Judith MacDonald

Title:    General Counsel


Principal Amount of the First Lien Term Loans:  ██████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:

Interests (please describe):  _____


Notice Address:


Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

███████████████████████

**By: Symphony Asset Management LLC, as General Partner**

By:      *Judith MacDonald*

Name:    Judith MacDonald

Title:     General Counsel


Principal Amount of the First Lien Term Loans:  █████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:

Interests (please describe): _____


Notice Address:


Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

███████████████████████

**By: Symphony Asset Management LLC, as Collateral Manager**

By: _Judith MacDonald_

Name:    Judith MacDonald

Title:    General Counsel

Principal Amount of the First Lien Term Loans:    ██████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:

Interests (please describe): _____

Notice Address:

Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

<span style="background-color:black">               </span>

**By: Symphony Asset Management LLC, as Collateral Manager**

By:  *Judith MacDonald*

Name:  <u>Judith MacDonald</u>

Title:  <u>General Counsel</u>

Principal Amount of the First Lien Term Loans:  <span style="background-color:black">         </span>

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:

Interests (please describe):  _____


<u>Notice Address</u>:


Fax: <u>415-291-9635</u>
Attention: <u>Loan Operations</u>
Email: <u>loan.ops@symphonyasset.com</u>

**CONSENTING CREDITOR**

████████████████████████████

**By: Symphony Asset Management LLC, as Investment Advisor**

By: _Judith MacDonald_

Name: _Judith MacDonald_

Title: _General Counsel_

Principal Amount of the First Lien Term Loans: ███████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt: █████████

Interests (please describe): _____

Notice Address:

Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**<u>CONSENTING CREDITOR</u>**

█████████████████████

**By: Symphony Asset Management LLC, as General Partner**

By: _Judith MacDonald_

Name: <u>Judith MacDonald</u>

Title: <u>General Counsel</u>

Principal Amount of the First Lien Term Loans: ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt: ████████

Interests (please describe): _____

<u>Notice Address</u>:

Fax: <u>415-291-9635</u>
Attention: <u>Loan Operations</u>
Email: <u>loan.ops@symphonyasset.com</u>

**CONSENTING CREDITOR**

███████████████████████████

**By: Symphony Asset Management LLC, as Investment Advisor**

By:     *Judith MacDonald*

Name:    Judith MacDonald

Title:     General Counsel


Principal Amount of the First Lien Term Loans: ██████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt: ██████████

Interests (please describe): _____


Notice Address:


Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

███████████████████

**By: Symphony Asset Management LLC, as Investment Advisor**

By: _Judith MacDonald_

Name:     Judith MacDonald

Title:      General Counsel

Principal Amount of the First Lien Term Loans: ███████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt: █████████

Interests (please describe): _____

Notice Address:

Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

████████████████████████████

**By: Symphony Asset Management LLC, as Investment Advisor**

By:    _Judith MacDonald_

Name:    Judith MacDonald

Title:    General Counsel


Principal Amount of the First Lien Term Loans:    ████████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:    ██████████

Interests (please describe): _____


Notice Address:


Fax: 415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

**CONSENTING CREDITOR**

<span style="background-color:black;color:black">████████████████████████████████████</span>

**By: Symphony Asset Management LLC, as Investment Advisor**

By:      *Judith MacDonald*

Name:    <u>Judith MacDonald</u>

Title:   <u>General Counsel</u>

Principal Amount of the First Lien Term Loans: ████████

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt: ████████

Interests (please describe): _____

<u>Notice Address</u>:

Fax: <u>415-291-9635</u>
Attention: <u>Loan Operations</u>
Email: <u>loan.ops@symphonyasset.com</u>

**CONSENTING CREDITOR**

**VOYA INVESTMENT MANAGEMENT CO. LLC**
*on its own behalf and, as applicable, on behalf of its affiliates and managed or sub-advised funds and accounts*


By: _____

Name:    Daniel A. Norman

Title:    Senior Managing Director


Principal Amount of the First Lien Term Loans:  $█████████

Principal Amount of the First Lien Revolving Loans:  $_____n/a_____

Principal Amount of the Second Lien Debt:  $____n/a____

Interests (please describe): _____n/a_____


Notice Address:

Voya Investment Management
7337 East Doubletree Ranch Road
Scottsdale, Arizona, USA 85258


Fax:    (480) 477-2607
Attention:    Jake Jamison, Vice President for Legal Affairs
Email:    jake.jamison@voya.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**Crown Managed Accounts SPC - Crown/Lodbrok Segregated Portfolio**

By: _____

Name:     Dushy Selvaratnam

Title:     Chief Operating Officer

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolvi

Principal Amount of the Second Lien Debt

Interests (please describe): _____

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**Kapitalforeningen Investin Pro - Lodbrok Select Opportunities**

By:

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Principal Amount of the First Lien Term Loan

Principal Amount of the First Lien Revolving Loan

Principal Amount of the Second Lien Debt:

Interests (please describe): _____

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

**CONSENTING CREDITOR**

**Lodbrok European Credit Opportunities Sàrl**

By:

Name:   Dushy Selvaratnam

Title:   Chief Operating Officer

Principal Amount of the First Lien Term Loans: $

Principal Amount of the First Lien Revolving Loans: $

Principal Amount of the Second Lien Debt:

Interests (please describe): _____

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**Lodbrok Funding Sàrl**

By:

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Principal Amount of the First Lien Term Loans ███████████

Principal Amount of the First Lien Revolving Loans ████

Principal Amount of the Second Lien Deb ████████████

Interests (please describe): _____

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**MAP 512 Sub Trust of LMA Ireland**

By: _____

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Lo

Principal Amount of the Second Lien Debt:

Interests (please describe): _____

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**Mercer QIF Fund PLC - Mercer Investment Fund 1**

By: _____

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loan ████████████

Principal Amount of the Second Lien Debt: ████████████

Interests (please describe): _____

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**Lodbrok Special Situation - 1 SCS**

By:

Name: Dushy Selvaratnam

Title: Chief Operating Officer

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loan

Principal Amount of the Second Lien Debt:

Interests (please describe): _____

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**Lodbrok Special Situation - 2 SCS**

By: _____

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Principal Amount of the First Lien Term Loans ████████████

Principal Amount of the First Lien Revolving Loan ████████

Principal Amount of the Second Lien Debt: ████████

Interests (please describe): _____

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

**CONSENTING CREDITOR**

**Lodbrok Special Situation - 3 SCS**

By:

Name:     Dushy Selvaratnam

Title:     Chief Operating Officer

Principal Amount of the First Lien Term Loans:

Principal Amount of the First Lien Revolving Loans

Principal Amount of the Second Lien Debt

Interests (please describe): _____

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**CRF2 SA**

By: _____

Name:    Quentin Leveque

Title:    Director

By: _____

Name:    Besar Muhameti

Title:    Director

Principal Amount of the First Lien Term Loans: ██████████

Principal Amount of the First Lien Revolving Loans: ██████

Principal Amount of the Second Lien De ██████████

Interests (please describe): _____

Notice Address:

Fax:_____

Attention: Besar Muhameti

Email: eqtcredit@eqtfunds.com

eqtcreditmidoffice@eqtpartners.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**EMPIRE CREDIT INVESTMENTS I SARL**


By: _____

Name:   Quentin Leveque

Title:   Manager



By: _____

Name:   Besar Muhameti

Title:   Manager


Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans: ████████████

Principal Amount of the Second Lien Debt: ████████████

Interests (please describe): _____


Notice Address:



Fax:_____
Attention:  Besar Muhameti
Email:  eqtcredit@eqtfunds.com
           eqtcreditmidoffice@eqtpartners.com


*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**EAD CREDIT INVESTMENTS I SARL**

By: _____

Name: Quentin Leveque

Title: Manager

By: _____

Name: Besar Muhameti

Title: Manager

Principal Amount of the First Lien Term Loans: ███████████

Principal Amount of the First Lien Revolving Loans: ██████

Principal Amount of the Second Lien Debt ████████████████

Interests (please describe): _____

Notice Address:

Fax: _____

Attention: Besar Muhameti

Email: eqtcredit@eqtfunds.com

eqtcreditmidoffice@eqtpartners.com

**CONSENTING CREDITOR**

**CRF3 Investments I S.à r.l.**


By: _____

Name:  Quentin Leveque _____

Title:  Manager _____


By: _____

Name:  Besar Muhameti _____

Title:  Manager _____


Principal Amount of the First Lien Term Loans: █████████████

Principal Amount of the First Lien Revolving L███████████████

Principal Amount of the Second Lien Debt:  $ ███████████████

Interests (please describe): _____


Notice Address:



Fax: _____
Attention:  Besar Muhameti _____
Email:  eqtcredit@eqtfunds.com _____
         eqtcreditmidoffice@eqtpartners.com

**CONSENTING CREDITOR**

NORTH HAVEN CREDIT PARTNERS II L.P.
By: MS Credit Partners II GP L.P., its general partner
By: MS Credit Partners II GP Inc., its general partner

By: _____

Name: _____Ashwin Krishnan_____

Title: _____Managing Director_____


Principal Amount of the First Lien Term Loans: ████████████████

Principal Amount of the First Lien Revolving Loans: ████████████

Principal Amount of the Second Lien Debt: ████████████████████

Interests (please describe): _____



Notice Address:




Fax: _+1 212 507 4216_____
Attention: _Ashwin Krishnan_____
Email: _Ashwin.krishnan@morganstanley.com_

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**SIGNATURE DIVERSIFIED YIELD FUND**

By:       _B. B_____

Name:    Brad Benson

Title:    VP – Portfolio Management


By:       _____

Name:    Carlton Ling

Title:    VP – Portfolio Management


Principal Amount of the First Lien Term Loans ████████████

Principal Amount of the First Lien Revolving Loans ████████████

Principal Amount of the Second Lien Debt: ████████████

Interests (please describe): _____


Notice Address:



Fax: _____
Attention: Brad Benson_____
Email: bbenson@signature.ci.com_____

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**CI INCOME FUND**

By: _____

Name:    Brad Benson

Title:    VP – Portfolio Management


By: _____

Name:    Carlton Ling

Title:    VP – Portfolio Management


Principal Amount of the First Lien Term Loans: ███████████████

Principal Amount of the First Lien Revolving Loans: ██████████

Principal Amount of the Second Lien Debt: ███████████████

Interests (please describe): _____


Notice Address:


Fax: _____

Attention:  Brad Benson

Email:  bbenson@signature.ci.com


*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**CI GLOBAL ASSET ALLOCATION PRIVATE POOL**

By: _____

Name:  Brad Benson

Title:  VP – Portfolio Management


By: _____

Name:  Carlton Ling

Title:  VP – Portfolio Management


Principal Amount of the First Lien Term Loans ▮▮▮▮▮

Principal Amount of the First Lien Revolving Loan ▮▮▮▮

Principal Amount of the Second Lien Debt: ▮▮▮▮▮

Interests (please describe): _____


Notice Address:


Fax:_____
Attention:  Brad Benson
Email:  bbenson@signature.ci.com

**CONSENTING CREDITOR**

**SIGNATURE HIGH YIELD BOND FUND**

By: _____

Name:    Brad Benson

Title:    VP – Portfolio Management


By: _____

Name:    Carlton Ling

Title:    VP – Portfolio Management


Principal Amount of the First Lien Term Loans: ███████████

Principal Amount of the First Lien Revolving Loan ██████

Principal Amount of the Second Lien Debt: ████████████████

Interests (please describe): _____


Notice Address:


Fax:_____

Attention: Brad Benson

Email:___bbenson@signature.ci.com___

**CONSENTING CREDITOR**

**SIGNATURE GLOBAL INCOME & GROWTH FUND**

By: _____

Name:  Brad Benson

Title:  VP – Portfolio Management


By: _____

Name:  Carlton Ling

Title:  VP – Portfolio Management


Principal Amount of the First Lien Term Loans: ██████████

Principal Amount of the First Lien Revolving Loans: ██████████

Principal Amount of the Second Lien Debt: ██████████

Interests (please describe): _____


Notice Address:


Fax: _____
Attention: Brad Benson
Email: bbenson@signature.ci.com

**CONSENTING CREDITOR**

**SIGNATURE DIVERSIFIED YIELD CORPORATE CLASS**

By: _____

Name: Brad Benson

Title: VP – Portfolio Management

By: _____

Name: Carlton Ling

Title: VP – Portfolio Management

Principal Amount of the First Lien Term Loans ██████████

Principal Amount of the First Lien Revolving Loans: ██████████

Principal Amount of the Second Lien Debt: ██████████

Interests (please describe): _____

Notice Address:

Fax:_____

Attention:_Brad Benson_____

Email:_bbenson@signature.ci.com_____

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**CI U.S. INCOME US$ POOL**

By: _____

Name:    Brad Benson

Title:    VP – Portfolio Management


By: _____

Name:    Carlton Ling

Title:    VP – Portfolio Management


Principal Amount of the First Lien Term Loans: ███████████████

Principal Amount of the First Lien Revolving Loans: ███████████

Principal Amount of the Second Lien Debt: ███████████████

Interests (please describe): _____


Notice Address: 


Fax:_____
Attention:  Brad Benson
Email:   bbenson@signature.ci.com

**CONSENTING CREDITOR**

**SENTRY GLOBAL HIGH YIELD FIXED
INCOME PRIVATE TRUST**


By: _____

Name:    Brad Benson

Title:    VP – Portfolio Management



By: _____

Name:    Carlton Ling

Title:    VP – Portfolio Management



Principal Amount of the First Lien Term Loans: ██████████

Principal Amount of the First Lien Revolving Loans: ████

Principal Amount of the Second Lien Debt ████████████

Interests (please describe): _____



Notice Address:



Fax:_____
Attention:_ Brad Benson_____
Email:_ bbenson@signature.ci.com_____

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**SIGNATURE INCOME & GROWTH FUND**


By: _____

Name:    Brad Benson

Title:    VP – Portfolio Management


By: _____

Name:    Carlton Ling

Title:    VP – Portfolio Management


Principal Amount of the First Lien Term Loans: ███████████

Principal Amount of the First Lien Revolving Loans: ███████████

Principal Amount of the Second Lien Debt: ███████████

Interests (please describe): _____


Notice Address:


Fax:_____

Attention:  Brad Benson_____

Email:__bbenson@signature.ci.com_____

**CONSENTING CREDITOR**

**SIGNATURE HIGH INCOME FUND**


By: _____

Name:  Brad Benson_____

Title:  VP – Portfolio Management____


By: _____

Name:  Carlton Ling_____

Title:  VP – Portfolio Management____


Principal Amount of the First Lien Term Loans: ███████████████

Principal Amount of the First Lien Revolving Loans: ████████

Principal Amount of the Second Lien Debt: ███████████████

Interests (please describe): _____


Notice Address:



Fax:_____
Attention:  Brad Benson_____
Email:  bbenson@signature.ci.com_____


*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**SIGNATURE FLOATING RATE INCOME POOL**


By: _____

Name:   Brad Benson

Title:   VP – Portfolio Management


By: _____

Name:   Carlton Ling

Title:   VP – Portfolio Management


Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans: ████████

Principal Amount of the Second Lien Debt: ████████████

Interests (please describe): _____


Notice Address:


Fax:_____
Attention: Brad Benson_____
Email:_ bbenson@signature.ci.com_____

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**SIGNATURE CORPORATE BOND FUND**

By: _____

Name:    Brad Benson

Title:    VP – Portfolio Management

By: _____

Name:    Carlton Ling

Title:    VP – Portfolio Management

Principal Amount of the First Lien Term Loans: ████████████

Principal Amount of the First Lien Revolving Loans: ████████

Principal Amount of the Second Lien Debt: ████████████

Interests (please describe): _____

Notice Address:

Fax:_____

Attention:__Brad Benson_____

Email:__bbenson@signature.ci.com_____

**CONSENTING CREDITOR**

**CANADIAN FIXED INCOME POOL**

By: _____

Name:    Brad Benson

Title:    VP – Portfolio Management


By: _____

Name:    Carlton Ling

Title:    VP – Portfolio Management


Principal Amount of the First Lien Term Loans: ███████

Principal Amount of the First Lien Revolving Loans: ███

Principal Amount of the Second Lien Debt ████████████

Interests (please describe): _____


Notice Address: _____



Fax:_____
Attention:  Brad Benson
Email:   bbenson@signature.ci.com


*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**ENHANCED INCOME POOL**

By: _____

Name:  Brad Benson

Title:  VP – Portfolio Management

By: _____

Name:  Carlton Ling

Title:  VP – Portfolio Management

Principal Amount of the First Lien Term Loans: ████████

Principal Amount of the First Lien Revolving Loans: ████████

Principal Amount of the Second Lien Debt: ████████

Interests (please describe): _____

Notice Address:

Fax:_____

Attention: Brad Benson

Email: bbenson@signature.ci.com

**CONSENTING CREDITOR**

**ENHANCED INCOME CORPORATE CLASS**


By:      _____

Name:    Brad Benson

Title:   VP – Portfolio Management


By:      _____

Name:    Carlton Ling

Title:   VP – Portfolio Management


Principal Amount of the First Lien Term Loans: ███████████

Principal Amount of the First Lien Revolving Loans: ███████████

Principal Amount of the Second Lien Debt: ███████████

Interests (please describe): _____


Notice Address: _____


Fax:_____
Attention:_ Brad Benson_____
Email:_ bbenson@signature.ci.com_____

## EXHIBIT A

## AD HOC CROSSHOLDER GROUP

1.  Lodbrok European Credit Opportunities Sàrl
2.  Crown Managed Accounts SPC - Crown/Lodbrok Segregated Portfolio
3.  Kapitalforeningen Investin Pro - Lodbrok Select Opportunities
4.  MAP 512 Sub Trust of LMA Ireland
5.  Mercer QIF Fund PLC - Mercer Investment Fund 1
6.  Lodbrok Special Situation - 1 SCS
7.  Lodbrok Special Situation - 2 SCS
8.  Lodbrok Special Situation - 3 SCS
9.  Lodbrok Funding Sàrl
10. CRF2 SA
11. CRF3 Investments I S.à r.l.
12. EAD CREDIT INVESTMENTS I SARL
13. EMPIRE CREDIT INVESTMENTS I SARL
14. Enhanced Income Corporate Class
15. Enhanced Income Pool
16. Canadian Fixed Income Pool
17. Signature Corporate Bond Fund
18. Signature Floating Rate Income Pool
19. Signature High Income Fund
20. Signature Income & Growth Fund
21. Sentry Global High Yield Fixed Income Private Trust
22. CI US Income $US Pool
23. Signature Diversified Yield Corporate Class
24. Signature Global Income & Growth Fund
25. Signature High Yield Bond Fund
26. CI Global Asset Allocation Private Pool
27. CI Income Fund
28. Signature Diversified Yield Fund
29. NORTH HAVEN CREDIT PARTNERS II L.P.

## **EXHIBIT B**

### **AD HOC FIRST LIEN GROUP**

*See* 2019 Statement filed by Gibson, Dunn & Crutcher LLP

# **EXHIBIT C**

## **DIP AND EXIT FACILITY TERM SHEET**

**POINTWELL LIMITED,** *ET AL.*

---

**Term Sheet for DIP and Exit Financing Facilities**
**Summary of Terms and Conditions**

---

June 12, 2020

This DIP and Exit Facility Term Sheet[1] sets forth the principal terms of the DIP Facility and the Exit Credit Facility.

Subject in all respects to the terms of the Restructuring Support Agreement, the Restructuring will be consummated through the Plan in the Chapter 11 Cases commenced by each of the Company Parties set forth on Schedule 1 to the Reorganization Term Sheet.

Without limiting the generality of the foregoing, this DIP and Exit Facility Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution, and delivery of the Definitive Documents, as provided in the Restructuring Support Agreement. This DIP and Exit Facility Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this DIP and Exit Facility Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions. Until publicly disclosed upon the prior written agreement of each of the Parent, the Ad Hoc First Lien Group, and the Ad Hoc Crossholder Group, this DIP and Exit Facility Term Sheet shall remain strictly confidential and may not be shared with any other party or person (other than members of the Ad Hoc First Lien Group, and the Ad Hoc Crossholder Group) without the consent of each of the Parent, the Ad Hoc First Lien Group, and the Ad Hoc Crossholder Group.

The regulatory, tax, accounting, and other legal and financial matters and effects related to the Restructuring or any related restructuring or similar transaction have not, as of the date hereof, been fully evaluated. Any such evaluation may affect the terms and structure of the Restructuring and/or certain related transactions.

