**<u>Exhibit A</u>**

**Proposed Order**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------- x

In re:                                              :
                                                    :          **Chapter 11**
                                                    :
**SKILLSOFT CORPORATION,** *et al.*                 :          **Case No. 20-11532-MFW**
                                                    :
**Debtors.**[1]                                     :          **(Jointly Administered)**
                                                    :

---------------------------------------------------------- x

### ORDER (I) AUTHORIZING CERTAIN DEBTORS
### TO CONTINUE SELLING RECIEVABLES AND RELATED RIGHTS
### PURSUANT TO ACCOUNTS RECEIVABLE AGREEMENT, (II) MODIFYING
### THE AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Skillsoft Corporation ("**Skillsoft**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of order (i) authorizing certain of the Originators to continue selling Receivables to the AR Borrower pursuant to the terms of the receivables purchase agreements attached hereto as **Exhibit A** (together with all related documents, the "**AR Purchase Agreement**"), (ii) modifying the automatic stay to permit offsets and reductions by the AR Borrower as permitted by the AR Purchase Agreement, and (iii) granting related relief; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b), and the *Amended Standing Order of Reference* from the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Skillsoft Corporation (6115); Amber Holding Inc. (0335); SumTotal Systems LLC (7228); MindLeaders, Inc. (6072); Accero, Inc. (4684); CyberShift Holdings, Inc. (2109); CyberShift, Inc. (U.S.) (0586); Pointwell Limited; SSI Investments I Limited; SSI Investments II Limited; SSI Investments III Limited; Skillsoft Limited; Skillsoft Ireland Limited; ThirdForce Group Limited; Skillsoft U.K. Limited; and Skillsoft Canada, Ltd. The location of the Debtors' corporate U.S. headquarters is 300 Innovative Way, Suite 201, Nashua, NH 03062.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

United States District Court for the District of Delaware, dated February 29, 2012; and

consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided to the Notice Parties, and it appearing

that no other or further notice need be provided; and this Court having held a hearing, if necessary,

to consider the relief requested in the Motion (the "**Hearing**"); and upon the First Day Declaration;

and the Court having determined that the legal and factual bases set forth in the Motion establish

just cause for the relief granted herein; and it appearing that the relief requested in the Motion is

in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all

of the proceedings had before the Court and after due deliberation and sufficient cause appearing

therefor,

### IT IS HEREBY ORDERED THAT

1.      The Motion is granted on a final basis to the extent set forth herein.

2.      The Originators hereby assume the AR Purchase Agreement and ratify and

affirm their respective obligations thereunder pursuant to sections 363 and 365 of the Bankruptcy

Code.  The Debtors in their capacity as Originators are authorized, but not directed to continue

complying with the terms of the AR Facility Agreement and the AR Purchase Agreement in the

ordinary course of business.  Any Receivables or other property sold to the AR Borrower pursuant

to the AR Purchase Agreement shall be sold free and clear of all liens, claims, and encumbrances,

pursuant to sections 363(b) and (f) of the Bankruptcy Code, and the AR Borrower shall be entitled

to all benefits under 363(m) in connection with such purchases.

3.      In accordance with section 503(b) of the Bankruptcy Code, any claim for

actual damages arising from any Originator's failure to satisfy its obligations to the AR Borrower

2

in its capacity as "Originator" or "Servicer" (each, as defined in the AR Purchase Agreement) under the AR Purchase Agreement (which, for the avoidance of doubt, does not and shall not include any obligation to pay, repay or prepay principal, interest or similar amounts owing to the AR Facility Lenders under the AR Facility Agreement) shall constitute allowed administrative expense claims against the Originators (without the need to file any proof of claim) (the "**AR Purchase Administrative Expense Claims**"), which allowed claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered allowed administrative expenses. Solely to the extent an Event of Default has occurred and is continuing under, and as defined in, the AR Facility Agreement, the AR Facility Agent shall be permitted to enforce, on a derivative basis, any AR Purchase Administrative Expense Claims belonging to the AR Borrower related to AR Purchase Agreement. The AR Purchase Administrative Expense Claims shall be considered allowed administrative expense allowed under section 503(b) of the Bankruptcy Code and shall be against each Debtor that acts as an Originator under the AR Purchase Agreement on a joint and several basis. For the avoidance of doubt, the AR Purchase Administrative Expense Claims shall be subject to and subordinate to the Carve Out, the DIP Superpriority Claims, and the Adequate Protection Superpriority Claims (each of which shall be senior to the AR Purchase Administrative Expense Claims).

4.      Notwithstanding the foregoing, if a transfer of Receivables pursuant to the AR Purchase Agreement is avoided or recharacterized as an extension of credit or a pledge, rather than an absolute sale, to secure each Originator's obligations to the AR Borrower and the AR Facility Agent, the AR Facility Agent (for the benefit of the AR Borrower) is hereby granted, pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, unavoidable and fully perfected first-priority continuing security interests in and liens upon all of

3

each Originator's rights in the Originator's Receivables and other property sold to the AR Borrower pursuant to the AR Purchase Agreements (the "**AR Back-Up Liens**").  The AR Back-Up Liens granted to the AR Facility Agent pursuant hereto shall not be subject to challenge and shall attach and become valid, enforceable, automatically perfected liens as of the Petition Date, without any further action by the AR Facility Agent, AR Facility Lenders, or AR Borrower.  No lien senior to or *pari passu* with the AR Back-Up Liens may be permitted under section 364(d)(1) of the Bankruptcy Code against any assets that secure the AR Back-Up Liens.  This Order shall continue the enforceability, perfection, and priority of any of the AR Back-Up Liens notwithstanding any name change, change of location, or any other action by the Debtors or any of their affiliates.  The AR Back-Up Liens shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

5.     To the extent expressly provided in the AR Purchase Agreement, the AR Borrower may (i) deduct from the purchase price of any Receivables or other property purchased under the AR Purchase Agreement, the amounts that are payable by any of the Debtors party thereto as a result of violations of representations, warranties, or other matters set forth in the AR Purchase Agreement, and (ii) if the AR Borrower provides any of the Debtors funds in respect of the AR Purchase Agreement in excess of the applicable purchase price of the Receivables and other property acquired, the AR Borrower may deduct such amounts from the purchase price for future Receivables purchase (such rights in (i) and (ii) collectively, the "**Repayment Amounts**").  The Automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit such offsets and deductions by the AR Borrower, as contemplated in the AR Purchase Agreement.  The payment by the AR Borrower of the purchase price for Receivables that

4

are subsequently reduced by the Repayment Amounts constitutes an extension of credit to the applicable Debtors that is hereby authorized under section 364 of the Bankruptcy Code.

6.      The terms and provisions of this Order relating to the AR Back-Up Liens and AR Purchase Administrative Expense Claims shall be binding upon all parties in interest in these cases, including, without limitation, the Debtors, the AR Borrower, the AR Facility Lenders, the AR Facility Agent, and the respective successors and assigns of the foregoing (including any chapter 7 or chapter 11 trustee hereafter appointed for the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as legal representative of the Debtors) and shall inure to the benefit of, without limitation, the Debtors, the AR Borrower, the AR Facility Lenders, and the AR Facility Agent.  If any or all provisions of this Order are reversed, modified, vacated, or stayed, all obligations or liabilities incurred or payments made relating to the AR Purchase Agreement prior to the effective date of such reversal, stay, modification, or vacatur shall be governed by this Order, and the AR Facility Agent, the AR Facility Lenders, and the AR Borrower shall be entitled to all of the rights, remedies, privileges, and benefits granted herein and pursuant to the AR Purchase Agreement.  If any order dismissing any Debtor's chapter 11 case is entered (to the extent such Debtor acts as an "Originator" or a "Servicer" under the AR Facility Agreement), such order shall provide, in accordance with sections 105 and 349 of the Bankruptcy Code, that the AR Back-Up Liens and AR Administrative Expense Claims shall continue in full force and effect, as provided in this Order, and that the Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing such AR Back-Up Liens and AR Purchase Administrative Expense Claims.

7.      Upon transfer of the Receivables and other property sold to the AR Borrower pursuant to the AR Purchase Agreement, and any all such Receivables and other

5

property, whenever created, shall be the property of the AR Borrower and not property of the estates of any of the Debtors. Accordingly, no expenses of administration of the chapter 11 cases or any future proceeding or case that may result from the chapter 11 cases, including liquidation in bankruptcy or other insolvency proceedings, shall be charged against any such property sold to the AR Borrower, or the proceeds thereof, pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the express, written consent of the AR Facility Agent. The automatic stay is hereby vacated and modified to the extent necessary to permit the AR Facility Agent to exercise any rights and remedies available to it under the AR Purchase Agreement and AR Facility Agreements after no less than five (5) Business Days' prior written notice and opportunity to cure afforded to the Debtors (other than remedies with respect to Repayment Amounts as set forth in Paragraph 22, which shall not be subject to any notice or opportunity to cure).

8.  Other than as expressly provided in the AR Purchase Agreement, the AR Facility Agent shall be entitled, derivatively, to assert any and all rights of the AR Borrower arising as a result of the AR Purchase Agreement, including, without limitation, those rights conveyed under Section 363(m) of the Bankruptcy Code; *provided, however*, that the Administrative Agent shall have no right to (i) enforce any Termination Event (as defined in the AR Purchase Agreement) and/or terminate the AR Purchase Agreement, (ii) assert an AR Purchase Administrative Expense Claim on a derivative basis, or (iii) deduct any Repayment Amount from the purchase price of any receivable, in each case of (i), (ii) or (iii), unless and until an Event of Default under, and as defined in, the AR Facility Agreement shall have occurred and be continuing.

9.  The Debtors are authorized to take all action necessary to effectuate the relief granted in this Order.

6

10.     The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2020
      Wilmington, Delaware

_____
THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

7

**Exhibit A**

**AR Purchase Agreement**

## AMENDED AND RESTATED RECEIVABLES PURCHASE AGREEMENT

This AMENDED AND RESTATED RECEIVABLES PURCHASE AGREEMENT is dated as of December 20, 2018 (as amended, supplemented or otherwise modified from time to time, this "Agreement"), by and among SKILLSOFT CORPORATION, a Delaware corporation ("Skillsoft"); SUMTOTAL SYSTEMS LLC, a Delaware limited liability company ("SumTotal"); MINDLEADERS, INC., a Delaware corporation ("MindLeaders"); SKILLSOFT CANADA, LTD., a New Brunswick corporation ("Skillsoft Canada"); SUMTOTAL SYSTEMS CANADA LTD., a Nova Scotia limited company ("SumTotal Canada"); SKILLSOFT U.K. LIMITED, a company organized under the laws of England and Wales ("Skillsoft UK" and an "Originator Trustee"); SUMTOTAL SYSTEMS U.K. LIMITED, a company organized under the laws of England and Wales ("SumTotal UK" and an "Originator Trustee"); each other entity affiliated with Skillsoft that hereafter becomes a party hereto by executing a joinder agreement (a "Joinder Agreement") in the form of Exhibit C attached hereto (a "New Originator"; together with Skillsoft, SumTotal, MindLeaders, Skillsoft Canada, SumTotal Canada, Skillsoft UK and SumTotal UK, the "Originators"); SKILLSOFT RECEIVABLES FINANCING LLC, a Delaware limited liability company (including in its capacity as beneficiary under the Declaration of Trust, the "Buyer"); and SKILLSOFT, as Originator Agent and as Servicer.

## RECITALS

WHEREAS, each of the Originators is a "software as a service" provider of on-demand e-learning and performance products (the "Goods") to certain customers (each an "Obligor") domiciled in Approved Obligor Jurisdictions under Contracts between such Originator and the Obligor;

WHEREAS, each of the Originators now owns, or will own from time, Receivables payable by Obligors on the terms and subject to the conditions set forth in the applicable Contract;

WHEREAS, each of the Originators desires to sell certain of its Receivables from time to time to the Buyer (or make these subject to a trust in favor of the Buyer under the Declaration of Trust (as applicable), and the Buyer wishes to purchase from each Originator all of such Originator's right, title and interest (or a beneficial interest therein (as applicable)) in and to such Receivables, together with the Related Security and Collections with respect thereto;

WHEREAS, the parties hereto have previously entered into that certain Receivables Purchase Agreement dated as of October 30, 2015 (the "Original RPA"), pursuant to which the Buyer has purchased Receivables prior to the date hereof (the "Prior Purchased Receivables");

WHEREAS, in connection with execution and delivery of the Original RPA and the purchase of or acquisition of a beneficial interest in (as applicable) the Receivables from each Originator, the Buyer entered into that certain Credit Agreement, dated as of October 30, 2015 (as the same has been amended, supplemented or otherwise modified from time to time, the "Original Credit Agreement"), with the Lenders from time to time party thereto and Wells Fargo Bank, N.A., in its capacities as Administrative Agent and Collateral Agent and as Accounts Bank under the Original Credit Agreement;

WHEREAS, the Buyer desires to terminate and repay in full the Original Credit Agreement and enter into that certain Credit Agreement, dated as of the date hereof (as the same may be amended, supplemented or otherwise modified from time to time, the "Credit

Agreement"), among the Buyer, as Borrower, the Lenders from time to time party thereto and CIT Bank, N.A., in its capacities as Administrative Agent and Collateral Agent and as Accounts Bank thereunder; and

WHEREAS, each Originator and the Buyer intend for the sales hereunder to be true sales to the Buyer, providing the Buyer with the full benefits of ownership of such Receivables, and not loans from the Buyer to the Originators;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual agreements herein contained and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto do hereby amend and restate the Original RPA in its entirety and agree as follows:

1.      <u>Definitions</u>.  Capitalized terms used in this Agreement shall have the meanings given to those terms in the Credit Agreement or, if not defined in the Credit Agreement, in <u>Exhibit A</u> attached hereto and thereby incorporated herein.

2.      <u>Sale and Purchase</u>.

*Closing Date*

(a)      <u>Sale on the Closing Date</u>.  Effective on the Closing Date, in consideration for the Purchase Price paid to each Originator which is not a Canadian Originator or a German Originator or a French Originator and upon the terms and subject to the conditions set forth herein, each such Originator does hereby sell, assign, transfer and otherwise convey to the Buyer, and the Buyer hereby purchases from such Originator, all of such Originator's right, title and interest (but none of such Originator's Retained Obligations) in and to each Eligible Receivable originated by such Originator and set forth on <u>Schedule I</u> (US and UKPurchased Receivables, UK Purchased Receivables, Australian Purchased Receivables and Singapore Purchased Receivables) attached hereto, together with all Related Security and Collections with respect thereto.  The Buyer shall pay the Purchase Price for the Eligible Receivables purchased pursuant to this paragraph (a) of this Section 2 on the Closing Date in accordance with Section 3.

(b)      <u>Sale by Canadian Originators on the Closing Date</u>.  Effective on the Closing Date, in consideration for the Purchase Price paid to each Canadian Originator and upon the terms and subject to the conditions set forth herein, each Canadian Originator shall pursuant to an Assignment sell, assign, transfer and otherwise convey to the Buyer, and the Buyer shall pursuant to such Assignment purchase from such Canadian Originator, all of such Canadian Originator's right, title and interest (but none of such Canadian Originator's Retained Obligations) in and to each Eligible Receivable originated by such Canadian Originator and set forth on <u>Schedule I</u> (Canadian Purchased Receivables) attached hereto, together with all Related Security and Collections with respect thereto.  The Buyer shall pay the Purchase Price for the Eligible Receivables purchased pursuant to this paragraph (b) of this Section 2 on the Closing Date in accordance with Section 3.

*Settlement Date*

(c)      <u>Sales on Each Settlement Date</u>.  Effective on each Settlement Date following the Closing Date, until the occurrence of the Revolving Credit Termination Date, in consideration for the Purchase Price paid to each Originator which is not a Canadian Originator or a German Originator or a French Originator and upon the terms and subject to the conditions set forth herein, each such Originator agrees hereby to sell, assign, transfer and otherwise convey to the Buyer, and the Buyer agrees to purchase from such Originator, all of such Originator's right, title and interest (but none of the

#62171535_v4
#62171535_v4

Originator's Retained Obligations) in and to the Eligible Receivables that are originated by such Originator and set forth in the report in substantially the form of Exhibit E attached hereto (each such report, a "Purchase Report") delivered in connection with such Settlement Date, together with all Related Security and Collections with respect thereto. The Buyer shall pay the Purchase Price for the Eligible Receivables purchased pursuant to this paragraph (c) of this Section 2 on any Settlement Date in accordance with Section 3.

(d)    Sales by Canadian Originators on Each Settlement Date.    Effective on each Settlement Date following the Closing Date, until the occurrence of the Revolving Credit Termination Date, in consideration for the Purchase Price paid to each Canadian Originator and upon the terms and subject to the conditions set forth herein, each Canadian Originator shall pursuant to an Assignment sell, assign, transfer and otherwise convey to the Buyer, and the Buyer shall pursuant to such Assignment purchase from such Canadian Originator, all of such Canadian Originator's right, title and interest (but none of such Canadian Originator's Retained Obligations) in and to the Eligible Receivables that are originated by such Canadian Originator and set forth in the Purchase Report delivered in connection with such Settlement Date, together with all Related Security and Collections with respect thereto. The Buyer shall pay the Purchase Price for the Eligible Receivables purchased pursuant to this paragraph (d) of this Section 2 on any Settlement Date in accordance with Section 3.

(e)    Sale by French Originators on each Settlement Date. Effective on each Settlement Date following the date on which each related French Originator executes a Joinder Agreement, until the occurrence of the Revolving Credit Termination Date, in consideration for the Subrogation Price paid to each French Originator upon the terms and subject to the conditions set forth herein, each such French Originator offers to sell, assign, transfer and otherwise convey to the Buyer, all of such French Originator's right, title and interest (but none of the French Originator's Retained Obligations) in and to the Eligible Receivables that are originated by such French Originator and set forth in a Purchase Report delivered in connection with such Settlement Date, together with all Related Security and Collections with respect thereto. The acceptance of an offer for purchase of French Receivables pursuant a Purchase Report may only be accepted by way of the Buyer countersigning for acknowledgment the relevant Purchase Report.