THIS DIP AND EXIT FACILITY TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE LAW.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement.

|  | DIP Facility | New First Out Term Loan Facility | New Second Out Term Loan Facility |
|---|---|---|---|
| **Summary** | <ul><li>$60,000,000 delayed draw term loan facility to be funded in escrow (subject to withdrawal conditions described below)<ul><li>Backstopped by certain members of the Ad Hoc First Lien Group and the Ad Hoc Crossholder Group (solely in their capacity as First Lien Lenders) (collectively, the "**DIP Backstop Parties**"); <u>provided</u> <u>that</u> the backstop commitment of each of the Ad Hoc First Lien Group and the Ad Hoc Crossholder Group shall be proportional to the First Lien Debt Claims held by or participated to all members of each such group</li><li>After the funding date, the DIP Facility will by syndicated to all First Lien Lenders on a pro rata basis</li></ul></li><li>"**Borrower**" to be Skillsoft Corporation</li><li>"**Credit Parties**" and "**Administrative Agent**" to be the same as those under the First Lien Credit Agreement, provided that the Evergreen Skills Entities shall not be Credit Parties</li></ul> | <ul><li>$110,000,000 super senior term loan facility under Exit Credit Agreement<ul><li>$60,000,000 rolled from DIP Facility</li></ul></li><li>"**Borrowers**" to be Newco Borrower, Skillsoft Corporation and such other Credit Parties to be agreed</li><li>"**Credit Parties**" and "**Administrative Agent**" to be the same as those under the DIP Facility, plus Newco Borrower and Newco Parent and any additional foreign entities required pursuant to the terms of the Exit Credit Agreement</li><li>Backstopped by certain members of Ad Hoc First Lien Group and the Ad Hoc Crossholder Group (solely in their capacity as First Lien Lenders) (the "**Exit Backstop Parties**"); <u>provided</u>, that the backstop commitment of each of the Ad Hoc First Lien Group and the Ad Hoc Crossholder Group shall be proportional to the First Lien Debt Claims held by or participated to all members of each such group</li></ul> | <ul><li>$410,000,000 first lien, second-out term loan facility under Exit Credit Agreement</li><li>Borrowers, Credit Parties and Administrative Agent to be the same as those under the New First Out Term Loan Facility</li></ul> |
| **Maturity** | <ul><li>Earlier of (i) 3 months after the Petition Date, subject to one 1-month extension at the sole discretion of DIP Lenders holding, as of the date of determination, at least a majority of the aggregate principal amount of loans outstanding under the DIP Facility (the "**Requisite DIP Lenders**"), (ii) conversion or dismissal of the Chapter 11 Cases, (iii) acceleration, (iv) sale of all or substantially all assets and (v) the Effective Date</li></ul> | <ul><li>Earlier of (i) December 2024 and (ii) acceleration</li></ul> | <ul><li>Earlier of (i) April 2025 and (ii) acceleration</li></ul> |
| **Carve-Out** | <ul><li>Usual and customary professional fee carve-out for DIP facilities of this type to be mutually agreed (the "**Carve-Out**")</li></ul> | <ul><li>n.a.</li></ul> | <ul><li>n.a.</li></ul> |

| | DIP Facility | New First Out Term Loan Facility | New Second Out Term Loan Facility |
|---|---|---|---|
| **Availability** | ▪ $25,000,000 available upon entry of the Interim DIP Order ("**Initial Availability**")<br>▪ Remaining $25,000,000 available upon entry of Final Order ("**Additional Availability**") | ▪ n.a. | ▪ n.a. |
| **Use of Proceeds** | ▪ Working capital, general corporate purposes and chapter 11 expenses, the operations of certain non-Debtor subsidiaries through "on-lending" or contributions of capital, and providing adequate protection in each case solely in accordance with a budget in form and substance acceptable to the DIP Lenders (the "**DIP Budget**") | ▪ Working capital, general corporate purposes, any DIP Facility paydown and chapter 11 emergence costs | ▪ n.a. |
| **Security & Ranking** | As set forth in the Bankruptcy Code, and subject to the Carve-Out, the DIP Facility shall be entitled to:<br>▪ Priming, perfected first priority DIP liens on all Collateral of the Debtors (as defined in the First Lien Credit Agreement) securing the First Lien Debt<br>▪ Perfected first priority DIP liens on all property of the Debtors not subject to valid, perfected and non-avoidable liens as of the commencement of the Chapter 11 Cases and the proceeds thereof<br>▪ Perfected junior DIP liens on all property of the Debtors that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Chapter 11 Cases or to valid and non-avoidable liens in existence at the time of such commencement (other than liens securing the First Lien Debt)<br>▪ Super-priority, administrative claim status | ▪ Perfected first priority liens on all Collateral (as defined in the First Lien Credit Agreement)<br>▪ Perfected first priority liens on all assets of the Credit Parties, subject to usual and customary exceptions for facilities of this type to be agreed<br>▪ Perfected first priority liens on 100% of equity in/assets of foreign subsidiaries, subject to usual and customary exceptions for facilities of this type to be agreed<br>▪ Other standard and customary assets to be included in collateral package | ▪ Same collateral package as the New First Out Term Loan Facility (such collateral package, the "**Exit Facility Collateral**")<br>▪ The New Second Out Term Loans shall be junior in all respects to the New First Out Term Loans with respect to the Exit Facility Collateral; provided that both the New First Out Term Loan Facility and the New Second Out Term Loan Facility shall be secured by a first lien on the Exit Facility Collateral |
| **Economics** | ▪ Coupon: L+750 bps<br>▪ LIBOR floor: 1.00% | ▪ Coupon: L+750 bps<br>▪ LIBOR floor: 1.00% | ▪ Coupon: L+750 bps<br>▪ LIBOR floor: 1.00% |

3

| | DIP Facility | New First Out Term Loan Facility | New Second Out Term Loan Facility |
|---|---|---|---|
| | ▪ Commitment payment: 300 bps earned and payable in cash to all DIP Lenders on the funding date | ▪ Commitment payment: (i) with respect to the new money portion of the Exit Credit Facility, 300 bps payable in cash to all Exit Facility Lenders (including Exit Backstop Parties) and (ii) with respect to the rolled portion of the Exit Credit Facility, 200 bps earned and payable in cash to all Exit Facility Lenders (including Exit Backstop Parties) on the funding date to occur on the Effective Date | ▪ n.a. |
| | ▪ Seasoning/fronting fees to be paid by the Company | ▪ Seasoning/fronting fees to be paid by the Company | ▪ n.a. |
| | ▪ Backstop payment: 250 bps earned and payable in cash to the DIP Backstop Parties on the funding date | ▪ Backstop payment: (i) with respect to the new money portion of the Exit Credit Facility, 250 bps earned and payable in cash to the Exit Backstop Parties and (ii) with respect to the rolled portion of the Exit Credit Facility, 150 bps earned and payable in cash to the Exit Backstop Parties on the funding date to occur on the Effective Date | ▪ n.a. |
| **Amortization** | ▪ n.a. | ▪ 1% per annum amortization payments, on a quarterly basis, with the first payment due on April 30, 2021<br>▪ Beginning on April 30, 2022, step up to 2% per annum amortization payments, payable on a quarterly basis with the first such payment due on April 30, 2022 | ▪ 1% per annum amortization payments, payable on a quarterly basis, with the first payment due on April 30, 2021<br>▪ Beginning on April 30, 2022, step up to 2% per annum amortization payments, payable on a quarterly basis with the first such payment due on April 30, 2022 |
| **Documentation** | ▪ The definitive documentation for the DIP Facility (the "**DIP Facility Documentation**") shall be negotiated in each case in form and substance reasonably acceptable to the DIP Lenders (collectively, the "**Documentation Principles**") | ▪ The definitive documentation for the Exit Credit Facility (the "**Exit Facility Documentation**") shall be negotiated in each case in form and substance reasonably acceptable to the DIP Lenders (collectively, the "**Documentation Principles**") | ▪ Same as New First Out Term Loan Facility |

WEIL:\97488488\11\74473.0003

| | DIP Facility | New First Out Term Loan Facility | New Second Out Term Loan Facility |
|---|---|---|---|
| **Reporting** | ▪ Usual and customary for facilities of this type and subject to the Documentation Principles<br>▪ Bi-Weekly cash flow reporting, including Bi-weekly variance reporting in the same format as the DIP Budget with written discussion of variances (including but not limited to whether variances are temporary or permanent) | ▪ Usual and customary for facilities of this type and subject to the Documentation Principles, and shall include:<br>▶ Annual budget<br>▶ Monthly reporting<br>▶ Quarterly and annual financials | ▪ Same as New First Out Term Loan Facility |
| **Withdrawal** | Conditions to a withdrawal shall include:<br>▪ Bringdown of representations and warranties in all material respects<br>▪ No Default or Event of Default under the DIP Credit Agreement<br>▪ Customary representation related to effectiveness of DIP Order<br>▪ The RSA shall be in full force and effect<br>▪ Cap on availability until entry of Final Order<br>▪ Compliance with DIP Budget (subject to permitted variance)<br>▪ Delivery of Withdrawal Notice<br>▪ Satisfaction of Financial Covenants | ▪ n/a | ▪ n/a |
| **Mandatory Prepayments** | ▪ Usual and customary for DIP facilities of this type and subject to the Documentation Principles | ▪ No ECF sweep<br>▪ Other mandatory prepayments usual and customary for facilities of this type and subject to the Documentation Principles | ▪ Same as New First Out Term Loan Facility |
| **Financial Covenants** | ▪ Receipts and Disbursements Variance Test with a 15% cushion on a cumulative basis (disbursements to exclude professional fees), tested bi-weekly on a rolling 4-week basis commencing on the third week after the Petition Date<br>▪ Minimum liquidity (to be defined as mutually agreed) in an amount to be agreed | ▪ Maximum leverage<br>▪ First test on January 31, 2022, quarterly testing thereafter<br>▪ Initial 6.00x covenant level with 0.5x step downs semi-annually until 4.50x after which the leverage covenant will remain flat | ▪ Same as New First Out Term Loan Facility |

WEIL:\97488488\11\74473.0003

| | DIP Facility | New First Out Term Loan Facility | New Second Out Term Loan Facility |
|---|---|---|---|
| | ▪ Cap on cash maintained by non-Credit Parties and/or non-Debtors in an amount to be agreed | ▪ EBITDA definition to exclude "pro forma" and similar add-backs except for cost savings programs already initiated (capped at 25% of Cash EBITDA) and restructuring costs related to the Restructuring | |
| **Affirmative Covenants** | ▪ Usual and customary for DIP facilities of this type and subject to the Documentation Principles | ▪ Usual and customary for facilities of this type and subject to the Documentation Principles | ▪ Usual and customary for facilities of this type and subject to the Documentation Principles |
| **Negative Covenants** | ▪ Usual and customary for DIP facilities of this type and subject to the Documentation Principles | ▪ Usual and customary for facilities of this type and subject to the Documentation Principles | ▪ Usual and customary for facilities of this type and subject to the Documentation Principles |
| **Adequate Protection** | ▪ Adequate protection liens on all DIP Collateral (including avoidance action proceeds)<br>▪ Adequate protection 507(b) super priority claim<br>▪ Current cash payment of reasonable and documented professional fees and expenses for the Ad Hoc First Lien Group and the Ad Hoc Crossholder Group<br>▪ All information and reporting rights set forth in the DIP Facility | ▪ n.a. | ▪ n.a. |
| **Events of Default** | ▪ Usual and customary for DIP facilities of this type and subject to the Documentation Principles | ▪ Usual and customary for facilities of this type and subject to the Documentation Principles | ▪ Usual and customary for facilities of this type and subject to the Documentation Principles |
| **Milestones** | ▪ Entry of Disclosure Statement and Plan (T+1 Business Day)<br>▪ Entry of Interim DIP Order (T+3 Business Days)<br>▪ Entry of Final DIP Order (T+25 Calendar Days)<br>▪ Entry of Confirmation Order (T+60 Calendar Days)<br>▪ Effective Date (T+80 Calendar Days)<br>▪ Canadian Borrower commences Canadian Recognition Proceeding (4 Business Days | ▪ n.a. | ▪ n.a. |

WEIL:\97488488\11\74473.0003

| | DIP Facility | New First Out Term Loan Facility | New Second Out Term Loan Facility |
|---|---|---|---|
| | following entry of Interim DIP Order and Prepack Scheduling Order)<br>▪ Canadian Borrower files motion in the Canadian Recognition Proceeding seeking entry of the Canadian Final DIP Recognition Order (4 Business Days following the entry of the Final DIP Order)<br>▪ Canadian Borrower files motion in the Canadian Recognition Proceeding seeking entry of the Canadian Plan Confirmation Recognition Order (4 Business Days following the entry of the Confirmation Order) | | |
| **Conditions Precedent** | Usual and customary for DIP facilities of this type and subject to the Documentation Principles, including without limitation:<br>▪ Delivery of acceptable DIP Budget<br>▪ Payment of accrued reasonable and documented fees and expenses of Ad Hoc First Lien Group and the Ad Hoc Crossholder Group<br>▪ Entry of Interim DIP Order followed by entry of Final Order<br>▪ Execution of DIP Credit Agreement and other DIP Documents | ▪ Usual and customary for facilities of this type and subject to the Documentation Principles, including, payment of accrued reasonable and documented fees and expenses of Ad Hoc First Lien Group and the Ad Hoc Crossholder Group | ▪ Usual and customary for facilities of this type and subject to the Documentation Principles |
| **Consent to Use Cash Collateral** | ▪ Prepetition First Lien Agent, Prepetition First Lien Lenders party to the RSA, Prepetition Second Lien Agent and Prepetition Second Lien Lenders party to the RSA shall consent to Debtors' use of all cash as cash collateral in accordance with use of proceeds and Approved DIP Budget | ▪ n.a. | ▪ n.a. |
| **Tax** | ▪ Usual and customary for DIP facilities of this type and subject to the Documentation Principles | ▪ Usual and customary for facilities of this type and subject to the Documentation Principles | ▪ Same as New First Out Term Loan Facility |
| **Other Terms & Conditions** | ▪ Existing AR Facility to remain in place on terms and conditions to be mutually agreed | ▪ Commercially reasonable efforts to obtain credit rating from both Moody's and S&P (i) prior to the Effective Date and (ii) if not | ▪ Same as New First Out Term Loan Facility |

WEIL:\97488488\11\74473.0003

| | DIP Facility | New First Out Term Loan Facility | New Second Out Term Loan Facility |
|---|---|---|---|
| | <ul><li>Waiver of section 506(c), section 552(b) equity of the cases exception and marshalling, subject to entry of a final DIP order</li><li>Prior to the earlier to occur of (i) 30 days after the Petition Date and (ii) the entry of the Final DIP Order, the Company to use commercially reasonable efforts to obtain private credit ratings of the DIP Facility from both Moody's and S&P</li><li>Upon Event of Default of the DIP Facility, Requisite DIP Lenders may direct the Administrative Agent to exercise remedies</li></ul> | obtained prior to the Effective Date, within 30 days post-close<ul><li>AR Facility in place on terms and conditions acceptable to Exit Facility Lenders</li></ul> | |

8

# EXHIBIT D

## REORGANIZATION TERM SHEET

EXECUTION VERSION

**POINTWELL LIMITED,** *ET AL.*

---

**Term Sheet for Reorganization Transaction**
**Summary of Terms and Conditions**

June 12, 2020

---

This Reorganization Term Sheet[1] sets forth the principal terms of the Restructuring and certain related transactions concerning the Company.

Subject in all respects to the terms of the Restructuring Support Agreement, the Restructuring will be consummated through the Plan in the Chapter 11 Cases commenced by each of the Parent and Company Parties set forth on Schedule 1 (each, a "**Debtor**" and, collectively, the "**Debtors**").

Without limiting the generality of the foregoing, this Reorganization Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution, and delivery of the Definitive Documents, as provided in the Restructuring Support Agreement. This Reorganization Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Reorganization Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions. Until publicly disclosed upon the prior written agreement of each of the Parent, the Ad Hoc First Lien Group, and the Ad Hoc Crossholder Group, this Reorganization Term Sheet shall remain strictly confidential and may not be shared with any other party or person (other than members of the Ad Hoc First Lien Group, and the Ad Hoc Crossholder Group) without the consent of each of the Parent, the Ad Hoc First Lien Group, and the Ad Hoc Crossholder Group.

The regulatory, tax, accounting, and other legal and financial matters and effects related to the Restructuring or any related restructuring or similar transaction have not, as of the date hereof, been fully evaluated, and such evaluation may affect the terms and structure of the Restructuring. Any such evaluation may affect the terms and structure of the Restructuring and/or certain related transactions.

THIS REORGANIZATION TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE LAW.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement.

| Summary of Prepetition Obligations and Interests | |
|---|---|
| **First Lien Revolving Credit Facility** | "**First Lien Revolving Credit Facility**" means the revolving credit facility provided under the First Lien Credit Agreement.<br><br>As of April 30, 2020, the principal obligations outstanding under the First Lien Revolving Credit Facility (collectively, the "**First Lien Revolving Credit Debt**") totaled approximately $80 million. "**First Lien Revolving Credit Claims**" means all claims (including any accrued and unpaid interest, fees, and/or deficiency claims) arising from the First Lien Revolving Credit Facility as of the Petition Date. |
| **First Lien Term Loan Facility** | "**First Lien Term Loan Facility**" means the term loan facility provided under the First Lien Credit Agreement.<br><br>As of April 30, 2020, principal obligations outstanding under the First Lien Term Loan Facility totaled approximately $1,290 million (collectively, the "**First Lien Term Loan Debt**" and, together with the First Lien Revolving Credit Debt, the "**First Lien Debt**").<br><br>"**First Lien Term Loan Claims**" (together with the First Lien Revolving Credit Claims, the "**First Lien Debt Claims**") shall refer to all claims (including any accrued and unpaid interest, fees, and/or deficiency claims) arising from the First Lien Term Loan Facility as of the Petition Date. |
| **Second Lien Term Loan Facility** | "**Second Lien Term Loan Facility**" means the term loan facility provided under the Second Lien Credit Agreement.<br><br>As of April 30, 2020, principal obligations outstanding under the Second Lien Term Loan Facility totaled approximately $670 million (collectively, the "**Second Lien Debt**").<br><br>"**Second Lien Debt Claims**" refers to all claims (including any accrued and unpaid interest, fees, and/or deficiency claims) arising from the Second Lien Term Loan Facility as of the Petition Date. |
| **Existing AR Facility** | "**Existing AR Facility**" means the senior secured credit facility comprised of a $75 million Class A revolving line of credit (the "**Class A Tranche**") and a $15 million Class B revolving line credit (the "**Class B Tranche**") provided under the Existing AR Credit Agreement.<br><br>As of April 30, 2020, principal obligations outstanding under the Class A Tranche totaled approximately $63.1 million and the principal obligations outstanding under the Class B Tranche totaled approximately $14.62 million. |
| **General Unsecured Claims** | "**General Unsecured Claims**" means any prepetition, general unsecured claim against one or more Debtors, *excluding* claims held by one or more Debtors, claims held by one or more non-Debtor affiliates of Parent (including claims held by the Evergreen Skills Entities (defined below) and/or the Sponsor or its affiliates), the First Lien Debt Claims, and the Second Lien Debt Claims. |
| **Intercompany Claims** | "**Intercompany Claims**" means any prepetition claim against one or more Debtors held by another Debtor or by a non-Debtor affiliate of Parent, including any claims held by Holdings, the Lux Borrower, Evergreen Skills Holding Lux, or Evergreen Skills Top Holding Lux (the preceding four entities, the "**Evergreen Skills Entities**"), other than the Pointwell Intercompany Debt (defined below). |

| Summary of Prepetition Obligations and Interests | |
|---|---|
| **Pointwell Intercompany Debt** | "**Pointwell Intercompany Debt**" means certain intercompany obligations owed to the Lux Borrower by the Parent which have been pledged to the First Lien Lenders pursuant (x) the First Lien Share Charge and (y) that certain First Lien Security Agreement, dated as of April 28, 2014, by and between Holdings, the First Lien Borrowers, certain subsidiaries of Holdings party thereto as grantors and the First Lien Agent and the Second Lien Lenders pursuant to (x) the Second Lien Share Charge and (y) that certain Second Lien Security Agreement, dated as of April 28, 2014, by and between Holdings, the Second Lien Borrowers, certain subsidiaries of Holdings party thereto as grantors and the Second Lien Agent. |
| **Intercompany Interests** | "**Intercompany Interests**" means any prepetition Interest in a Debtor held by another Debtor or non-Debtor affiliate of Parent (excluding the Evergreen Skills Entities and the Sponsor). |
| **Existing Parent Equity Interests** | "**Existing Parent Equity Interests**" means the equity securities of Parent, consisting of any common stock, preferred stock, warrants, or other ownership interest of or in Parent, including those interests held directly or indirectly by the Evergreen Skills Entities or the Sponsor. |
| **Subordinated Claims** | "**Subordinated Claims**" means any claim subject to subordination under section 510(b) of the Bankruptcy Code, including without limitation all accrued and unpaid management fees and other amounts owed to the Sponsor. |
| Overview of the Restructuring | |
| **Implementation of the Restructuring** | The Restructuring shall be implemented with the support of the Ad Hoc First Lien Group, the Ad Hoc Crossholder Group, the Evergreen Skills Entities, and the Sponsor through the Chapter 11 Cases pursuant to the Plan. |
| | Each of the Parent and the Company Parties shall commence the Chapter 11 Cases and shall use commercially reasonable efforts to confirm and consummate the Plan, which shall be consistent in all material respects with this Reorganization Term Sheet and the Restructuring Support Agreement and/or otherwise in form and substance reasonably acceptable to the Company and the Requisite Creditors. The Plan will provide creditors with the distributions reflected below. |
| | The Canadian Borrower shall commence the Canadian Recognition Proceeding seeking an order or orders recognizing the Chapter 11 Cases as a "foreign main proceeding" and granting related relief, including, without limitation, recognizing and giving full force and effect to the orders of the Bankruptcy Court approving the DIP Facility and confirming the Plan (such order of the Canadian Court recognizing the Bankruptcy Court order confirming the Plan, the "**Canadian Plan Confirmation Recognition Order**"). The granting of the Canadian Plan Confirmation Recognition Order shall be a condition precedent to the effectiveness of the Plan. |
| | If a Sponsor Material Breach (as defined in the Sponsor Side Agreement) has occurred or if the Sponsor Side Agreement has been terminated for any reason other than the occurrence of the Effective Date, the Consenting First Lien Lenders (constituting the Required Lenders under the First Lien Credit Agreement) shall promptly instruct the First Lien Agent to effect the Pledge Enforcement and take such other steps as may be necessary or desirable (including, but not limited to, voting (or exercising any powers or rights available to it) in favor of any matter) to support, facilitate, implement or otherwise give effect to the Pledge Enforcement, including entry into Pledge Enforcement Documents. |

| Summary of Prepetition Obligations and Interests | |
|---|---|
| **Consideration for Distribution** | The aggregate consideration that will be distributed pursuant to the Plan on the Effective Date will include, as and to the extent applicable: (i) the New Second Out Term Loan Facility (defined below); (ii) the Newco Equity (defined below); and (iii) the Warrants (defined below). |
| **DIP Facility; Use of Cash Collateral** | The Restructuring will be financed by (i) the consensual use of cash collateral and (ii) an up to $50 million DIP Facility to be provided by the DIP Lenders, subject to the terms and conditions set forth in the DIP and Exit Facility Term Sheet.<br><br>Subject to the terms of the DIP and Exit Facility Term Sheet, the DIP Facility shall be used to fund (i) the operations of the Debtors, as debtors and debtors in possession in the Chapter 11 Cases, including the Debtors' working capital and general corporate purposes, as well as the payment of professional fees and expenses and required fees and debt service on the DIP Facility, and (ii) the operations of certain non-Debtor subsidiaries through "on-lending" or contributions of capital with proceeds from the DIP Facility. |
| **New First Out Term Loan Facility** | "**New First Out Term Loan Facility**" means a new "first out" term loan facility (the loans thereunder, the "**New First Out Term Loans**") in an aggregate principal amount not to exceed (i) the aggregate principal amount outstanding under the DIP Facility as of [ten] days prior to the Effective Date (the "**Converted DIP Facility Loans**") (which Converted DIP Facility Loans shall be converted into New First Out Term Loans) and (ii) a cash amount equal to $90 million less the Converted DIP Facility Loans (collectively, the "**New First Out Term Loan Amount**" and the commitment to provide such amount, the "**New First Out Term Loan Commitment**").<br><br>The New First Out Term Loan Facility shall be made available to all holders of First Lien Debt Claims in accordance with the DIP and Exit Facility Term Sheet; *provided that* the New First Out Term Loan Facility shall be backstopped by certain members of Ad Hoc First Lien Group and the Ad Hoc Crossholder Group (solely in their capacity as First Lien Lenders) (the "**Exit Backstop Parties**") (it being understood and agreed that the backstop commitment of each of the Ad Hoc First Lien Group and the Ad Hoc Crossholder Group shall be proportional to the First Lien Debt Claims held by all members of each such group).<br><br>The New First Out Term Loan Facility shall be documented in a credit agreement which shall be in form and substance consistent with the terms and conditions set forth in the DIP and Exit Facility Term Sheet.<br><br>The New First Out Term Loan Facility shall be senior in respect of payment to the New Second Out Term Loan Facility (defined below). |
| **New Second Out Term Loan Facility** | "**New Second Out Term Loan Facility**" means a new "second out" term loan facility (the loans thereunder, the "**New Second Out Term Loans**") in an aggregate principal amount of $410 million (the "**New Second Out Term Loan Amount**") that shall be documented in the Exit Credit Agreement.<br><br>All claims and liens pursuant to the New Second Out Term Loan Facility shall be junior in all respects to the claims and liens pursuant to the New First Out Term Loan Facility; provided, that the New First Out Term Loan Facility and New Second Out Term Loan Facility shall be secured by a first lien on substantially all of the assets of the Credit Parties (as defined in the DIP and Exit Facility Term Sheet). |
| **Exit AR Facility** | "**Exit AR Facility**" means an accounts receivables facility in a principal amount up to $75 million to be provided under the Exit AR Credit Agreement. |