The assignment and transfer of French Receivables shall be effected by way of a *subrogation conventionnelle* pursuant to Art. 1346-1 of the French Code Civil as set forth in Exhibit H (*Transfer of French Receivables - Subrogation Conventionnelle*) hereto. With respect to French Receivables, each reference herein to an assignment or a transfer of French Receivables shall be construed as a reference to a transfer by way of a *subrogation conventionnelle*. The remaining provisions of this Agreement shall apply to the assignment and transfer of French Receivables save as otherwise set forth in Exhibit H (*Transfer of French Receivables - Subrogation Conventionnelle*), which shall prevail on any contrary terms.

(f)    Sale by German Originator on the Settlement Date.    Effective on each Settlement Date following the date on which the related German Originator executes a Joinder Agreement, until the occurrence of the Revolving Credit Termination Date, upon the terms and subject to the conditions set forth herein, a German Originator shall pursuant to a German Assignment sell and assign to the Buyer, and the Buyer shall pursuant to a German Assignment purchase and accept assignment from such German Originator, all Eligible Receivable originated by such German Originator as set forth in the Purchase Report delivered in connection with such Settlement Date (but none of such German Originator's Retained Obligations), and the German Originator shall also assign and transfer all Related Security and Collections with respect thereto.    The Buyer shall purchase and accept such assignment and transfer of Eligible Receivables and Related Security. The Buyer shall pay the Purchase Price for the Eligible

3

Receivables purchased pursuant to this paragraph (f of this Section 2 on the applicable Settlement Date in accordance with Section 3.

The Eligible Receivables purchased by the Buyer under paragraphs (a), through (b), (c) and (df) of this Section 2, together with the Prior Purchased Receivables, shall be referred to herein collectively as the "Purchased Receivables."

(e) True Sale; No Recourse.  Each of the Originators and the Buyer have structured the transactions contemplated by this Agreement as a sale consistent with their intention that each such sale and purchase of Eligible Receivables hereunder (including *inter alia* a transfer by way of a *subrogation conventionnelle*) constitute a "true sale," which sale is absolute and irrevocable and provides the Buyer with the full benefits of ownership of the Purchased Receivables.  The Buyer and each Originator agree to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including in their respective books, records, computer files, tax returns (federal, state, provincial and local), regulatory and governmental filings (and shall reflect such sale in their respective financial statements). Except as otherwise provided in Section 8, each purchase of the Purchased Receivables hereunder is made without recourse to the applicable Originator and no Originator shall have any right or obligation to repurchase from the Buyer any Purchased Receivables or to rescind or otherwise retroactively affect any sale of Purchased Receivables after they are sold to the Buyer hereunder; provided that such Originator shall be liable to the Buyer for all representations, warranties, covenants and indemnities made by such Originator under this Agreement and the other Transaction Documents to which such Originator is a party.  The sale of the Purchased Receivables does not constitute an assumption by the Buyer or any assignee thereof of any Originator's Retained Obligations. The Originators shall have no liability to the Buyer for any Obligor's failure to pay any Receivable when it is due and payable under the terms of the Contract applicable thereto.  The Buyer agrees that it shall assume the risk of non-payment of any Purchased Receivable purchased hereunder to the extent it is the result of an Insolvency Event of the applicable Obligor, such assumption of credit risk (with respect to the Principal Balance relating thereto only) being effective as of the applicable Transfer Date with respect to such Purchased Receivable.  Each Originator will advise all persons inquiring about the ownership of the Receivables that all Purchased Receivables have been sold to the Buyer.

(g)     (f) Security Interest.  Notwithstanding the mutual intent of the parties to treat each sale of the Purchased Receivables hereunder as a true sale, each Originator (other than the a Canadian Originators, and the English Originators, a German Originator, a Singapore Originator, a French Originator and an Australian Originator) hereby grants, effective as of the date hereof, to the Buyer a security interest in and to any and all present and future Purchased Receivables, the Related Security, the Collections and the proceeds thereof to secure the payment of all amounts paid to such Originators hereunder with interest accrued thereon at the applicable rates hereunder and performance by each such Originator of its obligations hereunder, including its obligation to repurchase the Purchased Receivables in the circumstances described in Section 8.  This Agreement shall be deemed to be a security agreement (other than in respect of the a Canadian Originators, a German Originator, and the English Originators, a Singapore Originator, a French Originator and an Australian Originator) for purposes of the UCC.  With respect to such grant of a security interest, the Buyer may at its option exercise from time to time any and all rights and remedies under this Agreement, the UCC, the PPSA (if applicable), the PPS Act (AU) or otherwise.  Each Originator (other than the a Canadian Originators, a Singapore Originator, and the English Originators, a German Originator, a French Originator  and an Australian Originator)

4

agrees that five Business Days shall be reasonable prior notice to the applicable Originator of the date of any public or private sale or other disposition of any or all of the Receivables.  In furtherance of the foregoing, upon the request of the Buyer or the Collateral Agent (as the Buyer's assignee and at the written direction of the Requisite Lenders), each such Originator shall file such financing, financing change statements or continuation statements, or amendments thereto or assignments thereof, and such other instruments or notices, as may be necessary or appropriate to perfect and maintain the perfection of Buyer's security interest (if applicable) and ownership interest in the Receivables originated by such Originator and the Related Security and Collections with respect thereto, or as the Buyer or the Collateral Agent (as the Buyer's assignee) may reasonably request from time to time.

(h)   Sale by Australian Originators on the Settlement Date.

(i)   Each Australian Originator agrees to do anything the Buyer reasonably requests to ensure (i) any security interest under this Agreement is fully effective, enforceable and perfected with the contemplated priority, for more satisfactorily assuring or securing to the Buyer the Eligible Receivables and for aiding the exercise of any right, power or remedy in connection with any such security interest, and (ii) the representations and warranties set out in Exhibit B (c) are true and correct at all times in respect of each Eligible Receivable transferred or to be transferred to the Buyer by the relevant Australian Originator including, without limitation, by the relevant Australian Originator taking all such steps as reasonably practicable to procure an executed deed of release or instrument of waiver of priority (in each case on terms satisfactory to the Buyer in all respects) in respect of any existing security interest (as defined in the PPS Act (AU)) which extends to the relevant Eligible Receivable in favour of any third party creditor which ranks pari passu or in priority (as determined by application of the PPS Act (AU)) to the interest of the Buyer in the relevant Eligible Receivable.

(ii)   If the PPS Act (AU) applies to transactions under this Agreement, (i) the parties acknowledge that for the purposes of section 109(1) of the PPS Act (AU), each transfer of Eligible Receivables does not secure payment or performance of an obligation; (ii) each Australian Originator acknowledges that each transfer of a Eligible Receivable by the relevant Australian Originator to the Buyer as contemplated by this Agreement will constitute a deemed security interest in favour of the Buyer as secured party in respect of the Eligible Receivable transferred; (iii) each Australian Originator consents to the registration by the Buyer, at the relevant Australian Originator's expense, of a financing statement or any financing change statement on the Australian Personal Property Securities Register; (iv) each Australian Originator waives its rights under the PPS Act (AU) to receive a copy of any verification statement in respect of any such financing statement or financing change statement as registered by the Buyer; (v) each Australian Originator agrees that it will not change its name, ACN or ABN without giving the Buyer at least ten (10) Business Days prior notice of such new name or relevant number; (vi); the parties agree to the extent permitted by law (A) for the purposes of sections 115(1) and 115(7) of the PPS Act (AU), the Buyer need not comply with sections 95, 118, 121(4), 125, 130, 132(3)(d) or 132(4); (B) sections 142 and 143 of the PPS Act (AU) are excluded and (C) for the purposes of section 115(7) of the PPS Act (AU) , the Buyer need not comply with sections 132 and 137(3).

(iii)    Where the Buyer has rights, powers or remedies in addition to, or existing separately from, those under the PPS Act (AU), those rights, powers and remedies will continue to apply and are not limited or excluded (or otherwise adversely affected) by the PPS Act (AU). This is despite this clause or any other provision of this Agreement.

(i)    Sale of Australian Receivables.   It is acknowledged that any sale, transfer or assignment to the Purchaser of the Australian Receivables referred to in clause 2 is equitable only, subject to section 6(p).

3.    Purchase Price.

(a)    Calculation of Purchase Price.    The purchase price for each Purchased Receivable (other than French Receivables) purchased on the Closing Date and on any Transfer Date thereafter (the "Purchase Price") shall equal the Net Invoice Amount thereof.

(b)    Payment. (i) In respect of any Purchased Receivable (other than French Receivables) sold by a Canadian Originator, an English Originator, a German Originator, a Singapore Originator, an Australian Originator, SumTotal or MindLeaders or any New Originator (other than a French Originator), the Purchase Price for the Purchased Receivables shall be payable in full by the Buyer to each applicable Originator in Dollars on the applicable Transfer Date as follows: (A) *first*, by set-off pursuant to Section 8(d) and (B) *second*, by delivery on such Transfer Date of immediately available funds, to the extent of funds available to the Buyer from its Borrowings under the Credit Agreement and other cash on hand ~~and~~, (ii) in respect of any Purchased Receivable sold by Skillsoft, the Purchase Price for the Purchased Receivables shall be payable in full by the Buyer to Skillsoft in Dollars on the applicable Transfer Date as follows: (A) *first*, by set-off pursuant to Section 8(d), (B) *second*, by delivery on such Transfer Date of immediately available funds, to the extent of funds available to the Buyer from its Borrowings under the Credit Agreement and other cash on hand and (C) *third*, subject to the terms of Section 3~~(c)~~(e), by means of an addition to the principal amount of the Subordinated Note in an amount equal to any remaining unpaid portion of such Purchase Price after application of clauses (ii)(A) and (B) above. and (iii) in respect of any Purchased Receivable which is a French Receivable transferred to the Buyer by way of *subrogation conventionnelle*, the Buyer shall pay to the relevant French Originator an amount equal to the aggregate face amount of such French Receivables, in accordance with the terms of Exhibit H (*Transfer of French Receivables*) (hereinafter called the Subrogation Price when applied to French Receivables) and the relevant French Originator shall deliver an executed subrogation receipt ("*Subrogation Receipt*") to the Buyer in the form as set out in Annex 1 to Exhibit H upon receipt of the relevant amount paid in respect of the relevant French Receivable transferred to the Buyer hereunder.

(c)    Subject, in the case of French Receivables, to the provisions of Exhibit H (*Transfer of French Receivables*) to this Agreement, the Buyer shall transfer the Purchase Price due in accordance with Clause 3 of the Agreement on the Settlement Date. The Purchase Price for each French Receivable shall be paid by the Buyer to the relevant French Originator on each relevant Settlement Date, in accordance with the terms of Exhibit H (*Transfer of French Receivables*).

(d)    Only to the extent applicable, for the purposes of (i) Articles L.314-1 et seq., L.341-49, R.314-1 et seq. of the French *Code de la consommation* and (ii) Article L.313-4 of the French *code monétaire et financier*, the Parties acknowledge that by virtue of certain characteristics of this Agreement, the effective global rate (*taux effectif global*) cannot be calculated at the date of this Agreement, but an indicative calculation of such rate (based on figured example calculated on the basis of

6

assumptions) shall be provided on the date hereof by the Buyer to the French Originators in a separate letter, which forms part of this Agreement (the "**TEG Letter**").

(e) ~~(c)~~ Subordinated Note. (i) On the Closing Date, the Buyer shall issue to Skillsoft an amended and restated subordinated promissory note substantially in the form of Exhibit D (the "Subordinated Note") payable by the Buyer to the order of Skillsoft. The aggregate principal amount of the Subordinated Note at any time shall be equal to the excess of (x) the sum of (A) the original principal amount of the Subordinated Note on the Closing Date and (B) the aggregate amount of each addition to the principal amount of the Subordinated Note made pursuant to Section 3(b)(ii)(C) as of such time over (y) the sum of (A) the aggregate amount of all payments made by the Buyer to Skillsoft in cash in respect of the principal amount of the Subordinated Note as of such time and (B) all reductions in such principal amount pursuant to Section 8(a). All payments made by the Buyer in respect of the Subordinated Note shall be allocated, *first*, to pay accrued and unpaid interest thereon, and *second*, to pay the outstanding principal amount thereof. Interest on the outstanding principal amount of the Subordinated Note shall accrue at the rate per annum set forth in the Subordinated Note, to be paid (x) on each Settlement Date and (y) on the maturity date thereof. Any principal amount of the Subordinated Note not paid or prepaid pursuant to the foregoing terms shall be payable on the maturity date thereof. Notwithstanding anything to the contrary contained in this Agreement, all obligations of the Buyer in respect of principal and interest evidenced by the Subordinated Note shall be paid solely from funds available to the Buyer that are not otherwise required to be applied or set aside for the payment of any obligations of the Buyer under the Loan Documents, and shall be non-recourse to the Buyer other than with respect to such funds. Accordingly, Skillsoft shall not have a claim against the Buyer to the extent that insufficient funds exist to make any payment in respect of the Subordinated Note, and any failure of the Buyer to pay interest or principal due on the Subordinated Note shall not constitute a Termination Event or Event of Default.

(i)     The Originator Agent shall record any addition to the principal amount of the Subordinated Note made on any Transfer Date by noting the date and amount thereof on the grid attached to the Subordinated Note; provided, however, that the failure to make any such recordation or any error in such grid shall not adversely affect Skillsoft's rights.

(ii)     Anything herein to the contrary notwithstanding, (x) the principal amount of the Subordinated Note as of any Transfer Date shall not exceed an amount equal to 30% of the aggregate Principal Balance of the Financed Receivables as of such Transfer Date and (y) no increase shall be made to the principal amount of the Subordinated Note on any Transfer Date if the Net Worth of the Buyer is less than $9,000,000 on such date, in each case after giving effect to all transactions contemplated hereunder or under the Credit Agreement to occur on such date.

(iii)     The Buyer and Skillsoft agree to treat the Subordinated Note as equity for U.S. Tax purposes, and not to take any inconsistent position (whether on a tax return or otherwise) unless required to do so by final determination of the IRS or other applicable Governmental Authority.

(f) ~~(d)~~ Originator Agent. Each of the Originators hereby appoints Skillsoft as its agent (in such capacity, the "Originator Agent") to perform all duties assigned to it hereunder or under the other Transaction Documents. The Originator Agent hereby accepts and agrees to such appointment.

4.     Conditions Precedent.

(a)     Initial Transfer or Trust on the Closing Date. The purchase or declaration of trust over (as applicable) of the Financed Receivables designated for sale or to be made subject to the Originator Trust by the applicable Originators on the Closing Date shall be subject to the condition that

#62171535_v4
#62171535_v4

all of the conditions precedent to the initial Loan under Section 3.1 of the Credit Agreement (as amended) shall have been satisfied or waived in accordance with the terms thereof.

(b)      Transfers on Settlement Dates.  The Buyer's obligation to purchase Eligible Receivables from any Originator or to acquire a beneficial interest in Eligible Trust Receivables on any Settlement Date shall be subject to the further conditions precedent that:

(i)      The Revolving Credit  Termination Date shall not have occurred as of such Settlement Date;

(ii)      Not later than the third Business Day prior to such Settlement Date, the Buyer shall have received a Purchase Report with respect to the Eligible Receivables proposed to be sold, together with such additional supporting documentation that the Buyer may have reasonably requested in connection therewith;

(iii)      Such Originator's and, if applicable, Originator Trustee's representations and warranties herein shall be true and correct in all material respects on and as of the applicable Settlement Date (or, if such representation or warranty is expressly made only as of another date, as of such date), including with respect to the Eligible Receivables designated to be sold in the applicable Purchase Report and the Eligible Trust Receivables designated as Trust Receivables in a Trust Asset Designation; provided that the materiality qualifier in the preceding clause shall not be applicable with respect to any representation or warranty which itself contains a materiality qualifier;

(iv)      No Event of Repurchase nor any Trust Surrender Event shall exist on such Settlement Date with respect to a Financed Receivable sold to the Buyer or made subject to the Originator Trust by such Originator, unless the applicable Originator has repurchased (or reacquired the beneficial interest therein) and paid (or is paying on such Settlement Date) the full amount of the Repurchase Price (or the amount subject to Dispute, to the extent provided pursuant to Section 8) for the affected Financed Receivables pursuant to the terms of Section 8 or such repurchase (or reacquisition of beneficial interest) or other payment is being effectuated on such Settlement Date by payment in cash or by set-off by the Buyer against the Purchase Price for the Eligible Receivables designated to be sold or against the Trust Consideration for the Eligible Trust Receivables designated to be added to the Originator Trust;

(v)      To the extent that there are any Borrowings to be made on such Settlement Date, all of the conditions precedent set forth in Section 3.2 of the Credit Agreement to the making of a Loan shall have been satisfied or waived in accordance with the terms thereof;

(vi)      No event shall have occurred and be continuing that constitutes a Termination Event; and

(vii)      No Material Adverse Change shall have occurred since the date of the last purchase hereunder.

(c)      Notwithstanding the foregoing conditions precedent, the Buyer shall be vested with full right, title and interest to and in each Purchased Receivable or in the entire beneficial interest in each Trust Receivable and, in each case, its Related Security and Collections with respect thereto on the first day on which any portion of the Purchase Price or Trust Consideration (as applicable) is paid under Section 3(b), and whether or not the conditions precedent set forth herein were in fact satisfied.  The failure, however, of any such Originator (other than a Canadian Originator) to satisfy any of the foregoing conditions precedent shall give rise to a right of the Buyer to rescind the related purchase or

acquisition of a beneficial interest and direct such Originator or Originator Trustee to pay to the Buyer an amount equal to the Purchase Price or Trust Consideration payment that had been made with respect to any Receivable related thereto in accordance with Section 8.