WEIL:\97461929\17\74473.0003

| Summary of Prepetition Obligations and Interests | |
| --- | --- |
| | The Exit AR Facility shall be secured on the same basis as the Existing AR Facility. |
| | The terms of the Exit AR Credit Agreement shall be materially consistent with the Existing AR Credit Agreement (provided that the provisions related to Class B Loans (as defined in the Existing AR Credit Agreement) may be modified to remove the Class B Tranche or replace the Class B Lender (as defined in the Existing AR Credit Agreement)) and otherwise be reasonably acceptable to the Company and the Requisite Creditors.  The Exit AR Facility shall mature December 2024 or later. |
| **Newco Equity** | "**Newco Equity**" has the meaning ascribed to it in the Restructuring Support Agreement. |
| **Tranche A Warrants** | "**Tranche A Warrants**" means warrants representing the right to acquire 5.0% of the Newco Equity issued and outstanding immediately as of the Effective Date, subject to dilution by the Incentive Plans (defined below), which shall be documented pursuant to a "**Warrant Agreement**," which shall conform in all material respects to the terms and conditions set forth in the Warrant Term Sheet. |
| **Tranche B Warrants** | "**Tranche B Warrants**" (together with the Tranche B Warrants, the "**Warrants**") means warrants representing the right to acquire 10.0% of the Newco Equity issued and outstanding as of the Effective Date, subject to dilution by the Incentive Plans, which shall be documented under the Warrant Agreement, which shall conform in all material respects to the terms and conditions set forth in the Warrant Term Sheet. |
| Classification and Treatment of Claims and Interests | |
| **Administrative Expense Claims**<br><br>Unimpaired, Unclassified and Non-Voting | On the Effective Date, or as soon as reasonably practicable thereafter, all administrative, priority, and priority tax claims (excluding DIP Facility Claims and Professional Fee Claims) (collectively, the "**Administrative Expense Claims**") shall be paid in full in cash. |
| **Professional Fee Claims**<br><br>Unimpaired; Unclassified and Non-Voting | On the Effective Date, or as soon as reasonably practicable thereafter, all holders of claims against a Debtor for professional services rendered or costs incurred on or after the Petition Date and through and including the Effective Date by professional persons retained by the Debtors or any statutory committee appointed in the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 363, or 1103 of the Bankruptcy Code in the Chapter 11 Cases (the "**Professional Fee Claims**") shall receive, in full and final satisfaction, release, and discharge of such claim, cash in an amount equal to the allowed amount of such Professional Fee Claim. |
| **DIP Facility Claims**<br><br>Unimpaired, Unclassified and Non-Voting | On the Effective Date, the principal amount outstanding of loans extended under the DIP Facility shall be (i) converted on a dollar-for-dollar basis to New First Out Term Loans or (ii) repaid in full in cash (provided that the New First Out Term Loan Commitment is met in full).  Accrued interest and other obligations under the DIP Facility will be paid in full in cash on the Effective Date. |
| **First Lien Debt Claims**<br><br>Impaired, Voting | On and from the Effective Date, in full and final satisfaction, release, and discharge of such First Lien Debt Claims, the holders of First Lien Debt Claims (or the permitted assigns and designees of such holders) shall receive their pro rata share of:<br><br>(i)     New Second Out Term Loans in an amount equal to the New Second Out Term Loan Amount; and<br><br>(ii)    96% of Newco Equity (subject to dilution by the Warrants and the Incentive Plans), |

| *Summary of Prepetition Obligations and Interests* | |
|---|---|
| | in each case based on the amount of First Lien Debt Claims as of the Petition Date. |
| **Second Lien Debt Claims**<br><br>Impaired, Voting | On and from the Effective Date, in full and final satisfaction, release, and discharge of such Second Lien Debt Claims, the holders of Second Lien Debt Claims shall receive their pro rata share of :<br><br>(i) 4% of Newco Equity (subject to dilution by the Warrants and the Incentive Plans);<br><br>(ii) the Tranche A Warrants; and<br><br>(iii) the Tranche B Warrants,<br><br>in each case based on the amount of Second Lien Debt Claims as of the Petition Date. |
| **General Unsecured Claims**<br><br>Unimpaired, Non-Voting | Except to the extent that a holder of an allowed General Unsecured Claim and the Company Party against which such allowed General Unsecured Claim is asserted agree to less favorable treatment for such holder, in full satisfaction of each allowed General Unsecured Claim against the Debtors, each holder thereof shall receive (i) payment in cash in an amount equal to such allowed General Unsecured Claim in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Claim, or (ii) such other treatment so as to render such Claim unimpaired. |
| **Intercompany Claims** | On the Effective Date, Intercompany Claims shall be reinstated, cancelled, or otherwise treated (by way of contribution to capital or otherwise), in each case at the Debtors' or Reorganized Debtors' option (with the consent of the Requisite Creditors), in accordance with the Restructuring Transaction Steps. |
| **Pointwell Intercompany Debt** | On the Effective Date, the Pointwell Intercompany Debt shall be treated in accordance with the Restructuring Transaction Steps. |
| **Intercompany Interests** | On the Effective Date, Intercompany Interests shall be reinstated, modified, cancelled, or otherwise treated, in each case at the Debtors' or Reorganized Debtors' option (with the consent of the Requisite Creditors), in accordance with the Restructuring Transaction Steps. |
| **Existing Parent Equity Interests**<br><br>Impaired, Non-Voting, and Deemed to Reject | On the Effective Date, the Pointwell Share Capital shall be transferred to Newco Borrower in accordance with the Restructuring Transaction Steps. |
| **Subordinated Claims**<br><br>Impaired, Non-Voting and Deemed to Reject | Holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Subordinated Claims. On the Effective Date, or as soon as practicable thereafter, all Subordinated Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. |
| *Miscellaneous* | |
| **Existing / Exit AR Facility** | The Existing AR Facility shall stay in place and the Existing AR Lenders shall continue to fund under the Existing AR Facility through consummation of the Plan (which the Company shall negotiate in good faith with the Existing AR Lenders to amend or modify, as needed, to allow for such funding during the pendency of the chapter 11 cases). On the Effective Date, the Existing AR Credit Agreement shall be amended and restated into the Exit AR Facility Agreement. |

6

| Summary of Prepetition Obligations and Interests | |
|---|---|
| **Professional Fee Escrow** | The Plan shall require the establishment of a professional fee escrow account (the "**Professional Fee Escrow**") to be funded with cash in the amount equal to the Professional Fee Reserve Amount (defined below). It shall be a condition precedent to the substantial consummation of the Plan that the Company shall have funded the Professional Fee Escrow in full in cash in an amount equal to the Professional Fee Reserve Amount. |
| | The Professional Fee Escrow shall be maintained in trust solely for the benefit of professionals retained by the Company, any official committee (a "**Committee**") appointed by the Bankruptcy Court, the Ad Hoc First Lien Group, and the Ad Hoc Crossholder Group (each a "**Professional**," and collectively, the "**Professionals**"). The Professional Fee Escrow shall not be considered property of the Company or its estates, and no liens, claims, or interests shall encumber the Professional Fee Escrow, or funds held in the Professional Fee Escrow, in any way. |
| | The "**Professional Fee Reserve Amount**" shall consist of the total amount of (a) any unpaid invoices for fees and expenses incurred by Professionals retained by the Company or any official committee through and including the Effective Date; (b) estimated fees and expenses of the Professionals retained by the Company or any Committee, as estimated by such Professionals in good faith, for (i) accrued but uninvoiced fees and expenses and (ii) post-Effective Date activities, in each case in accordance with the terms of their applicable engagement or reimbursement letters. |
| **Restructuring Fees and Expenses** | The Company shall pay, or cause to be paid, immediately prior to the Petition Date, all reasonable and documented fees and expenses for which invoices or receipts are furnished at least one (1) Business Day prior thereto by the Ad Hoc First Lien Group and the Ad Hoc Crossholder Group (the "**Restructuring Fees and Expenses**"), including fees and expenses estimated to be incurred prior to the filing of the Chapter 11 Cases, in each case in accordance with the terms of their applicable engagement or reimbursement letters. |
| | As a condition precedent to the occurrence of the Effective Date, the Company will pay all Restructuring Fees and Expenses, including those fees and expenses estimated to be incurred through the Effective Date to the extent invoiced at least two (2) Business Days before the Effective Date. |
| **Incentive Plans** | Following the Effective Date, the New Board will adopt a post-Restructuring equity incentive plan ("**Incentive Plan**") comprised of the Management Incentive Plan and the Board Incentive Plan, under which up to 10.0% of the Newco Equity will be reserved for issuance as awards thereunder, of which 15.0-20.0% (*i.e.*, between 1.5%-2.0% of Newco Equity) will be reserved for issuance to nonemployee directors under the Board Incentive Plan and the remaining 80.0-85.0% of which (*i.e.*, between 8.0-8.5% of Newco Equity) will be reserved for issuance under the Management Incentive Plan (the "**MIP Award Pool**"). |
| | The MIP Award Pool shall be subject to customary equitable adjustments for changes in capitalization and other reorganization events. |
| | Any initial grants under the Management Incentive Plan to individuals party to an employment agreement or similar agreement or offer letter that provides for the grant of any equity interests or similar long-term compensation will be subject to agreement by such executive to (x) eliminate such provisions, to the extent still operative, and (y) accept that all long-term compensation going forward will be in the discretion of the New Board. Awards under the Incentive Plan will be partially time-vesting and partially |

WEIL:\97461929\17\74473.0003

| Summary of Prepetition Obligations and Interests | |
|---|---|
| | performance-vesting, on such terms as determined by the New Board, subject to approval by the Evergreen Directors (as defined in the Governance Term Sheet).  All other terms with respect to the Incentive Plan (including types of awards, allocations and performance thresholds) will be in the discretion of the New Board, subject to approval by the Evergreen Directors (as defined in the Governance Term Sheet).<br><br>Any amendment to alter the design of the Incentive Plan or to increase the share reserve available for issuance under the Incentive Plan following the Effective Date will require approval by the Evergreen Directors.<br><br>The terms and conditions of the Board Incentive Plan shall be (i) agreed by a majority (in holdings or pro forma holdings of Newco Equity) of members of the Steering Committee and the Crossholder Group (each as defined in the Governance Term Sheet) and (ii) approved by the New Board following the Effective Date.  The Board Incentive Plan shall provide equal compensation to all directors other than the chairman of the New Board; *provided* that any director who is employed by a stockholder of the Company (or an affiliate thereof) shall not be entitled to receive compensation under the Board Incentive Plan.<br><br>Neither Skillsoft Corporation nor any of its affiliates shall pay an Exit Bonus, as defined in section 4 of the Employment Agreement dated July 9, 2018, if payable in connection with the Restructuring, in any amount in excess of the specified dollar amount set forth in the second line of section 4 of the Employment Agreement. |
| **Tax Attributes** | To the extent reasonably practicable, the Restructuring shall be structured in a manner which minimizes any current cash taxes payable by Company and the Consenting Creditors, if any, as a result of the consummation of the Restructuring.  The terms of the Plan shall be structured to maximize the favorable tax attributes of the Reorganized Debtors going forward. |
| **Indemnification** | The Company's indemnification provisions currently in place (whether in the bylaws, certificates of incorporation (or other equivalent governing documents), or employment contracts) for current and former directors, officers, employees, managing agents, and professionals and their respective affiliates will be assumed by the Company and not modified in any way by the Restructuring through the Plan or the transactions contemplated thereby. |
| **Transfer Restrictions** | No restrictions, subject to applicable law. |
| **Governance (Board Composition & Voting)** | The organizational documents and/or stockholders agreement of Newco Parent shall provide, in all material respects, for the terms set forth in the Governance Term Sheet. |
| Releases and Exculpations | |
| **Parties** | The "**Released Parties**" and "**Exculpated Parties**" shall include the Company, the First Lien Agent, the Second Lien Agent, [CIT,] the Sponsor and the Evergreen Skills Entities (collectively, the "**Sponsor Entities**"), the Ad Hoc First Lien Group and its current and former members, the Ad Hoc Crossholder Group and its current and former members, and each of their respective current and former affiliates, subsidiaries, members, managers, equity owners, managed entities, investment managers, employees, professionals, consultants, directors and officers (in each case in their respective capacities as such) and other persons and entities acceptable to the Company and the Requisite Creditors. |

WEIL:\97461929\17\74473.0003

| Summary of Prepetition Obligations and Interests | |
|---|---|
| | If a Sponsor Material Breach (as defined in the Sponsor Side Agreement) has occurred or if the Sponsor Side Agreement has been terminated for any reason other than the occurrence of the Effective Date, then the "Released Parties" and the "Exculpated Parties" shall not include the Sponsor Entities and each of their respective current and former affiliates (other than the Company), subsidiaries (other than the Company), members, managers, equity owners, managed entities, investment managers, employees, professionals, consultants, directors and officers (in each case solely in their respective capacities as such); *provided* that releases of the Evergreen Skills Entities shall not be effective until such time as is consistent with the Restructuring Transaction Steps. <br><br> The "**Releasing Parties**" means, collectively, (i) the holders of all Claims or Interests who vote to accept the Plan, (ii) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (iii) the holders of all Claims or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth therein, (iv) holders of Claims or Interests who voted to reject this Plan but did not opt out of granting the releases set forth in the Plan, and (v) the Released Parties. |
| **Releases by Debtors** | The Plan shall provide: <br><br> Except as otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including without limitation the efforts of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring contemplated by the Restructuring Support Agreement, on and after the Effective Date, to the maximum extent permitted by applicable law, the Debtors and the Estates are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time prior to or on the Effective Date, arising from or related in any way in whole or in part to the chapter 11 cases, the Restructuring, the Evergreen Skills Entities, the Parent, the Company or any direct or indirect subsidiary of the Parent, the First Lien Credit Agreement, Second Lien Credit Agreement, any Credit Document (as defined in the Credit Agreements), the Existing AR Credit Agreement, the purchase, sale, or rescission of the offer, purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim against or equity interest in the Company that is treated hereunder, or the negotiation, formulation, or preparation of the Definitive Documents or related agreements, instruments, or other documents, in each case other than claims or liabilities arising out of a Released Party's own intentional fraud, gross negligence, or willful misconduct. |
| **Releases by Holders of Claims and Interests** | The Plan shall provide: <br><br> Except as otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including without limitation the efforts of the Debtors and Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring contemplated by the Restructuring Support Agreement, on and after the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, |

WEIL:\97461929\17\74473.0003

| | |
|---|---|
| **Summary of Prepetition Obligations and Interests** | |
| | unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time prior to or on the Effective Date, arising from or related in any way in whole or in part to the chapter 11 cases, the Restructuring, the Evergreen Skills Entities, the Parent, the Company or any direct or indirect subsidiary of the Parent, the First Lien Credit Agreement, Second Lien Credit Agreement, any Credit Document (as defined in the Credit Agreements), the Existing AR Credit Agreement, the purchase, sale, or rescission of the offer, purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim against or equity interest in the Company that is treated hereunder, or the negotiation, formulation, or preparation of the Definitive Documents or related agreements, instruments, or other documents, in each case other than claims or liabilities arising out of a Released Party's own intentional fraud, gross negligence, or willful misconduct. |
| **Exculpation** | The Plan shall provide:<br><br>To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any claim or Cause of Action in connection with or arising out of the administration of the chapter 11 cases; the negotiation and pursuit of the DIP Facility, the New First Out Term Loan Facility, the New Second Out Term Loan Facility, the Exit AR Facility, the Warrants, the Management Incentive Plan, the Disclosure Statement, the Restructuring Supporting Agreement, the Restructuring, and the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes intentional fraud or willful misconduct as determined by a Final Order. In all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. |

**Schedule 1**

**Debtors**

Accero, Inc.
Amber Holding Inc.
CyberShift, Inc.
CyberShift Holdings, Inc.
MindLeaders, Inc.
Pointwell Limited
Skillsoft Canada, Ltd.
Skillsoft Corporation
Skillsoft Ireland Limited
Skillsoft Limited
Skillsoft U.K. Limited
SSI Investments I Limited
SSI Investments II Limited
SSI Investments III Limited SumTotal
Systems LLC
Thirdforce Group Limited

**<u>EXHIBIT E</u>**

**GOVERNANCE TERM SHEET**

**POINTWELL LIMITED,** *ET AL.*

---

**Governance Term Sheet**
June 12, 2020

---

This Governance Term Sheet[1] presents certain preliminary material terms in respect of the capital structure and governance of Newco Parent[2] (the "Company"), which will be reflected in definitive documentation to be negotiated, executed and delivered by the Debtors and the Consenting Creditors, subject in all respects to the terms of the Restructuring Support Agreement (the "RSA"). This Governance Term Sheet is not an exhaustive list of all the terms and conditions in respect of the governance of the Company.

| **CAPITALIZATION** | |
|---|---|
| **Capital Stock** | *Authorized Shares*:  The capital stock of the Company will consist of (i) [__] shares of common stock ("Common Stock") and (ii) 1,000,000 shares of "blank check" preferred stock ("Preferred Stock"), in each case, or the local law equivalent thereof. |
| | *Common Stock*:  An aggregate of [__] shares of Common Stock will be issued on the effective date of the reorganization (the "Effective Date") pursuant to the RSA. There will be one class of Common Stock, with one vote per share. |
| | *Preferred Stock*:  No shares of Preferred Stock will be issued on the Effective Date.  The Board of Directors of the Company (the "Board") will have the power to issue and define the terms of any class or series of Preferred Stock following the Effective Date. |
| **Warrants** | Two tranches of warrants (collectively, the "Warrants") will be issued on the Effective Date, having the terms set forth on Exhibit F to the RSA. |
| **BOARD OF DIRECTORS** | |
| **Number of Directors** | The board of directors of the Company (the "Board") will initially consist of seven directors (each, a "Director"). |
| **Initial Composition of the Board** | The Board shall initially be comprised of, and all stockholders will agree to vote their shares to elect, the following individuals: |
| | (i)    the Chief Executive Officer of the Company; |
| | (ii)    three Directors (each, an "SC Designated Director") nominated by the group of stockholders listed on Annex A hereto (such stockholders, collectively, the "Steering Committee"); |
| | (iii)    two Directors (each, a "CHG Designated Director") nominated by the group of stockholders listed on Annex B hereto |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement.

[2] NTD: Newco Parent will be domiciled in Luxembourg.  This Term Sheet remains subject to review and comment by local Luxembourg counsel, including to reflect necessary changes based on the final determination of entity type.  The Company shall be treated as a corporation for tax purposes.