5.    Originator Representations and Warranties.  Each Originator represents and warrants to the Buyer on each Transfer Date that the representations and warranties set forth on Exhibit B hereto are true and correct.

6.    Originator Covenants.  Until the later of the termination of this Agreement and the Revolving Credit Termination Date:

(a)    Corporate Existence.  Each Originator will (i) comply in all material respects with all material applicable laws, rules, regulations and orders and preserve and maintain its corporate existence, rights, franchises, qualifications, and privileges and (ii) keep its jurisdiction of incorporation, principal place of business and chief executive office and the office where it keeps its records concerning the Receivables at the address set forth in this Section 6 or, upon 30 days' prior written notice to the Buyer, at any other locations in jurisdictions where all actions reasonably requested by such the Buyer or the Collateral Agent (at the written direction of the Requisite Lenders) or otherwise necessary to protect, perfect and maintain the Buyer's security interest in the Receivables have been taken and completed.

(b)    Books and Records.  Each Originator will keep its books and accounts in accordance with GAAP and shall make a notation on its books and records, including any computer files, to indicate which Receivables (including any beneficial interest therein) have been sold to the Buyer. Originator shall maintain and implement administrative and operating procedures (including, without limitation, an ability to recreate records evidencing Receivables and related contracts in the event of the destruction of the originals thereof), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for collecting all Receivables (including, without limitation, records adequate to permit the daily identification of each Receivable and all collections of and adjustments to each existing Purchased Receivable).

(c)    Sales, Liens and Debt.  No Originator will sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Lien on or with respect to, the Receivables or upon or with respect to any account to which any collections of any Receivable are sent, or assign any right to receive income in respect thereof except the security interests in favor of (i) the Buyer and (ii) the agents under the Existing Credit Agreements (it being understood and agreed that no Originator shall enter into any control agreement with any agent or lender under any of the Existing Credit Agreements or otherwise permit any such agent or lender to take possession or control of (or otherwise perfect any Lien on) any deposit account or other account in which collections of any Receivable are transferred or deposited).

(d)    Extension or Amendment of Receivables.  No Originator shall (i) amend or extend the payment terms applicable to any Financed Receivables, (ii) reduce the amount of any Financed Receivable, or compromise or settle the same or allow any credit or discount whatsoever thereon, (iii) release wholly or partly any Obligor from the payment thereof, (iv) enter into any amendment or modification to the Contract that would adversely affect the Buyer's rights in any Financed Receivable in any manner or (v) otherwise waive or permit or agree to any deviation from the terms or conditions of any Financed Receivable, in each case unless approved in advance by the Buyer.

(e)    Audits and Visits.  Each Originator will, at any time and from time to time during regular business hours as requested by the Buyer, permit the Buyer, the Lenders or their respective agents or representatives, upon five Business Days' notice, (i) on a confidential basis, to examine and make

#62171535_v4
#62171535_v4

copies of and abstracts from all books, records and documents (including, without limitation, computer tapes and disks) in its possession or under its control relating to the Receivables including, without limitation, the related Contracts, and (ii) to visit its offices and properties for the purpose of examining and auditing such materials described in clause (i) above, and to discuss matters relating to the Receivables or its performance hereunder or under the related Contracts with any of its officers or employees having knowledge of such matters; provided that unless any Originator is in default in respect of any material obligation hereunder, the Buyer and the Lenders and their respective agents or representatives collectively shall perform no more than two on-site visits annually.

(f)     Reporting Requirements.   The Originators will provide to the Buyer the following:

(i)     the financial statements, certificates and opinions described in Section 6.1 of the Credit Agreement on or prior to the date specified therein;

(ii)     at least ten Business Days prior to any change in any Originator's name (including any French form of name), a notice setting forth the new name and the proposed effective date thereof;

(iii)     promptly (and in no event later than five Business Days following actual knowledge or receipt of written notice thereof), written notice in reasonable detail, of any Lien or Dispute asserted or claim made against a Financed Receivable or any credit memoranda issue relating to any Financed Receivables; and

(iv)     as soon as possible and in any event within five days after becoming aware of the occurrence thereof, written notice of any matter that could reasonably be expected to result in a Material Adverse Change.

(g)     Further Instruments.  Each Originator will, at its expense, promptly execute and deliver all further instruments and documents, and take all further actions that the Buyer may reasonably request, from time to time, in order to perfect, protect, defend or more fully evidence the full and complete ownership and security interest in the Receivables, free and clear of any Liens or adverse claims, other than those in favor of the Collateral Agent and the Secured Parties, or to enable the Buyer to exercise or enforce the rights of the Buyer hereunder or under the Receivables.

(h)     Taxes.   Subject to Section 8(c), each Originator will pay (or will cause the Originator Agent to pay) any and all taxes (excluding the Buyer's net income, franchise, doing business or similar taxes) relating to the transactions contemplated under this Agreement and the Declaration of Trust, including but not limited to the sale, transfer and assignment of or declaration of trust over (as applicable) each Financed Receivable, other than those taxes that any Originator is contesting in good faith and for which adequate reserves have been taken.

(i)     Perform Terms.  Each Originator will duly perform and comply with all terms under each Contract relating to the Financed Receivables and promptly inform the Buyer of any breach or default by any Originator or any Obligor of any of the terms thereof.

(j)     Not Adversely Affect Buyer's Rights.  Each Originator will refrain from any act or omission that could reasonably be expected to materially prejudice or limit the Buyer's rights under any of the Financed Receivables or this Agreement.

#62171535_v4
#62171535_v4

(k)     Class 1 Receivables.  On each Transfer Date, each Originator will sell to the Buyer, or declare in favor of the Buyer a trust over (as applicable), all of its Class 1 Receivables prior to selling, or declaring in favor of the Buyer a trust over (as applicable), any Financed Receivables in any other class on such date.

(l)     Maintenance of Business.  Each Originator will, and will cause each of its Subsidiaries to take all reasonable action to preserve, renew and keep in full force and effect the rights, licenses, permits, privileges, franchises, patents, industrial design rights, copyrights, trademarks and trade names material to the conduct of the business such Originator.  Without limiting the foregoing, each Originator (i) will preserve, renew (in its discretion) and keep in full force and effect the Contracts with its Obligors and (ii) will preserve, renew (or replace in its discretion) and keep in full force and effect any of its contracts with the entity or entities that provide the servers which permit such Originator to provide the digital platform for its customers and other services offered by such Originator.  Each Originator will, and will cause each of its Subsidiaries, to maintain the servers and the digital passkeys for an "uptime" level that is consistent in all respects with the "uptime" levels maintained prior to the Closing Date.

(m)     Centre of Main Interests.  With respect to any Originator formed, incorporated or organized in the European Union, for the purposes of the European Union Regulation and UNCITRAL Implementing Regulations, its "centre of main interests" shall be situated in its jurisdiction of incorporation, and it shall have no "establishment" (as defined in the European Union Regulation and UNCITRAL Implementing Regulations) or branch office in any other jurisdiction.

(n)     Declaration of Trust.  Except with the prior written consent or at the direction of the Buyer or as provided in or contemplated by the Declaration of Trust, the Credit Agreement or this Agreement, neither Skillsoft UK nor SumTotal UK shall, so long as it is acting as trustee of the Originator Trust created pursuant to the Declaration of Trust in relation to the Trust Receivables:

(i)     create or permit to exist any Lien upon the whole or any part of the Trust Receivable, present or future;

(ii)     transfer, sell, lend, part with or otherwise dispose of, or deal with, or grant any option or present or future right to acquire any of the Trust Receivable or any interest, estate, right, title or benefit therein or thereto or agree or attempt or purport to do so; or

(iii)     permit any person other than the Buyer to have any equitable or beneficial interest in any of its assets or undertakings or any interest, estate, right, title or benefit therein.

(o)     Default Notices.  As soon as practicable, and in any event within five Business Days after a Responsible Officer of any Originator has actual knowledge of the existence of any breach of a covenant under this Agreement, Termination Event or Event of Repurchase or other event which has had a Material Adverse Effect or which could reasonably be expected to have a Material Adverse Effect, such Originator shall give the Buyer written notice specifying the nature of such breach, Termination Event or Event of Repurchase or other event, including the anticipated effect thereof.

(p)     Default Notices to Obligors. Following the occurrence and during the continuance of an Event of Default, if so instructed by the Collateral Agent (at the written direction of the Requisite Lenders), the Originators agree to notify, and authorize the Buyer and the Collateral Agent to notify, the Obligors of the sale and assignment of the Eligible Receivables (or, in respect of the French Receivables of their transfer by way of *subrogation conventionnelle*) under this Agreement and to make payment directly to the Concentration Account.

#62171535_v4
#62171535_v4

7.      Collection Activities.

(a)      The Buyer (and, in respect of the Trust Receivables, each Originator Trustee) hereby affirms its appointment of Skillsoft as its servicer and agent (in such capacity, the "Servicer") for the administration and servicing of all Financed Receivables sold to the Buyer hereunder, and Skillsoft hereby confirms its acceptance of such appointment and agrees to assume the duties and the administration and servicing obligations as Servicer, and perform all necessary and appropriate commercial collection activities in arranging the timely payment of amounts due and owing by any Obligor, whereby the Buyer agrees that, with respect to German Receivables, such duties (in particular any collection activities) shall be sub-delegated to the German Originator, with Skillsoft remaining responsible and liable to the Buyer, all in accordance with applicable laws, rules and regulations, with reasonable care and diligence, including, without limitation, diligently and faithfully performing all servicing and collection actions (including, if necessary, acting as party of record in foreign jurisdictions), in each case in accordance with the Credit and Collection Policies; *provided, however*, that such appointment as Servicer and any sub-delegation of such duties shall not release Skillsoft from any of its duties, responsibilities, liabilities and obligations resulting from or arising hereunder.  The Buyer may replace the Servicer pursuant to Section 7(f).  In connection with its servicing obligations, Servicer will, and will ensure that each Originator will, perform its respective obligations and exercise its respective rights under the Contracts related to the Financed Receivables with the same care and applying the same policies as it applies to its own Receivables generally and would exercise and apply if it owned the Financed Receivables and shall act in the best interests of the Buyer to maximize Collections, in each case in accordance with the Credit and Collection Policies.  In addition, the Servicer shall assist the Buyer in the creation of all reports and other deliveries required to be delivered by the Buyer under the Transaction Documents.

(b)      The Buyer has established in its own name an account located at the Accounts Bank, ABA #322270288, Account #1841000394 (the "Concentration Account") to receive amounts owing by the Obligors under the Financed Receivables from the Originators.  Each Originator and Originator Trustee and the Servicer covenant and agree (i) to initiate transfer of all amounts received from any Obligor in respect of any Financed Receivables to the Concentration Account within two Business Days of receipt thereof from the applicable Obligor, (ii) to take any and all other actions, including actions requested by the Buyer, to ensure that all amounts owing under the Financed Receivables will be transferred exclusively to the Concentration Account, and (iii) to take any and all other actions, including actions requested by the Buyer, to ensure that any amounts not owing under the Financed Receivables will not be deposited in the Concentration Account.  Until remitted to the Concentration Account, any amounts held by any Originator or the Servicer in respect of a Financed Receivable shall be held in trust (to the extent legally possible) as the Buyer's exclusive property and safeguarded for the benefit of the Buyer (and its respective assignees).  If the transfer of any Collections in respect of a Financed Receivable to the Concentration Account is not initiated within two Business Days of receipt thereof by the applicable Originator, Originator Trustee or the Servicer, then the amount of such Collections not so remitted shall bear interest each day from such date due until the date deposited into the Concentration Account at the Delinquent Rate.  Such interest shall be payable on demand.

(c)      If any Originator, Originator Trustee or the Servicer misdirects payment to the Concentration Account of any Collections from a Receivable that was not a Financed Receivable, such Originator, Originator Trustee or the Servicer, as applicable, will immediately notify the Buyer and provide evidence of payment details documenting that the payment is for transactions other than the Financed Receivables and that no Event of Repurchase has occurred and is continuing.  If the Buyer has been so notified prior to the next Settlement Date, then the Buyer shall refund the amount of the misdirected payment to the applicable Originator or Originator Trustee, at the direction of the Servicer.  If the Buyer has not been so notified prior to the next succeeding Settlement Date, and as a result the amount

of such misdirected payment has been transferred, paid over or otherwise set aside for the benefit of the Agents or any Lender in accordance with the Credit Agreement, then the applicable Originator or Originator Trustee shall be entitled to offset the amount of the misdirected payment against any other amounts that such Originator or Originator Trustee is otherwise required to remit to the Buyer.  Under no circumstances whatsoever shall the Agents, the Accounts Bank or any Lender have any liability (whether direct or indirect, in contract, tort or otherwise) to the Servicer, any Originator, any Originator Trustee, the Parent, any affiliate thereof or any other Person in respect of, or obligation to return, refund or otherwise pay over to the Servicer, any Originator, any Originator Trustee, the Parent, any affiliate thereof or any other Person, any amount that represents a misdirected payment.

(d)     Pursuant to its servicing obligations under Section 7(a), the Servicer shall be responsible for identifying, matching and reconciling any payments received in the Originator's or Originator Trustee's accounts with the Receivable associated with such payment.  If any payment is received from an Obligor, and such payment is not identified by such Obligor or Originator Trustee as relating to a particular Receivable and cannot otherwise be reasonably identified (e.g. by invoice number or amount) as relating to a particular Receivable within five Business Days of receipt thereof, such payment shall be applied first to the unpaid Financed Receivables with respect to such Obligor in chronological order (beginning with the oldest unpaid Financed Receivable), and then to Receivables with respect to such Obligor that are not Financed Receivables, also in chronological order.

(e)     Based on the reconciliation information prepared by the Servicer in accordance with its servicing obligations under Sections 7(a) and 7(d), and other information available to the Servicer, (i) the Servicer will initiate remittance of Collections on account of Financed Receivables to the Concentration Account no later than two Business Days after receipt thereof in accordance with Section 7(b) of this Agreement and (ii) the applicable Originator or Originator Trustee or the Servicer will retain for its own account Collections on account of Receivables that are not Financed Receivables.

(f)     If the Servicer defaults in its obligations as servicer as set forth under this Section 7, the Buyer may at any time thereafter (and shall, without requirement of advance notice to the Servicer, any Originator or Originator Trustee or any other Person, upon an Insolvency Event of the Servicer) replace the Servicer (which replacement may be effectuated through the outplacement to a Person of all back office duties, including billing, collection and processing responsibilities, and access to all personnel, hardware and software utilized in connection with such responsibilities).  Any fees and expenses incurred by the Buyer, the Agents or the Lenders in connection with the replacement of the Servicer shall be reimbursed on demand by the Originators (or the Originator Agent), which shall be liable for such amounts on a joint and several basis.

(g)     The Servicer hereby agrees to indemnify the Buyer, the Agents, the Lenders and their respective officers, directors, agents, representatives, shareholders, counsel, employees (each, a "Servicer Indemnified Person") from and against any and all claims, losses and liabilities (including, without limitation, reasonable attorneys' fees) arising out of or resulting from any failure by the Servicer to perform its duties or obligations as Servicer hereunder in accordance with this Agreement or any claim brought by any Person other than a Servicer Indemnified Person arising from the Servicer's collection activities with respect to the Financed Receivables; provided, however, that in all events there shall be excluded from the foregoing indemnification (x) any claims, losses or liabilities to the extent resulting solely from the gross negligence or willful misconduct of a Servicer Indemnified Person as determined in a final non-appealable judgment of a court of competent jurisdiction or (y) as the result of an Insolvency Event of an Obligor.  Amounts due hereunder shall accrue interest at the Delinquent Rate.

#62171535_v4
#62171535_v4

(h)    As compensation for its servicing activities hereunder, the Servicer shall be entitled to receive the Servicer Fee from time to time payable in accordance with Section 5.22(c) or (d) of the Credit Agreement.

8.    <u>Repurchase Events; Indemnities and Set-Off</u>.

(a)    If any of the following events (each an "<u>Event of Repurchase</u>" or "<u>Trust Surrender Event</u>", as applicable) occurs and is continuing with respect to a Financed Receivable:

(i)    any representation or warranty by the applicable Originator or Originator Trustee hereunder with respect to such Financed Receivable is incorrect when made or deemed made;

(ii)    the applicable Originator (other than a Canadian Originator), Originator Trustee or the Servicer fails to perform or observe any other term, covenant or agreement with respect to such Financed Receivable and such failure has an adverse effect on the ability to collect any amount of the Principal Balance of such Financed Receivable;

(iii)    with respect to a Financed Receivable sold by an Originator (other than a Canadian Originator), an Obligor asserts a Dispute with respect to such Financed Receivable;

(iv)    the applicable Originator (other than a Canadian Originator), Originator Trustee or the Servicer breaches the covenants set forth in paragraph (d), (i), (j) or (l) of <u>Section 6</u>;

(v)    with respect to a Financed Receivable sold by an Originator (other than a Canadian Originator), any of the circumstances described in the last sentence of <u>Section 4(c)</u> hereof shall occur; or

(vi)    an Originator (other than a Canadian Originator) or Originator Trustee fails to perform its obligations under the Contract at any time to the extent that such failure, had it occurred prior to the sale of such Financed Receivable, or prior to the date such Financed Receivable is made subject to the Declaration of Trust, would have caused such Receivable not to be an Eligible Receivable or an Eligible Trust Receivable (as applicable) as of the applicable Transfer Date or date on which such Receivable is made subject to the Declaration of Trust (as applicable);

then, the applicable Originator or Originator Trustee shall, at the time, in the manner and otherwise as hereinafter set forth, repurchase such Purchased Receivable or reacquire the beneficial interest in the relevant Trust Receivable in accordance with the Declaration of Trust (or, if the Buyer agrees in writing, the portion subject to Dispute) at the Buyer's option and demand on the next succeeding Settlement Date. The Repurchase Price with respect to such Purchased Receivable or Trust Receivable, as applicable, shall be paid to the Concentration Account in Dollars in immediately available funds. The obligation to pay the Repurchase Price immediately upon the Buyer's demand shall be a joint and several obligation of each of the Originators. If, at any time prior to the payment in full in cash of the Repurchase Price (including any interest thereon accruing hereunder), the Buyer would be entitled to enforce its rights against the relevant Obligor, then the Buyer or any of its assignees (including the Lenders) shall be permitted to take such actions as it deems appropriate as (i) the owner and holder of such Purchased Receivable subject to an Event of Repurchase notwithstanding the occurrence of such Event of Repurchase or (ii) the holder of the beneficial interest in such Trust Receivable subject to a Trust Surrender Event in accordance with the Originator Power of Attorney, notwithstanding the occurrence of such Trust Surrender Event. Upon the payment in full in cash of the Repurchase Price (including any interest thereon accruing hereunder) with respect to a Financed Receivable, such Financed Receivable shall hereby be, and be deemed to be, repurchased <u>and reassigned (if applicable) to</u> by the applicable Originator (or the beneficial interest

#62171535_v4
#62171535_v4

therein re-acquired by the relevant Originator Trustee) from the Buyer without recourse to or warranty by the Buyer.  Each Originator agrees that the Buyer may set off any amount payable by the Buyer in respect of the Purchase Price of any Financed Receivables (other than French Receivables, and solely in the case of Skillsoft and no other Originator, including any principal amounts of the Subordinated Note) against any unpaid obligation of any Originator under this Section 8(a).  Amounts due hereunder in respect of the Repurchase Price of any Financed Receivables required to be repurchased shall accrue interest until paid in full, which interest shall be payable on demand, for the period from the date of such demand to (but excluding) the date of receipt by the Buyer of such amounts in full in cash, at the Delinquent Rate.