1

|  | (collectively, the "Crossholder Group"); and |
|---|---|
|  | (iv) one "independent director"[3] (an "Independent Director") nominated by the mutual agreement of the Steering Committee and the Crossholder Group; |
|  | provided, that the Independent Director shall serve as the Board's chairperson during the Initial Term; provided further that [Eaton Vance Management, Lodbrok Capital LLP and EQT][4] (such stockholders, the "Evergreen Stockholders") shall each have the right to nominate, in its sole discretion, one Director (an "Evergreen Director"; it being understood that the Evergreen Stockholders shall endeavor to name the Evergreen Directors to serve on the initial Board slate prior to the filing of the plan supplement; provided, further, that (x) the appointment of an Evergreen Director by an Evergreen Stockholder that is a lender in the Steering Committee shall correspondingly reduce the number of SC Designated Directors and (y) the appointment of an Evergreen Director by an Evergreen Stockholder that is a lender in the Crossholder Group shall correspondingly reduce the number of CHG Designated Directors. |
| **Term** | The initial Directors shall serve until the Company's annual meeting of stockholders held in 2021 (the "Initial Term"), after which all Directors will be elected at each annual meeting of stockholders to serve one-year terms (in each case unless earlier removed pursuant to the terms of the Company's governing documents, which terms will be mutually acceptable to the Steering Committee and the Crossholder Group). |
| **Nomination of Directors[5]** | Following the Initial Term, the following Directors shall be nominated for election at each annual meeting of the Company's stockholders or at a special meeting or by written consent of the stockholders at any time: |
|  | (i) the Chief Executive Officer of the Company; |
|  | (ii) the Evergreen Directors; provided that in the event the number of shares of Common Stock held by any Evergreen Stockholder (together with its affiliates) falls below 8% of the then outstanding Common Stock (calculated on a fully-diluted basis, excluding Award Shares and shares of Common Stock underlying the Warrants (collectively, "Excluded Shares")), then from and after such time such Evergreen Stockholder shall no longer be entitled to nominate an Evergreen Director (it being understood that during the Initial Term the applicable Evergreen Director then serving on the Board shall retain his or her seat on the Board until the first annual meeting); provided that, notwithstanding the foregoing, in the event of |

---

[3] NTD: The "independent director" shall qualify as "independent" as such term is used in the New York Stock Exchange rules.
[4] NTD: As of April 25, 2020, each of the Evergreen Stockholders was entitled to at least 10% of the outstanding shares of Common Stock (calculated on a fully-diluted basis, excluding Excluded Shares).
[5] NTD: Following the Initial Term, the Directors shall nominate, by majority vote, a chairperson to preside over meetings of the Board.

an Evergreen Transfer (as defined below), the applicable transferee shall be considered an "Evergreen Stockholder" for all purposes hereof, other than the right to nominate an Additional Director;

(iii) if, following the Effective Date, any stockholder of the Company who was a lender under the First Lien Credit Agreement or the Second Lien Credit Agreement as of April 25, 2020 (including the Evergreen Stockholders), together with its affiliates, increases its holdings of Common Stock to at least 25% of the then-outstanding Common Stock (calculated on a fully-diluted basis, excluding Excluded Shares) (the "25% Threshold"), such stockholder (a "Significant Stockholder") shall have the right to nominate two Directors (each, an "Additional Director") at the next annual meeting of the Company's stockholders at which Directors are to be elected or, following the Initial Term, at a special meeting, so long as such Significant Stockholder (together with its affiliates) holds at least 20% of the then outstanding Common Stock (calculated on a fully-diluted basis, excluding Excluded Shares) (the "Additional Directors Floor"); provided that, in the event the number of shares of Common Stock held by a Significant Stockholder (together with its affiliates) falls below the Additional Directors Floor, then from and after such time such Significant Stockholder shall no longer be entitled to nominate any Additional Director; provided, however, that if any Significant Stockholder is also an Evergreen Stockholder, and was an Evergreen Stockholder on the Effective Date, then (x) such Significant Stockholder shall only have the right to nominate one Additional Director (for a total of two Directors) and (y) if the holdings of such Significant Stockholder (together with its affiliates) falls below the Additional Director Floor, then such Significant Stockholder will retain the right to designate an Evergreen Director, subject to the proviso set forth in clause (ii) above; and provided further, that the number of Independent Directors nominated pursuant to clause (iv) immediately below will be reduced, to a number not less than one, in order to accommodate each Additional Director nominated in accordance with the foregoing (and for the avoidance of doubt, if the nomination by a Significant Stockholder of an Additional Director would cause the total number of nominees to the Board to exceed seven, then such Significant Stockholder shall not be entitled to nominate such Additional Director until such time as a seat on the Board becomes available such that such nomination would not cause the total number of nominees to the Board to exceed seven); and

(iv) a number of Independent Directors required to fill the remaining seats on the Board, nominated by the stockholders

|  | collectively holding a majority of the outstanding Common Stock (calculated on a fully-diluted basis, excluding Excluded Shares); provided that in no event will a number of Independent Directors be nominated that would result in the size of the Board exceeding seven Directors. |
|---|---|
| **Voting for Directors** | Directors shall be elected by stockholders collectively holding a majority of the outstanding Common Stock (calculated on a fully-diluted basis, excluding Excluded Shares); provided that all stockholders shall be required to vote in favor of the election of the Chief Executive Officer and, to the extent nominated in accordance with clauses (ii) and (iii) of the above section titled "Nomination of Directors", the Evergreen Directors and any Additional Director. |
| **Board Observers** | In the event that an Evergreen Stockholder elects an Evergreen Director or Additional Director(s), as applicable,  who are not employees of such Evergreen Stockholder or such Evergreen Stockholder's affiliates and who otherwise qualify as an Independent Director, then such Evergreen Stockholder shall also have the right to appoint one non-voting observer to the Board (an "Observer"); provided that any Observer shall execute a confidentiality agreement with the Company in a form reasonably satisfactory to the Company (it being understood that such confidentiality agreements will be in a form reasonably customary for such circumstances). |
| **Removal of Directors** | Any Director may be removed from office, either with or without cause, by an affirmative vote of stockholders owning a majority of the outstanding shares of Common Stock; provided that (i) during the Initial Term, a SC Designated Director may only be removed by the Steering Committee, a CHG Designated Director may only be removed by the Crossholder Group and the Independent Director may only be removed by the mutual agreement of the Steering Committee and the Crossholder Group; (ii) any Evergreen Director may only be removed by the applicable Evergreen Stockholder and (iii) any Additional Director may only be removed by the applicable Significant Stockholder; provided, further, that all stockholders shall be required to vote (as necessary) to remove any such SC Designated Director, CHG Designated Director, Independent Director, Evergreen Director or Additional Director, as applicable. |
| **Board Vacancies** | Any vacancy on the Board shall be filled by the stockholder(s) entitled to nominate the applicable Director in accordance with the nomination requirements described above in the sections titled "Initial Composition of Board" or "Nomination of Directors", as applicable, and all stockholders shall be required to vote (as necessary) to elect such person as a Director[6]; provided that, during the Initial Term, (i) any vacancy on the Board with respect to the SC Designated Directors shall be filled by |

---

[6] NTD: For the avoidance of doubt, no vacancy will result in the event that an Evergreen Stockholder or Significant Stockholder fails to maintain its holdings at the level required in clause (ii) or clause (iii) of "Nomination of Directors", as applicable.  Rather (subject to the rights of the Evergreen Stockholders during the Initial Term or with respect to an Evergreen Transfer), such Director seat shall be filled in accordance with clause (iv) of "Nomination of Directors".

| | |
|---|---|
| | any remaining SC Designated Director(s), (ii) any vacancy on the Board with respect to the CHG Designated Directors shall be filled by any remaining CHG Designated Director, and (iii) any vacancy on the Board with respect to the Independent Director shall be filled by the mutual agreement of the SC Designated Directors and the CHG Designated Directors; provided, further, that, during the Initial Term, (x) if there are no remaining SC Designated Directors, then any such vacancy shall be filled by a majority in interest of the Steering Committee and (y) if there are no remaining CHG Designated Directors, then any such vacancy shall be filled by a majority in interest of the Crossholder Group. |
| **Quorum** | The presence of a majority of all Directors then serving on the Board shall constitute a quorum at any meeting of the Board. |
| **Board Voting** | All matters will require approval of a majority of the Board; provided that, until the third anniversary of the Effective Date, the following actions (the "Supermajority Matters") shall require the affirmative vote of at least five of seven Directors (or, in the event of a vacancy that remains unfilled for 6 months, an equivalent supermajority): <br><br>(i)    any proposed disposition of 35% or more of the equity interests, or a majority of the assets, of SumTotal Systems, LLC or any of its successors; <br><br>(ii)    the appointment, termination or removal of the Chief Executive Officer of the Company; <br><br>(iii)    (A) a refinancing of 100% of the Company's existing financing arrangements, or (B) the incurrence by the Company and/or its subsidiaries of indebtedness (other than pursuant to financing arrangements in existence on the Effective Date) in excess of $65,000,000, including a partial refinancing of existing indebtedness in excess of such amount; and <br><br>(iv)    any Preferred Stock capital raise in excess of $30,000,000. |
| **Action by Written Consent** | Any action by the Board may be taken by unanimous written consent in lieu of a meeting. |
| **Board Committees** | Board committees may be created by the Board.  Committees are permitted to act in any manner only to the extent authorized by the Board and permitted by applicable law.  Board committee composition to reflect the composition of the Board. |
| **Subsidiary Boards** | Any board of directors (or similar governing body) of any subsidiary of the Company shall be comprised of the same individuals then serving as Directors on the Board, in each case, unless otherwise agreed by the person or group nominating such individual. |
| **Director Limitations** | Notwithstanding anything herein to the contrary, in no event shall any individual be nominated or elected as a Director if such person is also (i) employed by a Competitor (as defined below), (ii) employed by an affiliate of a Competitor, or (iii) a holder of 10% or more of the outstanding equity of a Competitor, or if the election of such person would cause the Company to violate applicable law, including antitrust |

| | laws. |
|---|---|
| | "<u>Competitor</u>" shall mean a competitor of the Company as determined by the Board in its reasonable business judgment; <u>provided</u>, <u>however</u>, that in no event shall the members of the Steering Committee and the Crossholder Group (including such members' directors, officers, employees, agents and affiliates) be considered "Competitors". |
| **STOCKHOLDER RIGHTS** | |
| **Annual Meetings** | Each annual meeting of the Company's stockholders must be held within 13 months of the prior year's annual meeting. |
| **Special Meetings** | One or more stockholders (the "<u>Requesting Stockholders</u>") collectively holding at least 25% of the outstanding shares of Common Stock may call a special meeting of the stockholders.  Special meetings must be held within 60 days of a request by the Requesting Stockholders. |
| **Stockholder Proposals** | At any meeting of stockholders, only the business brought forward by the Directors or the stockholders shall be decided.  To submit business (i) for an annual meeting, a stockholder must provide notice not less than 60 days nor more than 90 days prior to the first anniversary of the preceding year's annual meeting and (ii) for a special meeting, the Requesting Stockholders must provide notice in connection with their request for such meeting.  In each case, stockholders must provide a description of business to be discussed along with information about their holdings and interests in the Company in the notice.  There is no limit with respect to the number of matters that can be brought at a meeting. |
| **Quorum** | Stockholders holding a majority of the then-outstanding shares of Common Stock shall constitute a quorum.  Unless otherwise required by law or the Company's governing documents, the affirmative vote of holders of at least a majority of the then-outstanding shares of Common Stock present in person or voting by proxy shall be sufficient to take corporate action. |
| **Stockholder Approval Matters** | The following actions shall require the affirmative vote of holders of at least a majority of the then-outstanding shares of Common Stock: |
| | (i)  the matters set forth in clauses (i) and (iii) of the definition of "Supermajority Matters"; <u>provided</u> that stockholder approval shall not be required for any matter set forth in clause (iii)(A) of the definition of "Supermajority Matters", or for any matter set forth in clause (iii)(B) of the definition of "Supermajority Matters" if, in the case of any matter set forth in clause (iii)(B) of the definition of "Supermajority Matters", the proceeds of such financing are used for general corporate purposes; |
| | (ii)  the issuance, in one or more related transactions, of any shares of Common Stock (or Preferred Stock or other securities convertible into or exchangeable for Common Stock) exceeding 20% of the then-outstanding shares of Common Stock; and |

| | |
|---|---|
| | (iii) following the 48-month anniversary of the Effective Date, any sale of the Company (to include a sale of a majority of the then-outstanding capital stock, a merger, a sale of all or substantially all of the assets and other similar change-of-control transactions). |
| **Stockholder Action by Written Consent** | Stockholders may take any action without a meeting if stockholders having at least the minimum number of votes required to take such action at a meeting at which all shares entitled to vote thereon were present and voted consent in writing (including by electronic submission), <u>provided</u> that prompt written notice of such action is provided to the non-consenting stockholders; and <u>provided</u>, <u>further</u>, that, except with respect to the election of Directors following the Initial Term in accordance with the above section titled "Nomination of Directors", such written notice will be delivered not less than [___] days following such action. |
| **Transfers** | Common Stock will be freely transferable, subject to compliance with applicable law.  Notwithstanding the foregoing, holders of Common Stock (including Common Stock issuable upon exercise of Warrants) or Warrants shall not transfer any such Common Stock or Warrants, as applicable, if, in the Board's judgment, such transfer could, or may reasonably be expected to, result in an increase in the number of holders of record of such class of equity securities which would cause the Company to become required to register such securities under Section 12(g) of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"). |
| | In the event that an Evergreen Stockholder transfers all of its Common Stock to an unaffiliated transferee and, at the time of such transfer, such Evergreen Stockholder is entitled to nominate an Evergreen Director in accordance with clause (ii) of the above section titled "Nomination of Directors" (such transfer, an "<u>Evergreen Transfer</u>"), then the right of such Evergreen Stockholder to nominate an Evergreen Director shall transfer to such unaffiliated transferee and all rights and limitations hereunder applicable to an Evergreen Stockholder (other than the right to nominate an Additional Director) shall apply to such transferee mutatis mutandis. |
| **Sale of the Company** | During the 48-month period following the Effective Date, any sale of the Company (to include a sale of a majority of the then-outstanding capital stock, a merger, a sale of a majority of the assets and other similar change-of-control transactions), will require the approval of the holders of 66 2/3% or more of the then-outstanding shares of Common Stock. |
| **Drag-Along Right[7]** | Subject to the stockholder approval rights set forth in the above sections titled "Reserved Matters" and "Sale of the Company", as applicable, the Company and stockholders will have customary drag-along rights (the "<u>Drag-Along Rights</u>") to require all stockholders to participate on a *pro* |

---

[7] NTD: The definitive governance agreements will address the issue of non-cash consideration in drag or tag-along transactions and the ability of CLOs to participate in such transactions.

| | |
|---|---|
| | *rata* basis in any merger, consolidation or other similar transaction or series of related transactions pursuant to which any person or group of persons acquires from the stockholders of the Company 50% or more of the then-outstanding shares of Common Stock (calculated on a fully-diluted basis, excluding Excluded Shares) of all shares of Common Stock held by such selling stockholders to an unaffiliated third party in a bona fide transaction.  The Drag-Along Rights shall be subject to customary limits on representations, warranties, restrictive covenants and indemnities and the consideration to be received by stockholders shall be in the same form and amount per share. |
| **Tag-Along Right** | Stockholders will have customary tag-along rights in the event that one or more stockholders wish to sell Common Stock representing at least [____]% of the then-outstanding shares of Common Stock (calculated on a fully-diluted basis, excluding Excluded Shares) to an unaffiliated third party in a bona fide transaction (a "<u>Tag-Along Sale</u>").  Tag-along rights shall be subject to customary limits on representations, warranties, restrictive covenants and indemnities and the consideration to be received by stockholders participating in transactions subject to such tag-along rights shall be in the same form and amount per share.  In the event of a Tag-Along Sale, the Company shall provide notice to the holders of Warrants in order to enable any such holders to exercise their Warrants and, to the extent permitted, participate in the Tag-Along Sale with respect to the Common Stock received pursuant to such exercise. |
| **Preemptive Rights** | From and after the Effective Date and prior to a qualified IPO, holders of more than 1% of then-outstanding Common Stock (calculated on a fully-diluted basis, excluding Excluded Shares) will have customary preemptive rights on all issuances by the Company and its subsidiaries of equity and convertible debt securities (subject to customary exceptions.[8]  In the event of any such issuance, the Company shall provide notice to the holders of Warrants in order to enable any such holders to exercise their Warrants and, to the extent permitted, exercise preemptive rights with respect to the Common Stock received pursuant to such exercise. |
| **Information Rights** | The Company shall provide all holders of more than 1.5% of then-outstanding Common Stock (calculated on a fully-diluted basis, excluding Excluded Shares) with both quarterly unaudited financial statements within a customary time period following each quarter's end and annual audited financial statements within a customary time period following each fiscal year's end (the foregoing financial statements provided to all stockholders, the "<u>Financial Statements</u>"); <u>provided</u> that the Company shall not provide such information to any stockholder that is a Competitor.[9]  Information to be subject to customary confidentiality requirements.  In addition, the Company will schedule a teleconference |

---

[8] NTD: Ability to issue securities in the event emergency funding is required to be discussed in conjunction with the stockholders agreement and, unless such issuance is exclusively in the form of debt securities, all holders that were otherwise entitled to participate shall be provided with preemptive rights post-closing.

[9] NTD: Timing of information rights related deliveries to align with reporting requirements under credit documents of the Company and/or its subsidiaries.

| | |
|---|---|
| | with (i) all holders of more than 3.5% of then-outstanding Common Stock (calculated on a fully-diluted basis, excluding Excluded Shares), other than Competitors, and (ii) all holders of then-outstanding Common Stock who are also members of the Steering Committee and Crossholder Group as of the date of the RSA, between 5 and 15 business days after the delivery of each quarterly and annual financial report to discuss the Company's business, financial condition and financial performance, prospects, liquidity and capital resources. |
| **Registration Rights** | ***Demand Registration Rights***:  Following an initial public offering by the Company (an "<u>IPO</u>"), upon receipt of a demand by one or more holders collectively holding at least 10% of the outstanding shares of Common Stock (collectively, "<u>Registrable Securities</u>"), subject to mutually agreed restrictions regarding the aggregate number of demand rights and customary time limitations and suspension/blackout periods, the Company shall provide a notice to all holders of Registrable Securities to allow participation in a registration as selling holders. Amounts sold by selling holders will be *pro rata* based on the relative amounts of Registrable Securities held by them, subject to *pro rata* reduction based on any cap on the number of securities to be sold as advised by the underwriters, and subject to normal blackout provisions.<br><br>For the avoidance of doubt, Warrants shall not be considered "Registrable Securities" hereunder.  Notwithstanding the foregoing, following the Company's receipt of a demand in accordance with the preceding paragraph, the Company shall provide notice to the holders of Warrants in order to enable any such holders to exercise their Warrants and, to the extent permitted, participate in such registration with respect to the Common Stock received pursuant to such exercise.<br><br>***Piggyback Registration Rights***:  If the Company plans to file a registration statement (other than for an IPO or in other customary circumstances in which piggy-back rights are not appropriate), the Company shall provide a notice to all holders of Registrable Securities to offer participation in the registration as selling holders.  The Company shall have the right to sell as many shares as the Company wants and any additional securities that may be sold as advised by the underwriters will be allocated among the participating selling holders on a *pro rata* basis based on the relative amounts of Registrable Securities held by them, in all cases subject to normal blackout provisions.<br><br>***Lock-Up***:  Any reasonable lock-up requested by underwriters shall apply only to selling holders and, in connection with an IPO only, holders holding more than 5% of the outstanding shares of Common Stock.<br><br>Registration Rights shall be provided pursuant to an agreement in reasonably customary form for transactions of this type. |
| **OTHER** | |
| **Dividends** | Subject to applicable law, the Board may declare and pay dividends upon the shares of the Company's capital stock. |

| | |
|---|---|
| **Corporate Opportunities** | No executive director or officer of the Company and/or its subsidiaries shall be permitted to pursue any corporate opportunity that could reasonably benefit the Company and/or its subsidiaries based on the then-current business plan. No non-executive director of the Company and/or its subsidiaries shall be permitted to pursue any corporate opportunity that could reasonably benefit the Company and/or its subsidiaries based on the then-current business plan, in each case, if, and only to the extent, such corporate opportunity was presented to, or acquired, created or developed by, or otherwise came into the possession of, such non-executive director expressly, solely and directly in such person's capacity as a director of the Company, unless a majority of disinterested Directors confirms that the Company (including its subsidiaries) will not pursue such opportunity. For the avoidance of doubt, no stockholder of the Company shall be restricted from pursuing any corporate opportunities, unless such stockholder is also a director or officer of the Company and/or its subsidiaries. |
| **Related Party Transactions** | Other than commercial transactions in the ordinary course of business consistent with past practice on arms'-length terms and the issuance of securities pursuant to the preemptive rights described above, the entering into of any transaction with (i) a stockholder, director or officer of the Company, (ii) any entity in which one or more stockholders, directors or officers of the Company owns, directly or indirectly, individually or in the aggregate, 5% or more of the outstanding equity securities of such entity or (iii) any "affiliate", "associate" or member of the "immediate family" (as such terms are respectively defined in rules and regulations under the Exchange Act) of any person described in the foregoing clauses (i) or (ii) shall, in each case, require the affirmative vote of a majority of Directors (excluding any Director who is, or is a related party of, the person with whom the Company or any of its subsidiaries is proposing to enter into the relevant transaction). |
| **Amendments to Governing Documents** | ***Bylaws***:  Subject to applicable law and the terms of the stockholder agreement to which the Company is party (the "<u>Stockholder Agreement</u>") and the Company's certificate of incorporation (as amended, the "<u>Charter</u>"), the bylaws of the Company (the "<u>Bylaws</u>") may be amended or repealed, or new Bylaws adopted, by either the Board or stockholders holding a majority of outstanding shares of Common Stock. <br><br> ***Charter***:  Any amendment to the Charter shall be made in accordance with applicable law. <br><br> ***Stockholder Agreement***: Amendments to provisions of the Stockholder Agreement shall require the prior consent of stockholders holding (a) 66 2/3% of the then-outstanding shares of Common Stock, with respect to amendments to provisions of the Stockholder Agreement related to: (i) Board participation rights; (ii) size of the Board; (iii) supermajority Board approval rights; (iv) stockholder approval rights; (v) Tag-Along Sale rights; (vi) sale of the Company approval rights; (vii) preemptive rights; and (viii) registration rights and (b) a majority of the then-outstanding shares of Common Stock for all other amendments (in |

| | either case of (a) or (b), the "<u>Amendment Threshold</u>"); <u>provided</u> that (i) no amendment may adversely affect a stockholder relative to other stockholders without such stockholder's specific written consent; (ii) any amendment to the provisions of the Stockholder Agreement regarding the rights of one or more stockholders to nominate Directors shall require the written consent of all such nominating stockholders; and (iii) no provision of the Stockholder Agreement which requires the consent of stockholders owning more than the Amendment Threshold to take the action described therein may be amended without the consent of stockholders owning such higher percentage of shares of Common Stock. Upon an IPO, the Stockholder Agreement (other than provisions relating to registration rights) shall terminate. In the event of a conflict between the Stockholder Agreement, on the one hand, and the Bylaws or the Charter, on the other hand, the Stockholder Agreement will prevail, and the stockholders will take all actions necessary to amend the Charter and/or Bylaws to the extent necessary to conform to the relevant terms of the Stockholder Agreement. |
|---|---|

## ANNEX A

## Steering Committee

- Alcentra Limited
- Apollo Capital Management, L.P.
- Benefit Street Partners L.L.C.
- DDJ Capital Management, LLC
- Eaton Vance Management, Boston Management and Research, Calvert Research and Management
- PGIM, Inc.
- Symphony Asset Management LLC
- Voya Investment Management Co, LLC

**ANNEX B**

**Crossholder Group**

- CRF2 SA, CRF3 Investments I S.à.r.l., EAD Credit Investments I SARL, and Empire Credit Investments I SARL (collectively, "<u>EQT</u>")

- Lodbrok Capital LLP

- Signature Global Asset Management, a division of CI Investments Inc.

- MS Capital Partners Adviser Inc.

## **EXHIBIT F**

## **WARRANT TERM SHEET**

---

**Warrant Term Sheet[12]**

June 12, 2020

---

This Warrant Term Sheet, which is <u>Exhibit F</u> to a Restructuring Support Agreement dated June 12, 2020 (the "***Restructuring Support Agreement***"), by and among Pointwell Limited and certain of its affiliates and subsidiaries, the Agent, and the Consenting Lenders, describes the material terms relating to warrants to be issued by Newco Parent that would be issued in connection with the consummation of the Restructuring.[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Restructuring Support Agreement.