(b)     Each Originator and Originator Trustee hereby agrees on a joint and several basis to indemnify Buyer (together with its officers, directors, agents, representatives, shareholders, counsel, employees and lenders, each, an "Indemnified Party") from and against any and all claims, losses and liabilities (including, without limitation, reasonable attorneys' fees) (all of the foregoing being collectively referred to as "Indemnified Amounts") arising out of or resulting from any of the following: (i) the sale to Buyer of any Receivable which purports to be an Eligible Receivable, or the declaration of trust in favor of the Buyer over any Receivable which purports to be an Eligible Trust Receivable, in each case as to which any of the representations and warranties made herein are not true and correct on the Transfer Date therefor; (ii) any representation or warranty made or deemed made by an Originator or Originator Trustee (or any of its officers) under or in connection with this Agreement or the Declaration of Trust (except with respect to the Financed Receivables) shall have been incorrect in any material respect when made; (iii) the failure by any Originator or any Financed Receivable to comply with any applicable law, rule or regulation; (iv) the failure to vest in Buyer a perfected ownership or, if applicable, security interest (as understood under the UCC, the PPSA, the PPS Act (AU) and other applicable law) in each Purchased Receivable and the proceeds and Collections in respect thereof and its Related Security, or the failure to vest in the Buyer a valid beneficial interest in each Trust Receivable and its Related Security and the proceeds and Collections in respect thereof, in each case, free and clear of any Lien of any kind or nature whatsoever; (v) any Dispute or any other claim resulting from the services or merchandise related to such Financed Receivable or the furnishing or failure to furnish such services or Goods or relating to collection activities with respect to such Financed Receivable; *provided*, *however*, this clause (v) shall not be deemed to include any failure to pay arising out of any Insolvency Event of an Obligor; (vi) the commingling by any Originator of Collections at any time with other funds of such Originator or any other Person resulting in a misdirected payment to the Concentration Account; (vii) with respect to a Financed Receivable sold by a Canadian Originator, or a French Originator, any failure by such Canadian Originator or French Originator or the Servicer to perform or observe any term, covenant or agreement (other than a representation or warranty) with respect to such Financed Receivable and such failure has an adverse effect on the ability to collect any amount of the Principal Balance of such Financed Receivable; (viii) with respect to a Financed Receivable sold by a Canadian Originator or a French Originator, the assertion by the applicable Obligor of a Dispute with respect to such Financed Receivable on or after the applicable Transfer Date; (ix) with respect to a Financed Receivable sold by a Canadian Originator or a French Originator, such Canadian Originator or French Originator or the Servicer breaches the covenants set forth in paragraph (d), (i), (j) or (l) of Section 6; (x) with respect to a Financed Receivable sold by a Canadian Originator or a French Originator, the occurrence of any of the circumstances described in the last sentence of Section 4(c) hereof; or (xi) with respect to a Financed Receivable sold by a Canadian Originator or a French Originator, such Canadian Originator or French Originator fails to perform its obligations under the Contract at any time to the extent that such failure, had it occurred prior to the sale of such Financed Receivable would have caused such Receivable not to be an Eligible Receivable as of the applicable Transfer Date; or (xii) with respect to a Financed Receivable sold by a French Originator, the occurrence of any circumstance whereby the transfer of the French Receivables by way of subrogation is void (including *inter alia* a failure to deliver the subrogation receipt or a failure by the Buyer to pay the relevant Purchase Price); *provided*, *however*, that in all events there shall be excluded from the foregoing indemnification any claims, losses or liabilities resulting solely from the gross negligence or willful

#62171535_v4
#62171535_v4

misconduct of an Indemnified Party as determined in a final non-appealable judgment of a court of competent jurisdiction or as the result of an Insolvency Event of an Obligor; and *provided further* for purposes of clauses (vii) to (xii) above (the "Canadian Indemnity Events" or, where relevant, the "French Indemnity Events"), (A) the maximum Indemnified Amount for all Losses in respect of a Financed Receivable affected by a Canadian Indemnity Event or French Indemnity Events shall be an amount equal to the Repurchase Price for such Financed Receivable plus reasonable attorney's fees and (B) the term "Losses" shall mean for purposes of clause (A) all identifiable claims, losses and liabilities, whether matured or unmatured, liquidated or unliquidated, realized or unrealized.  Amounts due hereunder shall accrue interest at the Delinquent Rate from the date due until receipt of payment in full in cash.

(c)    Tax Indemnification.  Any and all payments (of whatever nature and including taxes) made to the Buyer pursuant to this Agreement or the Declaration of Trust (including, but not limited to, the payments on the Financed Receivables from the Obligors)  shall be made free and clear of and without deduction or withholding for or on account of any Taxes (including any sales, occupational, excise, gross receipts, personal property, privilege or license Taxes, or withholdings or other deductions, including Taxes due and payable by the Buyer to the Agents or the Lenders under the Credit Agreement or any other Transaction Documents entered into by the Buyer with any Agent or Lender), withholdings or other deductions.  If any Taxes are required to be withheld or paid under this Section 8(c) by an Originator or Originator Trustee, then such Originator or Originator Trustee (or the Originator Agent, on behalf of such Originator or Originator Trustee), shall pay such Taxes to the applicable taxing authority and such Originator or Originator Trustee shall send the original or a certified copy of the receipt evidencing such Tax payment, within 30 days of the payment date, to the Buyer and shall ensure that the Buyer receives an amount equal to the amount it otherwise would have received had no such withholding been required by applicable Law unless such Taxes were imposed upon the Buyer with respect to its net income.  Each Originator and Originator Trustee, on a joint and several basis, shall indemnify and hold the Buyer harmless from and against, any Taxes that may at any time be asserted against the Buyer in respect of the transactions contemplated hereunder (including any sales, occupational, excise, gross receipts, personal property, privilege or license taxes, or withholdings or other deductions, including taxes and additional amounts due and payable, or indemnifiable, by the Buyer to the Agents or the Lenders under the Credit Agreement or any other Transaction Documents entered into by the Buyer with any Agent or Lender, but not including Taxes imposed upon the Buyer with respect to its net income), and all reasonable costs related thereto, without duplication for any Taxes that such Originator or Originator Trustee has paid pursuant to this Section 8(c).  All indemnifications required to be made under this Section 8(c) shall be made within thirty (30) days from the date Buyer makes written demand therefor.

(d)    Set-Off.  Subject, in relation to French Receivables, to the terms of Exhibit H (*Transfer of French Receivables*), Each Originator and Originator Trustee agrees that, unless such Originator or Originator Trustee notifies the Buyer in writing that it desires to pay on the date when due any amounts due under this Section 8 and such Originator or Originator Trustee makes such payment to the Buyer in immediately available funds on such date such payment is due, each Originator and Originator Trustee hereby irrevocably instructs and authorizes the Buyer to offset such amount against the Purchase Price or Trust Consideration of any Financed Receivables designated to be sold or made subject to a trust in favor of the Buyer (other than any French Receivable) on or after such date or against any Collections; *provided*, *however*, that Buyer shall only exercise its right of set-off hereunder in circumstances where there is mutuality between the Buyer and the applicable Originator.  No notification, act or consent of any nature whatsoever is required prior to the exercise by the Buyer of such right of set-off.

(e)      UCC.  The rights granted to the Buyer hereunder are in addition to all other rights and remedies afforded to the Buyer as a secured party under the UCC, the PPSA, the PPS Act (AU) and other applicable law.

(f)      Tax Treatment of Indemnification. For all Tax purposes, the Originators and the Buyer agree to treat any indemnity payment under this Agreement as an adjustment to the Purchase Price unless a final determination of the IRS or other applicable Taxing Authority provides otherwise.

(g)      Future Purchase and Sale by Mutual Agreement.  Notwithstanding anything herein to the contrary, after the date hereof, the Buyer and any Canadian Originator, both acting at all times on an arm's length basis, may mutually agree that such Canadian Originator will purchase from the Buyer, and that the Buyer will sell to such Canadian Originator, any Financed Receivable previously sold by such Canadian Originator to the Buyer which is affected by one or more Canadian Indemnity Events, in each case for a price equal to the Principal Balance with respect to such Financed Receivable. If any such purchase and sale is completed, the Buyer will then have no further claim pursuant to Section 8(b) in respect of such Canadian Indemnity Events as they relate to such Financed Receivable; provided that, after giving effect to such purchase and sale and all other transactions made on the date thereof, no Excess Funding exists; and provided further that neither the Buyer nor such Canadian Originator will have any obligation whatsoever to so agree and that each of the Buyer and such Canadian Originator may determine not to do so at any time and from time to time in its sole unfettered discretion.

9.      Termination Events. The occurrence of any one or more of the following shall constitute a "Termination Event":

(a)      Any Originator or Originator Trustee shall fail to make any payment or deposit required hereunder when due; provided that no Termination Event shall occur under this Section 9(a) as a result of any late payment or deposit which is cured within one Business Day if (i) such late payment or deposit was attributable to circumstances beyond such Originator's or Originator Trustee's control or (ii) such late payment or deposit has not occurred more than two times in any calendar year and (iii) such Originator or Originator Trustee pays interest on the overdue amount of such payment or deposit until paid at the Delinquent Rate; or

(b)      Any Originator or Originator Trustee shall fail to observe or perform any term, covenant or agreement hereunder (other than as referred to in clause (a) of this Section 9) or any other Transaction Document to which it is a party and such failure shall continue for five consecutive Business Days, except that there shall be no grace period for a breach of paragraph (a)(i), (d), (i), (j) or (l) of Section 6; or

(c)      An Insolvency Event shall occur in respect of any Originator or Originator Trustee or any of their respective Affiliates; or

(d)      A Change of Control shall occur.

Upon the occurrence and during the continuance of a Termination Event, the Buyer may terminate this Agreement, without further demand, protest or notice of any kind, and no longer be required to purchase any Receivables from any Originator or to acquire the beneficial interest in any Trust Receivables until such Termination Event is cured or waived.  Notwithstanding the foregoing, in the event that a Termination Event occurs as a result of a breach of Section 6(l), the Buyer shall have the right (in consultation with the Lenders) to cure any such Termination Event, including by paying any amounts owed under the contract with the Originator's server providers (the "Cure Right").  Any such amount paid

17

by the Buyer shall bear interest at the Delinquent Rate and be payable on demand by the Originators and the Originator Trustees on a joint and several basis.

10.    Notices.    Unless otherwise provided herein, all communications by an Originator, Originator Trustee, the Servicer  or the Buyer or any other agreement entered into in connection herewith shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid, or by email) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or by email to such Originator, Originator Trustee or Buyer, as the case may be, at its address set forth on the attached Schedule II.

Any Purchase Report, and any supporting documentation in connection herewith or therewith, such as copies of invoices, may be sent by an Originator or an Originator Trustee by fax or as a PDF file attachment to an email, and the Buyer and Originator or Originator Trustee may otherwise communicate by email or fax.  Each Originator and Originator Trustee agrees that the Buyer may presume the authenticity, genuineness, accuracy, completeness and due execution of any email or fax communication bearing a facsimile or scanned signature resembling a signature of an authorized Person of an Originator or an Originator Trustee without further verification or inquiry by the Buyer.  Notwithstanding the foregoing, the Buyer in its sole discretion may elect not to act or rely upon such a communication and shall be entitled (but not obligated) to make inquiries or require further Originator action to authenticate any such communication.

Any party may change the address at which it is to receive notices hereunder by written notice in the foregoing manner given to the other parties hereto.

11.    Survival.    All covenants, representations and warranties made herein shall continue in full force and effect so long as any Purchased Receivables remain outstanding and this Agreement remains in effect.  Each Originator's and the Servicer's obligations to indemnify the Buyer under Sections 8(b), 8(c) and 12, the Servicer's obligations to indemnify each Servicer Indemnified Person under Section 7(g) and the obligations of each of the Originators and the Originator Trustees to the Buyer, the Accounts Bank, the Agents and each Lender and any of their respective Related Parties in respect of the Indemnification Obligations under Section 14 shall survive notwithstanding any termination of this Agreement or the resignation or removal of the Originator Agent or the removal of Skillsoft in its role as Servicer.

12.    Expenses.    Each Originator agrees on a joint and several basis to reimburse (or to cause the Originator Agent to reimburse) the Buyer for all reasonable costs (including reasonable attorneys' fees and expenses) the Buyer incurs in connection with the preparation, negotiation, documentation, administration and enforcement hereof.

13.    Joinder of New Originators.

(a)    Addition of New Originators.  From to time upon not less than 30 days' prior written notice to the Buyer, the Administrative Agent and the Lenders, the Servicer may propose that one or more of its Affiliates become a New Originator hereunder.  No such entity shall become a New Originator hereunder unless and until (i) such entity shall have executed and delivered a Joinder Agreement and delivery of  the certificates, opinions and documents required to be delivered under clause (c) below and (ii) the Buyer and the Requisite Lenders have consented to such entity becoming a New Originator; provided that if such entity is domiciled and has its chief executive office in an Approved Originator Jurisdiction, such consent shall not be required.

#62171535_v4
#62171535_v4

(b)      New Approved Originator Jurisdictions.  If the Servicer requests that an Affiliate become a New Originator hereunder and such entity is not domiciled or does not have its chief executive office in an Approved Originator Jurisdiction, the Buyer (or its assignees) agrees to negotiate in good faith the requirements for any wholly-owned subsidiary of the Parent to become a New Originator hereunder, including any additional certificates, opinions and other documents that may be required to be delivered under applicable law in accordance with clause (c) below.

(c)      Documentation.  In connection with becoming a New Originator in accordance with paragraph (a) of this Section 12, such New Originator will execute a Joinder Agreement and shall deliver the analogous opinions, certificates and other documents required to be delivered by an Originator on the Closing Date under Section 3.1 of the Credit Agreement (along with any additional certificates, opinions or other documents required pursuant to clause (b) above), together with such updated Schedules and Exhibits as may be necessary to ensure that after giving effect to the joinder of such New Originator. The addition of such New Originator shall not be effective until each of the Buyer, the Lenders and the Administrative Agent receives a copy of the documents referenced herein in form and substance reasonably satisfactory to the Buyer and the Requisite Lenders.

14.      Originator Undertaking.  Each of the Originators and the Originator Trustees, on a joint and several basis, unconditionally and irrevocably guarantees to the Buyer, the Accounts Bank, the Agents and each Lender and any of their respective Related Parties as a primary obligor and not merely as a surety, the due and punctual payment and performance of the indemnification obligations owed by the Buyer (in its capacity as the borrower under the Credit Agreement), any Originator or Originator Trustee, the Servicer or any Affiliate thereof under this Agreement, the Credit Agreement and any other Transaction Document (collectively, the "Indemnification Obligations"); provided that the Indemnification Obligations shall not include payment of principal of, or interest on, the Loans. Each Originator and Originator Trustee further agrees that the Indemnification Obligations may be amended, extended, renewed or otherwise modified from to time, in whole or in part, without notice to or further assent from it and it will remain bound upon its guarantee notwithstanding any amendment, extension, renewal or other modification of any Indemnification Obligation.  Each Originator and Originator Trustee waives presentment to, demand of payment from and protest to the applicable indemnifying party under the Transaction Documents, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment.  Each Originator and Originator Trustee further agrees that its guarantee hereunder constitutes a guarantee of payment when due and not of collection, and waives any right to require that any resort be had by an indemnified party to any other source of payment.  The obligations of each Originator and Originator Trustee hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by the reason of the invalidity, illegality or unenforceability of the Indemnification Obligations whatsoever.

15.      Governing Law; Submission to Jurisdiction; Service of Process

(a)      Governing Law.  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York with the exception of (i) the German Assignment and (ii) the transfer of French Receivables set forth under Clause 2 and Exhibit H (*Transfer of French Receivables*) of this Agreement which shall be governed by, and construed in accordance with French law.

(b)      Submission to Jurisdiction.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties

hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Agents or any Lender may otherwise, to the extent permitted by applicable law, have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Buyer or its properties in the courts of any jurisdiction.