**THIS WARRANT TERM SHEET IS PRESENTED FOR DISCUSSION AND SETTLEMENT PURPOSES AND IS ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OF SIMILAR IMPORT.**

**THIS WARRANT TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, COVENANTS AND OTHER PROVISIONS THAT MAY BE CONTAINED IN THE FULLY NEGOTIATED AND EXECUTED DEFINITIVE DOCUMENTATION IN CONNECTION WITH THE ISSUANCE OF WARRANTS.  THIS WARRANT TERM SHEET AND THE INFORMATION CONTAINED HEREIN SHALL REMAIN STRICTLY CONFIDENTIAL.[4]**

| Term | Description |
|------|-------------|
| **Issuer:** | Newco Parent (such entity, "***Issuer***").[5] |
| **Warrants:** | On the Effective Date (the "***Effective Date***"), Issuer will issue the following two tranches of warrants (collectively, the "***New Warrants***") to the holders thereof (collectively, the "***Holders***"): |
| |     -  ***Tranche A Warrants***, which will entitle the Holders thereof to receive, upon exercise of the Tranche A Warrants, common stock of Issuer ("***New Common Stock***") representing in the aggregate 5% of the total outstanding New Common Stock; and |
| |     -  ***Tranche B Warrants***, which will entitle the Holders thereof to receive, upon exercise of the Tranche B Warrants, New Common Stock representing in the aggregate 10% of the total outstanding New Common Stock. |
| | For purposes of calculating the percentage of New Common Stock issued upon exercise of the New Warrants, the total outstanding New Common Stock shall be calculated as of the Effective Date and assuming the exercise of all such New Warrants (but excluding any New Common Stock issued or reserved for issuance under any management and/or board incentive plan implemented by Issuer).[6] |

| | |
|---|---|
| **Exercise Price:** | The exercise price for the New Warrants (the "***Exercise Price***") will be fixed as of the Effective Date (as may be thereafter adjusted as set forth under "Fundamental Transaction" and "Anti-Dilution" below) and shall be as follows:<br><br>    -   To the extent that the Holder elects to exercise the Tranche A Warrants: a price per share equal to [\_\_\_][7] with the Exercise Price being allocated at par value per share to share capital and the difference to share premium; and<br><br>    -   Tranche B Warrants: a price per share equal to [\_\_\_] with the Exercise Price being allocated at par value per share to share capital and the difference to share premium.[8][9] |
| **Term:** | The New Warrants will expire on the earlier of (x) the fifth (5th) anniversary of the Effective Date and (y) the consummation of a Fundamental Transaction (as defined below) (the "***Expiration Date***").<br><br>Upon the fifth (5th) anniversary of the Effective Date, each outstanding New Warrant shall automatically be deemed to be exercised on a "cashless basis"[10] (as described below). |
| **Fundamental Transaction:** | Each New Warrant shall be automatically exercised immediately prior, but subject to, the consummation of a Fundamental Transaction on a "cashless basis" (as described below) and each Holder shall participate in such Fundamental Transaction with respect to the shares of New Common Stock issuable upon such exercise.[11]<br><br>The exercise price applicable to such exercise will be the lesser of (i) the then-current Exercise Price, and (ii) a Black Scholes Adjusted Exercise Price (which will be a price calculated to provide to each Warrant holder ordinary shares which, when exchanged for the Fundamental |

---

[1] **Note to Draft**:  Subject to review in connection with ongoing structuring discussions.

[2] **Note to Draft:** Subject to review by Luxembourg counsel to the Company.

[3] **Note to Draft:** All definitions subject to alignment with RSA.

[4] The terms of the New Warrants remain subject to revision for reconciliation with applicable Luxembourg law.

[5] Issuer to be top entity in post-reorganization structure.

[6] Subject to revision for reconciliation with applicable Luxembourg law.

[7] **Note to Draft**: Price per share should reflect an amount that will equal 105% recovery to the 1L lenders on converted face amount.

[8] **Note to Draft**: Price per share should reflect an amount that will equal 110% recovery to the 1L lenders on converted face amount.

[9] **Note to Draft**: Par value must be set and remain at a point that causes the maximum cash exercise price for all Warrants not to exceed [$100].

[10] Subject to revision for reconciliation with applicable Luxembourg law.

[11] **Note to Draft**: Parties to address potential competition law filings to resulting from actual issuance of shares in this context.

4845-4142-8923v18

Transaction consideration per ordinary share (the "***Transaction Consideration***"), will cause the holder to realize, net of the Black Scholes Adjusted Exercise Price, a net Fair Market Value of the Transaction Consideration equal to the Black Scholes Value per share of each Warrant).

As used herein, "***Fundamental Transaction***" means any (i) merger, consolidation, amalgamation or other similar transaction or series of related transactions to which the Issuer is a party and pursuant to which (A) an existing Stockholder (or its affiliate, or other person comprising an existing stockholder and one or more of its affiliates) acquires 90% or more of the voting power of the outstanding securities of the Issuer or (B) the "beneficial owners" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, as amended) of the outstanding equity securities of Issuer immediately prior to such transaction "beneficially own" in the aggregate less than 50% of the voting power of the outstanding equity securities of the surviving entity immediately following such transaction, (ii) sale, transfer or disposition of all or substantially all of Issuer's assets (by value), which is consummated with a third-party who is unaffiliated with Issuer (other than a stockholder who is affiliated with the Issuer) at the time of such transaction, or (iii) voluntary or involuntary dissolution, liquidation or winding-up of Issuer, in each of cases (i)-(iii), which is effected in such a way that the holders of New Common Stock receive or are entitled to receive (either directly or upon subsequent liquidation) cash, stock, securities or other assets or property with respect to or in exchange for New Common Stock.

As used herein, "***Black Scholes Value***" means the value of the unexercised portion of any New Warrants remaining on the date of any Holder's notice of election, which value shall be determined by an investment banking firm or independent third-party appraiser, in each case of nationally recognized standing (the "***Appraiser***") using the Black Scholes Option Pricing Model for a "call" option, as obtained from the "OVME" function on Bloomberg, L.P. subject to the following assumptions: (i) an underlying price per share equal to the sum of the price per share of New Common Stock being offered in cash in the applicable Fundamental Transaction (if any) *plus* the Fair Market Value of the non-cash consideration being offered to holders with respect to each share of New Common Stock in the applicable Fundamental Transaction (if any), (ii) a strike price equal to the Exercise Price in effect on the date of the Holder's notice of election, (iii) a risk-free interest rate corresponding to the interpolated rate on the United States Treasury securities with a maturity closest to the remaining term of the New Warrant as of the date of consummation of the applicable Fundamental Transaction, (iv) a zero cost of borrow and (v) an expected volatility equal to 35%.

For purposes of determining the Black Scholes Value and the Fair Market Value (as described below), the Appraiser shall be selected by the Independent Director (as defined in the Governance Term Sheet) or, if there is more than one Independent Director on the New Board at such

| | |
|---|---|
| | time, a majority of such Independent Directors, in each case at the sole cost and expense of the Issuer.[12] |
| **Exercise; Payment of Exercise Price:** | The New Warrants shall be exercisable, at the option of the Holder thereof, at any time prior to the Expiration Date, in whole or in part, into New Common Stock, by delivering to Issuer such New Warrant(s), together with a notice of exercise of such New Warrant(s).  The issuance of New Common Stock pursuant to the exercise of New Warrants (collectively, the "***Warrant Shares***") shall be subject to payment in full by the Holder of the applicable Exercise Price either (i) by delivery to Issuer of a certified or official bank check or by wire transfer of immediately available funds in the amount of the aggregate Exercise Price for such Warrant Shares or (ii) on a "cashless basis" by paying the Exercise Price (or the Black Scholes Adjusted Exercise Price, as applicable) as follows: (i) payment by the Holder of the par value of the Warrant Shares in cash, and (ii) payment of the difference of the Exercise Price (or the Black Scholes Adjusted Exercise Price, as applicable) by instructing Issuer to withhold a number of Warrant Shares (or fraction thereof) then issuable upon exercise of such New Warrant(s) with an aggregate Fair Market Value as of the Exercise Date equal to such aggregate Exercise Price (or the Black Scholes Adjusted Exercise Price, as applicable) (in either case, less the amount of the cash exercise payment).  For purposes of such a "cashless" exercise, the value of the Warrant Shares withheld will be calculated based on the per share fair market value ("***Fair Market Value***") of New Common Stock:  (a) if the Warrant Shares are then listed for trading on a national securities exchange, based on the 30 consecutive trading day volume weighted average closing price as of such date or (b) if the Warrant Shares are not so listed for trading on a national securities exchange, as determined by the Appraiser.[13] |
| **Stockholder Rights:** | Neither the New Warrants nor anything contained in the definitive documentation for the New Warrants shall be construed as conferring upon the Holders thereof (i) the right to vote, participate, consent or receive notice as a holder of New Common Stock in respect of any meeting of holders of New Common Stock for the election of directors of Issuer or any other matter, (ii) the right to receive dividends or other distributions as a holder of New Common Stock, or (iii) any other rights of a stockholder, whether or not granted to holders of New Common Stock under Issuer's governing documents. |
| **Issuer Obligation:** | The Issuer shall ensure that it at all times maintains an authorized share capital equivalent to the number of outstanding New Warrants to ensure that exercise of same may be completed at any time prior to the Expiration Date. |

---

[12] Subject to revision for reconciliation with applicable Luxembourg law.

[13] Subject to revision for reconciliation with applicable Luxembourg law.

| Anti-Dilution: | The New Warrants will be subject to (i) dilution by the management and board incentive plans, consistent with the Restructuring Term Sheet and (ii) customary adjustments (an ***Anti-Dilution Adjustment***") for (a) the subdivision or combination of the New Common Stock underlying the New Warrants, (b) the payment by Issuer of dividends or other distributions on the outstanding New Common Stock in Issuer payable in New Common Stock, other shares of capital stock of Issuer, rights to purchase shares of capital stock at a price per share that is less than the Fair Market Value of such capital stock, or in cash or other property and (c) repurchase of New Common Stock at a price that is greater than the then Fair Market Value of such New Common Stock; <u>provided</u>, <u>however</u>, there shall be no Anti-Dilution Adjustment to the Warrants (x) for any (1) payment by Issuer of dividends or other distributions on the outstanding New Common Stock of Issuer payable in rights to purchase shares of capital stock at a price per share that is less than the Fair Market Value of such capital stock (a "***Below FMV Issuance***") to the extent such rights are offered solely to holders of New Common Stock that are also New Warrant holders, or (2) repurchase of New Common Stock at a price that is greater than the then Fair Market Value of such New Common Stock (an "***Above FMV Repurchase***") to the extent such repurchase solely applies to shares of New Common Stock held by holders of New Common Stock that are also New Warrant holders or (y) with respect to any Below FMV Issuance or Above FMV Repurchase approved by the New Board if, at the time of such approval, a majority of the New Board comprises representatives of EQT (as defined in the Governance Term Sheet), Lodbrok Capital LLP, their respective affiliates or the transferees of New Warrants from any of the foregoing. |
|---|---|
|  | In addition, in the event of any (i) reclassification of the New Common Stock, (ii) consolidation or merger of Issuer with or into another person or (iii) other similar transaction, in each case which (x) does not constitute a Fundamental Transaction and (y) entitles the holders of New Common Stock to receive (either directly or upon subsequent liquidation and whether in whole or in part) securities or other assets in exchange for the New Common Stock, the New Warrants shall, immediately after such transaction, remain outstanding and shall thereafter, in lieu of the number of shares of New Common Stock then issuable upon exercise of the New Warrants, be exercisable for the kind and number of securities or other assets resulting from such transaction which the Holders would have received upon consummation of such transaction if the Holders had exercised the New Warrants in full immediately prior to the time of such transaction and acquired the applicable number of shares of New Common Stock then issuable upon exercise of the New Warrants as a result of such exercise.[14] |
|  | For purposes of any Anti-Dilution Adjustment, the "Fair Market Value" of New Common Stock shall be determined in the same manner as |

---

[14] Subject to revision for reconciliation with applicable Luxembourg law.

| | |
|---|---|
| | described above with respect to the Fair Market Value of Warrant Shares. |
| **Transferability:** | The New Warrants shall be transferrable, subject to applicable securities laws (including securities laws applicable to the Issuer as a private company) and such restrictions as are in effect in respect of the New Common Stock. |
| **Amendment:** | The terms and conditions of the New Warrants may be amended (i) within the first year following the Effective Date, by vote of more than 66.7% of the Board members appointed by shareholders other than the members of the Ad Hoc Crossholder Group and (ii) after the first anniversary of the Effective Date, by vote of 5 of 7 members of the New Board; *provided* that any amendment that would affect the Exercise Price, number of Warrant Shares for which the New Warrants may be exercised, or would materially and adversely affect the Holders shall require the affirmative vote or written consent of the Holders of a majority of the outstanding New Warrants.[15] |
| **Governing Law:** | Luxembourg[16] |

---

[15] Subject to revision for reconciliation with applicable Luxembourg law. The amendment provisions of the New Warrants to contain a power of attorney to permit such provisions to function without requiring consent by all contracting parties.

[16] Power of attorney function is intended to address the concern about amendments.

## <u>EXHIBIT G</u>

**FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS**

This Joinder Agreement to the Restructuring Support Agreement, dated as of June 12, 2020 (as amended, supplemented, or otherwise modified from time to time, the "**Agreement**"), by and among the Company and the Consenting Creditors, is executed and delivered by _____ (the "**Joining Party**") as of [●], 2020.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be (i) a "Consenting First Lien Creditor" and/or a "Consenting Second Lien Creditor," (ii) a "Consenting Creditor," and (iii) a "Party" for all purposes under the Agreement and with respect to any and all Claims and Interests held by such Joining Party.

2. Representations and Warranties.  With respect to the aggregate principal amount of the First Lien Debt, the Second Lien Debt, and Interests, in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in Section 7 and Section 21 of the Agreement to each other Party to the Agreement.

3. Governing Law.  This Joinder Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date written above.

**CONSENTING CREDITOR**

By: _____

Name: _____

Title: _____

Principal Amount of the First Lien Term Loans:  $_____

Principal Amount of the First Lien Revolving Loans:  $_____

Principal Amount of the Second Lien Debt:  $_____

Interests (please describe): _____

Notice Address:

Fax:_____
Attention:_____
Email:_____

Acknowledged:

[●]

By:_____
Name:
Title:

## Exhibit B

**Sponsor Side Agreement**

**Weil, Gotshal & Manges (London) LLP**
110 Fetter Lane
London EC4A 1AY
+44 20 7903 1000 main tel
+44 20 7903 0990 main fax
weil.com



**EXECUTION VERSION**

**12 June 2020**

**CO-OPERATION AGREEMENT**

**between**

**POINTWELL LIMITED**

**and**

**THE CONSENTING CREDITORS**

**and**

**CHARTERHOUSE GENERAL PARTNERS (IX) LIMITED**

**and**

**EVERGREEN SKILLS INTERMEDIATE LUX S.À R.L.**

**and**

**EVERGREEN SKILLS LUX S.À R.L.**

**and**

**EVERGREEN SKILLS TOP HOLDING LUX S.À R.L**

**and**

**EVERGREEN SKILLS HOLDING LUX S.À R.L**

## TABLE OF CONTENTS

**Page No.**

1    INTERPRETATION ........................................................................................................1

2    UNDERTAKINGS .........................................................................................................4

3    LIMITATIONS ..............................................................................................................8

4    TERMINATION ............................................................................................................8

5    REPRESENTATIONS AND WARRANTIES ..............................................................9

6    AMENDMENTS, REMEDIES AND WAIVERS ........................................................9

7    SPECIFIC PERFORMANCE .....................................................................................10

8    PARTIES' RIGHTS AND OBLIGATIONS ..............................................................10

9    SUCCESSORS AND ASSIGNS ...............................................................................10

10    COUNTERPARTS ......................................................................................................11

11    PARTIAL INVALIDITY ............................................................................................11

12    ENTIRE AGREEMENT .............................................................................................11

13    NOTICES ....................................................................................................................11

14    GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL .......................13

SCHEDULE 1 CONSENTING CREDITORS .........................................................................14

SCHEDULE 2 MUTUAL RELEASE .....................................................................................15

SCHEDULE 3 JOINDER AGREEMENT ...............................................................................16

**THIS AGREEMENT** is made on ___ June 2020 between the following parties

(1)       **THE CONSENTING CREDITORS** (as defined below) listed in Schedule 1;

(2)       **POINTWELL LIMITED** (the "**Company**");

(3)       **CHARTERHOUSE GENERAL PARTNERS (IX) LIMITED** (the "**Sponsor**");

(4)       **EVERGREEN SKILLS INTERMEDIATE LUX S.À R.L.**;

(5)       **EVERGREEN SKILLS LUX S.À R.L.**;

(6)       **EVERGREEN SKILLS TOP HOLDING LUX S.À R.L.**; and

(7)       **EVERGREEN SKILLS HOLDING LUX S.À R.L.**

**WHEREAS,** the Company is party to a term loan facility provided under that certain First Lien Credit Agreement, dated as of April 28, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**") between, among others, Evergreen Skills Intermediate Lux S.à r.l., Evergreen Skills Lux S.à r.l., Skillsoft Canada Ltd, Skillsoft Corporation and the undersigned lenders, or investment advisors or managers for the account of lenders, party thereto from time to time (the "**First Lien Lenders**" and, the undersigned First Lien Lenders (together with their respective successors and permitted assigns) and any subsequent First Lien Lender that becomes party hereto in accordance with the terms hereof, each in its capacity as a First Lien Lender, a "**Consenting First Lien Lender**" and, collectively, the "**Consenting First Lien Lenders**");

**WHEREAS,** the Company is party to a term loan facility provided under that certain Second Lien Credit Agreement, dated as of April 28, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**") between, among others, Evergreen Skills Intermediate Lux S.à r.l., Evergreen Skills Lux S.à r.l., Skillsoft Canada Ltd, Skillsoft Corporation and the undersigned lenders, or investment advisors or managers for the account of lenders, party thereto from time to time (the "**Second Lien Lenders**" and, the undersigned Second Lien Lenders (together with their respective successors and permitted assigns) and any subsequent Second Lien Lender that becomes party hereto in accordance with the terms hereof, each in its capacity as a Second Lien Lender, a "**Consenting Second Lien Lender**" and, collectively, the "**Consenting Second Lien Lenders**" and, together with the Consenting First Lien Lenders, the "**Consenting Creditors**");

**WHEREAS,** the Sponsor, the Evergreen Entities, the Company, and the Consenting Creditors in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree each on a several and not joint basis as follows:

# 1       INTERPRETATION

## 1.1       Definitions

In this agreement unless otherwise defined herein, terms shall have the meaning given to them in the Restructuring Support Agreement:

"**Affiliate**" means with respect to a person, any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person, provided that: (i) for the purposes of this definition of Affiliate the term "control", "controlled by" and "under common control with" means the possession, directly or indirectly, through one or more intermediaries, of: (A) the power to direct or cause the direction of the management and policies of a person whether by contract or otherwise; (B) the right to more than 50 percent. of the profits of a person, in each case whether through the ownership of shares, interests and/or other securities of any kind, by contract or otherwise or (C) vote on more than 50 percent, of the securities having ordinary voting power for

1

the election of directors of such person; (ii) in respect of a limited partnership or a fund, any general partner, investment manager, investment adviser, nominee or trustee of such limited partnership or fund, shall be deemed to be an Affiliate of any member of the Sponsor; (iii) a portfolio company of any fund or account managed or advised by a Party, other than the Company or any company in the Group, shall not be deemed to be an Affiliate of such Party; and (iv) any person which is deemed to be an Affiliate of the Sponsor principally as a result of being managed and/or advised by the Sponsor, shall only be an "Affiliate" for so long as it continues to be managed and/or advised in such manner;

"**Agreed Fees**" means the fees, costs and expenses of the Sponsor (or relevant Affiliates) (but excluding the Replacement Agent Fees and the Group Audit Fees), subject to the maximum amount, payable by the Company in accordance with and pursuant to the terms of this Agreement which shall total, in aggregate, not more than $1,426,259.18;

 "**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in London, Dublin and New York;

"**CIT Facility**" means that certain Credit Agreement (as may be further amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time), dated as of December 20, 2018, among Skillsoft Receivables Financing LLC, a Delaware Limited Liability Company, the lenders party thereto and CIT Bank, N.A., as administrative agent, collateral agent and accounts bank;

"**Evergreen Entities**" means, collectively, Evergreen Skills Intermediate Lux S.à r.l., Evergreen Skills Lux S.à r.l., Evergreen Skills Top Holding Lux S.à r.l. and Evergreen Skills Holding Lux S.à r.l.;

"**Group**" means the Company and any of its subsidiaries from time to time;

"**Group Audit Fees**" means any fees, costs and expenses incurred by the Company, the Evergreen Entities and/or the Sponsor or its Affiliates in connection with Ernst & Young's audit and subsequent report on the consolidated financial statements of Evergreen Skills Top Holding Lux S.à r.l. (which audit and report are conducted and issued, respectively, on a Group-wide basis) for the financial year ending 31 January 2020;

"**LN Litigation**" means the litigation captioned *Neal v. SkillSoft Corporation*, Case No. 1:17-cv-11833-MLW, currently pending in the District Court for the District of Massachusetts and any other lawsuits stating substantially the same causes of action;

"**Mutual Release**" means the mutual release agreement, the final form of which is attached hereto as Schedule 2;

"**Party**" means a party to this Agreement, each such party bound on a several but not a joint basis;

"**Public Restructuring Documents**" means any of the Definitive Documents or other ancillary document that is required to be filed or disclosed in connection with the Restructuring Transactions and as result of such filing or disclosures becomes available to persons other than direct stakeholders of the Group;

"**Related Entity**" in relation to an entity (the "**First Entity**"), means an entity which is managed or advised by the same investment manager or investment advisor as the First Entity (or its Affiliates) or, if it is managed by a different investment manager or investment advisor, an entity whose investment manager or investment advisor is an Affiliate of the investment manager or investment advisor of the First Entity (or its Affiliates);

"**Replacement Agent Fees**" means any fees, costs and expenses incurred by the Company, the Evergreen Entities and/or the Sponsor or its Affiliates in connection with the replacement of the

2

First Lien Agent and Second Lien Agent, as defined in the First Lien Credit Agreement and Second Lien Credit Agreement, respectively;

"**Requisite Creditors**" means, as of the date of determination, the Requisite First Lien Lenders and the Requisite Second Lien Lenders;

"**Requisite First Lien Lenders**" means, as of the date of determination, Consenting First Lien Lenders holding at least a majority of the aggregate principal amount outstanding of the First Lien Debt then held by all Consenting First Lien Lenders;

"**Requisite Second Lien Lenders**" means, as of the date of determination, Consenting Second Lien Lenders holding at least a majority of the aggregate principal amount outstanding of the Second Lien Debt then held by all Consenting Second Lien Lenders;

"**Reservations**" means the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to bankruptcy, insolvency, reorganisation, moratorium and other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, and similar principles, rights and defences under the laws of any relevant jurisdiction;

"**Restructuring Support Agreement**" means the agreement dated on or around the date of this Agreement between, among others, the Company and the Consenting Creditors in connection with the Restructuring (as defined therein) as amended, restated, supplemented or otherwise from time to time, a copy of which has been delivered by the Company to the Sponsor on or before the date of this Agreement;

"**Restructuring Transactions**" means the Restructuring as set out in the Restructuring Term Sheets;

"**Sponsor Material Breach**" means a breach of Clause 2.6 or Clause 2.8 of this Agreement by the Sponsor or the Evergreen Entities which may reasonably be expected to materially delay, impede, frustrate, hinder or prevent the implementation or consummation of the Restructuring Transactions, provided: (i) always that the Company and/or the Consenting Lenders must notify the Sponsor as soon as reasonably practicable upon becoming aware of any such breach; and (ii) that if the breach is remedied within five (5) Business Days of the Sponsor receiving written notice of such breach from the Company and/or the Consenting Lenders, such breach shall not constitute a Sponsor Material Breach; and "**Sponsor Representative**" means any current or former employee, director, officer, agent of the Sponsor and any Affiliate or Related Entity of the Sponsor, including any holding company of the Company, but excluding any current employee, director, officer or agent of a member of the Group.