(c)    Waiver of Venue.  Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Service of Process.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

16.    General Provisions.

This Agreement, together with the other Transaction Documents, represents the final agreement of the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous understandings and agreements with respect to such subject matter.  No provision of this Agreement may be amended or waived except by a writing signed by the parties hereto.  This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; *provided*, *however*, that no Originator or Originator Trustee may assign any of its rights hereunder without the Buyer's prior written consent, given or withheld in the Buyer's sole discretion.  The Buyer shall have the right without the consent of or notice to Originator or Originator Trustee to sell, transfer, negotiate, or grant participations in all or any part of, or any interest in, Buyer's obligations, rights and benefits hereunder.

The parties hereto hereby expressly intend and agree that (i) this Agreement amend and restate in its entirety the Original RPA, (ii) the security interests granted pursuant to the Original RPA shall be continued herein and (iii) this Agreement shall not in any manner affect, replace, impair, or extinguish the creation, attachment, perfection or priority of the security interests granted pursuant to the Original RPA, which except as expressly provided herein, each Originator (other than the Canadian Originators and, the English Originators and the Singapore Originators) hereby reaffirms and confirms and acknowledges to be valid and existing.

The Buyer may assign at any time its rights and obligations hereunder and interests herein to any other Person without the consent of any Originator or Originator Trustee.  Without limiting the foregoing, each Originator and Originator Trustee acknowledges that the Buyer may grant to the Collateral Agent, for the benefit of the Secured Parties, a security interest in its rights, pledge (*nantissement*), remedies, powers and privileges hereunder.  Each Originator and Originator Trustee further agrees that the Agents and the Lenders shall be third-party beneficiaries of this Agreement and the Collateral Agent (at the written direction of the Requisite Lenders) shall, subject to the terms of the Credit Agreement, have the right to enforce this Agreement and to exercise directly all of the Buyer's rights and remedies under this Agreement (including the right to give or withhold any consents or approvals of the Buyer to be given or withheld hereunder or to exercise the Cure Right and the right to enforce directly the agreements of the

#62171535_v4
#62171535_v4

Originator and Originator Trustees and the Servicer set forth in <u>Section 14</u>) and each Originator and Originator Trustee agrees to cooperate fully with the Collateral Agent and the Lenders in the exercise of such rights and remedies.

Each provision of this Agreement shall be severable from every other provision hereof for the purpose of determining the legal enforceability of any specific provision. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by electronic mail attachment in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Agreement.

This Agreement shall terminate on the later of (i) the Termination Date (as such date may be extended from time to time pursuant to the definition thereof), and (ii) the date on which all of the aggregate Principal Balance of the Financed Receivables (other than Financed Receivables which have not been paid as a result of an Insolvency Event with respect to an Obligor) has been paid in full by the respective Obligors.

17.     <u>Calculating Interest</u>.

All interest amounts calculated on a per annum basis hereunder are calculated on the basis of a year of three hundred sixty (360) days.

Any rate that is calculated with reference to a period (the "**deemed interest period**") that is less than the actual number of days in the calendar year of calculation is, for the purposes of the *Interest Act* (Canada), if applicable, equivalent to a rate based on a calendar year calculated by multiplying that rate of interest by the actual number of days in the calendar year of calculation and dividing by the number of days in the deemed interest period.

The Parties intend to comply with applicable law relating to usury. Notwithstanding any other provision of this Agreement, in no event shall this Agreement require the payment or permit the collection of interest or other amounts in an amount or at a rate in excess of the amount or rate that is permitted by applicable law or in an amount or at a rate that would result in the receipt by the Buyer of interest at a criminal rate. Where more than one applicable law applies to any Obligor or the Servicer, as applicable, that Obligor or the Servicer shall not be obliged to make payment in an amount or at a rate higher than the lowest permitted amount or rate.

18.     <u>Judgment Currency</u>.

(a)     If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency, the parties hereto agree, to the fullest extent permitted by law, that the rate of exchange used shall be that at which, in accordance with normal banking procedures, the Buyer could purchase Dollars with such other currency at the buying spot rate of exchange in the New York foreign exchange market on the Business Day immediately preceding that on which any such judgment, or any relevant part thereof, is given.

(b)     The obligations of the Originator Agent or any Originator or any Originator Trustee in respect of any sum due to the Buyer hereunder and under any of the other Transaction Documents shall, notwithstanding any judgment in a currency other than Dollars, be discharged only to the extent that on the Business Day following receipt by the Buyer of any sum adjudged to be so due in such other currency the Buyer may, in accordance with normal banking procedures, purchase Dollars with

#62171535_v4
#62171535_v4

such other currency. If the amount of Dollars so purchased is less than the sum originally due to the Buyer in Dollars, the Originator Agent and each Originator and Originator Trustee agrees, to the fullest extent that it may effectively do so, as a separate obligation and notwithstanding any such judgment, to indemnify the Buyer against such loss. If the amount of Dollars so purchased exceeds the sum originally due to the Buyer in Dollars, the Buyer shall remit such excess to the Originator Agent.

19.    <u>No Petition</u>.

Each Originator hereby agrees that it will not institute any proceedings against the Buyer under any Insolvency Statute prior to the date which is one year and one day after all amounts due and owing under the Credit Agreement are paid in full.

20.    Ipse Facto (Stay on Enforcement).

Each party agrees that this Agreement is a document to which regulations 5.3A.50(2)(x) of the Corporations Regulations 2001 (Cth) applies. Each party agrees that to the extent that a Transaction Document is not a document to which regulation 5.3A.50(2)(x) of the Corporations Regulations 2001 (Cth) applies and any provision of that Transaction Document is not enforceable by a party to that Transaction Document as a result of the operation of section 415D, 415F, 415FA, 434J, 434L, 434LA, 451E, 451G or 451GA of the Corporations Act 2001 (Cth), the rights conferred on the party by such a provision are exercisable by that party under this Agreement. Nothing in this clause is intended to imply that any of sections 415D, 434J or 451E of the Corporations Act would otherwise apply to any Transaction Document, or that the application of any of those sections to this Agreement or any other Transaction Document would not otherwise be wholly or partially excluded by reason of any other paragraph of regulation 5.3A.50(2) of the Corporations Regulations or by any provision of the Corporations (Stay on Enforcing Certain Rights) Declaration 2018.

[Remainder of page intentionally blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

SKILLSOFT CORPORATION
as Originator, Originator Agent and Servicer


By: _____
Name: Michael Pellegrino
Title:   Chief Financial Officer, Secretary and Treasurer

[Signature Page – Amended and Restated Receivables Purchase Agreement]

SUMTOTAL SYSTEMS LLC
as Originator


By: _____
Name: Michael Pellegrino
Title:   Vice President and Treasurer

#62171535
WEIL:\97063491\2\74473.0003

MINDLEADERS, INC.
as Originator

By: _____
Name: Michael Pellegrino
Title:   President, Treasurer and Secretary

[Signature Page – Amended and Restated Receivables Purchase Agreement]

SKILLSOFT CANADA, LTD.
as Originator

By: _____
Name: Michael Pellegrino
Title:   Secretary and Treasurer

SUMTOTAL SYSTEMS CANADA LTD.
as Originator


By: _____
Name: Michael Pellegrino
Title:   Treasurer

[Signature Page – Amended and Restated Receivables Purchase Agreement]

SKILLSOFT U.K. LIMITED
as Originator


By: _____
Name: Michael Pellegrino
Title:   Director

SUMTOTAL SYSTEMS U.K. LIMITED
as Originator


By: _____
Name: Michael Pellegrino
Title:   Director

[Signature Page – Amended and Restated Receivables Purchase Agreement]

SKILLSOFT RECEIVABLES FINANCING LLC
as Buyer


By: _____
Name: Michael Pellegrino
Title:   President

[Signature Page – Amended and Restated Receivables Purchase Agreement]

[Signature Page – Amended and Restated Receivables Purchase Agreement]

Schedule I
List of Proposed Receivables

|  | Customer ID | Customer name | Invoice # | Invoice Date | Currency | Maturity Date | Payment Terms | Invoice Amount | Sales Tax VAT/GST | Invoice Net of Tax | FX Rate | USD Amount | Class | Class % | Amount Financed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US Purchased Receivables |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| UK Purchased Receivables |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Canadian Purchased Receivables |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Australian Purchased Receivables |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| German Purchased Receivables |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Singapore Purchased Receivables |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

**Purchase Price for the Proposed Receivables**:                                    $_____

Schedule I-1

Obligor Address and Contact Details

| Eligible Receivable/Eligible Trust Receivable | Obligor | Point of Contact | Address |
|---|---|---|---|
| | | Name:<br>Email:<br>Telephone: | |
| | | Name:<br>Email:<br>Telephone: | |
| | | Name:<br>Email:<br>Telephone: | |
| | | Name:<br>Email:<br>Telephone: | |
| | | Name:<br>Email:<br>Telephone: | |
| | | Name:<br>Email:<br>Telephone: | |

#62171535_v4<br>#62171535_v4<br>WEIL:\97063491\2\74473.0003

Schedule II
Notice Addresses

| Entity | Address |
|--------|---------|
| Skillsoft | 300 Innovative Way, Suite 201 Nashua, NH 03062 |
| SumTotal | 300 Innovative Way, Suite 201 Nashua, NH 03062 |
| MindLeaders | 300 Innovative Way, Suite 201 Nashua, NH 03062 |
| Skillsoft Canada | 300 Innovative Way, Suite 201 Nashua, NH 03062 |
| SumTotal Canada | 300 Innovative Way, Suite 201 Nashua, NH 03062 |
| Skillsoft UK | 300 Innovative Way, Suite 201 Nashua, NH 03062 |
| SumTotal UK | 300 Innovative Way, Suite 201 Nashua, NH 03062 |
| Skillsoft NETg GmbH | |
| Skillsoft Asia Pacific Pty Ltd. | |
| SumTotal Systems ANZ Pty. Ltd. | |
| Skillsoft Asia Pacific Pte Ltd. | |
| Buyer | 300 Innovative Way, Suite 201 Nashua, NH 03062 |

Schedule II-1

Schedule II-2

Exhibit A
Certain Defined Terms

As used herein, the following terms shall have the following meanings:

"Applicable Rate":  At any time, the rate per annum equal to the sum of (i) the Base Rate at such time and (ii) the Applicable Margin then in effect.

"Agreement":  The meaning set forth in the preamble hereto.

"Assignment":  An assignment agreement in the form of Exhibit F attached hereto.

"Australian Originator":  Each of Skillsoft Australia, SumTotal Australia and any New Originator that is incorporated or formed under the laws of Australia.

"Buyer":  The meaning set forth in the preamble hereto.

"Canadian Indemnity Event":  The meaning set forth in Section 8(b) hereof.

"Canadian Originator":  Each of Skillsoft Canada, SumTotal Canada and any New Originator that is incorporated or formed under the federal laws of Canada or the laws of a province or territory of Canada.

"Change of Control":  The meaning set forth in the Existing First Lien Credit Agreement as in effect on the date hereof without giving effect to any amendments, waivers or any other modifications thereto.

"Closing Date":  The first date on which the conditions set forth in Section 4(a) are satisfied or waived.

"Concentration Account":  The meaning set forth in Section 7(b) hereof.

"Credit Agreement":  The meaning set forth in the recitals hereto.

"Delinquent Rate":  The rate per annum equal to the sum of (i) the Applicable Rate and (ii) 2.00%.

"Dispute":  Any dispute, discount, deduction, claim, offset, set-off, defense or counterclaim of any kind relating to a Financed Receivable (other than a discount or adjustment granted with the Buyer's written approval), regardless of whether the same (i) is in an amount greater than, equal to or less than the face amount of such Financed Receivable or (ii) arises by reason of an act of God, civil strife, war, terrorism, currency restrictions, foreign political restrictions or regulations or any other circumstance beyond the control of any Originator or the related Obligor.

"English Originator":  Each of Skillsoft UK, SumTotal UK and any New Originator that is incorporated or formed under the laws of England and Wales.

"Event of Repurchase":  The meaning set forth in Section 8(a) hereof.

"French Originator": Each of Skillsoft France SARL, SumTotal France SAS and Skillsoft Digital (France) SAS and any New Originator that is incorporated or formed under the laws of France which execute a Joinder Agreement.

"French Receivables": means Eligible Receivables originated by either Skillsoft France SARL, SumTotal France SAS and Skillsoft Digital (France) SAS and any New Originator that is incorporated or formed under the laws of France.

"German Assignment": An assignment agreement in the form of Exhibit G attached hereto

"German Originator": Skillsoft NETg GmbH and any New Originator that is incorporated or formed under the laws of Germany.

"German Receivable": Any Eligible Receivable governed by the laws of Germany.

"Goods": The meaning set forth in the recitals hereof.

"Indemnified Amounts": The meaning set forth in Section 8(b) hereof.

"Indemnified Party": The meaning set forth in Section 8(b) hereof.

"Insolvency Event": With respect to any Person, such Person is not able or shall admit in writing its inability to pay its debts generally, or is presumed or deemed by law to be unable to pay its debts, at any time, or shall be involved as a debtor or applicant in any proceeding under an Insolvency Statute or make a general assignment for the benefit of creditors under such Insolvency Statute, or otherwise shall be involved in a proceeding instituted by or against such Person under any Insolvency Statute seeking liquidation, dissolution, judicial management, administration, winding up, reorganization (by way of scheme of arrangement or otherwise), arrangement, adjustment, protection, relief, or composition of it or its debts, under any Insolvency Statute for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of 60 days, or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, liquidator, administrator, receiver and manager, manager, judicial manager, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur; or such Person shall take any action to authorize any of the actions set forth above in this definition; provided, that in the case of the inability of a person to pay its debts as such debts become due arising by reason of currency restrictions or foreign political restrictions or regulations beyond the control of such Person, such event shall not be deemed an "Insolvency Event" hereunder.

"Insolvency Statute": Any laws relating to bankruptcy, insolvency, winding up or reorganization or relief of a debtor, or seeking the entry of an order for relief or the appointment of a liquidator, receiver, trustee, judicial manager, administrator, custodian or other similar official on behalf of any Person in any jurisdiction, including the Bankruptcy Code, the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada),  the Winding-Up and Restructuring Act (Canada), the Fraudulent Preference Act (Ontario), the Assignments and Preferences Act (Ontario), the Fraudulent Conveyances Act (Ontario) and, the U.K. Insolvency Act, the Companies Act, Chapter 50 of Singapore, the Bankruptcy Act, Chapter 20 of Singapore and the *Corporations Act 2001* (Cth) and rules and secondary legislation thereunder, the Insolvency Code (Germany) and the Book VI of the French Commercial Code.

"<u>Joinder Agreement</u>":  The meaning set forth in the introduction hereto.

"<u>Law</u>" means any federal, state, provincial, local, municipal, foreign, international, multinational or other law, statute, code, constitution, treaty, ordinance, order, rule or regulation or common law principle or requirement.

"<u>Losses</u>": The meaning set forth in Section 8(b) hereof.

"<u>Material Adverse Change</u>": Any event that results or could likely result in (a) a material adverse change in (i) the business, condition (financial or otherwise), operations, performance, properties or prospects of any Originator or Originator Trustee, (ii) the ability of an Originator or Originator Trustee or the Servicer to fulfill its obligations hereunder or under the Declaration of Trust, or (b) the impairment of the validity or enforceability of, or the rights, remedies or benefits available to, Buyer under this Agreement or the Declaration of Trust.

"<u>Net Invoice Amount</u>":  With respect to any Purchased Receivable <u>(other than French Receivables)</u>, the amount of the applicable Purchased Receivable shown on the invoice for such Purchased Receivable as the total amount payable by the related Obligor (which, in the case of any Foreign Currency Receivable, shall be the Dollar Equivalent with respect to such Foreign Currency Receivable) net of all finance charges, late fees and other fees which are unearned, termination fees, cancellation charges, sales, excise or similar taxes and credits or allowances granted.

"<u>Net Worth</u>": As of any date of determination, the excess, if any, of (a) the aggregate Principal Balance of the Financed Receivables as of such date over (b) the sum of (i) the Revolving Credit Outstanding Amount as of such date and (ii) the aggregate outstanding principal balance of the Subordinated Note as of such date.

"<u>New Originator</u>":  The meaning set forth in the preamble hereto.

"<u>Originator</u>":  The meaning set forth in the preamble hereto.

"<u>Originator Agent</u>":  The meaning set forth in <u>Section 3(d)</u> hereof.

"<u>PPS Act (AU)</u>" means Australia's Personal Property Securities Act 2009 (Cth) and regulations made under it.

"<u>Proposed Receivables</u>":  With respect to any Transfer Date, the Eligible Receivables proposed by the applicable Originator to the Buyer for purchase hereunder and described in a Purchase Report delivered to the Buyer in connection with such Transfer Date and the Eligible Trust Receivables proposed by the applicable Originator Trustee to the Buyer to be made subject to the Declaration of Trust and described in a Trust Asset Designation delivered to the Buyer in connection with such Transfer Date under the Declaration of Trust.

"<u>Purchase Price</u>":  The meaning set forth in <u>Section 3(a)</u> hereof.

"<u>Purchase Report</u>":  The meaning set forth in <u>Section 2(c)</u> hereof.

"<u>Purchased Receivables</u>":  The meaning set forth in <u>Section 2(d)</u> hereof.

"<u>Related Security</u>":  With respect to any Receivable:

(i)    all of the applicable Originator's interest in any Goods (including returned Goods) relating to any sale giving rise to such Receivable;

(ii)    all security interests or Liens and property subject thereto from time to time purporting to secure payment of such Receivable, whether pursuant to the Contract related to such Receivable or otherwise, together with all financing statements describing any collateral securing such Receivable;

(iii)    all tax refunds and proceeds of insurance with respect thereto;

(iv)    all guaranties, insurance and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Receivable whether pursuant to the Contract related to such Receivable or otherwise; and

(v)    all books, records and other information (including computer programs, tapes, discs, punch cards, data processing software and related property and rights) relating to such Receivable and the related Obligor.