1.2    Construction

In this Agreement, unless a contrary indication appears or the context otherwise requires:

(a)    singular includes plural and vice versa;

(b)    a reference to a Clause, Sub-clause or Schedule is a reference to a clause or sub-clause of, or a schedule to, this Agreement;

(c)    the headings and recitals in this Agreement do not affect its interpretation;

(d)    a reference to a provision of law is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

(e)    a reference to a regulation includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being

of a type with which any person to which it applies is accustomed to comply) of any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

**(f)**　　a reference to any document is a reference to that document as amended, supplemented, novated, extended or restated;

**(g)**　　a reference to a "**person**" includes any individual, firm, company, corporation, unincorporated association, governmental body, state or agency of a state or any association, trust, fund, joint venture, consortium or other partnership (whether or not having separate legal personality);

**(h)**　　a reference to a Party or any other person includes its successors in title, permitted assigns and permitted transferees; and

**(i)**　　where reference is made to the Company or the Group committing to an undertaking, the Consenting Creditors are acknowledging such undertaking in their capacity as First Lien Lenders, Second Lien Lenders and prospective shareholders of the Group (as applicable).

**1.3**　　Third party rights

No consent of any third party (including, but not limited to, any third party to which rights are expressly granted under this agreement), is required for any amendment (including any release or compromise of any liability) or termination of this Agreement.

**2**　　**UNDERTAKINGS**

**2.1**　　The Company and the Consenting Creditors undertake to the Sponsor, from the date of this Agreement until this Agreement is terminated, that:

**(a)**　　no Public Restructuring Document shall include the details of any Sponsor Representative's prior or existing directorships, save for any directorships held in the Group, without the prior written consent of the relevant Sponsor Representative; *provided* that nothing herein shall prohibit the Parties from disclosing such information to the Bankruptcy Court or from filing it publicly with the Bankruptcy Court where such disclosure is required; and

**(b)**　　neither they, nor any of their advisors or Affiliates (and in the case of the Company, shall procure that no other member of the Group) shall make any public statement or issue any press release that refers to or otherwise names the Sponsor, a Sponsor Representative, any Affiliate of the Sponsor (but excluding the Group, as well as any current employee, director, officer or agent of a member of the Group) or any Related Entity of the Sponsor or the Sponsor Affiliates (the "**Relevant Sponsor Entity**") without such reference having been agreed in advance of issuance with the Sponsor; *provided however*, that nothing herein shall prohibit the Parties from disclosing the existence of this Agreement or the terms thereof to the Bankruptcy Court or from filing this Agreement publicly with the Bankruptcy Court.

**2.2**　　The Company undertakes to the Sponsor, from the date of this Agreement until this Agreement is duly terminated, that:

**(a)**　　it shall use its reasonable endeavours to update the Sponsor, or advisors to the Sponsor, on the progress of the Restructuring Transactions and to inform them, as soon as reasonably practicable, of any key milestone dates (including, but not limited to) any court hearings to be held in connection with the Restructuring Transactions;

**(b)**　　if the Restructuring Support Agreement is amended, restated, supplemented or otherwise modified (an "**RSA Amendment**"), details of such RSA Amendment shall be provided to the Sponsor on or before the date falling three (3) Business Days after such RSA

Amendment has become effective. So long as no Sponsor Material Breach has occurred, no RSA Amendments shall be made that could be reasonably expected to materially adversely affect the Sponsor without the Sponsor's prior written consent; and

**(c)**    it shall use its reasonable endeavours to facilitate an orderly wind-down of the Evergreen Entities as soon as reasonably practicable such that it can be managed in a tax-efficient manner for the Sponsor, but only to the extent such steps would not result in (i) any material costs or expenses to the Company; (ii) any material delay of the Restructuring; (iii) any material adverse effect on the Consenting Creditors; or (iv) any material adverse tax consequences for the Company or any other member of the Group. In order to satisfy this undertaking the Company shall facilitate reasonable access for the Sponsor and/or any relevant Affiliate or Related Entity of the Sponsor, to the Group's auditors, to Bobby Jenkins (Bobby.Jenkins@skillsoft.com), John Frederick (John.Frederick@skillsoft.com), Greg Porto (Greg.Porto@skillsoft.com), and Ryan Murray (Ryan.Murray@skillsoft.com), and to such information as the Sponsor may reasonably require.

2.3    Provided that: (i) there has been no Sponsor Material Breach; and (ii) this Agreement has not been terminated for any reason other than the occurrence of the Effective Date, the Company shall (and shall procure that any relevant member of the Group shall), at its own cost (to the extent covered by any insurance):

**(a)**    continue to defend the LN Litigation for so long as the litigation remains pending against a member of the Company or current or former officers of the Company;

**(b)**    bear the costs of any judgment or settlement of the LN Litigation (unless a judgment against any defendant finds that such defendant committed an act of wilful misconduct or fraud);

**(c)**    not enter into any settlement with respect to the LN Litigation that contains any admission of liability, without the prior written consent of the defendant to whom such admission relates; and

**(d)**    use its reasonable endeavours to update the Sponsor (or the Sponsor's advisors), on the progress and status of the LN Litigation and to inform them, as soon as reasonably practicable, of any key milestones and key milestone dates (including, but not limited to) any court hearings (or similar) to be held in connection with the LN Litigation, and to provide information relating to the LN Litigation as soon as reasonably practicable upon receiving a reasonable request from the Sponsor or its advisors; *provided* that the Company may withhold any information to the extent it reasonably believes that providing such information to the Sponsor or the Sponsor's advisors could impair the Company's evidentiary privileges. It is understood that all defendants in the LN Litigation shall have the right to enforce this Subsection as third party beneficiaries of the same.

2.4    Provided that: (i) there has been no Sponsor Material Breach; (ii) this Agreement has not been terminated for any reason other than the occurrence of the Effective Date; and (iii) CIT Bank, N.A. provides any necessary consents, the Company shall (or shall procure that the relevant member of the Group shall) discharge in full all amounts owed to the Sponsor and/or Affiliate or Related Entity of the Sponsor (or the nominee thereof) under the CIT Facility upon the earlier of:

**(a)**    the Effective Date; and

**(b)**    as and when they fall due in accordance with the terms of the CIT Facility.

2.5    The Company and the Consenting Creditors agree, provided that: (i) there has been no Sponsor Material Breach; and (ii) this Agreement has not been terminated for any reason other than the occurrence of the Effective Date, that:

(a)      releases substantially in the form appended at Schedule 2 (*Mutual Release*) shall be granted by them on the Effective Date to the Released Persons (as defined in the Mutual Release);

(b)      the Company shall pay (or shall procure that another member of the Group shall pay): (i) the Agreed Fees which have been duly invoiced no later than five (5) Business Days prior to the Effective Date, on the Effective Date; and (ii) all other Agreed Fees which have been duly invoiced after the Effective Date, no later than ten (10) Business Days after such Agreed Fees have been duly invoiced;

(c)      the Company shall fund Evergreen Skills Lux S.à r.l. ("**ESL**") to pay (or shall procure that another member of the Group shall fund ESL to pay) the Group Audit Fees upon the completion of Ernst & Young's work related to the audit and report of the audit on Evergreen Skills Top Holding Lux S.à r.l. (which audit and report are conducted and issued, respectively, on a Group-wide basis) for the financial year ending 31 January 2020; and

(d)      the Company shall pay (or shall procure that another member of the Group shall pay) the Replacement Agent Fees in accordance with terms mutually agreed between the Company and Wilmington Savings Fund Society, in its capacity as successor agent under the First Lien Credit Agreement and Second Lien Credit Agreement. Any amounts payable pursuant to these sub-clauses 2.5(c)-(d) are expressly excluded from the Agreed Fees.

2.6      The Sponsor and the Evergreen Entities undertake to the Company and the Consenting Creditors that from the date of this Agreement until this Agreement is duly terminated:

(a)      they shall procure that ESL takes all steps necessary to facilitate the consensual implementation of the Restructuring Transactions including, but not limited to authorising, approving and transferring:

    (i)      the shares in the Company; and

    (ii)      the Intercompany Note, dated April 28, 2014 between the Company and ESL,

     in each case as required to give effect to the relevant Restructuring Transaction as notified to ESL no later than five (5) Business Days prior to the Effective Date. Subject in all respects to sub-clause 2.2(c), the Company, the Sponsor and the Sponsor Affiliates will use their reasonable efforts to co-operate to make the Restructuring Transactions, including the steps set out at sub-clauses 2.6(a)(i) and 2.6(a)(ii), tax-efficient for the Sponsor;

(b)      they shall not commit a Sponsor Material Breach;

(c)      they shall not (and they shall procure that no relevant Affiliate, Related Entity nor any Sponsor Representative shall) prevent or otherwise limit any holding company of the Company including, but not limited to, ESL from taking any step necessary to facilitate the consensual implementation of the Restructuring Transactions;

(d)      they shall (and they shall procure that any relevant Affiliate, Related Entity and Sponsor Representative shall) provide the Company and its advisors access to: (i) all service providers of the Evergreen Entities' including, without limitation, to accountants; (ii) all necessary documentation and information relating to the Evergreen Entities, including, without limitation, to company records, as may be reasonably required to facilitate and complete the wind-down of the Evergreen Entities within 6 months and 10 days of the Effective Date;

(e)      they shall (and they shall procure that any relevant Affiliate, Related Entity and Sponsor Representative shall) instruct and direct all applicable, agents, employees and other service providers to complete all necessary steps, including, without limitation: (i) obtaining all consents and signatures; (ii) providing any necessary information and documents in a timely

6

manner; and (iii) finalising any applicable financial accounts and tax returns, as may be reasonably required to facilitate and complete the wind-down of the Evergreen Entities within 6 months and 10 days of the Effective Date;

(f)     they shall not direct any administrative agent or collateral agent (as applicable) under the CIT Facility to take any action inconsistent with Sponsor's obligations under this Agreement, and, if any administrative agent or collateral agent takes any action inconsistent with such obligations under this Agreement, they shall request that and use their commercially reasonable efforts to exercise any applicable contractual rights under the CIT Facility in order to cause such administrative agent or collateral agent to cease, withdraw, and refrain from taking any such action;

(g)     they shall support and take all actions reasonably necessary or reasonably requested by the Company to facilitate the Restructuring Transactions within the timeframes contemplated by the Restructuring Support Agreement;

(h)     they shall timely vote or cause to be voted all of its Claims and Interests (held by them now or in the future), to accept the Plan by delivering or causing to be delivered its duly authorized, executed, and completed ballot or ballots, and consent to and, if applicable, not opt out of, the releases set forth in the Plan against each Released Party on a timely basis, and, in any event, within three (3) Business Days following commencement of the Solicitation;

(i)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, they shall negotiate in good faith appropriate additional, or alternative provisions to address any such impediment; and

(j)     Notwithstanding the occurrence or existence of any Event of Default, they shall forbear from exercising any rights and remedies under the Loan Documents (as defined in the CIT Facility) and shall remain obligated to, and shall continue to, make credit extensions as Class B Lender to Borrower under the CIT Facility in the ordinary course as if no Event of Default had occurred or is occurring, up until the Effective Date but only to the extent that the Class A Lender continues to make credit extensions as Class A Lender to the Borrower under the CIT Facility as if no Event of Default had occurred or is occurring (it being understood and agreed that the Class B Lender shall not be obligated to make any credit extension on any date to the extent the Class A Lender is not also making a pro rata credit extension on such date). Capitalised terms in this sub-clause 2.6(j) which are not defined in this Agreement shall have the meaning set forth in the CIT Facility.

2.7     The Consenting Creditors hereby undertake to the Sponsor that with effect from the Effective Date, they shall use all their reasonable endeavours to exercise their rights to release and discharge the Evergreen Entities from all present or future, actual or contingent liabilities, obligation, guarantees and security created, evidenced or conferred by, and all claims, actions, suits, accounts and demands arising under the First Lien Credit Agreement and the Second Lien Credit Agreement, in each case, to give effect to the Restructuring Transactions and any restructuring, dissolution or liquidation of the Evergreen Entities (including, but not limited to, the issuing of instructions to the collateral agent, as applicable).

2.8     Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise reasonable efforts with respect to the pursuit, delivery, implementation, and consummation of, the transactions contemplated by this Agreement. Furthermore, subject to the terms hereof, each of the Parties shall (i) take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and (ii) refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**3        LIMITATIONS**

Nothing in this Agreement shall:

**(a)**        require any Party to take any action which would breach:

   **(i)**        any law or regulation; or

   **(ii)**        any order or direction of any relevant court or governmental body,

   in each case provided that such breach cannot be avoided or removed by taking reasonable steps;

**(b)**        require any Party to waive or forego the benefit of any applicable legal professional privilege;

**(c)**        restrict, or attempt to restrict, any director or officer of any member of the Group, the Sponsor, any Sponsor Representative, or any Consenting Creditor from complying with any common law, regulatory or legal obligations (including, for the avoidance of doubt, fiduciaries duties), where such action is reasonably likely to result in any officer or director of this entity incurring personal liability or sanction due to a breach of their legal or fiduciary duties or obligations as officer or director of such entity;

**(d)**        require any Party to:

   **(i)**        incur any liability or any additional material costs other than as expressly contemplated by this Agreement;

   **(ii)**        subject in all respects to Clause 2.4, make any equity, debt or other financing available to any member of the Group, except in the cases of (A) the Consenting Creditors as expressly contemplated by the Restructuring Support Agreement and (B) the Sponsor pursuant to sub-clause 2.6(j) hereof; or

   **(iii)**        commence or become party to any litigation, court proceedings, arbitration or similar proceedings; or

**(e)**        prevent any Party from providing debt financing, equity capital or other services (including advisory services) or from carrying on its activities in the ordinary course and providing services to clients.

**4        TERMINATION**

**4.1        Automatic termination**

This Agreement will terminate automatically on the Effective Date.

**4.2        Termination by agreement**

This Agreement may be terminated by the mutual written agreement of the Company, the Sponsor and the Requisite Creditors.

**4.3        Termination upon termination of the Restructuring Support Agreement**

This Agreement may be terminated at any time by written notice at the election of any of the Requisite Creditors, the Company or the Sponsor if the Restructuring Support Agreement terminates.

WEIL:\97470480\25\74473.0003

**4.4**     **Termination for Sponsor Material Breach**

This Agreement may be terminated at any time by written notice at the election of the Requisite Creditors or the Company if a Sponsor Material Breach occurs.

**4.5**     **No termination for own breach**

Notwithstanding any other Clause in this Agreement, nothing in this Agreement permits any Party to terminate this Agreement as a result of its own breach of this Agreement.

**4.6**     **Effect of termination**

This Agreement will cease to have any further effect on and from the date on which it terminates under this Clause 4, save for:

**(a)**     accrued rights in respect of breaches of this Agreement which occurred before such termination;

**(b)**     the provisions of Clauses 1, 7 and 14 which will remain in full force and effect; and

**(c)**     provided that this Agreement is terminated only as a result of the occurrence of the Effective Date, Clauses 2 and 3 will remain in full force and effect in accordance with their terms.

**5**     **REPRESENTATIONS AND WARRANTIES**

Each Party represents and warrants to each other Party on the date of this Agreement, by reference to the facts and circumstances existing at that time, that:

**(a)**     it is duly incorporated (if a corporate person) or duly established (in any other case) and validly existing under the laws of its jurisdiction of incorporation or formation;

**(b)**     the obligations expressed to be assumed by it in this Agreement are legal, valid, binding and enforceable, subject to any applicable Reservations; and

**(c)**     it and, if applicable, the duly authorised attorney acting on its behalf, has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, this Agreement.

**6**     **AMENDMENTS, REMEDIES AND WAIVERS**

**6.1**     Amendments and waivers

**(a)**     Subject to sub-clause 6.1(b), any term of this Agreement may be amended or waived with the written consent of each of the Sponsor, the Company and the Requisite Creditors.

**(b)**     An amendment or waiver which imposes a more onerous obligation on any Party or affects any Party disproportionately in comparison to other Parties may not be effected without the consent of that Party.

**6.2**     Remedies and waivers

**(a)**     No failure to exercise, nor any delay in exercising, on the part of any Party, any right or remedy under this Agreement shall operate as a waiver of any such right or remedy or constitute an election to affirm this Agreement.

**(b)**     No election to affirm this Agreement on the part of any Party shall be effective unless it is in writing.

9

(c)     No single or partial exercise of any right or remedy shall prevent any further or other exercise of such right or remedy or of any other right or remedy.

(d)     The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

## 7    SPECIFIC PERFORMANCE

Without prejudice to any other remedy available to any Party, the obligations of each Party under this Agreement may, subject to applicable law, be the subject of specific performance by the relevant Parties. Each Party acknowledges that damages are not an adequate remedy for any breach of its obligations under this Agreement.

## 8    PARTIES' RIGHTS AND OBLIGATIONS

**8.1**    The obligations of each Party under this Agreement are separate and independent obligations. Failure by a Party to perform its obligations under this Agreement shall not affect the obligations of any other Party under this Agreement. No Party is responsible for the obligations of any other Party under this Agreement.

**8.2**    The rights of each Party under or in connection with this Agreement are separate and independent rights. Each Party may separately and independently enforce its rights under this Agreement.

## 9    SUCCESSORS AND ASSIGNS

**9.1**    Each Consenting Creditor agrees that, for the duration of this Agreement, applicable to such Consenting Creditor, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign, or otherwise dispose of (each, a "**Transfer**"), directly or indirectly, in whole or in part, any of its Claims or Interests or any option thereon (including grant any proxies, deposit any Claims or Interests into a voting trust, or enter into a voting agreement with respect thereto), unless the transferee thereof either (i) is a Consenting Creditor or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims or Interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is annexed hereto as Schedule 3 (the "Joinder Agreement"), and delivering an executed copy thereof within three (3) Business Days following such execution, to Weil, Gotshal & Manges LLP ("**Weil**"), as counsel to the Company, and the Consenting Creditor Counsel, in which event (A) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder with respect to such transferred Claims or Interest and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred Claims or Interests. Each Consenting Creditor agrees that any Transfer of any Claims or Interests that does not comply with the terms and procedures set forth herein shall be deemed void ab initio, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer. Notwithstanding anything to the contrary herein, a Consenting Creditor may Transfer its Claims or Interests to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Party; provided, however, that (i) such Qualified Marketmaker must Transfer such right, title or interest by five (5) Business Days prior to the Voting Deadline and (ii) the transferee of such Company Claims or Interests from the Qualified Marketmaker shall become a Consenting Creditor hereunder and comply in all respects with the terms of this Agreement (including executing and delivering a Joinder) and (iii) notwithstanding anything to the contrary in this Agreement, to the extent that a Consenting Creditor, acting in its capacity as a Qualified Marketmaker, acquires any Company Claims or Interests from a holder of such claims that is not a Consenting Creditor, such Qualified Marketmaker may Transfer such Company Claims or Interests without the requirement that the transferee be or become a Consenting Creditor.

10

**9.2**    To the extent any Consenting Creditor (i) acquires additional Claims or Interests or (ii) Transfers any Claims or Interests, then, in each case, each such Consenting Creditor shall promptly (in no event less than three (3) Business Days following such acquisition or transaction) notify Weil and Consenting Creditor Counsel and each such Consenting Creditor agrees that such additional Claims or Interests shall be subject to this Agreement.

**9.3**    Notwithstanding any other provision of this Agreement, any Transfer conducted in compliance with the terms of this Agreement must also be conducted in accordance with any relevant provisions of the Restructuring Support Agreement, otherwise such Transfer shall be deemed void ab initio, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.

**9.4**    For purposes of Clauses 9.1 and 9.2 hereof, "Business Day" shall bear the meaning ascribed to it in the Restructuring Support Agreement.

## 10    COUNTERPARTS

This Agreement may be executed in any number of counterparts, which may be delivered by electronic mail in portable document format (PDF). This has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

## 11    PARTIAL INVALIDITY

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction:

(a)    neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provisions under the law of any other jurisdiction will in any way be affected or impaired; and

(b)    the invalid provision will be deemed to be replaced with a legal provision that is as close as possible to the original.

## 12    ENTIRE AGREEMENT

**12.1**    This Agreement and, with respect to the Company and the Consenting Creditors members, the Restructuring Support Agreement, set out the Parties' entire understanding of the Restructuring Transactions and supersede any previous agreement between any of the Parties with respect to the Restructuring Transactions (save for the Restructuring Support Agreement, which shall continue to be binding on the parties thereto).

**12.2**    The Company and the Sponsor shall and shall procure that their Affiliates and/or Related Entities (other than in the case of the Sponsor, the Company and its subsidiaries) treat all terms of the reimbursement agreement dated June 24, 2019 (the "**Reimbursement Agreement**") as waived by all parties from and with effect from the date hereof until either: (i) the Effective Date occurring, in which case the Reimbursement Agreement shall be treated as terminated and without effect; or (ii) this Agreement being terminated for any reason other than the occurrence of the Effective Date, in which case the waiver of the terms of the Reimbursement Agreement shall cease to apply with effect from such termination notwithstanding anything contained in this Agreement to the contrary.

## 13    NOTICES

**13.1**    Any communication to be made under or in connection with this Agreement shall be made in writing in English and may be made by letter or electronic mail.