"<u>Repurchase Price</u>":  (i) With respect to a Purchased Receivable, the amount equal to the sum of (a) the Principal Balance with respect to such Purchased Receivable and (b) interest at the Applicable Rate on the amount of the Purchase Price paid by the Buyer for such Receivable from the date of such payment until the date of repurchase; and (ii) with respect to a Trust Receivable, the amount equal to the sum of (i) the Principal Balance with respect to such Trust Receivable and (ii) interest at the Applicable Rate on the amount of the Purchase Price paid by the Buyer for the acquisition of the beneficial interest in such Receivable from the day of such payment until the date of such reacquisition of the relevant beneficial interest.

"<u>Retained Obligations</u>":  With respect to any Receivable, any obligations of an Originator under a Contract, including all representation and warranty obligations, all performance obligations, all servicing obligations, all maintenance obligations, and all delivery (via the internet or otherwise) and insurance obligations.

"<u>Servicer</u>":  The meaning set forth in <u>Section 7(a)</u> hereof.

"<u>Singapore Originator</u>": Skillsoft Asia Pacific Pte. Ltd., a company incorporated in Singapore with company registration number 199904491E and its registered office at 6 Temasek Boulevard, #29-00 Suntec Tower Four Singapore 038986 and any New Originator that is incorporated or formed under the laws of Singapore.

"<u>Servicer Indemnified Person</u>": The meaning set forth in <u>Section 7(g)</u> hereof.

"<u>Subrogation Price</u>": The purchase price payable by the Buyer for any French Receivable, which shall be an amount equal to the face amount of the relevant French Receivable (including VAT), expressed in the same currency.

"<u>Taxing Authority</u>" means any Governmental Authority charged with the administration of any Law relating to Taxes.

"<u>Termination Event</u>": The meaning set forth in <u>Section 9</u> hereof.

"<u>Trust Asset Designation</u>" means a designation of Eligible Trust Receivables as Trust Receivables under the Declaration of Trust by way of that asset notice designation thereunder.

"<u>Trust Consideration</u>" has the meaning given to it in the Declaration of Trust.

"<u>UCC</u>": The Uniform Commercial Code in effect in the State of New York from time to time.

## Exhibit B
### Representations and Warranties

(a)    The information with respect to the Proposed Receivables contained on the exhibit to each Purchase Report and each Trust Asset Designation is a true and correct in all material respects on the applicable Transfer Date.  Each Purchase Report and each Trust Asset Designation contains for each Proposed Receivable included therein the correct name of the Obligor, the name of the contact person for each such Obligor, the contact information for such person and such other information necessary to identify the applicable Obligor. The Buyer has received true and correct copies of all the documentation relating to each of the Financed Receivables.  None of the Financed Receivables are evidenced by chattel paper or instruments or negotiable or bearer instruments as of the applicable Transfer Date.  Each of the Financed Receivables is in full force and effect and is the valid and binding obligation of the related Obligor, enforceable in accordance with its terms, and constitutes such Obligor's legal, valid and binding obligation to pay to the relevant Originator or Originator Trustee the amount of the Financed Receivables, subject, as to enforcement of such Obligor's payment obligation, to bankruptcy, insolvency, reorganization, arrangement, moratorium and other laws of general applicability relating to or affecting creditors' rights.  Neither the applicable Originator nor the applicable Originator Trustee nor in each case the related Obligor is in default in the performance of any of the provisions of the documentation applicable to its transactions included within the Financed Receivables as of the applicable Transfer Date. The applicable Originator has delivered to the related Obligor all property and performed all services required to be so delivered or performed by the terms of the documentation giving rise to the Financed Receivables.  The payments due with respect to each Financed Receivable are not contingent upon the relevant Originator's fulfillment of any further obligation other than permitting the Obligor access to the relevant Originator's platforms through a digital passkey and making such platform available in accordance with the Contract with such Obligor.

(b)    Each Proposed Receivable listed on a Purchase Report is an Eligible Receivable, and a bona fide payment obligation of an Obligor due on the Maturity Date for such Proposed Receivable. Each Proposed Receivable listed on a Trust Asset Designation is an Eligible Trust Receivable, and bona fide payment obligation of an Obligor due on the Maturity Date for such Proposed Receivable. No actual or pending Dispute or event of default with respect to any Proposed Receivable exists as of the applicable Transfer Date.  The amount owed under each Proposed Receivable is free of allowances, set-offs, counterclaims, or side agreements, and no credits are available that may be applied by the applicable Obligor to such Proposed Receivable.  All invoices relating to each Proposed Receivable arising out of the sale of services have been accepted by the applicable Obligors.

(c)    As of the applicable Transfer Date, the applicable Originator is the legal and beneficial owner of each Eligible Receivable free and clear of any Lien other than the Lien granted under the Existing Credit Agreements. Upon each purchase of a Purchased Receivable, the Buyer is acquiring valid ownership of each Purchased Receivable and the Related Security and Collections with respect thereto, free and clear of all Liens (including those Liens granted under the Existing Credit Agreements), other than Permitted Encumbrances, and such sale constitutes a true sale or other absolute transfer of such Purchased Receivable, the Related Security and Collections with respect thereto by such Originator to the Buyer. As of the applicable Transfer Date, the relevant Originator or Originator Trustee is the legal and beneficial owner of each Eligible Trust Receivable free and clear of any Lien. Upon the designation of each Eligible Trust Receivable as a Trust Receivable under the Declaration of Trust, the Buyer is acquiring a valid and indefeasible beneficial interest in each such Eligible Trust Receivable and the Related Security and Collections with respect thereto, free and clear of all Liens, other than Permitted Encumbrances.

[Signature Page – Receivables Purchase Agreement]

(d)      Each Originator and Originator Trustee is duly incorporated or formed, validly existing and (other than in the case of an Australian Originator, a Singapore Originator and a German Originator) in good standing under the laws of its jurisdiction of formation, and is duly qualified to do business, and (other than in the case of an Australian Originator, a Singapore Originator and a German Originator) is in good standing, in every jurisdiction where the nature of its business requires it to be so qualified, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

(e)      The execution, delivery and performance by each Originator and Originator Trustee of this Agreement and the Declaration of Trust and the other documents to be delivered by each Originator and Originator Trustee hereunder or thereunder, and the consummation of the transactions contemplated thereby, (i) are within such Originator's or Originator Trustee's corporate powers, (ii) have been duly authorized by all necessary corporate action, (iii) do not and will not contravene any provision of such Originator's or Originator Trustee's Constituent Documents, (iv) do not and will not violate any other Requirement of Law applicable to such Originator or Originator Trustee, or any order or decree of any Governmental Authority or arbitrator applicable to such Originator or Originator Trustee, and (v) do not and will not conflict with or result in the breach of, or constitute a default under, or result in or permit the acceleration of, (A) any of the Existing Credit Agreements or loan documents executed or delivered in connection therewith or (B) any other Contractual Obligation of such Originator or Originator Trustee, except in the case of clauses (iv) and (v)(B), where such violation or conflict could not be reasonably expected to have a Material Adverse Effect.  The Agreement and the Declaration of Trust have been duly executed and delivered by each Originator and Originator Trustee.

(f)      No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by any Originator or Originator Trustee of this Agreement and the Declaration of Trust or any other document to be delivered hereunder except for (x) the filings or notices as may be necessary to perfect the security interest granted to the Buyer pursuant to this Agreement, (y) the notices required to be provided to, and the acknowledgements required to be obtained from, any applicable Governmental Authority in accordance with paragraph (aa) of the definition of "Eligible Receivables" in the Credit Agreement and (z) any other authorization, approval, notice or filing, the failure of which to give or obtain could not be reasonably be expected to have a Material Adverse Effect.

(g)      This Agreement and the Declaration of Trust constitutes the legal, valid and binding obligations of each Originator, Originator Trustee and the Servicer, enforceable against each Originator and Originator Trustee and the Servicer in accordance with their respective terms, except as limited by bankruptcy, insolvency, moratorium, fraudulent conveyance or other laws relating to the enforcement of creditors' rights generally and general principles of equity (regardless of whether enforcement is sought at equity or law).

(h)      There is no pending or, to its knowledge, threatened action, proceeding, investigation or injunction, writ or restraining order affecting any Originator or Originator Trustee, the Servicer or any of their respective Affiliates before any court, governmental entity or arbitrator which could reasonably be expected to result in a Material Adverse Effect, and no Originator, Originator Trustee nor the Servicer is currently the subject of, and has no present intention of commencing, an insolvency proceeding or petition in bankruptcy.

(i)      The sale of the Proposed Receivable does not constitute a bulk sale under applicable law.

(j)     Each Originator and Originator Trustee is in compliance in all material respects with the agreements and sale and Declaration of Trust (as applicable) terms relating to the Financed Receivables.  No effective financing statement or other instrument similar in effect covering any Receivable is on file in any recording office, except those filed in favor of (i) the Buyer relating to this Agreement and (ii) the collateral agent under the Existing Credit Agreements, and no competing notice or notice inconsistent with the transactions contemplated in this Agreement remains in effect with respect to any Obligor.

(k)     None of the Originators (excluding any Canadian Originator) has changed the location of its jurisdiction of incorporation in the last five years.  None of the Canadian Originators has changed the location of its jurisdiction of incorporation or has, in the last 12 months, changed the location of its chief executive office or principal place of business to any jurisdiction other than its jurisdiction of incorporation or New Hampshire.

(l)     With respect to any Originator and Originator Trustee formed, incorporated or organized in the European Union, for the purposes of the European Union Regulation and UNCITRAL Implementing Regulations, its "centre of main interests" is situated in its jurisdiction of incorporation, and it has no "establishment" (as defined in the European Union Regulation and UNCITRAL Implementing Regulations) or branch office in any other jurisdiction.

(m)     Each Originator has entered into this transaction for the purposes of receiving from the Buyer the consideration therefor specified herein, and not for the purpose of defeating, hindering, delaying, defrauding, oppressing, obstructing, injuring or impeding the rights and claims of creditors of an Originator or a trustee in bankruptcy or liquidator of an Obligor (collectively, the "Creditors") or others or for any purpose relating in any way to the claims of Creditors or others against the Originators and not in contemplation of any Insolvency Event.  The statements made in each Originator Trustee Solvency Certificate are true and correct as of the date of each such Originator Trustee Solvency Certificate.

(n)     Since the Closing Date there has not occurred any event which has or could reasonably be expected to have a Material Adverse Change.

(o)     Each of the Originator's assets are free and clear of any Liens in favor of the Internal Revenue Service, the Canada Revenue Service, any Employee Benefit Plan or the PBGC (each as defined in the Existing  Credit Agreements) or other similar applicable agencies of other jurisdictions applicable to such Originator other than inchoate tax liens resulting from an assessment of any Originator.

(p)     As of the applicable Transfer Date, no Obligor has a right of set-off or counterclaim in respect of the Purchased Receivables.

(q)     The Proposed Receivables were not selected using selection procedures reasonably believed by the related Originator to be adverse to the Buyer.

(r)     With respect to Skillsoft UK and SumTotal UK only, (i)  the Declaration of Trust has been duly authorized, executed and delivered by it and constitutes the valid, legally binding and enforceable obligations of it, except as limited by bankruptcy, insolvency, moratorium, fraudulent conveyance or other laws relating to the enforcement of creditors' rights generally and general principles of equity (regardless of whether enforcement is sought at equity or law) and (ii) the entry into and performance by it of the Declaration of Trust and the transactions contemplated by the Declaration of Trust do not conflict with any law or regulation applicable to it, its constitutional document or any agreement or instrument which is binding on it or its assets

(s)    As of the applicable Settlement Date:

(i)    No payment by an Obligor under any Financed Receivable is subject to a reduction or withholding for any Tax or if an Obligor is required by applicable Law to deduct any Tax from such a payment, then, pursuant to the Contract under which the applicable Financed Receivable arose, the sum payable by the applicable Obligor shall be increased as necessary so that after such Obligor makes all required deductions (including deductions for any additional amounts paid for any reduction or withholding for any Tax) the Originator or Originator Trustee (and following the sale, transfer or assignment of the Purchased Receivables, the Buyer) receives an amount equal to the sum it would have received had no such deductions been made.

(ii)    All material Tax Returns required to be filed by any Originator or Originator Trustee and relating in any manner to the Financed Receivables sold by, or made subject to the Declaration of Trust by, such Originator or Originator Trustee have been timely filed.

(iii)    All such Tax Returns (a) were prepared in the manner required by applicable Law and (b) are true, correct and complete in all material respects.

(iv)    All material Taxes due with respect to any of the Financed Receivables whether or not shown (or required to be shown) on a Tax Return have been paid; and such Taxes paid include those for which an Originator may be liable in its own right, or as the transferee of the assets of, or as successor to, any other entity.

(v)    There has been no notice of a deficiency or assessment or other claim relating in any manner to any of the Financed Receivables from any Governmental Authority which has not been fully paid or finally settled.  There are no current audits or examinations of, and no written notice of audit or examination of, any Tax Return that relates to any of the Financed Receivables other than with respect to Taxes that an Originator or Originator Trustee is contesting in good faith and for which adequate reserves have been taken.  No Originator or Originator Trustee has given, nor has there been given on behalf of any Originator or Originator Trustee, a waiver or extension of any statute of limitations relating to the payment of Taxes relating to any of the Financed Receivables.

(vi)    Each Originator and or Originator Trustee has complied in all material respects with all applicable Laws, rules and regulations relating to the withholding of Taxes and the payment thereof to the appropriate Taxing Authority.

(vii)    To the knowledge of the applicable Originator or Originator Trustee, no claim has ever been made by any Taxing Authority with respect to the Financed Receivables in a jurisdiction where such Originator or Originator Trustee does not file Tax Returns that such Originator or Originator Trustee may be subject to taxation in that jurisdiction.

(viii)    There are no encumbrances or security interests on any of the Financed Receivables that arose in connection with any failure (or alleged failure) to pay any Taxes and there are no Liens for any Tax upon any Financed Receivable other than with respect to Taxes that any Originator or Originator Trustee is contesting in good faith and for which adequate reserves have been taken.  The Buyer will not be liable for, and none of the Financed Receivables will be subject to a Lien with respect to, any Taxes arising out of, relating to or in respect of the Financed Receivables for any tax period or portion thereof ending on or before the Settlement Dates.

Exhibit C

(ix)     the Eligible Receivables are not regulated by the Australian *National Consumer Credit Protection Act* (Cth).

Exhibit C

Joinder Agreement


This JOINDER AGREEMENT (this "Agreement"), dated as of [●] is entered into among [●], a [●] (the "New Originator"), SKILLSOFT RECEIVABLES FINANCING LLC, ("Buyer") and SKILLSOFT CORPORATION as Originator Agent and Servicer ("Servicer") under that certain Amended and Restated Receivables Purchase Agreement dated as of December 20, 2018 (as the same may be amended, modified, extended or restated from time to time, the "Receivables Purchase Agreement") among SKILLSOFT CORPORATION, the other Originators party thereto, the Buyer and the Servicer as Originator Agent and Servicer.  All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Receivables Purchase Agreement.

The New Originator, the Buyer and the Servicer hereby agree as follows:

1.     The New Originator hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Originator will be deemed to be an Originator under the Receivables Purchase Agreement and shall have all of the obligations of an Originator thereunder as if it had executed the Receivables Purchase Agreement.  The New Originator hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Receivables Purchase Agreement, including without limitation (a) all of the representations and warranties of the Loan Parties set forth in Exhibit B of the Receivables Purchase Agreement and (b) all of the covenants set forth in Sections 6 and 8 of the Receivables Purchase Agreement.

2.     The address of the New Originator for purposes of Section 10 of the Receivables Purchase Agreement is as follows: _____.

3.     This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument.

4.     This Agreement shall be governed by, and construed in accordance with, the law of the State of New York.


*[Remainder of Page Intentionally Left Blank]*

Exhibit C

**IN WITNESS WHEREOF**, the New Originator has caused this Agreement to be duly executed by its authorized officer, and the Buyer and Servicer have caused the same to be accepted by their authorized officer, as of the day and year first above written.

[**NEW ORIGINATOR**]

By: _____

Name:

Title:

Acknowledged and Accepted:

**SKILLSOFT RECEIVABLES FINANCING LLC**,
as Buyer

By: _____

Name:

Title:

**SKILLSOFT CORPORATION**,
as Originator Agent and Servicer

By: _____

Name:

Title:

Exhibit D

Subordinated Note

**EXHIBIT D**

Form of
AMENDED & RESTATED SUBORDINATED NOTE

[_____ __, _____]

FOR VALUE RECEIVED, the undersigned, Skillsoft Receivables Financing LLC, a Delaware limited liability company (the "Buyer"), hereby promises to pay to the order of Skillsoft Corporation, a Delaware corporation (the "Holder"), in lawful money of the United States of America and in immediately available funds, the principal amount of the aggregate unpaid principal amount of this Note, determined as described below, upon the date that is one year and one day after the Termination Date, together with interest thereon from time to time at the Base Rate then in effect.  All capitalized terms, unless otherwise defined herein, shall have the meanings assigned to them in the Amended and Restated Receivables Purchase Agreement, dated as of December [●], 2018  (as may be subsequently amended, restated or otherwise modified, the "RPA"), by and among the Buyer, the Originators from time to time party thereto (the "Originators") and the Originator Agent. This Note is issued pursuant to the RPA and is the Subordinated Note referred to therein.

The principal amount of this Note at any time shall be equal to the excess of (x) the sum of (A) the original principal amount of this Note on the Closing Date and (B) the aggregate amount of each addition to the principal amount of this Note made pursuant to Section  3(b)(ii)(C) of the RPA as of such time over (y) the sum of (A) the aggregate amount of all payments made by the Buyer to the Originators in cash in respect of the principal amount of this Note as of such time and (B) all reductions in such principal pursuant to Section 8(a) of the RPA.