**13.2**  The contact details of the Parties for all communications under or in connection with this Agreement are as identified below, or any substitute contact details as a Party may notify the other Parties by not less than five (5) Business Days' notice:

**(a)**  the Consenting Creditors:

    **(i)**  if to a Consenting First Lien Lender or a transferee thereof, to the addresses set forth below such member's signature (or as directed by any transferee thereof), as the case may be, with copies to:

| | |
|---|---|
| Address: | Gibson Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166 |
| Attention: | Scott J. Greenberg, Esq. (sgreenberg@gibsondunn.com)<br>Steven A. Domanowski, Esq. (sdomanowski@gibsondunn.com)<br>Matthew J. Williams, Esq. (mjwilliams@gibsondunn.com)<br>Christina M. Brown, Esq. (christina.brown@gibsondunn.com) |

    **(ii)**  if to a Consenting Second Lien Lender, or a transferee thereof, to the addresses set forth below such member's signature (or as directed by any transferee thereof), as the case may be, with copies to:

| | |
|---|---|
| Address: | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001 |
| Attention: | Evan Fleck (efleck@milbank.com)<br>Sarah Levin (slevin@milbank.com)<br>Benjamin Schak (bschak@milbank.com) |

**(b)**  the Company:

| | |
|---|---|
| Address: | Pointwell Limited<br>2nd Floor 1-2 Victoria Buildings<br>Haddington Road, Dublin 4, Ireland D04XN32 |
| Attention: | Greg Porto (Greg.Porto@skillsoft.com) |
| With a copy to: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153 |
| | Attention: Gary Holtzer, Esq. (Gary.Holtzer@weil.com)<br>Andrew Wilkinson, Esq. (Andrew.Wilkinson@weil.com)<br>Robert Lemons, Esq. (robert.lemons@weil.com)<br>Katherine T. Lewis, Esq. (katherine.lewis@weil.com) |

**(c)**  the Sponsor:

| | |
|---|---|
| Address: | Warwick Court, Paternoster Square, London, United Kingdom EC4M 7DX |
| Attention: | Tom Patrick (tom.patrick@charterhouse.co.uk)<br>William Trevelyan Thomas (will.trevelyanthomas@charterhouse.co.uk) |

WEIL:\97470480\25\74473.0003

13.3 Any communication or document made or delivered by one person to another under or in connection with this Agreement will only be effective:

(a) if by letter:

(i) delivered in person, when it has been left at the relevant address;

(ii) sent by post, five (5) Business Days after being deposited in the post, postage prepaid, in an envelope addressed to it at that address; or

(iii) sent by international priority courier delivery, three (3) days after delivery to such courier,

and, if a particular department or individual is specified as part of its address details provided above, if addressed to that department or individual; and

(b) if by e-mail, when received in legible form.

## 14 GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL

14.1 This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

14.2 The Bankruptcy Court shall have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement. The Parties agree that the Bankruptcy Court is the most appropriate and convenient courts to settle disputes relating to the obligations arising out of or in connection with this Agreement and/or a dispute regarding the existence, validity or termination of this Agreement and accordingly no Party will argue to the contrary.

14.3 EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**THIS AGREEMENT** has been entered into on the date stated at the beginning of this Agreement.

13

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

COMPANY:

**POINTWELL LIMITED**

By: _____

Name: Ronald Hovsepian
Title: Director

**CONSENTING CREDITOR**

By: _____

Name: Jens Hoellermann        Simon Barnes

Title: managers

Notice Address: 160 Queen Victoria street, London EC4V 4LA

Fax: _____

Attention: Amos Ouattara and Christopher Schubert

Email: amos.ouattara@alcentra.com / Christopher.schubert@alcentra.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: _____

Name: <u>Jens Hoellermann        Simon Barnes</u>

Title: <u>managers</u>


<u>Notice Address</u>: 160 Queen Victoria street, London EC4V 4LA



Fax:_____
Attention: Amos Ouattara and Christopher Schubert
Email: amos.ouattara@alcentra.com / Christopher.schubert@alcentra.com_____


[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By:

Name:    Chris Barris

Title:    Portfolio Manager

Notice Address:
200 Park Avenue, New York, NY 10166, US

and

160 Queen Victoria Street, London EC4V 4LA, UK

Fax:
Attention: Chris Barris, Amos Ouattara and Christopher Schubert
Email: chris.barris@alcentra.com / amos.ouattara@alcentra.com /
christopher.schubert@alcentra.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By:

Name:     Chris Barris

Title:     Portfolio Manager

Notice Address:
200 Park Avenue, New York, NY 10166, US

and

160 Queen Victoria Street, London EC4V 4LA, UK

Fax:
Attention: Chris Barris, Amos Ouattara and Christopher Schubert
Email: chris.barris@alcentra.com / amos.ouattara@alcentra.com /
christopher.schubert@alcentra.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By:

Name:    Chris Barris

Title:    Portfolio Manager

Notice Address:
200 Park Avenue, New York, NY 10166, US

and

160 Queen Victoria Street, London EC4V 4LA, UK

Fax:
Attention: Chris Barris, Amos Ouattara and Christopher Schubert
Email: chris.barris@alcentra.com / amos.ouattara@alcentra.com /
christopher.schubert@alcentra.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: _____

Name:    Chris Barris

Title:    Portfolio Manager

Notice Address:
200 Park Avenue, New York, NY 10166, US

and

160 Queen Victoria Street, London EC4V 4LA, UK

Fax:
Attention: Chris Barris, Amos Ouattara and Christopher Schubert
Email: chris.barris@alcentra.com / amos.ouattara@alcentra.com /
christopher.schubert@alcentra.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By:

Name:    Chris Barris

Title:    Portfolio Manager

Notice Address:
200 Park Avenue, New York, NY 10166, US

and

160 Queen Victoria Street, London EC4V 4LA, UK

Fax:
Attention: Chris Barris, Amos Ouattara and Christopher Schubert
Email: chris.barris@alcentra.com / amos.ouattara@alcentra.com /
christopher.schubert@alcentra.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: _____

Name: Chris Barris

Title: Portfolio Manager

Notice Address:
200 Park Avenue, New York, NY 10166, US

and

160 Queen Victoria Street, London EC4V 4LA, UK

Fax:
Attention: Chris Barris, Amos Ouattara and Christopher Schubert
Email: chris.barris@alcentra.com / amos.ouattara@alcentra.com /
christopher.schubert@alcentra.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

███████████████████████████

By: _Eric Larsson_

(for Alcentra Limited as investment manager)

Name: Eric Larsson

Title: Mangaging Director

<u>Notice Address:</u> 160 Queen Victoria street, London EC4V 4LA

Fax: _____

Attention: Amos Ouattara and Christopher Schubert

Email: amos.ouattara@alcentra.com / Christopher.schubert@alcentra.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: Apollo Credit Management (CLO), LLC,
     its collateral manager

By: _____

Name:    Joseph D. Glatt

Title:    Vice President


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: Apollo Credit Management (CLO), LLC,
     its collateral manager

By: _____

Name:   Joseph D. Glatt

Title:   Vice President

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

[Signature Page – Co-Operation Agreement]

**<u>CONSENTING CREDITOR</u>**

█████████████

By: Apollo Credit Management (CLO), LLC,
     its collateral manager

By: _____

Name:   Joseph D. Glatt_____

Title:   Vice President_____


<u>Notice Address</u>:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

████████████████████████

By: Apollo Credit Management, LLC,
    its investment manager

By: _____

Name:   Joseph D. Glatt

Title:   Vice President

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

███████████████████████

By: Apollo ST Fund Management LLC,
    its investment manager

By: _____

Name: Joseph D. Glatt_____

Title: Vice President_____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: Apollo ST Fund Management LLC,
      its collateral manager

By: _____

Name:    Joseph D. Glatt

Title:    Vice President


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

███████████████████

By: Apollo ST Fund Management LLC,
    its investment adviser

By: _____

Name:   Joseph D. Glatt

Title:   Vice President

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

███████████████

By: Apollo TRF MP Management, LLC,
     its investment manager

By: _____

Name:   Joseph D. Glatt_____

Title:   Vice President_____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

[Signature Page – Co-Operation Agreement]

**<u>CONSENTING CREDITOR</u>**

By: Redding Ridge Asset Management LLC,
    its portfolio manager

By: _____

Name:    <u>Joseph D. Glatt</u>

Title:    <u>Chief Legal Officer</u>

<u>Notice Address</u>:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: <u>jglatt@apollo.com</u>

[Signature Page – Co-Operation Agreement]

**<u>CONSENTING CREDITOR</u>**

███████

By: Redding Ridge Asset Management LLC, Management Series 2,
  its collateral manager

By: _____

Name:  Joseph D. Glatt

Title:  Chief Legal Officer

<u>Notice Address</u>:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

████████

By: Redding Ridge Asset Management LLC,
        its collateral manager

By:        _____

Name:        Joseph D. Glatt_____

Title:        Chief Legal Officer_____


<u>Notice Address</u>:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

███████████████████████

By: Apollo ST Fund Management LLC,
        its investment adviser

By:     _____

Name:     Joseph D. Glatt_____

Title:     Vice President_____


Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

███████████████████████

By: Apollo ST Fund Management LLC,
    its investment adviser

By: _____

Name:   Joseph D. Glatt _____

Title:    Vice President _____

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

[REDACTED]

By: Redding Ridge Asset Management LLC,
     its collateral manager

By: _____

Name:   Joseph D. Glatt

Title:   Chief Legal Officer

<u>Notice Address</u>:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com

[Signature Page – Co-Operation Agreement]

**<u>CONSENTING CREDITOR</u>**

███████

By: Redding Ridge Asset Management LLC,
     its asset manager

By: _____

Name:   <u>Joseph D. Glatt</u>

Title:    <u>Chief Legal Officer</u>


<u>Notice Address</u>:
9 West 57th Street, 37th Floor
New York, NY 10019


Fax: _____
Attention: _____
Email: <u>jglatt@apollo.com</u>


[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

████████████████████████

By: Apollo Credit Management, LLC,
       its investment adviser

By: _____

Name:    Joseph D. Glatt_____

Title:    Vice President_____

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

**CONSENTING CREDITOR**

███████████████████████

By: Apollo Credit Management (CLO), LLC,
    its collateral manager

By: _____

Name:   Joseph D. Glatt

Title:    Vice President

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

█████████████

By: Apollo Credit Management (CLO), LLC,
      its collateral manager

By: _____

Name:    Joseph D. Glatt

Title:    Vice President

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com _____

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

███████████

By: Apollo Credit Management (CLO), LLC,
      its collateral manager

By:    _____

Name:    Joseph D. Glatt_____

Title:    Vice President_____

Notice Address:
9 West 57th Street, 37th Floor
New York, NY 10019

Fax: _____
Attention: _____
Email: jglatt@apollo.com_____

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

Benefit Street Partners LLC,  on behalf of certain managed funds and accounts

By:

Name:    Alex McMillan

Title:    Chief Compliance Officer

Notice Address:
9 W 57th St, suite 4920
New York, NY 10019

Fax: n/a
Attention: Alex McMillan
Email: a.mcmillan@benefitstreetpartners.com and j.rodbard@benefitstreetpartners.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

**DDJ Capital Management, LLC,**
in its capacity on behalf of the
Consenting Creditors that it manages and/or advises

By:

Name:     David J. Breazzano

Title:     President

Notice Address:

DDJ Capital Management, LLC
130 Turner Street
Building #3, Suite 600
Waltham, MA 02453

Fax: (781) 419-9189
Attention: Legal Department
Email: legal@ddjcap.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: Eaton Vance Management
as Portfolio Manager

By: Eaton Vance Management
as Investment Sub-Advisor

By: Calvert Research and Management

By: Eaton Vance Management
Portfolio Manager

By: Eaton Vance Management
As Investment Advisor

By: Eaton Vance Management
as Investment Advisor

By: Eaton Vance Management
as Investment Advisor

By: Eaton Vance Management
as Investment Advisor

By: Eaton Vance Management
as Investment Advisor

[Signature Page – Co-Operation Agreement]

████████████████████████████████

By: Eaton Vance Management as Investment Advisor

███████████████

By: Eaton Vance Management
as Investment Advisor

███████████████████████

By: Eaton Vance Management as Investment Advisor

█████████████████

By: Eaton Vance Management as Investment Advisor

████████████████████

By: Eaton Vance Management as Investment Advisor

█████████████████

By: Eaton Vance Management
as Investment Advisor

████████████████

By: Boston Management and Research
as Investment Advisor

████████████

By: Boston Management and Research
as Investment Advisor

█████████████

By: Eaton Vance Management
as Investment Advisor

By:    *Michael B. Botthof*

Name:    Michael B. Botthof
         Vice President

Title:    _____

2

<u>Notice Address</u>:


2 International Place
Boston MA 02110


Attention: Raymond Peepgass
Email: rpeepgass@eatonvance.com

**CONSENTING CREDITOR**

██████████████████████

By: PGIM, Inc., as Collateral Manager

By: _____

Name: _____

Title: _____

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email:  Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

███████████████████

By: PGIM, Inc., as Collateral Manager

By: _____

Name: _____

Title: _____

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email:  Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _Ian Johnston_

Name: _Ian Johnston_

Title: _Vice President_

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

█████████████████████████

By: PGIM, Inc., as Collateral Manager

By: _Jon John_

Name: _Ian Johngton_

Title: _Vice President_

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _____

Name: Ian Johnston

Title: Vice President


Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102


Fax: (973) 367-8047
Attention: Ian Johnston
Email:  Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _____

Name: Ian Johnston

Title: Vice President

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By:

Name: Ian Johnston

Title: Vice President

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _____

Name: _Ian Johnston_____

Title: _Vice President_____

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _____

Name: Ian Johnston

Title: Vice President


Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102


Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _____

Name: _____Ian Johnston_____

Title: _____Vice President_____

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

▉▉▉▉▉▉▉▉▉▉▉▉▉▉

By: PGIM, Inc., as Collateral Manager

By: _____

Name: _____

Title: _____

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _Jeav Mut._

Name: _Ian Johnston_

Title: _Vice President_

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

## CONSENTING CREDITOR

▮▮▮▮▮▮▮▮▮▮▮▮

By: PGIM, Inc., as Collateral Manager

By: _Jer Jdt._

Name: _Ian Johnston_

Title: _Vice President_

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By:

Name:  Ian Johnston

Title:  Vice President

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email:  Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _____

Name: _Ian Johnston_

Title: _Vice President_

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email:  Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _____

Name: ___Ian Johnston___

Title: ___Vice President___

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email:  Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _____

Name: Ian Johnston

Title: Vice President

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email:  Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Collateral Manager

By: _Jew Mut,_

Name: _Ian Johnston_

Title: _Vice President_


Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102



Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Investment Advisor

By: _____

Name: _____

Title: _____

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email:  Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: PGIM, Inc., as Investment Manager

By: _____

Name: _Ian Johnston_____

Title: _Vice President_____

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

**CONSENTING CREDITOR**

By: PGIM, Inc., as Investment Advisor

By: _____

Name: Ian Johnston

Title: Vice President

Notice Address:
655 Broad Street, 7th Floor
Newark, New Jersey 07102

Fax: (973) 367-8047
Attention: Ian Johnston
Email: Ian.johnston@pgim.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

**Symphony Asset Management LLC, on behalf of certain managed funds and accounts as Investment Manager, General Partner, Sub-Advisor and Collateral Manager**

By: _Judith MacDonald_

Name: _Judith MacDonald_

Title: _Authorized Signatory_

Notice Address:

Fax:  415-291-9635
Attention: Loan Operations
Email: loan.ops@symphonyasset.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

**VOYA INVESTMENT MANAGEMENT CO. LLC**
*on its own behalf and, as applicable, on behalf of its affiliates and managed or sub-advised funds and accounts*

By: _____

Name:    Daniel A. Norman

Title:    Senior Managing Director

Notice Address:

Voya Investment Management
7337 East Doubletree Ranch Road
Scottsdale, Arizona, USA 85258

Fax:          (480) 477-2607
Attention:   Jake Jamison, Vice President for Legal Affairs
Email:        jake.jamison@voya.com

[Signature Page – Co-Operation Agreement]

**CONSENTING CREDITOR**

By: _____

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

By:

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

**CONSENTING CREDITOR**

By:

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

By:

Name:   Dushy Selvaratnam

Title:   Chief Operating Officer

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

By:

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

By: _____

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

**CONSENTING CREDITOR**

By:

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

By:

Name:    Dushy Selvaratnam

Title:    Chief Operating Officer

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

**CONSENTING CREDITOR**

By: 

Name: Dushy Selvaratnam

Title: Chief Operating Officer

Notice Address:

Fax: +44 (0) 20 7681 3844
Attention: Operations Department
Email: operations@lodbrokcapital.com

**CONSENTING CREDITOR**

█████

By: _____

Name: Quentin Leveque

Title: Director

By: _____

Name: Besar Muhameti

Title: Director

Notice Address: _____

Fax: _____
Attention: Besar Muhameti
Email: eqtcredit@eqtfunds.com
    eqtcreditmidoffice@eqtpartners.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

████████████████████████████

By: _____

Name:   Quentin Leveque

Title:   Manager

By: _____

Name:   Besar Muhameti

Title:   Manager

Notice Address:

Fax:_____
Attention: Besar Muhameti
Email: eqtcredit@eqtfunds.com
        eqtcreditmidoffice@eqtpartners.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

By: _____

Name: Quentin Leveque

Title: Manager

By: _____

Name: Besar Muhameti

Title: Manager

Notice Address:

Fax: _____
Attention: Besar Muhameti
Email: eqtcredit@eqtfunds.com
        eqtcreditmidoffice@eqtpartners.com

**CONSENTING CREDITOR**

By: _____

Name: Quentin Leveque

Title: Manager

By: _____

Name: Besar Muhameti

Title: Manager

Notice Address:

Fax: _____
Attention: Besar Muhameti
Email: eqtcredit@eqtfunds.com
        eqtcreditmidoffice@eqtpartners.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

By: _____

Name:    Ashwin Krishnan _____

Title:    Managing Director _____

Notice Address:

Fax: +1 212 507 4216 _____
Attention: Ashwin Krishnan _____
Email: Ashwin.krishnan@morganstanley.com

**CONSENTING CREDITOR**

By: _____

Name:  Brad Benson

Title:  VP – Portfolio Management


By: _____

Name:  Carlton Ling

Title:  VP – Portfolio Management

Notice Address:

Fax:_____

Attention: Brad Benson_____

Email:__ bbenson@signature.ci.com_____

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

By: _____

Name: Brad Benson

Title: VP – Portfolio Management


By: _____

Name: Carlton Ling

Title: VP – Portfolio Management


Notice Address:


Fax: _____

Attention: Brad Benson

Email: bbenson@signature.ci.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

By: _____

Name: Brad Benson

Title: VP – Portfolio Management


By: _____

Name: Carlton Ling

Title: VP – Portfolio Management


Notice Address:


Fax:_____
Attention: Brad Benson
Email: bbenson@signature.ci.com

**CONSENTING CREDITOR**

███████████████████████

By: _____

Name:    Brad Benson

Title:    VP – Portfolio Management


By: _____

Name:    Carlton Ling

Title:    VP – Portfolio Management


Notice Address:


Fax:_____
Attention: Brad Benson
Email:____bbenson@signature.ci.com____

**CONSENTING CREDITOR**

███████████████████████████

By: _____

Name: Brad Benson

Title: VP – Portfolio Management


By: _____

Name: Carlton Ling

Title: VP – Portfolio Management


Notice Address:


Fax:_____
Attention: Brad Benson
Email: bbenson@signature.ci.com

**CONSENTING CREDITOR**

████████████████████████████████

By:      _____

Name:    Brad Benson

Title:    VP – Portfolio Management


By:      _____

Name:    Carlton Ling

Title:    VP – Portfolio Management




Notice Address:



Fax:_____
Attention:_ Brad Benson
Email:_ bbenson@signature.ci.com

## CONSENTING CREDITOR

██████████████████

By: _____

Name: Brad Benson

Title: VP – Portfolio Management


By: _____

Name: Carlton Ling

Title: VP – Portfolio Management

Notice Address:

Fax:_____
Attention: Brad Benson
Email: bbenson@signature.ci.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

By: _____

Name: Brad Benson

Title: VP – Portfolio Management

By: _____

Name: Carlton Ling

Title: VP – Portfolio Management

Notice Address:

Fax:_____

Attention: Brad Benson

Email: bbenson@signature.ci.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

████████████████████████

By: _____

Name:     Brad Benson

Title:     VP – Portfolio Management


By: _____

Name:     Carlton Ling

Title:     VP – Portfolio Management


Notice Address:


Fax:_____

Attention:  Brad Benson

Email:   bbenson@signature.ci.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

~~SIGNATURE HIGH INCOME FUND~~

By: _____

Name:    Brad Benson

Title:    VP – Portfolio Management


By: _____

Name:    Carlton Ling

Title:    VP – Portfolio Management


Notice Address:


Fax:_____
Attention:_Brad Benson_____
Email:_bbenson@signature.ci.com_____

**CONSENTING CREDITOR**

By: _____

Name:    Brad Benson

Title:    VP – Portfolio Management


By: _____

Name:    Carlton Ling

Title:    VP – Portfolio Management


Notice Address:


Fax:_____
Attention: Brad Benson
Email: bbenson@signature.ci.com

**CONSENTING CREDITOR**

███████████████████████████

By: _____

Name:   Brad Benson

Title:   VP – Portfolio Management


By: _____

Name:   Carlton Ling

Title:   VP – Portfolio Management


Notice Address:


Fax:_____

Attention:__Brad Benson_____

Email:__bbenson@signature.ci.com_____

**CONSENTING CREDITOR**

By: _____

Name:   Brad Benson

Title:    VP – Portfolio Management

By: _____

Name:   Carlton Ling

Title:    VP – Portfolio Management

Notice Address:

Fax: _____

Attention:  Brad Benson

Email:   bbenson@signature.ci.com

*[Signature Page to Co-Operation Agreement]*

**CONSENTING CREDITOR**

▪▪▪▪▪▪▪▪▪▪▪▪▪▪

By: _____

Name: Brad Benson

Title: VP – Portfolio Management


By: _____

Name: Carlton Ling

Title: VP – Portfolio Management



Notice Address:



Fax:_____
Attention: Brad Benson
Email: bbenson@signature.ci.com

**CONSENTING CREDITOR**

By: _____

Name:  Brad Benson

Title:  VP – Portfolio Management

By: _____

Name:  Carlton Ling

Title:  VP – Portfolio Management

Notice Address:

Fax:_____

Attention:_ Brad Benson _____

Email:_ bbenson@signature.ci.com _____

*[Signature Page to Co-Operation Agreement]*

SPONSOR:

**CHARTERHOUSE GENERAL PARTNERS (IX) LIMITED, acting in its capacity as general partner of CHARTERHOUSE EVERGREEN LP**

By: _____

Name: T. PATRICK
Title: DIRECTOR

EVERGREEN ENTITIES:

**EVERGREEN SKILLS INTERMEDIATE LUX S.À R.L.**

By: _____

Name:  Eva Carroll
Title:  Manager B

**EVERGREEN SKILLS LUX S.À R.L.**

By: _____

Name:  Eva Carroll
Title: Manager B

**EVERGREEN SKILLS TOP HOLDING LUX S.À R.L.**

By: _____

Name:   Eva Carroll
Title: Manager B

**EVERGREEN SKILLS HOLDING LUX S.À R.L.**

By: _____

Name:   Eva Carroll
Title: Manager B

## SCHEDULE 1

## CONSENTING CREDITORS

### Consenting Creditors

Each, as applicable, as lenders, investment advisors or managers, or sub-advisors or sub-managers, or other similar capacities, together with certain affiliates and managed, advised, sub-managed, or sub-advised funds and accounts

1.  Alcentra NY LLC & Alcentra Limited

2.  Apollo Management Holdings, L.P.

3.  Benefit Street Partners, LLC

4.  DDJ Capital Management, LLC

5.  Eaton Vance Management & Boston Management and Research

6.  EQT Partners UK Advisors LLP

7.  Lodbrok Capital LLP

8.  MS Capital Partners Adviser Inc.

9.  PGIM, Inc.

10. Signature Global Asset Management, a division of CI Investment Inc.

11. Symphony Asset Management LLC

12. Voya Investment Management Co. LLC

WEIL:\97470480\25\74473.0003

**SCHEDULE 2**

**MUTUAL RELEASE**

WEIL:\97470480\25\74473.0003

**MUTUAL RELEASE**

_____ 2020

between

**POINTWELL LIMITED**

and

**THE CONSENTING CREDITORS**

and

**CHARTERHOUSE GENERAL PARTNERS IX LIMITED**

and

**EVERGREEN SKILLS INTERMEDIATE LUX S.À R.L.**

and

**EVERGREEN SKILLS LUX S.À R.L.**

and

**EVERGREEN SKILLS TOP HOLDING LUX S.À R.L**

and

**EVERGREEN SKILLS HOLDING LUX S.À R.L**

**THIS MUTUAL RELEASE** is made as of _____ 2020 among the following parties:

(1)         **THE CONSENTING CREDITORS** (as defined below) listed in Schedule 1;

(2)         **POINTWELL LIMITED** (the **"Company"**);

(3)         **CHARTERHOUSE GENERAL PARTNERS IX LIMITED** (the "**Sponsor**");

(4)         **EVERGREEN SKILLS INTERMEDIATE LUX S.À R.L.**;

(5)         **EVERGREEN SKILLS LUX S.À R.L.**;

(6)         **EVERGREEN SKILLS TOP HOLDING LUX S.À R.L.**; and

(7)         **EVERGREEN SKILLS HOLDING LUX S.À R.L.**

(each, a "**Party**", and together, the "**Parties**").