The amount and interest payable on, and principal of, this Note and each payment made by or on behalf of the Buyer on account of interest on or the principal of this Note, shall be recorded by the Originator Agent, on behalf of the Holder, on its books. The books of the Originator Agent shall be presumptive evidence of the amounts due and owing to the Holder by the Buyer; provided, that any failure of the Originator Agent to record a notation in its books as aforesaid or any error in so recording shall not limit or otherwise affect the obligation of the Buyer to repay this Note in accordance with the terms set forth herein.

The Buyer shall pay interest to the Holder with respect to the outstanding principal amount of this Note, in arrears on each applicable Settlement Date; provided that any accrued interest on this Note that is not so paid shall (to the maximum extent permitted by law) be added to the principal amount of this Note. All computations of interest shall be made by the Holder on the basis of a 360 day year, in each case for the actual number of days occurring in the Interest Period for which such interest is payable. Each determination by the Holder of an interest rate hereunder shall be final, binding and conclusive on the Buyer (absent manifest error).

If any payment or prepayment on this Note becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the Interest Rate during such extension.

Upon the occurrence and during the continuance of any Termination Event, Event of Default or Default, the Holder shall not demand, accelerate, sue for, take, receive or accept from the Buyer, directly or indirectly, in cash or other property or by set-off or any other manner (including, without limitation, from or by way of collateral) any payment of or security for all or any part of the

indebtedness under this Note or exercise any remedies or take any action or proceeding to enforce the same. The Holder hereby agrees that prior to the date that is one year and one day after all of the Obligations have been indefeasibly paid in full in cash and the Transaction Documents terminated in accordance with their respective terms, the Holder shall not take any action to institute any Insolvency Event in respect of the Buyer or which would be reasonably likely to cause the Buyer to be subject to, or seek the protection of, any such Insolvency Event.

The Buyer may at any time and from time to time voluntarily repay, in whole or in part, the principal amount of this Note.  Notwithstanding anything in this Note  or elsewhere to the contrary, the Holder, by its acceptance hereof, hereby acknowledges and agrees that all payments of principal of, and interest on, this Note shall be made solely out of funds available to the Buyer pursuant to the terms of the Credit Agreement, shall be non-recourse other than with respect to such funds and shall not constitute a claim to the extent that insufficient funds exist to make such payment.

In no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of money advanced hereunder exceed the highest rate of interest permissible under law (the "<u>Maximum Lawful Rate</u>"). In the event that a court of competent jurisdiction determines that the Holder has charged or received interest hereunder in excess of the Maximum Lawful Rate, the amount of interest payable hereunder shall be equal to the amount payable under the Maximum Lawful Rate; <u>provided</u>, that if at any time thereafter the amount of interest payable to the Holder  hereunder is less than the amount payable under the Maximum Lawful Rate, the Buyer shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by the Holder under this Note is equal to the total interest that the Holder would have received had the amount of interest payable to the Holder hereunder been (but for the operation of this paragraph) the amount of interest payable from the Closing Date. Thereafter, the amount of interest payable hereunder shall be the amount determined in accordance with the terms hereof unless and until the amount so calculated again exceeds the amount payable under the Maximum Lawful Rate, in which event this paragraph shall again apply. In no event shall the total interest received by the Holder pursuant to the terms hereof exceed the amount that Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. In the event the amount payable under the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. In the event that a court of competent jurisdiction, notwithstanding the provisions of this Note, shall make a final determination that the Holder has received interest hereunder in excess of the Maximum Lawful Rate, the Holder shall, to the extent permitted by applicable law, promptly apply such excess first to any interest due and not yet paid hereunder, then to the outstanding principal amount of the this Note, then to fees and any other unpaid charges, and thereafter shall refund any excess to the Buyer or as a court of competent jurisdiction may otherwise order.

Wherever possible each provision of this Note shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or remaining provisions of this Note.

This Note amends and restates, and replaces in its entirety, the Subordinated Note, dated as of October 30, 2015, issued by the Buyer to the Holder.

**THE BUYER HERETO WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES UNDER THIS NOTE, THE SALE AGREEMENT OR THE TRANSACTIONS**

**CONTEMPLATED HEREBY OR THEREBY, WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE.**

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK.

[Signature Page to Follow]

IN WITNESS WHEREOF, the Buyer has caused this Note to be signed and delivered by its duly authorized officer as of the date set forth above.

SKILLSOFT RECEIVABLES FINANCING LLC

By: _____
     Name:
     Title:

Exhibit E

Form Of Purchase Report

[date]

SKILLSOFT RECEIVABLES FINANCING LLC
300 Innovative Way, Suite 201
Nashua, NH 03062
USA

Reference is hereby made to the Amended and Restated Receivables Purchase Agreement, dated as of December 20, 2018, by and among SKILLSOFT CORPORATION, SUMTOTAL SYSTEMS LLC, MINDLEADERS, INC., SKILLSOFT CANADA, LTD., SUMTOTAL SYSTEMS CANADA LTD., SKILLSOFT U.K. LIMITED, SUMTOTAL SYSTEMS U.K. LIMITED, Skillsoft NETg GmbH ("Skillsoft Germany"), SKILLSOFT ASIA PACIFIC PTY LTD ("Skillsoft Australia"), SUMTOTAL SYSTEMS ANZ PTY LTD ("SumTotal Australia"), SKILLSOFT ASIA PACIFIC PTE LTD ("Skillsoft Singapore") each other entity affiliated with Skillsoft Corporation that becomes a party thereto by executing a joinder agreement (the "Originators") and SKILLSOFT RECEIVABLES FINANCING LLC ("Buyer") (as it may be amended, modified or supplemented from time to time, the "Agreement"; terms not otherwise defined herein shall have the meanings set forth in the Agreement).

Pursuant to the terms of the Agreement, each Originator hereby requests that Buyer purchase from such Originator the Eligible Receivables listed on Exhibit A attached hereto with an aggregate Purchase Price of $[_____].

Each Originator represents and warrants that as of the date hereof, assuming the purchase of the Eligible Receivables pursuant to terms of the Agreement:

1.     The Originators' representations, warranties and covenants set forth in the Agreement are true and correct in all material respects as of the date hereof (or, if any such representation or warranty is expressly made only as of another date, as of such date ) and the Originators are in compliance with each of the covenants applicable to them set forth in the Agreement;

2.     No Event of Repurchase exists except for repurchases being effectuated on the date hereof by set-off by Buyer against the Purchase Price for the Proposed Receivables; and

3.     The address and point of contact details listed on Exhibit B attached hereto for the Obligor associated with each of the Eligible Receivables listed on Exhibit A are true and correct as of the date hereof.

[Remainder of page intentionally blank]

Exhibit E-1

Upon acceptance by the Buyer of this Purchase Report and payment of the portion of the Purchase Price referred to in Section 3(b)(i) and 3(b)(ii) of the Agreement in respect of such Purchased Receivables, or of the Subrogation price referred to in Section 3(b)(iii) of this Agreement in respect of the French Receivables, the Buyer hereby purchasesacquires and receives (or, (i) in the case of an Eligible Receivables of a Canadian Originator, shall purchase pursuant to an Assignment, (ii) in the case of an Eligible Receivables of a German Originator, shall purchase pursuant to a German Assignment and (iii) in the case of Eligible Receivables of a French Originator, shall purchase in accordance pursuant to the terms of Exhibit H (*Transfer of French Receivables - Subrogation Conventionnelle*) hereto), and the Originator hereby sells, transfer and assigns (or, (i) in the case of an Eligible Receivables of a Canadian Originator, shall sell pursuant to an Assignment), (ii) in the case of an Eligible Receivables of a German Originator, shall sell pursuant to a German Assignment and (iii) in the case of Eligible Receivables of a French Originator, shall transfer by way of *subrogation conventionnelle* in accordance pursuant to the terms of Exhibit H (*Transfer of French Receivables - Subrogation Conventionnelle*) hereto), all of the Originator's right, title and interest (but none of the Originator's Retained Obligations) with respect to the Eligible Receivables on the attached Exhibit as of the date hereof, and the Eligible Receivables shall become Ppurchased Receivables in the manner set forth in the Agreement.

[TBD].

By: _____
Title: _____

REQUEST ACCEPTED:
SKILLSOFT RECEIVABLES FINANCING LLC

By: _____
Title: _____

#62171535_v4
#62171535_v4
WEIL:\97063491\2\74473.0003

<u>EXHIBIT A to Purchase Report</u>

List of Proposed Receivables
Proposed for Purchase as of _____, 20__

| | Customer ID | Customer name | Invoice # | Invoice Date | Currency | Maturity Date | Payment Terms | Invoice Amount | Sales Tax VAT/GST | Invoice Net of Tax | FX Rate | USD Amount | Class | Class % | Amount Financed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US Purchased Receivables | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| UK Purchased Receivables | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Canadian Purchased Receivables | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Australian Purchased Receivables | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| German Purchased Receivables | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Singapore Purchased Receivables | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| French Purchased Receivables | | | | | | | | | | | | | | | |

**Purchase Price for the Proposed Receivables**:                    $_____

**<u>Subrogation Price for the Proposed Receivables:</u>**             <u>€_____</u>

1

EXHIBIT B to Purchase Report

| Eligible Receivable | Obligor | Point of Contact | Address |
|---|---|---|---|
| | | Name:<br>Email:<br>Telephone: | |
| | | Name:<br>Email:<br>Telephone: | |
| | | Name:<br>Email:<br>Telephone: | |
| | | Name:<br>Email:<br>Telephone: | |
| | | Name:<br>Email:<br>Telephone: | |
| | | Name:<br>Email:<br>Telephone: | |
| | | Name:<br>Email:<br>Telephone: | |

2

<u>Exhibit F</u>

<u>Form Of Assignment</u>

#62171535_v4

# ASSIGNMENT

**THIS ASSIGNMENT** is made at Fredericton, Province of New Brunswick, Canada on this 30th day of October, 2015.

**BETWEEN :**    **SKILLSOFT CANADA, LTD.**

(the "**Originator**")

**AND:**    **SKILLSOFT RECEIVABLES FINANCING LLC**

(the "**Buyer**")

**WHEREAS** the Originator, the Buyer and others have entered into a receivables purchase agreement dated as of October 30, 2015 (the "**Receivables Purchase Agreement**");

**NOW THEREFORE**, for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Originator and the Buyer hereby agree as follows:

1. With effect on the date hereof, the Originator hereby sells, assigns, transfers and otherwise conveys to the Buyer, and the Buyer hereby purchases from the Originator, all of the Originator's right, title and interest (but none of the Originator's Retained Obligations) in and to each Eligible Receivable originated by the Originator and set forth on Schedule 1 to the Receivables Purchase Agreement, together with all Related Security and Collections with respect thereto, all for a Purchase Price of US$2,153,906.29 which shall be paid by the Buyer to the Originator in accordance with the terms of the Receivables Purchase Agreement.

2. With effect on each Settlement Date following the date hereof, until the occurrence of the Revolving Credit Termination Date, the Originator agrees hereby to sell, assign, transfer and otherwise convey to the Buyer, and the Buyer agrees hereby to purchase from the Originator, all of the Originator's right, title and interest (but none of the Originator's Retained Obligations) in and to the Eligible Receivables that are originated by the Originator and set forth in the Purchase Report delivered in connection with such Settlement Date, together with all Related Security and Collections with respect thereto, all for a Purchase Price which shall be calculated and paid by the Buyer to the Originator in accordance with the terms of the Receivables Purchase Agreement. Upon acceptance by the Buyer of the Purchase Report pertaining to a Settlement Date and payment of the Purchase Price pursuant to Section 3(b)(i) of the Receivables Purchase Agreement in respect of the applicable Eligible Receivables, the Buyer shall automatically purchase from the Originator without any requirement for further action or documentation to be executed and delivered by the parties hereto (and shall be deemed to have purchased from the Originator), and the Originator shall automatically sell, assign, transfer and otherwise convey to the Buyer without any requirement for further action or documentation to be executed and delivered by the parties hereto (and shall be deemed to have sold, assigned, transferred and otherwise conveyed to the Buyer), all of the

Originator's right, title and interest (but none of the Originator's Retained Obligations) with respect to the Eligible Receivables that are originated by the Originator and set forth in such Purchase Report, as of the date of such Purchase Report, and such Eligible Receivables shall thereby become Purchased Receivables in the manner set forth in the Receivables Purchase Agreement.

3.    Nothing herein shall limit the rights and obligations of the parties hereto under the Receivables Purchase Agreement.

4.    Capitalized terms used herein and not otherwise defined shall have the meanings set forth, directly or indirectly, in the Receivables Purchase Agreement.

5.    This Assignment shall be governed by, and construed and interpreted in accordance with, the laws of the Province of Ontario and the federal laws of Canada applicable therein.

[Signature page follows]

IN WITNESS WHEREOF, each of the undersigned has caused this Assignment to be duly executed as of the date first above written.

ORIGINATOR:

**SKILLSOFT CANADA, LTD.**

By: _____

Name: Shawn Quinlan

BUYER:

**SKILLSOFT RECEIVABLES FINANCING LLC**

By: _____

Name: Shawn Quinlan

[Signature Page – Skillsoft Canada, Ltd. Assignment]

## AMENDMENT AGREEMENT

**THIS AGREEMENT** is made as of the 20th day of December, 2018.

**BETWEEN :**     **SKILLSOFT CANADA, LTD.**
                          (the "**Originator**")

**AND:**            **SKILLSOFT RECEIVABLES FINANCING LLC**
                          (the "**Buyer**")

WHEREAS the Originator, the Buyer and others have entered into a receivables purchase agreement dated as of October 30, 2015 (the "**Original RPA**");

WHEREAS pursuant to the Original RPA, the Originator and the Buyer have entered into an assignment agreement dated October 30, 2015 (the "**Original Assignment**");

WHEREAS the Originator, the Buyer and others have entered into an amended and restated receivables purchase agreement (the "**Amended and Restated RPA**") dated as of December 20, 2018, which amends and restates the terms of the Original RPA;

WHEREAS on the date hereof the Originator wishes to sell, assign, transfer and otherwise convey to the Buyer, and the Buyer wishes to purchase from the Originator, certain Eligible Receivables (as defined in the Amended and Restated RPA) originated by the Originator; and

WHEREAS the Originator and the Buyer wish to amend the Original Assignment in accordance with the terms of this Agreement;

NOW THEREFORE, for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Originator and the Buyer hereby agree as follows:

1.      The recital to the Original Assignment is hereby amended and restated as follows:

"**WHEREAS** the Originator, the Buyer and others have entered into a receivables purchase agreement dated as of October 30, 2015, which has been amended and restated pursuant to the terms of an amended and restated receivables purchase agreement dated as of December 20, 2018 (as the same may be further amended, restated, supplemented or otherwise modified from time to time, the "**Receivables Purchase Agreement**");"

2.      Section 1 of the Original Assignment is hereby amended and restated as follows:

"With effect on October 30, 2015, the Originator hereby sells, assigns, transfers and otherwise conveys to the Buyer, and the Buyer hereby purchases from the Originator, all of the Originator's right, title and interest (but none of the Originator's Retained Obligations) in and to each Eligible Receivable originated by the Originator and set forth on Schedule I to the Receivables Purchase Agreement (as in effect on October 30, 2015), together with all Related Security and Collections with respect thereto, all for a Purchase Price of US$2,153,906.29 which shall be paid by the Buyer to the Originator in

accordance with the terms of the Receivables Purchase Agreement (as in effect on October 30, 2015)."

3.    Sections 3, 4 and 5 of the Original Assignment are hereby renumbered as Sections 4, 5 and 6, respectively, and the following is hereby inserted as Section 3 to the Original Assignment immediately after Section 2 thereof:

"With effect on December 20, 2018, the Originator hereby sells, assigns, transfers and otherwise conveys to the Buyer, and the Buyer hereby purchases from the Originator, all of the Originator's right, title and interest (but none of the Originator's Retained Obligations) in and to each Eligible Receivable originated by the Originator and set forth on Schedule I to the Receivables Purchase Agreement, together with all Related Security and Collections with respect thereto, all for a Purchase Price of US$1,873,169.53 which shall be paid by the Buyer to the Originator in accordance with the terms of the Receivables Purchase Agreement.

4.    Except for the amendments made pursuant to this Agreement, the Original Assignment remains in full, force and effect, unamended.

5.    This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the Province of Ontario and the federal laws of Canada applicable therein.

[Signature page follows]

#11894853 v4

**IN WITNESS WHEREOF,** each of the undersigned has caused this Agreement to be duly executed as of the date first above written.

ORIGINATOR:

**SKILLSOFT CANADA, LTD.**

By: _____
     Name: Michael Pellegrino
     Title:   Secretary and Treasurer

BUYER:

**SKILLSOFT RECEIVABLES FINANCING LLC**

By: _____
     Name: Michael Pellegrino
     Title:   President

# ASSIGNMENT

**THIS ASSIGNMENT** is made at Fredericton, Province of New Brunswick, Canada on this 30th day of October, 2015.

**BETWEEN :**     **SUMTOTAL SYSTEMS CANADA LTD.**

(the "**Originator**")

**AND:**          **SKILLSOFT RECEIVABLES FINANCING LLC**

(the "**Buyer**")

**WHEREAS** the Originator, the Buyer and others have entered into a receivables purchase agreement dated as of October 30, 2015 (the "**Receivables Purchase Agreement**");

**NOW THEREFORE**, for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Originator and the Buyer hereby agree as follows:

1.       With effect on the date hereof, the Originator hereby sells, assigns, transfers and otherwise conveys to the Buyer, and the Buyer hereby purchases from the Originator, all of the Originator's right, title and interest (but none of the Originator's Retained Obligations) in and to each Eligible Receivable originated by the Originator and set forth on Schedule 1 to the Receivables Purchase Agreement, together with all Related Security and Collections with respect thereto, all for a Purchase Price of US$148,531.35 which shall be paid by the Buyer to the Originator in accordance with the terms of the Receivables Purchase Agreement.