**NOW, THEREFORE**, in consideration of the mutual releases herein contained and for other good and valuable consideration (the receipt, adequacy and sufficiency of which are hereby acknowledged), the Parties hereto agree as follows:

1.         **DEFINITIONS**

In this Agreement unless otherwise defined herein, terms shall have the meaning given to them in the Restructuring Support Agreement:

"**Acceding Released Party**" means a person who accedes to this Agreement in accordance with the Mutual Release Joinder Agreement;

"**Affiliate**" means with respect to a person, any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person, provided that: (i) for the purposes of this definition of Affiliate the term "control" means the possession, directly or indirectly, through one or more intermediaries, of: (A) the power to direct or cause the direction of the management and policies of a person; or (B) the right to more than 50 per cent. of the profits of a person, in each case whether through the ownership of shares, interests and/or other securities of any kind, by contract or otherwise; (ii) in respect of a limited partnership or a fund, any general partner, investment manager, investment adviser, nominee or trustee of such limited partnership or fund, shall be deemed to be an Affiliate of any member of the Sponsor and if applicable, an Acceding Released Party; (iii) a portfolio company of any fund or account managed or advised by the Sponsor and if applicable, an Acceding Released Party, other than the Company or any company in the Group, shall not be deemed to be an Affiliate of any member of the Sponsor and if applicable, an Acceding Released Party; and (iv) any person which is deemed to be an Affiliate of the Sponsor and if applicable, an Acceding Released Party, principally as a result of being managed and/or advised by the Sponsor and if applicable, an Acceding Released Party, shall only be an "Affiliate" for so long as it continues to be managed and/or advised in such manner;

"**Agreement**" means this Mutual Release;

WEIL:\97474182\16\74473.0003

"**Ad Hoc Groups**" means the two ad hoc groups of lenders to the Company, one represented by Milbank LLP and the other by Gibson, Dunn & Crutcher LLP;

"**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in London, Dublin and New York;

"**Chapter 11 Cases**" means cases commenced by the Company and certain of its direct and indirect subsidiaries pursuant to chapter 11 of title 11 of the United States Code and the terms of the Restructuring Support Agreement or a Replacement RSA;

"**Claim**" means any action, suit, claim, right, demand, set-off, investigation or proceeding commenced or threatened (including any action, suit, claim, right, demand, set-off, investigation or proceeding to preserve or enforce rights) at any time, in any jurisdiction, whether known or unknown, whether foreseen or unforeseen, whether in law, in equity or otherwise, and whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured;

"**Consenting Creditors**" means the Consenting First Lien Lenders and the Consenting Second Lien Lenders;

"**Consenting First Lien Lenders**" means, collectively, the lenders party to the First Lien Credit Agreement that are listed at Schedule 1 and are signatories to this Agreement or Acceding Released Parties (together with their respective successors and permitted assigns) (the "**First Lien Lenders**");

"**Consenting Second Lien Lenders**" means, collectively, the lenders party to the Second Lien Credit Agreement that are listed at Schedule 1 and are signatories to this Agreement or Acceding Released Parties (together with their respective successors and permitted assigns) (the "**Second Lien Lenders**");

"**Control**", "**controlled by**" and "**under common control with**" shall mean the power, direct or indirect, to (a) vote on more than 50 per cent. of the securities having ordinary voting power for the election of directors of such person, or (b) direct or cause the direction of the management and policies of such person whether by contract or otherwise;

"**Evergreen Entities**" means, collectively, Evergreen Skills Intermediate Lux S.à r.l., Evergreen Skills Lux S.à r.l., Evergreen Skills Top Holding Lux S.à r.l. and Evergreen Skills Holding Lux S.à r.l.;

"**Existing AR Credit Agreement**" means the credit agreement dated as of December 20, 2018, among Skillsoft Receivables Financing LLC, a Delaware Limited Liability Company, the lenders party thereto and CIT Bank, N.A., as administrative agent, collateral agent and accounts bank;

"**First Lien Credit Agreement**" means the term loan facility dated April 28, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) between, among others, the Company, Evergreen Skills Intermediate Lux S.à r.l, Evergreen Skills Lux S.à r.l, Skillsoft Canada Ltd, Skillsoft Corporation and the lenders party thereto from time to time;

"**Group**" means the Company and any of its direct and indirect subsidiaries from time to time;

"**Liability**" or "**Liabilities**" means any present or future obligation, liability, Claim, remedy or damages, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, in any jurisdiction, including without limitation, any derivative claims and avoidance actions,

the payment of money, performance of an act or obligation, or otherwise, whether in respect of principal, interest or otherwise, whether actual or contingent, whether fixed or undetermined, whether owed jointly or severally and whether owed as principal, surety or in any capacity whatsoever, and in any manner whatsoever, including any amount which would constitute such a liability but for any discharge, non-provability, unenforceability or non-allowance of the same in any insolvency or other proceedings, including any Claim for breach of representation, warranty or undertaking or on an event of default or under any indemnity given under or in connection with any document or agreement evidencing or constituting any other Liability falling within this definition, and any Claim for damages or restitution;

"**Mutual Release Joinder Agreement**" means a joinder agreement in or substantially in the form set out in Schedule 2;

"**Related Entity**" in relation to an entity (the "**First Entity**"), means an entity which is managed or advised by the same investment manager or investment adviser as the First Entity (or its Affiliates) or, if it is managed by a different investment manager or investment adviser, an entity whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the First Entity (or its Affiliates);

"**Related Parties**" of a person or entity means such person or entity's parent, direct and indirect subsidiaries directly or indirectly controlled by such person or entity, assignees, transferees, representatives, principals, agents, officers or directors;

"**Released Persons**" means (i) each Party, including if applicable, an Acceding Released Party and each of their respective current and former Affiliates, Related Entities, direct and indirect subsidiaries, members, managers, equity owners, managed entities and investment managers; and (ii) each of their (and, for the avoidance of doubt, the Ad Hoc Groups') respective current and former employees, professionals, consultants, directors and officers (in each case in their respective capacities as such), but excluding any portfolio company of any fund or account managed or advised by the Sponsor, other than the Company or any company in the Group;

"**Releases**" has the meaning given to such term in Clause 3(a) (*Releases*);

"**Replacement RSA**" means any agreement executed after the date of the Restructuring Support Agreement between, among others, the Company and the Consenting Creditors in connection with a restructuring (as defined therein) as amended, restated, supplemented or otherwise from time to time a copy of which has been delivered by the Company to the Sponsor on or before the date of this Agreement; *provided, however,* that the Replacement RSA shall provide for treatment of any interests held by the Sponsor or the Evergreen Entities equivalent or superior to the treatment provided to the Sponsor and the Evergreen Entities in the Restructuring Support Agreement and that the Replacement RSA shall not otherwise cause any material adverse effect to the Sponsor or the Evergreen Entities absent the Sponsor's prior written consent;

"**Restructuring**" means certain transactions agreed between the Consenting Lenders and the Group in furtherance of a global restructuring of the Company's capital structure;

"**Restructuring Support Agreement**" means the agreement dated as of June ___, 2020, between, among others, the Company and the Consenting Creditors in connection with the Restructuring (as

defined therein) as amended, restated, supplemented or otherwise from time to time a copy of which has been delivered by the Company to the Sponsor on or before the date of this Agreement;

"**Second Lien Credit Agreement**" means the term loan facility dated April 28, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) between, among others, the Company, Evergreen Skills Intermediate Lux S.à r.l, Evergreen Skills Lux S.à.r.l, Skillsoft Canada Ltd, Skillsoft Corporation and the lenders party thereto from time to time; and

"**Subsidiary**" means, with respect to a person (the Company), any other person who is controlled by the Company.

## 2.    CONSTRUCTION

(a)    In this Agreement, unless the contrary intention appears, a reference to:

   (i)    this Agreement includes all schedules, appendices and other attachments hereto;

   (ii)    an agreement, deed or other document is a reference to such agreement, deed or other document as amended and an amendment includes a supplement, novation, extension (whether of maturity or otherwise), restatement, re-enactment or replacement (however fundamental and whether or not more onerous) and as amended will be construed accordingly;

   (iii)    a person includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, fund, joint venture or consortium), government, state, agency, organisation or other entity whether or not having separate legal personality;

   (iv)    a provision of law is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

   (v)    "include" or "including" shall mean include or including without limitation;

   (vi)    the singular includes the plural (and vice versa);

   (vii)    a Clause or a Schedule is a reference to a clause or a schedule to this Agreement;

   (viii)    headings to Clauses and Schedules are for ease of reference only and shall not affect the construction or interpretation of this Agreement.

(b)    The headings and recitals in this Agreement do not affect its interpretation.

## 3.    RELEASES

(a)    Subject to paragraph (b) below, the Parties hereby agree that, immediately upon the execution of this Agreement, each Party: (i) irrevocably and unconditionally releases, waives and discharges each Released Person from; and (ii) agrees not to take (and shall procure that none of its Related Parties, its Affiliates or Related Parties of its Affiliates takes, and shall not in any way assist any third party in taking) any proceedings in respect of, in each case, any and all Claims and Liabilities arising out of or in connection with any steps, acts or omissions, transactions, or other occurrences or circumstances existing or taking place on or prior to the Effective Date arising from or related in any way in whole or in part to the Chapter 11 Cases, the Restructuring, the Evergreen Entities, the Parent, the Company or any direct or indirect

5

subsidiary of the Parent, the First Lien Credit Agreement, the Second Lien Credit Agreement, any Credit Document (as defined in the Credit Agreements), the Existing AR Credit Agreement, the purchase, sale, or rescission of the offer, purchase or sale of any security of the Company, the subject matter of or the events or transactions giving rise to any claim against or equity interest in the Company that is treated under the Plan, or the negotiation, formulation or preparation of the Definitive Documents for the Restructuring or related agreements, instruments or other documents (the "**Releases**").

(b)      The Releases shall not apply to any Claim or Liability:

    (i)      which exists under or relates to a breach of this Agreement, Plan, or any agreements entered into by any of the Parties in connection with the Plan;

    (ii)      which is caused by or relates to intentional fraud or wilful misconduct of that Released Person; or

    (iii)      for the avoidance of doubt, which cannot be waived or released due to restrictions under applicable law provided that each Party takes all necessary action to give effect to the Releases provided for in this Agreement, including, but not limited to, pursuant to Clause 4 (*Further Assurance*).

(c)      Without prejudice to paragraph (a) above and subject to paragraph (b), on and from the Effective Date, each Party undertakes to the Released Persons and any entity within the Group that it will not commence or continue any Claim (other than Claims to which paragraph (b) above applies) anywhere in the world or instruct, direct, authorize, assist or encourage any other person to commence or continue any Claim (other than Claims to which paragraph (b) above applies) against the Released Person and/or any other entity in the Group in relation to or in connection with or in any way arising out of paragraph (a) above, or otherwise to assert any such Claim against the Released Persons and any entity within the Group.

(d)      By executing this Agreement, the Consenting Creditors, in their capacity as putative shareholders of the Group with effect from the Effective Date, hereby approve and ratify (as applicable) entry into this Agreement or accession thereto (as applicable) by Company, and approve entry into any associated board and/or shareholder resolution in connection therewith.

## 4.      FURTHER ASSURANCE

At the request of a Party, the other Parties shall execute and deliver such documents, and do such things, as may reasonably be required by any of the Parties to give full effect to this Agreement provided that the requesting Party shall pay the other Parties' reasonable costs of complying with such request.

## 5.      THIRD PARTY RIGHTS

Each Released Person may enforce the terms of this Agreement notwithstanding it not being a party to this Agreement.  No other person who is not a Party to this Agreement has any rights to enforce any term of this Agreement.  However, the terms of this Agreement may be amended by the Parties hereto without the consent of any person who is not a Party.

## 6.      CONFIDENTIALITY

6

(a)   Subject to paragraph (b) below, each of the Parties shall treat as confidential and not disclose to any other person:

    (i)   details of the negotiations relating to this Agreement;

    (ii)   this Agreement or any part thereof; or

    (iii)   the existence of or subject matter of this Agreement.

(b)   Paragraph (a) above shall not prohibit disclosure or use of any information if and to the extent:

    (i)   the disclosure or use is required or requested by law, any competent court, governmental body, any industry or regulatory body or by any recognised stock exchange including in connection with or to facilitate the Restructuring;

    (ii)   the disclosure is to any of its Affiliates or Related Entities;

    (iii)   the disclosure is made in the Chapter 11 Cases;

    (iv)   the disclosure is required for the purposes of any proceedings arising out of or in connection with this Agreement;

    (v)   the disclosure is made to auditors and legal or other professional advisers who need to know such information to discharge their duties, provided that any such person to whom such confidential information is to be given pursuant to this sub-paragraph (iv) is informed in writing of its confidential nature; or

    (vi)   the information is or becomes publicly available (other than by breach of this Agreement),

provided that prior to disclosure of any information pursuant to sub-paragraph (b)(i) above, reasonable prior written notice must be given (to the extent practicable and legally possible) by the Party disclosing the information to the other Parties, such that: (i) the other Parties have the opportunity to comment on the proposed disclosure; and (ii) the Parties will co-operate to minimise the scope of any such disclosure.

## 7.   SPECIFIC PERFORMANCE

Without prejudice to any other remedy available to any Party, the obligations of each Party under this Agreement may, subject to applicable law, be the subject of specific performance by the relevant Parties. Each Party acknowledges that damages are not an adequate remedy for any breach of its obligations under this Agreement.

## 8.   COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which, when executed, shall be an original, and all the counterparts together shall constitute one and the same instrument. A signature delivered by facsimile transmission or in PDF format shall be acceptable as an original.

9.      **PARTIAL INVALIDITY**

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction:

(a)      neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provisions under the law of any other jurisdiction will in any way be affected or impaired; and

(b)      the invalid provision will be deemed to be replaced with a legal provision that is as close as possible to the original.

10.      **ENTIRE AGREEMENT**

This Agreement and any non-contractual obligations arising out of or in connection with it constitutes the entire agreement between, and understanding of, the Parties with respect to the subject matter of this Agreement and supersedes any prior written or oral agreement(s) or arrangement(s) between the Parties in relation thereto; *provided* that nothing in this Agreement shall diminish or derogate from rights and remedies of any Party or any other Person under the Plan or any order entered in the Chapter 11 Cases.

11.      **ACCESSION**

(a)      Within 10 calendar days following the Effective Date, VEP Aggregator LLC, Park Square Capital II S.à r.l., Park Square Capital II Parallel S.à r.l. and Park Square Capital II Supplemental S.à r.l. (together with their respective successors, permitted assigns and permitted transferees) may become a party to this Agreement as an Acceding Released Party upon the delivery to the Company of a duly executed Mutual Release Joinder Agreement.

(b)      An Acceding Released Party that becomes party to this Agreement in accordance with the preceding paragraph shall be entitled to the benefit of all the provisions and bound by all of the obligations contained in this Agreement with effect from the date of such accession as if such person had been an original party to this Agreement.

(c)      No other persons other than VEP Aggregator LLC, Park Square Capital II S.à r.l., Park Square Capital II Parallel S.à r.l. and Park Square Capital II Supplemental S.à r.l. (together with their respective successors, permitted assigns and permitted transferees) may become party to this Agreement as an Acceding Released Party or otherwise, unless agreed in advance in writing between the Parties.

12.      **NOTICES**

(a)      Any communication to be made under or in connection with this Agreement shall be made in writing in English and may be made by letter or electronic mail.

(b)      The contact details of the Parties for all communications under or in connection with this Agreement are as identified below, or any substitute contact details as a Party may notify the other Parties by not less than five (5) Business Days' notice:

(i)      the Consenting Creditors:

(A)      if to a Consenting First Lien Lender or a transferee thereof, to the addresses set forth below such member's signature (or as directed by any transferee thereof), as the case may be, with copies to:

WEIL:\97474182\16\74473.0003

Address:     Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Attention:   Scott J. Greenberg, Esq. (sgreenberg@gibsondunn.com)
Steven A. Domanowski, Esq. (sdomanowski@gibsondunn.com)
Matthew J. Williams, Esq. (mjwilliams@gibsondunn.com)
Christina M. Brown, Esq. (christina.brown@gibsondunn.com)

(B)     if to a Consenting Second Lien Lender, or a transferee thereof, to the addresses set forth below such member's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Address:     Milbank LLP
55 Hudson Yards
New York, NY 10001

Attention:   Evan Fleck (efleck@milbank.com)
Sarah Levin (slevin@milbank.com)
Benjamin Schak (bschak@milbank.com)

(ii)     the Company:

Address:     Pointwell Limited
2nd Floor 1-2 Victoria Buildings
Haddington Road, Dublin 4, Ireland D04XN32

Attention:   Greg Porto (Greg.Porto@skillsoft.com)

With a copy to:     Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Attention: Gary Holtzer, Esq. (Gary.Holtzer@weil.com)
Andrew Wilkinson, Esq. (Andrew.Wilkinson@weil.com)
Robert Lemons, Esq. (robert.lemons@weil.com)
Katherine T. Lewis, Esq. (katherine.lewis@weil.com)

(iii)     the Sponsor:

Address:     Warwick Court, Paternoster Square, London, United Kingdom EC4M 7DX

Attention:   Tom Patrick (tom.patrick@charterhouse.co.uk)
William Trevelyan Thomas (will.trevelyanthomas@charterhouse.co.uk)

(c)     Any communication or document made or delivered by one person to another under or in connection with this Agreement will only be effective:

(i)     if by letter:

(A)     delivered in person, when it has been left at the relevant address;

WEIL:\97474182\16\74473.0003

| | (B) | sent by post, five Business Days after being deposited in the post, postage prepaid, in an envelope addressed to it at that address; or |
|---|---|---|

(C)      sent by international priority courier delivery, three (3) days after delivery to such courier,

(D)      and, if a particular department or individual is specified as part of its address details provided above, if addressed to that department or individual; and

(ii)      if by e-mail, when received in legible form.

## 13.    GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL

(a)      This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)      Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any Party shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York  (the "**New York Courts**") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring.  Each of the Parties agrees not to commence any proceeding relating to this Agreement or the Restructuring except in the New York Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any New York Court.  Each of the Parties further agrees that notice as provided in Clause 12 (*Notices*) shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the New York Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Clause 13(b) (*Governing Law; Jurisdiction; Waiver of Jury Trial*) shall be brought in the United States Bankruptcy Court for the District of Delaware.

(c)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).   EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER

INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

WEIL:\97474182\16\74473.0003

**Schedule 1 – Consenting Creditors**[*]

| Consenting Creditors |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

---

[*] *Note to draft*: will be same parties as the RSA and the Co-Operation Agreement

**Schedule 2 – Joinder Agreement**

**FORM OF MUTUAL RELEASE JOINDER AGREEMENT**

This Joinder Agreement to the Mutual Release, dated as of [●], 2020 (as amended, supplemented, or otherwise modified from time to time, the "**Agreement**"), by and among the Sponsor, the Company and the Consenting Creditors, is executed and delivered by _____ (the "**Acceding Released Party**") as of [●], 2020.  Each capitalised term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions hereof). The Joining Party shall hereafter be deemed to be an "Acceding Released Party" and a "Party" for all purposes under the Agreement.

2.  This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of New York.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as a deed poll as of the date first written above.

13

**SIGNATORIES**

WEIL:\97474182\16\74473.0003

## SCHEDULE 3

## JOINDER AGREEMENT


**FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS**

This Joinder Agreement to the Co-Operation Agreement, dated as of [●], 2020 (as amended, supplemented, or otherwise modified from time to time, the "Agreement"), by and among the Sponsor, the Company and the Consenting Creditors, is executed and delivered by _____ (the "Joining Party") as of [●], 2020.  Each capitalised term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1      The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions hereof). The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims and Interests held by such Joining Party.

2      This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of New York.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as a deed poll as of the date first written above.

**CONSENTING CREDITOR**


By: _____

Name: _____

Title: _____


Notice Address: _____


Fax:_____
Attention:_____
Email:_____

17