2.       With effect on each Settlement Date following the date hereof, until the occurrence of the Revolving Credit Termination Date, the Originator agrees hereby to sell, assign, transfer and otherwise convey to the Buyer, and the Buyer agrees hereby to purchase from the Originator, all of the Originator's right, title and interest (but none of the Originator's Retained Obligations) in and to the Eligible Receivables that are originated by the Originator and set forth in the Purchase Report delivered in connection with such Settlement Date, together with all Related Security and Collections with respect thereto, all for a Purchase Price which shall be calculated and paid by the Buyer to the Originator in accordance with the terms of the Receivables Purchase Agreement. Upon acceptance by the Buyer of the Purchase Report pertaining to a Settlement Date and payment of the Purchase Price pursuant to Section 3(b)(i) of the Receivables Purchase Agreement in respect of the applicable Eligible Receivables, the Buyer shall automatically purchase from the Originator without any requirement for further action or documentation to be executed and delivered by the parties hereto (and shall be deemed to have purchased from the Originator), and the Originator shall automatically sell, assign, transfer and otherwise convey to the Buyer without any requirement for further action or documentation to be executed and delivered by the parties hereto (and shall be deemed to have sold, assigned, transferred and otherwise conveyed to the Buyer), all of the

Originator's right, title and interest (but none of the Originator's Retained Obligations) with respect to the Eligible Receivables that are originated by the Originator and set forth in such Purchase Report, as of the date of such Purchase Report, and such Eligible Receivables shall thereby become Purchased Receivables in the manner set forth in the Receivables Purchase Agreement.

3.    Nothing herein shall limit the rights and obligations of the parties hereto under the Receivables Purchase Agreement.

4.    Capitalized terms used herein and not otherwise defined shall have the meanings set forth, directly or indirectly, in the Receivables Purchase Agreement.

5.    This Assignment shall be governed by, and construed and interpreted in accordance with, the laws of the Province of Ontario and the federal laws of Canada applicable therein.

[Signature page follows]

IN WITNESS WHEREOF, each of the undersigned has caused this Assignment to be duly executed as of the date first above written.

ORIGINATOR:

**SUMTOTAL SYSTEMS CANADA LTD.**

By: _____

     Name:  Shawn Quinlan

BUYER:

**SKILLSOFT RECEIVABLES FINANCING LLC**

By: _____

     Name:  Shawn Quinlan

[Signature Page – SumTotal Systems Canada Ltd. Assignment]

## AMENDMENT AGREEMENT

**THIS AGREEMENT** is made as of the 20th day of December, 2018.

**BETWEEN :**     **SUMTOTAL SYSTEMS CANADA LTD.**
                  (the "**Originator**")

**AND:**          **SKILLSOFT RECEIVABLES FINANCING LLC**
                  (the "**Buyer**")

**WHEREAS** the Originator, the Buyer and others have entered into a receivables purchase agreement dated as of October 30, 2015 (the "**Original RPA**");

**WHEREAS** pursuant to the Original RPA, the Originator and the Buyer have entered into an assignment agreement dated October 30, 2015 (the "**Original Assignment**");

**WHEREAS** the Originator, the Buyer and others have entered into an amended and restated receivables purchase agreement (the "**Amended and Restated RPA**") dated as of December 20, 2018, which amends and restates the terms of the Original RPA;

**WHEREAS** on the date hereof the Originator wishes to sell, assign, transfer and otherwise convey to the Buyer, and the Buyer wishes to purchase from the Originator, certain Eligible Receivables (as defined in the Amended and Restated RPA) originated by the Originator; and

**WHEREAS** the Originator and the Buyer wish to amend the Original Assignment in accordance with the terms of this Agreement;

**NOW THEREFORE**, for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Originator and the Buyer hereby agree as follows:

1.      The recital to the Original Assignment is hereby amended and restated as follows:

"**WHEREAS** the Originator, the Buyer and others have entered into a receivables purchase agreement dated as of October 30, 2015, which has been amended and restated pursuant to the terms of an amended and restated receivables purchase agreement dated as of December 20, 2018 (as the same may be further amended, restated, supplemented or otherwise modified from time to time, the "**Receivables Purchase Agreement**");"

2.      Section 1 of the Original Assignment is hereby amended and restated as follows:

"With effect on October 30, 2015, the Originator hereby sells, assigns, transfers and otherwise conveys to the Buyer, and the Buyer hereby purchases from the Originator, all of the Originator's right, title and interest (but none of the Originator's Retained Obligations) in and to each Eligible Receivable originated by the Originator and set forth on Schedule I to the Receivables Purchase Agreement (as in effect on October 30, 2015), together with all Related Security and Collections with respect thereto, all for a Purchase

Price of US$148,531.35 which shall be paid by the Buyer to the Originator in accordance with the terms of the Receivables Purchase Agreement (as in effect on October 30, 2015)."

3.      Sections 3, 4 and 5 of the Original Assignment are hereby renumbered as Sections 4, 5 and 6, respectively, and the following is hereby inserted as Section 3 to the Original Assignment immediately after Section 2 thereof:

"With effect on December 20, 2018, the Originator hereby sells, assigns, transfers and otherwise conveys to the Buyer, and the Buyer hereby purchases from the Originator, all of the Originator's right, title and interest (but none of the Originator's Retained Obligations) in and to each Eligible Receivable originated by the Originator and set forth on Schedule I to the Receivables Purchase Agreement, together with all Related Security and Collections with respect thereto, all for a Purchase Price of US$601,041.38 which shall be paid by the Buyer to the Originator in accordance with the terms of the Receivables Purchase Agreement.

4.      Except for the amendments made pursuant to this Agreement, the Original Assignment remains in full, force and effect, unamended.

5.      This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the Province of Ontario and the federal laws of Canada applicable therein.

[Signature page follows]

#11895171 v3

**IN WITNESS WHEREOF,** each of the undersigned has caused this Agreement to be duly executed as of the date first above written.

ORIGINATOR:

**SUMTOTAL SYSTEMS CANADA LTD.**


By: _____
      Name:  Michael Pellegrino
      Title:    Treasurer




BUYER:

**SKILLSOFT RECEIVABLES FINANCING LLC**


By: _____
      Name: Michael Pellegrino
      Title:    President

Exhibit G

Form Of German Assignment

References to "**Sections**" in this Schedule shall always be construed as references to the sections of the Amended and restated Receivables Purchase Agreement dated as of December 20, 2018, as amended from time to time ("**Receivables Purchase Agreement**"). For the purposes of this exhibit, the definitions of the Receivables Purchase Agreement shall apply mutatis mutandis.

Each receipt (*Zugang*) by the Buyer of a Purchase Report as set out in Exhibit E of the Receivables Purchase Agreement and a list of German Receivables as set forth in Exhibit E-A of the Receivables Purchase Agreement by the German Originator constitutes an irrevocable offer by the German Originator to sell and to assign to the Buyer the German Receivables listed therein and to assign any Related Security in respect thereto at the relevant Purchase Price (the "**Offer**").

The Buyer shall accept the Offer by sending a countersigned Purchase Report in the form as set out in Exhibit E of the Receivables Purchaser Agreement (the "**Acceptance**") to the German Originator not later than 5:00 p.m. New York City time on the Transfer Date. The receipt of such Acceptance Letter shall not be a condition for the Acceptance to become valid (Section 151 of the German Civil Code (*Bürgerliches Gesetzbuch*)).

The countersigned Purchase Report shall specify the amount of all Receivables purchased or purported to be purchased by the Buyer. In the case of doubt, all Eligible Receivables set out in the relevant Offer shall be purchased or purported to be purchased by the Buyer and all Receivables set out in the relevant Offer shall be assigned to the Buyer, together with any Related Security.

To the extent that title to the Related Security in respect of any Germany Receivable cannot be assigned and transferred by mere agreement between the German Originator and the Buyer, the German Originator and the Buyer hereby agree and undertake that any notice to be given, form or registration to be effected or other thing or act to be done in order to effect the assignment and transfer of title in the Related Security to the Buyer shall as soon as possible be given or done by the German Originator if and in such form as the Buyer requires.

The provisions of this Exhibit G (including all non-contractual obligations) shall be governed by and construed in accordance with the laws of the Federal Republic of Germany.

F-2

Exhibit H

**Transfer of French Receivables - *Subrogation Conventionnelle***

The transfer of French Receivables to the Buyer that is the subject of any offer for purchase of Receivables relating to French Receivables shall be effected by way of a *subrogation conventionnelle* pursuant to Art. 1346-1 of the French *Code Civil* and made in accordance with the terms set forth in this Exhibit H (*Transfer of French Receivables - Subrogation Conventionnelle*). In the event of any conflict, discrepancy or contradiction between the provisions of the Agreement and this Exhibit H, the latter provisions of this Exhibit H shall prevail and the provisions of the Agreement shall be construed accordingly.

1. Each offer for purchase of Receivables relating to French Receivables set out in a Purchase Report delivered by the relevant French Originator to the Buyer pursuant to Clause 2 of this Agreement shall constitute an irrevocable offer by the relevant French Originator to transfer by way of *subrogation conventionnelle* (within the meaning of Article 1346-1 of the French Code Civil) to the Buyer all of the French Originator's right, title and interest in and to the French Receivables designated in such offer for purchase of Receivables relating to French Receivables and, to the extent possible under French law, all Related Security in respect thereof.

2. The Buyer shall identify which of the French Receivables designated in the relevant Purchase Report relating to French Receivables it wishes to acquire by way of *subrogation conventionnnelle* by delivering to the relevant French Originator a countersigned Purchase Report, in accordance with Clause 2 of the Agreement, to be countersigned by the relevant French Originator.

3. On each Settlement Date:

    (i)    The Buyer shall pay in full to the relevant French Originator the Subrogation Price due for the acquisition of each French Receivables to be transferred on such date which must be equal to the aggregate face amount of such French Receivables.

    (ii)   Simultaneously, the relevant French Originator shall deliver to the Buyer the original copy of a duly completed, dated as at the date of the said Settlement Date and executed subrogation certificate (*quittance subrogative*) substantially in the form set out in the Annex to this Exhibit H (the "**Subrogation Certificate**"), relating to the French Receivables duly identified in the Subrogation Certificate, previously offered for sale, in the relevant offer for purchase of Receivables relating to French Receivables and listed in the relevant countersigned offer for purchase of Receivables delivered by the Buyer to the relevant French Originator in accordance with the terms of the Agreement.

    (iii)  The relevant French Originator shall pay in full all the sums due by it to the Buyer for the Buyer's claims in relation to all finance charges, late fees and other fees which are unearned, termination fees, cancellation charges, sales, excise or similar taxes and credits or allowances granted, in relation to the relevant French Receivables transferred on the relevant Settlement Date.

F-3

In all cases, all such payments into the relevant bank accounts as provided for under the Agreement shall be made in immediately available funds in Euros.

4.  Upon payment of the Subrogation Prices in accordance with paragraph 3(i) and delivery by the relevant French Originator of the Subrogation Certificate to the Buyer simultaneously with the said payment in accordance with paragraph 3 (ii) above, the Buyer will be subrogated to all of the rights and interests of the relevant French Originator in, under and to, and all of the claims of the relevant French Originator in respect of, such French Receivables and, to the extent possible under French law of all Related Security with respect thereto, in accordance with Article 1346-1 of the French *Code Civil* and pursuant to the terms and conditions of the Agreement.

However, such subrogation will not be enforceable against the relevant Debtor(s) unless and until it is notified to such Debtor(s), pursuant to Article 1346-5 of the French *Code Civil* and clause 6 (p) of the Agreement.

5.  The relevant French Originator shall, in each Subrogation Certificate delivered to the Buyer in accordance with the above paragraphs:

(i)  have specified the aggregate Subrogation Prices due in connection with all the French Receivables transferred on the Settlement Date and the Subrogation Price due for each of the French Receivables identified into the Subrogation Certificate; and

(ii)  have duly identified the French Receivables, by setting out into provisions or appending to it a schedule specifying for each such French Receivable the information provided in the relevant offer for Purchase of Receivables relating to French Receivables.

#62171535_v4
#62171535_v4
WEIL:\97063491\2\74473.0003

**ANNEX 1 TO EXHIBIT H**

*QUITTANCE SUBROGATIVE*

A :    **SKILLSOFT RECEIVABLES FINANCING LLC**
[adresse]

Conformément aux stipulations d'une convention intitulée "*Amended and Restated Receivables Purchase Agreement*" (en ce compris plus particulièrement son Annexe H intitulée "*Transfer of French Receivables - Subrogation Conventionnelle*") en date initialement du 20 décembre 2018, telle que modifiée, conclue entre notamment, **[*relevant French Originator*]** en qualité de cédant de créances (French Originator) soumises au droit français et **SKILLSOFT RECEIVABLES FINANCING LLC** en qualité d'acheteur desdites créances,

**Le soussigné,**

**[*relevant French Originator*]**, une société de droit français, dont le siège social est sis [•], au capital social de [•], immatriculée auprès du registre du commerce de [•] sous le numéro [•], en qualité de titulaire des créances à l'encontre des débiteurs dont la liste est jointe en annexe (les « **Débiteurs** »), reconnaît et déclare par les présentes qu'il a reçu ce jour, en qualité de subrogeant, paiement intégral d'une somme globale égale au montant des créances concernées soit [*insert the aggregate Subrogation Price for the transferred French Receivables*] euros, de **SKILLSOFT RECEIVABLES FINANCING LLC**, se répartissant comme indiqué en Annexe à la présente quittance subrogative.

**[*relevant French Originator*]**, en qualité de subrogeant, donne par les présentes quittance valable à **SKILLSOFT RECEIVABLES FINANCING LLC**, en qualité de subrogé du complet paiement des créances décrites en Annexe et le subroge dans tous les droits, actions, privilèges et hypothèques visés à l'article 1346-1 du code civil français dont il est titulaire au titre des créances identifiées en Annexe à la présente quittance subrogative.

En conséquence et conformément aux dispositions de l'article 1346-1 du code civil français, **SKILLSOFT RECEIVABLES FINANCING LLC** est valablement et intégralement subrogé, jusqu'à concurrence du paiment réalisé ce jour, dans tous les droits de créance, actions, privilèges et hypothèques que le soussigné détient à l'encontre des Débiteurs, au titre des créances qui sont dument identifiées en Annexe aux présentes lesquelles lui sont ainsi transférés par voie de subrogation conventionnelle en vertu de l'article 1346-4 du code civil français.

La présente quittance subrogative est soumise au droit français.

Fait à [*place of signature*],

Le [*date*],

_____
**[*relevant French Originator*]**

F-5

Par : [*Insert The Name Of The Authorised Signatory*]

#62171535_v4
#62171535_v4
WEIL:\97063491\2\74473.0003

## ANNEXE

### Identification des créances cédées

[Cette annexe doit indiquer pour chacune des Créances Françaises les informations suivantes:

- Nom du débiteur, adresse et numéro RCS
- Montant de la créance
- Date d'échéance
- Date et numéro de référence du Contrat
- [Numéro de facture (le cas échéant)]]

_____

#62171535_v4
#62171535_v4
WEIL:\97063491\2\74473.0003

**TRANSLATION FOR INFORMATION PURPOSES ONLY**

*SUBROGATION CERTIFICATE*

**TO :**    **SKILLSOFT RECEIVABLES FINANCING LLC**
[*address*]

Pursuant to the terms and conditions of an agreement named " *Amended and Restated Receivables Transfer Agreement* " (including in particular its Exhibit H named "*Transfer of French Receivables - Subrogation Conventionnelle*") originally dated 20 December 2018, as amended, entered into between [***relevant French Originator***] as seller of French law governed receivables (French Originator) and **SKILLSOFT RECEIVABLES FINANCING LLC** as purchaser of such receivables,

**The undersigned,**

[***relevant French Originator***], a company incorporated under the laws of France, having its registered office at [•], with a share capital of [•], and registered in the commercial registry of [•] under [•], as owner of the receivables against debtors whose list is set out in schedule (the "**Debtors**"), hereby acknowledges and declares that it has received, on today's date, in its capacity as *subrogeant*, full payment of an amount equal to the amount of the concerned Receivables [*insert the aggregate Subrogation Price for the transferred French Receivables*] euros, from **SKILLSOFT RECEIVABLES FINANCING LLC**, split as set out in the Schedule to this Subrogation certificate.

[***relevant French Originator***] as *subrogeant*, hereby acknowledges receipt of the complete payment of the Receivables described in the Schedule below (*donne quittance valable*) from **SKILLSOFT RECEIVABLES FINANCING LLC**, as *subrogé* and subrogates **SKILLSOFT RECEIVABLES FINANCING LLC** in all the rights, actions and privileges referred to under article 1346 of the French Civil Code owned by [***relevant French Originator***] pursuant to the receivables identified in Schedule to this Subrogation certificate.

Consequently and pursuant to article 1346-1 of the French Civil Code, **SKILLSOFT RECEIVABLES FINANCING LLC** is validly and fully subrogated, up to the payment made as at today's date, in all claims, actions and privileges which the undersigned owns against the Debtors, pursuant to the receivables which are duly identified in the Schedule below, and which are transferred by way of *subrogation conventionnelle* pursuant to Article 1346-4 of the French Civil Code.

This Subrogation certificate is governed by French law.

Signed in [*place of signature*],

On [*date*],

_____
[***relevant French Originator***]
By : [*Insert The Name Of The Authorised Signatory*]

#62171535_v4
#62171535_v4
WEIL:\97063491\2\74473.0003

**SCHEDULE**

**Identification of the transferred receivables**

[This Schedule should indicate in respect of each French Receivable the following data :

- Obligor's name, address and RCS number
- Receivable amount
- Maturity date
- Contract reference number and date
- Invoice number (if applicable)]]

F-9